UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                              Chapter 11 (Subchapter V)

HAL LUFTIG COMPANY, INC.,                           Case No. 22-_____ (___)


                        Debtor.
------------------------------------------------------------x

## DECLARATION OF HAL LUFTIG UNDER LOCAL RULE 1007-2 IN CONNECTION WITH CHAPTER 11 FILING, AND LOCAL RULE 9077-1 IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Hal Luftig, declare as follows under penalty of perjury:

### BACKGROUND

1. I am the President and sole shareholder of Hal Luftig Company, Inc. (the "Debtor"). In that capacity, I am familiar with the Debtor's day-to-day operations, business, and financial affairs.

**Nature of the Debtor's Business**

2. The Debtor is a New York corporation with its principal place of business at 117 West 17th Street, New York, New York 10011.

3. I formed the Debtor in 2000 as a Broadway production company, and it has been in business in that capacity ever since.

4. The Debtor is a theatrical producing company that develops, acquires, presents and promotes theatrical plays, musicals, and similar works of theater on stage and in other media.

**The Debtor's Chapter 11 Filing**

5. On December 1, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in this Court

and elected to proceed under Subchapter V of the Bankruptcy Code as a small business reorganization case. The Debtor is authorized to continue to operate and manage its business and property as a debtor in possession under Bankruptcy Code §§ 1107(a) and 1108.

6. As explained below, in April 2022 an unfavorable arbitration award based on breach of a contract was entered against me and the Debtor, jointly and severally, despite the fact that I was not a party to the underlying agreement, in the amount of approximately $2.6 million.

7. The arbitration was based on certain breach of contract claims asserted by Warren Trepp ("Trepp") through his wholly owned entity FCP Entertainment Partners, LLC ("FCP"), a former business partner and investor in the Debtor.

8. After efforts to vacate the Final Award (defined below) were denied by the District Court (defined below), a final judgment was entered against me and the Debtor.

9. The Debtor commenced this voluntary Subchapter V small business reorganization case in response to entry of that final judgment in order to propose a plan to restructure its debts and satisfy the FCP obligation and certain other obligations.

10. I am jointly and severally liable under that final judgment and have filed a notice of appeal of the judgment. During the pendency of the appeal I expect that FCP will seek to enforce the judgment against me. Because the success of the Debtor's case largely rests on my ability to give adequate attention to the operation of the Debtor's business, and to this chapter 11 case, the Debtor will be asking this Court to extend the bankruptcy stay to me so that I can focus on the Debtor's reorganization and successful emergence from chapter 11.

11. I am informed by the Debtor's attorneys that extending the bankruptcy stay for my benefit is only granted in extraordinary situations. I respectfully submit that in these circumstances, extending the stay is critical to provide the Debtor with the best chance to promptly negotiate with

the relevant parties, including the Subchapter V trustee, and propose a confirmable chapter 11 plan. My personal efforts, relationships and reputation in the entertainment industry are the bedrock of the Debtor's business, and my efforts and attention must be focused on working on the Debtor's existing projects and identifying and pursing new opportunities which might flow from the Debtor's legacy productions to generate revenue to fund a plan of reorganization.

12. For example, Kinky Boots recently opened in Tokyo and Seoul, and the film rights to Kinky Boots that might be exploited would flow through Kinky Boots LLC, the "mother company" of the Kinky Boots production.[1] *See* Exhibit A and Exhibit B annexed hereto. I did extensive press and promotion for those Asian revivals, and I believe that my work contributed to the success of those projects. In addition, the production company for Plaza Suite starring Matthew Broderick and Sarah Jessica Parker, Suite 719 LLC, is considering launching shows in London and Los Angeles.[2] Both of those productions would require significant time and commitment from me with respect to hands-on producing and marketing efforts. The Debtor has only two (2) employees other than me. Therefore, my time and attention are essential to the Debtor's successful reorganization.

---

[1] With respect to the Kinky Boots production, Kinky Boots LLC as the "mother company," is the producing entity for Kinky Boots the musical on Broadway, receives and distributes all profits in connection with the production, enters into license agreements for future related projects, and serves as a parent company or affiliate for related productions. The Debtor is the "General Partner" of Kinky Boots LLC and owns 15.7315% of the interests in Kinky Boots LLC. Under the Final Award, the arbitrator found that in addition to compensatory damages, FCP is entitled to 55% of the profits generated from the Debtor's 15.7315% interest in Kinky Boots LLC.

[2] Suite 719 LLC is the producing entity for the Broadway revival of Neil Simon's Plaza Suite starring Matthew Broderick and Sarah Jessica Parker, and will serve as the "mother company" for all future

3

987691

**Hal Luftig and the Debtor's Broadway and Off-Broadway Productions**

13.     I am an award-winning Broadway producer who has worked in theatrical productions for over 30 years. My many successful shows include George Wolf's *Jelly's Last Jam,* Tony Kushner's *Angels in America,* Twyla Tharp and Billy Joel's *Movin' Out,* and Tony Award-winning musicals like *Thoroughly Modern Millie* and *Kinky Boots*. I have produced over 30 Broadway shows that collectively have garnered over 80 Tony Awards, and I personally have won four Tony Awards, including two as lead producer.

14.     Between 2001 and 2022, the Debtor produced several hit Broadway and off-Broadway shows including, but not limited to: *Fiddler on the Roof in Yiddish*; *American Utopia*; *Plaza Suite* starring Matthew Broderick and Sarah Jessica Parker; *Becoming Nancy*; *Legally Blonde the Musical*; *Evita*; *Catch Me If You Can the Musical*; and *Come Fly Away*.

15.     Much of the Debtor's success is as a result of, or related to, my reputation in the Broadway and theatrical production community.

**The Business of Theatrical Production Companies**

16.     There are two potential revenue streams for a theatrical production company: (a) producer income; and (b) investor income.

    a.  **Producer Income.** Generally, a theatrical production company works with other third parties to co-produce shows and those entities form joint ventures through partnerships or limited liability companies. Those joint ventures and the companies' roles therein are similar or identical to those one would expect to see in a corporate structure. For example, when theatrical production companies are

---

subsidiaries. The Debtor is the General Partner for Suite 719 LLC, and owns 11.5% of the interests in Suite 719 LLC.

987691

organized as limited partnerships, the general partner, by definition, is liable for the obligations of the production company. And even when theatrical production companies are organized as limited liability companies, it is customary for managing members to fund expenses to the extent needed so as to maintain a good reputation in the Broadway community. Theatrical production companies like the Debtor then work together with their partners to raise money to produce a show.

b. **Investor Income**. Sometimes, the theatrical production company will not take an active role in production, but rather makes an investment in a theatrical production. Once the production opens, if it is a success (critically and financially), the goal is to recoup the investors' investment and generate profits. Essentially, investor income from a theatrical project depends on the project's financial performance. Once a project "recoups" investors' initial investment and returns those funds, the project may achieve a profit.

**FCP, Warren Trepp, and the 2001 and the 2007 Agreements**

17. I first started doing business with Warren Trepp in 1988. At that time, I had recently received my M.F.A. in Commercial Theatre Management from Columbia University. Warren Trepp was a wealthy man, having made a fortune as Michael Milken's right-hand man and chief trader at Drexel Burnham Lambert in the 1980s before the firm collapse into bankruptcy.

18. In or about 2000, Trepp decided that it would be beneficial for one of his business entities, FCP, to undertake roles as a general partner or managing member of a production company, rather than simply continuing as an investor in live theater productions.

19. On or about January 14, 2000, I formed the Debtor to transact business with FCP in connection with live theatre productions.

5

987691

20.  On or about August 16, 2001, FCP and the Debtor entered into an agreement (the "2001 Agreement") to, among other things, identify potential theatrical properties for investment and possible production. Under the terms of the 2001 Agreement, I did not personally guarantee any of the Debtor's obligations to FCP, or Trepp.

21.  Effective as of January 1, 2007, FCP and the Debtor entered into a new agreement (the "2007 Agreement"), which amended and restated the 2001 Agreement in its entirety. Under the terms of the 2007 Agreement, I did not personally guarantee any of the Debtor's obligations to FCP, or Trepp.

22.  FCP and the Debtor mutually agreed to terminate the 2007 Agreement effective January 1, 2015.

**The Debtor's Continued Success After the FCP Agreement**

23.  Since termination of the 2007 Agreement, the Debtor continued producing award-winning Broadway shows under my leadership and guidance, and based upon my relationships in the industry and my reputation as a theatrical producer.[3]

**The Lawsuit by FCP and Trepp**

24.  On July 23, 2019, FCP filed a complaint in Los Angeles Superior Court (the "Superior Court Action") against the Debtor claiming for the first time that FCP had not received certain income from *Kinky Boots* and *Elephant Man* to which it claimed to be entitled. Despite the fact that the 2007 Agreement required mediation in the first instance and then confidential arbitration, FCP filed a public lawsuit.

---

[3] In addition to my role as president and sole shareholder of the Debtor, I am also involved, in my individual capacity, in other projects and joint ventures, and directly and indirectly own and/or benefit from investments and interests in other partnerships in the theatrical production industry.

6

987691

25. On August 5, 2019, after the Debtor's lawyers insisted that alternative dispute resolution was required under the 2007 Agreement, FCP filed a request for dismissal of the Superior Court Action.[4]

**The Arbitration**

26. On August 12, 2019, FCP initiated an arbitration with the American Arbitration Association against the Debtor for breach of contract, and against me for breach of fiduciary duty (AAA Case No. 01-19-0002-5183).

27. On or about July 21, 2021, the arbitrator issued an interim award (the "Interim Award") determining certain issues of liability and noting that various issues remained to be determined and that a final award would be forthcoming.

28. On April 1, 2022, the arbitrator issued his final award (the "Final Award") incorporating the Interim Award and holding that the Debtor and I, as an individual, were jointly and severally liable for breach of contract for the damages set forth in the Final Award.

29. The Final Award assigned damages to the breach of contract claim in the amount of $2,638,925.78, to be born jointly and severally by the Debtor and me, but the Final Award does not set forth any legal basis for finding me individually liable for breach of the 2007 Agreement to which I am not a party. Indeed, in the arbitration, FCP only sought relief against me individually on a breach of fiduciary duty claim; however, the arbitrator ruled *against* FCP on that breach of fiduciary duty claim and in my favor.

---

[4] I do not believe that FCP's filing of the Superior Court Action in violation of the 2007 Agreement's mandatory arbitration provision was an innocent mistake. By filing the Superior Court Action, FCP succeeded in publicly smearing me through an article on the entertainment gossip website, www.theblast.com. The Blast published an article naming me and prominently featuring my photo along with the salacious headline "'Kinky Boots' Producer Sued for $10 Million for Allegedly Screwing Over Business Partner." https://www.yahoo.com/entertainment/kinky-boots-producer-sued-10-154102493.html.

30. The Final Award also found that *Kinky Boots* was a "vested project" under the 2007 Agreement and, as a result, the Debtor and I had both breached the 2007 Agreement by failing to pay FCP the 55% share of income due to FCP (above and beyond the $2.6 million in compensatory damages) under the relevant payment provisions of the 2007 Agreement in relation to the production of *Kinky Boots*.

**District Court Actions to Confirm and Vacate the Final Award**

31. On April 4, 2022, FCP filed a petition to confirm the Final Award with the U.S. District Court for the Southern District of New York (the "District Court"), Case No. 22-02768 (LAK). The Debtor and I both opposed FCP's petition.

32. On May 6, 2022, I filed in my individual capacity a "Petition to Vacate the Final Award" with the District Court, Civ. Case No. 22-03697 (LAK). It seems impossible to me that I could be jointly and severally liable for a breach of contract claim when I was not a party to the 2007 Agreement, FCP made no election under the applicable "Inducement Letter" annexed to the 2007 Agreement as a basis for FCP to hold me liable, there were no allegations of piercing the corporate veil or alter ego, and the Arbitrator explicitly rejected FCP's breach of fiduciary duty claim against me. FCP opposed my petition to vacate the Final Award.

33. On October 26, 2022, the District Court entered a Memorandum and Order in both actions granting FCP's petition to confirm the Final Award and denying my petition to vacate the Final Award (Civ. Case No. 22-cv-02768-LAK, ECF No. 33).

**Final Judgment and Automatic Stay**

34. On October 31, 2022, FCP filed a Motion for Judgment with the District Court and submitted a proposed Final Judgment.

987691

35. On November 2, 2022, the District Court entered the Clerk's Final Judgment, not FCP's proposed final judgment. The Court also rejected FCP's proposed abstract of judgment as deficient and premature, and closed both related cases before the District Court.

36. On November 15, 2022, FCP submitted a proposed judgment in the action to confirm the Final Award, which was reviewed and approved by the District Court as to form on November 16, 2022 but has not yet been entered.

37. On November 22, 2022, FCP filed a letter motion to reopen the case in which it moved to confirm the Final Award to address FCP's motion for entry of an amended final judgment.

38. I am advised that under Rule 62 of the Federal Rules of Civil Procedure there is a 30-day automatic stay imposed upon judgment enforcement proceedings, which stays FCP's judgment enforcement efforts through December 2, 2022, or 30 days from entry of the amended final judgment when one is entered, whichever is later. I am informed that FCP plans on actively pursuing collection actions on the date that the Rule 62 stay expires, including notifying my investors in other projects.

**Appeal by Hal Luftig**

39. On November 23, 2022, I timely filed a Notice of Appeal with respect to the District Court's October 26, 2022 Order in both U.S. District Court cases.

40. The Debtor did not appeal the District Court's Order.

**Debtor's Other Liabilities and COVID Operations**

41. As a theatrical production company operating during a global pandemic and government shutdown, while also defending a sizeable arbitration, the Debtor was subject to financial setbacks over the last few years. Between March 2020 and December 2021, as a result

9

987691

of the COVID-19 global pandemic, the Debtor received modest income from its theatrical productions.

42. In response, the Debtor implemented various cost-saving measures, and the Debtor and I incurred additional liabilities in order to ensure the Debtor's survival. For example, (a) I stopped taking a salary during that time period, (b) the Debtor applied for and was granted two (2) forgivable Paycheck Protection Program grants through the federal government in the amounts of $66,915 in 2021 and $66,915 in 2020, as well as an Economic Injury Disaster Loan in 2020 in the amount of $150,000 (for which repayment starts in December 2022), (c) in 2021, the Debtor applied for and received $614,068.77 as a forgivable grant from the federal government under the Shuttered Venue Operators' Grant program,[5] and (d) my spouse and I borrowed funds from a bank secured by our home, and loaned those funds in the amount of approximately $450,000 to the Debtor pursuant to a promissory note.

43. Notwithstanding these challenges, during this time period, the Debtor paid its employees and continued to provide full benefits through my membership in the Broadway League.[6]

**Debtor's Employees**

44. The Debtor has two (2) employees besides me: Kevin Connor and Eli Cohen.

45. I am the lead producer and principal of the Debtor. I produce all of the projects (*i.e.,* shows, live productions, and collaborations) and lead the entire organization. I lead the Debtor's

---

[5] These grants provided emergency assistance for eligible venues affected by COVID-19. The SVOG program was established by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, and amended by the American Rescue Plan Act. The Debtor was an eligible applicant, because SVOG provides emergency assistance for eligible performing arts businesses affected by COVID-19.

10

987691

efforts to raise funds on behalf of various live theater projects for legacy productions by attending meetings with various business contacts and potential investors (locally in New York and around the world), and I collaborate with other producers to create new revenue-generating projects from the Debtor's legacy productions.

46. Eli Cohen began working for the Debtor on January 27, 2022 as a Producing Assistant. In that capacity, Mr. Cohen is responsible for the Debtor's bookkeeping, attending and taking notes during all meetings, and providing advice and guidance in connection with ongoing projects and productions.

47. Kevin Connor began working for the Debtor in or about October 2016. Mr. Connor is the Debtor's Managing Producer, and in that capacity, he produces and project manages all the Debtor's productions. Mr. Connor also supervises Mr. Cohen.

**Debtor's Subchapter V Reorganization**

48. I understand that Subchapter V of the Bankruptcy Code offers a streamlined path towards reorganization for eligible small businesses, and I believe it is in the best interests of the Debtor and its creditors to follow that approach under the circumstances.

49. Through this Subchapter V small business chapter 11 case, the Debtor intends to propose a plan of reorganization that will satisfy the Debtor's obligations to its creditors, including FCP, and allow the Debtor to emerge from bankruptcy and continue with projects associated with its legacy productions.

50. With the assistance of the Debtor's professionals and the Subchapter V Trustee appointed to the Debtor's case, the Debtor will use financial projections to determine how much it

---

[6] The Broadway League is the national trade association for the Broadway industry. The Broadway League has 700-plus members including theatre owners and operators, producers, presenters, and general managers

can pay to creditors over time under a plan of reorganization and continue to maintain its business operations in the ordinary course.

51. The Debtor had little choice in filing this case and seeking the protection of the automatic stay because, for reasons unknown to me, FCP and Trepp are engaged in a vendetta to destroy the Debtor, me, and my reputation. The Debtor and I were unsuccessful in our attempts to settle with Trepp and FCP during the arbitration. Accordingly, the only rational way to proceed is to pursue this Subchapter V reorganization and propose a plan which will satisfy the Debtor's obligations to creditors, including FCP, over time.

**First Day Motion & Adversary Proceeding to Extend the Automatic Stay**

52. On the Petition Date, the Debtor filed certain "First Day" motions seeking emergency interim relief. As set forth below, I believe that obtaining the relief requested in each of the First Day motions is critical to avoid irreparable harm to the Debtor, its business, and its prospects for maximizing the value of its business as a going concern.

**Motion to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms**

53. The motion seeking authority to continue using the Debtor's pre-Petition Date cash management system and to maintain its existing pre-Petition Date bank accounts and business forms is critical to ensure the Debtor's compliance with certain guidelines promulgated by the Office of the U.S. Trustee, without disrupting the Debtor's business operations, interfering with its obligations to business partners in connection with revenue from legacy productions, and jeopardizing the Debtor's chance for success in this case.

---

in North American cities, as well as suppliers of goods and services to the commercial theatre industry.

987691

54. I understand that the Office of the U.S. Trustee issued guidelines for debtors in chapter 11 which, among other things, would require the Debtor to close its existing bank accounts, open new accounts and immediately obtain new checks with "Debtor in Possession" designated on them.

55. The Debtor maintains three (3) bank accounts at two different banks. The Debtor maintains a primary business account which serves as the initial depository for all checks received by the Debtor for itself and The Catch Me LLC (the "Catch Me LLC").[7] Funds for the Debtor's payroll then are transferred to a separate second account, which utilizes "Gusto" as a third-party, cloud-based payroll service to distribute payroll and pay associated tax and insurance obligations, and to pay my salary. All checks for The Catch Me LLC are transferred to a third separate account which holds income to the now closed "Catch Me If You Can General Partnership" for the benefit of the former limited partners/investors.

56. If the Debtor is required to strictly comply with the U.S. Trustee guidelines, its continued operations in chapter 11 will be negatively impacted by the disruption, confusion and delay which would most certainly result. For example, the Debtor receives periodic but unpredictable distributions from license agreements for *Catch Me If You Can the Musical,* which the Debtor holds on behalf of other investors in the show. If the Debtor is forced to close that account and move the funds, future periodic deposits may be lost.

---

[7] The Debtor was the general partner of the "Catch Me If You Can the Musical" general partnership until the partnership was closed in 2021. As the general partner, the Debtor had full discretion as to when disbursements would be made from funds received on account of show profits and future projects from various license agreements. Now that the partnership is closed, the Debtor serves as an agent holding funds which belong to the former limited partners/ investors.

13

987691

57. The Debtor's bank accounts are located at JPMorgan Chase Bank, N.A. and City National, N.A., which are approved depositories under the Guidelines for Region 2 of the U.S. Trustee's Office.

58. For these reasons, and as more fully described in the Debtor's motion, the Debtor seeks authority to continue utilizing its existing cash management system.

**Debtor's Adversary Proceeding and Emergency Request to Extend the Stay**

59. As stated above, the extension of the automatic stay to me, individually, is not only appropriate under the circumstances, it is crucial to the Debtor's success in this case. The Debtor intends to file a plan of reorganization within the guidelines set forth in the Bankruptcy Code, but without an extension of the automatic stay to me, I will be forced to defend myself in connection with FCP's judgment enforcement efforts – something FCP has made clear it intends to pursue – and my ability to focus on the Debtor's efforts to propose a confirmable chapter 11 plan will be compromised.

60. Trepp has made it clear to me and my counsel that he intends to immediately upon the expiration of the stay imposed by the Federal Rules of Civil Procedure, and without delay, proceed with judgment enforcement and collection efforts against me personally.

61. The Debtor's professionals and my personal lawyers have advised me that the 30-day stay available under the Federal Rules of Civil Procedure which prohibit judgment enforcement collection efforts during that time, is due to expire December 2, 2022, or a few weeks later if FCP's proposed amended judgment is entered by the District Court.

62. Additionally, I am entitled to be indemnified by the Debtor for any amounts that I am obligated to pay to satisfy the judgment, plus attorneys' fees. In that regard, my interests and

14

987691

the Debtor's interests are aligned, and an extension of the stay will protect the Debtor's estate with respect to my indemnity claim.

63. Accordingly, on the Petition Date, the Debtor is commencing an adversary proceeding seeking on an emergency basis immediate entry of an order by this Court extending the automatic stay to me in my individual capacity, as well as a temporary, preliminary and permanent injunction precluding FCP and Trepp from enforcing the Clerk's Final Judgment. As stated above, if I cannot focus on the Debtor's business operations and generating revenue to pay creditors, including FCP, the Debtor's ability to successfully propose and confirm a plan of reorganization will be seriously and perhaps irreparably compromised.

**Local Bankruptcy Rule 1007-2 Required Information**

64. It is my understanding that Local Rule 1007-2 requires the Debtor to disclose certain information relating to the Debtor's assets, liabilities, and financial condition. That information is set forth below and in the attached exhibit as described below. In compliance with Local Bankruptcy Rule 1007-2(a):

   a. attached as <u>Exhibit C</u> to this Declaration is a list of the Debtor's twenty (20) largest unsecured creditors, excluding insiders;

   b. the Debtor does not have any secured creditors;

   c. as of the Petition Date, the Debtor has approximately $150,000.00 in assets and $2,800,000.00 in liabilities;

   d. I am the sole shareholder and President of the Debtor;

   e. the Debtor does not have any property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity;

987691

    f.  the Debtor operates its business from my primary residence located at 117 West 17th Street, #2B/C; there has never been, and there is currently no lease agreement between the Debtor and me and my spouse, and the Debtor has never, and does not currently, pay any rent to me or my spouse;

    g.  the Debtor's physical assets, and books and records are located at 117 West 17th Street, #2B/C;

    h.  the Final Judgment was entered by the District Court against the Debtor and me in my individual capacity, and I am advised that once the automatic stay afforded by Rule 62 of the Federal Rules of Civil Procedure terminates, FCP will aggressively pursue judgment enforcement and collection efforts against me and the Debtor; and

    i.  I am the only member of the Debtor's "existing senior management," I formed the Debtor in 2000 and I have worked for the Debtor since 2000. The Debtor has two (2) full-time employees: Kevin Connor and Eli Cohen.

65.  In compliance with Local Bankruptcy Rule 1007-2(b), I am providing the Court and interested parties with additional information because the Debtor intends to continue its business operations:

    a.  the estimated amount of weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty (30) day period following the Petition Date is $2,403.85 for payroll, plus $1,316.00 for insurance costs, which is consistent with pre-Petition Date amounts;

    b.  the amount paid and proposed to be paid for services for the thirty (30) day period following the Petition Date to myself, the sole officer and shareholder of the Debtor, is $19,500.00, which is consistent with pre-Petition Date amounts;

987691

    c.  attached as <u>Exhibit D</u> is a schedule, for the thirty (30) day period following the Petition Date of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

[*remainder of this page is intentionally blank*]

987691

## **CONCLUSION**

66. I believe that under the protection of this Court and the Bankruptcy Code, the Debtor will be able to maximize the value of its business and assets for the benefit of creditors and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 30, 2022

                                                *s/ Hal Luftig*
                                                Hal Luftig

987691