Sheryl P. Giugliano
Michael S. Amato
RUSKIN MOSCOU FALTISCHEK, P.C.
1425 RXR Plaza
East Tower, 15th Floor
Uniondale, New York 11556
Telephone:  516-663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Counsel to Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:

HAL LUFTIG COMPANY, INC.,

                                Debtor.
-----------------------------------------------------------x

Chapter 11 (Subchapter V)

Case No. 22-11617 (JPM)

<u>**NOTICE OF FILING OF PLAN SUPPLEMENT**</u>

**PLEASE TAKE NOTICE** that Hal Luftig Company, Inc. (the "Debtor") the debtor and debtor in possession in the above-captioned Subchapter V reorganization case hereby files this plan supplement (the "Plan Supplement") in support of the *Chapter 11 Small Business Subchapter V Plan* (ECF Doc. No. 55) filed March 1, 2023 (the "Plan") as contemplated by the Plan.

**PLEASE TAKE FURTHER NOTICE** that as contemplated by the Plan, the Plan Supplement includes the following documents:[1]

      Exhibit A – Financial Projections

      Exhibit B – Liquidation Analysis

      Exhibit C – Proposed Form of Employment Agreement with Hal Luftig

      Exhibit D – Proposed Form of Secured Note and Security Agreement with Hal Luftig

---

[1] The Debtor anticipates filing Exhibit E upon reaching an agreement with FCP with respect to the Plan.

990282

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in the Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtor and interested parties with respect thereto. The Debtor reserves the right to alter, amend, modify, or supplement any document in this Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; provided, however, that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of a hearing to consider confirmation of the Plan, the Debtor will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that you may obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein, or by contacting counsel to the Debtor.

Uniondale, New York
March 27, 2023

**RUSKIN MOSCOU FALTISCHEK, P.C.**

By: __/s Sheryl P. Giugliano_____
Sheryl P. Giugliano
Michael Amato

1425 RXR Plaza
East Tower, 15th Floor
Uniondale, New York 11556
Telephone: 516-663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Counsel to Debtor and Debtor in Possession*

2

990282

# EXHIBIT A

**Hal Luftig Company**
*Disposable Income*

| | 23-27 TOTAL | 2023 Q1 | Q2 | Q3 | Q4 | 2024 Q1 | Q2 | Q3 | Q4 | 2025 Q1 | Q2 | Q3 | Q4 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assumptions:** | | | | | | | | | | | | | | | |
| Expense Applied | | 100% | 50% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 50% | 50% | 50% | 50% | 50% |
| Deferred Compensation | | 46% | 23% | 11% | 11% | 11% | 11% | 11% | 11% | 11% | 23% | 23% | 23% | 23% | 23% |
| | | | | | | | | | | | | | | | |
| Opening cash | $ 89,771 | $ 89,771 | $ 62,329 | $ 13,968 | $ 81,716 | $ 46,646 | $ 21,575 | $ 6,405 | $ 51,334 | $ 16,264 | $226,193 | $155,832 | $233,571 | $216,310 | $300,966 |
| Cash Receipts | $1,964,000 | $309,000 | $ 21,000 | $124,000 | $ 9,000 | $ 9,000 | $ 34,000 | $ 84,000 | $ 9,000 | $244,000 | $ 9,000 | $147,000 | $ 57,000 | $347,000 | $561,000 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Payroll, Payroll taxes and related costs (Applied) | $ 928,043 | $106,062 | $ 53,031 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 53,031 | $ 53,031 | $ 53,031 | $212,124 | $212,124 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Other Operating Expenses | $ 84,525 | $ 14,700 | $ 7,350 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 7,350 | $ 7,350 | $ 7,350 | $ 7,350 | $ 7,350 |
| Total Operating Cash Disbursements | $1,181,068 | $122,437 | $ 67,156 | $ 36,866 | $ 41,866 | $ 31,866 | $ 46,966 | $ 36,866 | $ 41,866 | $ 31,866 | $ 77,156 | $ 67,056 | $ 72,056 | $253,524 | $253,524 |
| Net operating cash flow | $ 782,933 | $186,563 | $ (46,156) | $ 87,135 | $ (32,866) | $ (22,866) | $ (12,966) | $ 47,135 | $ (32,866) | $212,135 | $ (68,156) | $ 79,944 | $ (15,056) | $ 93,476 | $307,476 |
| **Restructuring Cash Disbursements** | | | | | | | | | | | | | | | |
| Restructuring Costs | $ 211,800 | $211,800 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Priority Claims (Class 1) | $ 17,181 | $ - | $ - | $ 17,181 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| SBA Loan (Class 2) | $ 44,100 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 8,820 | $ 8,820 |
| FCP Entertainment Partners LLC (Class 3) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| General Unsecured Claims (Class 4) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Restructuring Cash Disbursements | $ 273,081 | $214,005 | $ 2,205 | $ 19,386 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 8,820 | $ 8,820 |
| Net operating and restructuring cash flow | $ 509,852 | $ (27,442) | $ (48,361) | $ 67,749 | $ (35,071) | $ (25,071) | $ (15,171) | $ 44,930 | $ (35,071) | $209,930 | $ (70,361) | $ 77,739 | $ (17,261) | $ 84,656 | $298,656 |
| Ending cash | $ 599,622 | $ 62,329 | $ 13,968 | $ 81,716 | $ 46,646 | $ 21,575 | $ 6,405 | $ 51,334 | $ 16,264 | $226,193 | $155,832 | $233,571 | $216,310 | $300,966 | $599,622 |
| Deferred Compensation (Cumulative) | $ 230,580 | $ 26,352 | $ 39,528 | $ 46,116 | $ 52,704 | $ 59,292 | $ 65,880 | $ 72,468 | $ 79,056 | $ 85,644 | $ 98,820 | $111,996 | $125,172 | $177,876 | $230,580 |

It has been determined by Management, payroll and direct employee expenses will be applied for services needed based on expected operations during a given quarter.

The above 5-year forecast of disposable income reflects $1.96 million in cash receipts, aggregate operating costs of $1.18 million, deferred compensation from the owner of $230,000 for net operating cash flow of $783,000. To forecast the disposable income for the Company, the net loss of $783,000 was adjusted for payments related to bankruptcy professionals and the secured lender. **The resulting disposable income for the forecasted 5 year period is $550,000.**

**Hal Luftig Company**
*Disposable Income Including Proposed Reorganization Distributions*

| | 23-27 TOTAL | 2023 Q1 | Q2 | Q3 | Q4 | 2024 Q1 | Q2 | Q3 | Q4 | 2025 Q1 | Q2 | Q3 | Q4 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assumptions:** | | | | | | | | | | | | | | | |
| Expense Applied | | 100% | 50% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 50% | 50% | 50% | 50% | 50% |
| Deferred Compensation | | 46% | 23% | 11% | 11% | 11% | 11% | 11% | 11% | 11% | 23% | 23% | 23% | 23% | 23% |
| Opening cash | $ 89,771 | $ 89,771 | $ 62,329 | $ 563,968 | $131,716 | $ 96,646 | $ 71,575 | $ 56,405 | $ 101,334 | $ 66,264 | $126,193 | $ 55,832 | $ 133,571 | $116,310 | $ 50,966 |
| Settlement and Contribution | $ 550,000 | $ - | $ 550,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts | $1,964,000 | $309,000 | $ 21,000 | $ 124,000 | $ 9,000 | $ 9,000 | $ 34,000 | $ 84,000 | $ 9,000 | $244,000 | $ 9,000 | $147,000 | $ 57,000 | $347,000 | $561,000 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Payroll, Payroll taxes and related costs (Applied) | $ 928,043 | $106,062 | $ 53,031 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 26,516 | $ 53,031 | $ 53,031 | $ 53,031 | $212,124 | $212,124 |
| Other Operating Expenses (Applied) | $ 84,525 | $ 14,700 | $ 7,350 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 3,675 | $ 7,350 | $ 7,350 | $ 7,350 | $ 7,350 | $ 7,350 |
| Other Operating Expenses | $ 168,500 | $ 1,675 | $ 6,775 | $ 6,675 | $ 11,675 | $ 1,675 | $ 16,775 | $ 6,675 | $ 11,675 | $ 1,675 | $ 16,775 | $ 6,675 | $ 11,675 | $ 34,050 | $ 34,050 |
| Total Operating Cash Disbursements | $1,181,068 | $122,437 | $ 67,156 | $ 36,866 | $ 41,866 | $ 31,866 | $ 46,966 | $ 36,866 | $ 41,866 | $ 31,866 | $ 77,156 | $ 67,056 | $ 72,056 | $253,524 | $253,524 |
| Net operating cash flow | $ 782,933 | $186,563 | $ (46,156) | $ 87,135 | $ (32,866) | $ (22,866) | $ (12,966) | $ 47,135 | $ (32,866) | $212,135 | $ (68,156) | $ 79,944 | $ (15,056) | $ 93,476 | $307,476 |
| **Restructuring Cash Disbursements** | | | | | | | | | | | | | | | |
| Restructuring Costs | $ 211,800 | $211,800 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Priority Claims (Class 1) | $ 17,181 | $ - | $ - | $ 17,181 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| SBA Loan (Class 2) | $ 44,100 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 8,820 | $ 8,820 |
| FCP Entertainment Partners LLC (Class 3) | $1,070,000 | $ - | $ - | $ 500,000 | $ - | $ - | $ - | $ - | $ - | $142,500 | $ - | $ - | $ - | $142,500 | $285,000 |
| General Unsecured Claims (Class 4) | $ 30,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 7,500 | $ - | $ - | $ - | $ 7,500 | $ 15,000 |
| Insider (Class 5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Restructuring Cash Disbursements | $1,373,081 | $214,005 | $ 2,205 | $ 519,386 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $ 2,205 | $152,205 | $ 2,205 | $ 2,205 | $ 2,205 | $158,820 | $308,820 |
| Net operating and restructuring cash flow | $ (590,149) | $ (27,442) | $ (48,361) | $ (432,252) | $ (35,071) | $ (25,071) | $ (15,171) | $ 44,930 | $ (35,071) | $ 59,930 | $ (70,361) | $ 77,739 | $ (17,261) | $ (65,344) | $ (1,344) |
| Ending cash | $ 49,622 | $ 62,329 | $ 563,968 | $ 131,716 | $ 96,646 | $ 71,575 | $ 56,405 | $101,334 | $ 66,264 | $126,193 | $ 55,832 | $133,571 | $ 116,310 | $ 50,966 | $ 49,622 |
| Deferred Compensation (Cumulative) | $ 230,580 | $ 26,352 | $ 39,528 | $ 46,116 | $ 52,704 | $ 59,292 | $ 65,880 | $ 72,468 | $ 79,056 | $ 85,644 | $ 98,820 | $111,996 | $ 125,172 | $177,876 | $230,580 |

Disposable income exceeds the liquidation value of the assets, accordingly, the Debtor has projected the distribution of $550,000 to creditors.  In addition, the Debtor is projecting settlements with Mr. Luftig and FCP Entertainment Partners, LLC.  The results of those settlements are reflected in the distributions above.

# <u>EXHIBIT B</u>

**Hal Luftig Company**
*Liquidation Analysis*
*Estimated as of Effective Date - March 26, 2023*

| | Est Liquidation % | Value | Estimated Liquidation Value | Note |
|---|---|---|---|---|
| Cash | 100% | 62,329 $ | 62,329 | A |
| Affiliate Business Sales | 75% | 1,293,468 | 972,061 | B |
| FF&E | 25% | 1,300 | 325 | C |
| Deposits | 100% | - | - | D |
| Other Assets (Including Intellectual Property) | | - | - | E |
| Other - Potential Causes of Action | 10% | 416,066 | 41,607 | F |
| **Estimated Proceeds from Liquidation of Assets** | | **1,773,162** | **1,076,321** | |
| | | | | |
| **Administrative Claims** | | | | |
| Chapter 7 Trustee Fees | | 32,290 | 32,290 | G |
| Chapter 7 Trustee Professional Fees | | 100,000 | 100,000 | G |
| Operational Winddown Costs | | 40,000 | 40,000 | H |
| **Net Proceeds Available after Administrative Claims** | | | **904,031** | |
| | | | | |
| **Secured Claims** | | | | |
| SBA Loan (excluding interests and fees) (Class 2) | | 163,947 | 160,000 | I |
| **Net Proceeds Available to Priority Creditors** | | | **744,031** | |
| | | | | |
| **Chapter 11 Admin and Priority Claims** | | | | |
| Accounts Payable Post-Petition | 100% | 40,000 | 40,000 | H |
| Chapter 11 Professional Fees and Sub V Trustee | | 211,800 | 211,800 | J |
| Priority Claims (Class 1) | | 17,181 | 17,181 | I |
| **Net Proceeds Available to Unsecured Creditors** | | | $ **475,050** | |
| | | | | |
| Unsecured Claims (as of the Filing Date) | | | | |
| FCP Entertainment Partners LLC (Class 3) | | $ 2,862,776 | $ 324,465 | I |
| General Unsecured Claims (Class 4) | | 114,123 | 12,935 | I |
| Insider Claims (Class 5) | | 1,214,506 | 137,651 | I |
| | | $ 4,191,405 | $ 475,050 | |
| | | | | |
| **Percentage Return to Unsecured Creditors** | | | **11%** | |
| **Net Proceeds Available to Equity** | | | $ **-** | |

A.  Cash and Cash Equivalents - The cash balances are estimated as of the effective date.

B.  Affiliate Business Sales - The Debtor's schedules of assets and liabilities reflect minority investment in 13-active entities.  In addition, we noted 5 additional closed entities which could distribute funds in the future.  RKC valued each of the investments using both the cost and income approach, for purposes of the liquidation analysis, we assumed the highest value prior to applying a liquidation discount.

C.  FF&E - As of the Petition Date of 12/1/2022, the Debtor's Schedules (ECF Doc. No. 23) indicate approximately $1,300 of furniture and computer equipment.

D.  Deposits - The Debtor does not represent to have any deposits.

E.  Other Assets (Including Intellectual Property) - The Debtor's Schedules reflect intellectual property including its website and domain, RKC determined there is limited value.

F.  Other - Potential Causes of Action- Estimated recoveries from avoidance actions and other assigned litigation claims.  Specifically, The Debtor notes $416,000 in potential preferential transfers.  Based on our experience, the net recovery to the Debtor for these types of litigation assets is approximately 10% of the gross amount transferred.

G.  Chapter 7 Trustee Fee - A recovery estimate of 3% of gross proceeds is assumed for trustee fees.  The Trustee Professional Fees are estimated based on the complicated assets for liquidation and recovery to the creditors.

H.  Based on the cash flow presented, two weeks of operating expenses total approximately $40,000.

I.  Per the schedule of assets and liabilities filed by the Debtor as well as the proofs of claims filed to date.

J.  Estimated fees due bankruptcy professionals and the Sub V Trustee related to the Chapter 11 process.

# <u>EXHIBIT C</u>

*RMF DRAFT 3202023*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT, effective as of _____**2023** (the "Effective Date"), is hereby entered into by and between Hal Luftig, an individual ("Executive"), and Hal Luftig Company, Inc., a company organized and existing under the laws of the State of New York (the "Company").

### WITNESSETH:

WHEREAS, Executive is currently employed by the Company as its President;

WHEREAS, on December 1, 2022, the Company filed a Chapter 11 case under Subchapter V of the Bankruptcy Code (the "Case") in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on March 1, 2023, the Company filed a chapter 11 plan (the "Plan") in the Case which provided, among other things, that if the Plan is confirmed in its current form with the Luftig Contribution and the Luftig Release (each as defined therein), then the Company and Executive shall execute an employment agreement with a term that coincides with the period of time during which the Company will make payments to creditors under the Plan;

WHEREAS, the Plan provides that the Company will make certain distributions to the creditors holding allowed claims against the Company;

WHEREAS, in furtherance of the purposes of the Plan, and to ensure that the Executive is available to continue to perform services on behalf of the Company, the Company agrees to continue to employ Executive and Executive agrees to continue to be employed by the Company on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1)      <u>EMPLOYMENT OF EXECUTIVE</u>: The Company hereby employs Executive, and Executive hereby accepts employment with the Company, in each case pursuant to the terms and conditions of this Agreement.  The Company and the Executive acknowledge and agree that the Executive's employment under this Agreement is non-exclusive and that the Executive will be entitled to work on projects unrelated to the Company and its business in the Executive's sole discretion.

2)      <u>DUTIES</u>: Executive shall continue his position as President of the Company under this Agreement and shall have the authority, functions, duties, powers and responsibilities normally associated with such position. Executive agrees to devote the time and effort necessary to fulfill his duties under this Agreement, which the Executive and the Company agree is approximately 50% of his business time and efforts, except for customary vacations and reasonable absences due to illness or other incapacity as set forth herein, and to perform all of his duties to

*RMF DRAFT 3202023*

the best of his professional ability and comply with such reasonable policies, and standards of the Company.  Notwithstanding the foregoing, nothing contained herein shall be construed so as to prohibit or prevent Executive from working for other companies and businesses, regardless of whether he holds an interest in those entities, so long as such activities do not interfere with the performance of his duties hereunder. By entering into this Agreement, Executive represents that he is not a party to any restrictive covenants, or other agreement or understanding which would conflict or interfere with the performance of any of his duties hereunder.

3)    <u>TERM</u>: The term of employment under this Agreement shall commence on the Effective Date and shall continue until all of the Company's payments under the Plan have been completed or otherwise satisfied, or pursuant to an order of the Bankruptcy Court (the "Term").

4)    <u>PLACE OF EMPLOYMENT</u>: Executive's principal work location shall be the Company's office located in New York, New York.  Executive shall travel to such other locations, at the Company's expense, as reasonably necessary in his sole discretion to carry out his duties hereunder on an as-needed basis.

5)    <u>COMPENSATION</u>:

(a)    For all services rendered to the Company by Executive, Executive agrees to accept as total compensation a sum computed as set forth in this Section 5. All payments of compensation (whether under this Section 5 or under any other section of this Agreement) shall be subject to all applicable withholdings, deductions, and other authorized deductions in accordance with applicable law and Company policies and procedures.

(b)    <u>Base Salary</u>. The Company shall pay Executive an annual base salary at the rate of Two Hundred and Ten Thousand Dollars ($210,000.00) per year ("Base Salary") during the Term, in accordance with the customary payroll practices of the Company. In addition, the Company shall advance to the Executive distributions equal to the Executive's tax liability on a quarterly basis. During the Term, the Base Salary shall not be increased. If any part of the Base Salary is not paid to the Executive, then the Company will record the unpaid compensation as deferred compensation ("Deferred Compensation") on the Company's books and records and shall pay the Deferred Compensation when sufficient cash becomes available. The Executive's Deferred Compensation will be paid to the Executive only if the Company is able to make the required payments to creditors under the Plan.

6)    <u>VACATION/SICK TIME</u>: Executive shall be entitled to **[four] (4) weeks** of paid vacation during each year of Executive's employment. The scheduling of any vacation shall be coordinated with the Company so that the staffing needs of the Company are met to the extent reasonably possible. The Executive shall be granted sick time in accordance with the Company's policies then in effect from time to time.

7)    <u>REIMBURSEMENT OF BUSINESS EXPENSES</u>: The Company agrees to pay, either directly or indirectly by payment to Executive, for all of Executive's reasonable research, entertainment, travel and other miscellaneous business expenses incurred by him which are directly related to the performance of his services under this Agreement, in accordance with the

*RMF DRAFT 3202023*

Company's policies regarding such reimbursements. As a prerequisite to any reimbursement by the Company for business expenses, Executive shall submit receipts of all such expenses to the Company; and the Company's obligation to effect payment or reimbursement of such expenses shall be only to the extent of such receipts.

8)    <u>ADDITIONAL BENEFITS</u>: Executive shall be eligible to participate in the Company's medical and dental insurance plans in accordance with the terms and conditions of such plans.  The Company shall make any payments to any third-parties necessary to keep such benefits in effect.

9)    <u>COMPANY PROPERTY</u>: Executive understands and agrees that Company files, intellectual property and other work product or property, and all copies thereof (collectively, "Company Property") are the sole and exclusive property of the Company.

10)    <u>DISPOSITION OF PROPERTY UPON TERMINATION OF EMPLOYMENT</u>: In the event that Executive's employment with the Company is terminated for any reason, Executive agrees and understands that all Company Property in his possession or control shall be, at the Company's option, promptly destroyed or returned to the Company, and Executive shall have no right, title or interest in the same.

11)    <u>TERMINATION OF EMPLOYMENT</u>: Upon the Executive's termination of employment for any reason, he shall automatically be deemed to have stepped down from all positions and offices held with the Company.  The employment of Executive may be terminated as follows:

(a)    <u>Termination upon Death or Disability</u>.  This Agreement and Executive's employment hereunder shall automatically terminate on the date on which Executive dies or becomes permanently incapacitated. Executive shall be deemed to have become "permanently incapacitated" on the date that is thirty (30) days after the Company has determined that Executive has suffered a Permanent Incapacity (as defined below) and so notifies Executive. For purposes of this section, "Permanently Incapacitated" shall mean: (i) Executive's actual or anticipated inability, due to physical or mental incapacity, to substantially perform his duties and responsibilities under this Agreement with or without reasonable accommodation for four (4) months out of any twelve (12) month period; or (ii) Executive is receiving income benefits for a period of ninety (90) days under any long-term disability plan by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of four (4) months or more.

(b)    <u>Termination by the Company</u>.  The Company may terminate this Agreement and Executive's employment hereunder with or without cause, upon at least thirty (30) days prior written notice to Executive; provided, however, the Company will not terminate the Executive prior to the end of the Term without an appropriate order of the Bankruptcy Court.

12)    <u>PAYMENTS UPON TERMINATION</u>.  In the event of the termination of this Agreement and Executive's employment hereunder, Executive (or Executive's estate or beneficiaries in the case of the death of Executive) shall be entitled to: (a) receive any unpaid Base

RMF DRAFT 3202023

Salary, Deferred Compensation, and benefits earned and accrued under this Agreement prior to the date of termination (and reimbursement under this Agreement for expenses incurred prior to the date of termination) in accordance with any applicable Company plan or policy; and (b) indemnification in accordance with the Company's Bylaws and applicable law, and any vested rights pursuant to any insurance plan, benefit plan or retirement plan.

13)   <u>INDEMNIFICATION</u>: During and after the period of Executive's employment by the Company, the Company shall indemnify Executive to the maximum extent permitted by the Company's Bylaws and applicable law, in either case against all liabilities, losses, damages and expenses actually and reasonably incurred by Executive, including reasonable attorney's fees, in connection with any claim or proceeding arising out of, or relating to, his services for the Company, other than (a) any claim or proceeding by the Company against Executive, and (b) any claim or proceeding by Executive against the Company, except if such claim or proceeding is to recover pursuant to this Section 13 of the Agreement.

14)   <u>NOTICES</u>: Any notice required or permitted to be given pursuant to this Agreement shall be sufficient if in writing, and if personally delivered to the party to be notified or if sent by nationally recognized overnight delivery service to said party at the following addresses, or such other address as provided by the parties in writing:

If to the Company:          Hal Luftig Company, Inc.
                            117 West 17th Street, #2C
                            New York, NY 10011-5446
                            Attn:  Hal Luftig

With a copy to:             Ruskin Moscou Faltischek, P.C.
                            1425 RXR Plaza
                            East Tower, 15th Floor
                            Uniondale, New York 11556
                            Attn:  Sheryl P. Giugliano

If to Executive:            Hal Luftig
                            117 West 17th Street, #2C
                            New York, NY 10011-5446

With a copy to:             Martin J. Foley, PLC
                            601 S. Figueroa Street
                            Ste. 2050
                            Los Angeles, CA 90017

15)    <u>SEVERABILITY</u>: In the event any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion or provision shall not affect any other provision hereof and this Agreement shall be construed and enforced as if the invalid provision had not been included.

16)    <u>BINDING EFFECT</u>: This Agreement shall inure to the benefit of and shall be binding upon the Company and upon any person, firm or corporation with which the Company may be merged or consolidated or which may acquire all or substantially all of the Company's assets through sale, lease, liquidation or otherwise.  Except as otherwise specifically provided herein, the rights and benefits of Executive are personal to him, and no such rights or benefits shall be subject to assignment or transfer by Executive.

17)    <u>GOVERNING LAW AND VENUE</u>: This Agreement shall be construed and interpreted in accordance with the laws of the State of New York, without regard to its conflict of laws provisions. Any legal proceeding arising out of or relating to this Agreement will be instituted in a state or federal court in New York, and Executive and the Company hereby consent to the personal and exclusive jurisdiction of such court(s) and hereby waive any objection(s) that they may have to personal jurisdiction, the laying of venue of any such proceeding and any claim or defense of inconvenient forum.

18)    <u>ENTIRE AGREEMENT</u>: This Agreement constitutes the entire agreement between the parties and merges, integrates and supersedes any prior agreement in its entirety; and there are no other agreements between the parties with respect to the subject matter contained herein except as set forth herein.

19)    <u>AMENDMENT AND MODIFICATION</u>: All terms, conditions and provisions of this Agreement shall remain in full force and effect unless modified, changed, altered or amended, in writing, executed by both parties.

20)    <u>NON-WAIVER</u>. No waiver of any breach of any term or provision of this Agreement shall be construed to be, or shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

21)    <u>SURVIVAL</u>.   Unless otherwise provided elsewhere in this Agreement, the following provisions shall survive the termination or expiration of this Agreement: 9; 10; 12; 13; 15; 16; 17; 18; and 20.

22)    <u>CAPTIONS</u>. Captions of the sections or paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

*RMF DRAFT 3202023*

23)    <u>COUNTERPARTS</u>.  This Agreement may be executed electronically, by email or facsimile, and in counterparts, and shall be fully binding and enforceable upon the parties when so executed.

HAL LUFTIG COMPANY, INC.

By: _____          Date: _____2023
Name:  Hal Luftig
Title:    President

BY SIGNING BELOW, EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT AS OF THE DATE SET FORTH BELOW.

_____          Date: _____2023
        Hal Luftig

# **<u>EXHIBIT D</u>**

## GENERAL SECURITY AGREEMENT

**GENERAL SECURITY AGREEMENT** ("Agreement") dated as of March __, 2023 between **HAL LUFTIG COMPANY, INC.** (the "Debtor"), with an address at 117 West 17th Street, Apt. 2C, New York, New York 10011, and **HAL LUFTIG**, having an address at c/o Martin J. Foley, PLC, 601 S Figueroa St., Ste. 2050, Los Angeles, CA 90017 ("Secured Party").

It is agreed as follows:

1.     Grant of Security Interest. In accordance with the Debtor's small business chapter 11 plan of reorganization, dated March 1, 2023 (the "Plan") filed in the U.S. Bankruptcy Court for the Southern District of New York (the "Court") in the Debtor's Subchapter V reorganization case, No. 22-11617 (JPM), the Confirmation Order entered by the Court (ECF Doc. No. ____) confirming the Plan, and the Secured Promissory Note, dated **March [•],** 2023 (the "Note") between the above parties, the Debtor is granting the subordinated security interest described in this Agreement to secure the payment, performance and observance of all indebtedness, obligations, liabilities and agreements of any kind of Debtor to Secured Party, in connection with the Debtor's obligations under Plan and the Note (all of the foregoing collectively referred to as the "Obligations"). The effectiveness of this Agreement is conditioned upon the approval of the Plan by the Court in the form of a final and non-appealable Confirmation Order which includes the Luftig Contribution and the Luftig Release. Pursuant to the terms of this Agreement, the Debtor hereby grants to Secured Party a lien and interest, subordinate to the rights of the U.S. Small Business Administration (the "Senior Secured Party") until the Debtor's loan is paid in full and such senior lien is released, and the payments due under the Plan pursuant to the Confirmation Order, in and right of setoff against, the following property (the "Collateral"):

    a.   Substantially all of the Debtor's assets related to the Debtor's business, including, without limitation (i) personal property, including equipment and furniture, and (ii) the Debtor's interest in and right to receive distributions, royalties and payments relating to the Debtor's interest in theatrical productions; and

    b.   Any and all products and proceeds of any of the foregoing, in any form (including, without limitation, any insurance proceeds or claims by Debtor against third parties for loss or damage to or destruction of any or all of the foregoing property.

2.     Representations, Warranties and Covenants. Debtor represents, warrants and covenants that:

    a.   Debtor will not assign, transfer, sell, lease or otherwise dispose of or abandon any Collateral, nor will Debtor suffer or permit any of the same to occur with respect to any Collateral, without prior written notice to and consent of Secured Party;

    b.   Debtor will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances and regulations;

    c.   Debtor will, at its sole cost and expense, perform all acts and execute all documents requested by Secured Party from time to time to evidence, perfect, maintain or enforce Secured Party's security interest granted herein, and to effectuate or maintain the priority thereof, or otherwise to carry out the provisions and purposes of this Agreement, including, without limitation, the execution and delivery of financing statements pursuant to the UCC, and Debtor hereby authorizes Secured Party to execute and file at any time and from time to time one or more financing statements or copies thereof or of this Agreement with respect to the Collateral signed only by Secured Party and/or signed by Secured Party as attorney-in-fact of Debtor;

    d.   Debtor will pay Secured Party for any sums, costs, and expenses which Secured Party may pay or incur pursuant to the provisions of this Agreement or in negotiating, executing, perfecting, amending, defending, protecting or enforcing this Agreement or the security interest granted herein or in enforcing payment of the Obligations or otherwise in connection with the provisions hereof, including but not limited to court costs, collection charges, travel expenses, and reasonable attorneys' fees, all of which, together with interest at the highest rate then payable on any of the Obligations, shall be part of the Obligations and be payable on demand;

    e.   Debtor will protect and insure the Collateral in accordance with prudent business management;

    f.   Debtor has made, and will continue to make, payment or deposit, or otherwise has provided and will provide for the payment, when due, of all taxes, assessments or contributions or other public or private charges which have been or may be levied or assessed against Debtor, whether with respect to any Collateral, to any wages or salaries paid by Debtor, or otherwise, and will deliver to Secured Party, on demand, certificates or other evidence satisfactory to Secured Party attesting thereto; and

    g.   Secured Party shall at reasonable times and upon reasonable notice have access to and right of inspection of the Collateral and any records pertaining thereto (and the right to make extracts from and to receive from Debtor originals or true copies of such records and any papers and instruments relating to any Collateral upon request therefor).

    3.    <u>Events of Default</u>.  Each of the following events shall constitute an event of default ("<u>Event of Default</u>") under this Agreement:

    a.   if Debtor shall default in the timely payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of any Obligations or this Agreement beyond any applicable cure period as set forth in the applicable agreement;

b.  if the Debtor shall default in the timely payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of the Confirmation Order beyond any applicable cure period;

c.  if any warranty or representation made to Secured Party at any time by Debtor is false or misleading in any material respect when made and Debtor fails to cause such warranty or representation to cease to be false or misleading within ten 10 days after written notice thereof from Secured Party; or

d.  if there shall be any loss, theft, substantial damage to or diminution of value of any Collateral. or the making or filing of any lien, levy, or execution on, or seizure, attachment of or garnishment of, any Collateral which is not discharged within thirty (30) days.

4.    <u>Remedies Upon Default</u>.  Upon the occurrence and during the continuance of an Event of Default, Secured Party may, without notice to or demand upon Debtor, declare any Obligations immediately due and payable and Secured Party shall have the following rights and remedies (to the extent permitted by applicable law), in addition to all rights and remedies of a secured party under the UCC, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently:

a.  Secured Party may take the necessary steps to take possession of the Collateral, and/or dispose of any Collateral, and/or remove any Collateral for the purpose of effecting sale or other disposition thereof, and/or sell, resell, lease, assign and deliver, grant options for or otherwise dispose of any Collateral in its then condition or following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels, at the same or different times, with or without having the Collateral at the place of sale or other disposition, pursuant to applicable law. Secured Party may buy any Collateral at any public sale and, if any Collateral is of a type customarily sold in a recognized market or is of the type which is the subject of widely distributed standard price quotations, Secured Party may buy such Collateral at private sale and in each case may make payment therefor by any means.

b.  Secured Party may apply the cash proceeds actually received from any sale or other disposition of Collateral to the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like, to reasonable attorneys' fees and all legal, travel and other expenses which may be incurred by Secured Party in attempting to collect the Obligations or enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; and then to the Obligations in such order and as to principal or interest as Secured Party may desire; and Debtor shall remain liable and will pay Secured Party on demand any deficiency remaining after the application of such cash proceeds, together with interest thereon at die highest rate then payable on the Obligations, and the balance of any expenses unpaid, with any surplus to be paid to Debtor, subject to any duty of Secured Party

3

imposed by law to the holder of any subordinate security interest in the Collateral known to Secured Party.

c. Secured Party may appropriate, set off and apply to the payment of the Obligations, any Collateral in or coming into the possession of Secured Party or its agents, without notice to Debtor and in such manner as Secured Party may in its discretion determine.

5. <u>Subordination</u>.

a. Notwithstanding the foregoing, the Debtor agrees, and the Secured Party also agrees, that the Obligations and Note are and shall be subordinate, to the extent and in the manner hereafter set forth, to the prior payment in full in cash of all obligations due to the Senior Secured Party and that the subordination is for the benefit of and enforceable by the Senior Secured Party.

b. The Senior Secured Party shall first be entitled to receive payment in full of all amounts due or in respect of amounts due by the Debtor to the Secured Party, before the Secured Party shall be entitled to receive any payment under the Note with respect to the Obligations, except that the Secured Party may receive and maintain a permitted junior security interest in the Collateral, including in the event of any distribution to creditors of the Debtor in (a) any liquidation or dissolution of the Debtor, (b) any bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Debtor or its property, (c) any assignment by the Debtor for the benefit of its creditors, or (d) any marshaling of the Debtor's assets and liabilities.

c. The Debtor shall not make any payment under the Note in respect of the Obligations if: (i) a payment default has occurred with respect to amounts due to the Senior Secured Party; (ii) the maturity date under the Senior Secured Party's loan documents is accelerated due to the occurrence of an event of default thereunder; or (iii) any other default occurs and is continuing that permits the Senior Secured Party to accelerate its maturity and the Debtor receives a notice of such default.

d. If payment under the Note is accelerated because of an Event of Default, the Debtor shall promptly notify the Senior Secured Party of the acceleration. If any amounts are due to the Senior Secured Party, the Debtor may not make any payments under the Note until five (5) business days after the Senior Secured Party receives notice of such acceleration and, thereafter, may pay the Note if permitted under this Agreement.

e. If a payment is made to the Secured Party that because of this Section of the Agreement should not have been made to it, then the Secured Party shall hold it in trust for the Senior Secured Party, segregated from other funds and property held by the Secured Party, and pay it over to the Senior Secured Party.

f.  The Debtor and the Secured Party will, at any time and from time to time and at the Debtor's expense, promptly execute and deliver all further instruments, documents, and agreements, and take all further action, that may be necessary or desirable, or that the Senior Secured Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable such Senior Secured Party to exercise its rights and remedies hereunder.

6.  <u>Power of Attorney</u>.

a.  To the limited extent necessary to effectuate the terms and provisions of this Agreement, Debtor hereby designates and appoints Secured Party and each of its designees or agents as attorney-in-fact of Debtor, irrevocably and with power of substitution, with authority to: (i) endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, instruments or other evidences of Collateral that may come into Secured Party's possession; (ii) sign the name of Debtor on any invoices, documents, drafts against and notices to account debtors or obligors of Debtor, assignments and requests for verification of accounts; (iii) execute proofs of claim and loss; (iv) execute endorsements, assignments or other instruments of conveyance or transfer; (v) adjust and compromise any claims under insurance policies or otherwise; (vi) receive, open and dispose of all mail addressed to Debtor and, upon the occurrence of an Event of Default, notify the Post Office authorities to change the address for delivery of mail addressed to Debtor to such address as Secured Party may designate; (vii) file UCC financing statements and/or amendments thereto; and (viii) do all other acts and things necessary or advisable in the sole discretion of Secured Party to carry out and enforce this Agreement or the Obligations. All acts done under the foregoing authorization are hereby ratified and approved and neither Secured Party nor any designee or agent thereof shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law, provided that Secured Party or any designee or agent thereof shall not be relieved of liability to the extent it is determined by a final judicial decision that its act, error or mistake constituted gross negligence or willful misconduct. This power of attorney being coupled with an interest is irrevocable while any Obligations shall remain unpaid.

b.  Debtor hereby authorizes Secured Party to file Financing Statements as required to evidence or perfect the security interest granted herein.

7.  <u>Care of Collateral</u>.  Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any Collateral in its possession, which duty shall be fully satisfied if Secured Party accords such Collateral treatment substantially the same as that which it accords similar property owned by it.  Except for any claims, causes of action or demands arising out of Secured Party's failure to perform its agreements set forth in the preceding sentence, Debtor releases Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Agreement, the Obligations, the Collateral and its use and/or any actions taken or omitted to be taken by Secured Party with respect thereto, and Debtor hereby agrees to hold Secured

Party harmless from and with respect to any and all such claims, causes of action and demands. Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations.

8.    <u>Waivers</u>.  No act, omission or delay by Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise.  No single or partial waiver by Secured Party of any Event of Default or right or remedy which it may have shall operate as a waiver of any other Event of Default, right or remedy or of the same Event of Default, right or remedy on a future occasion. Debtor hereby waives presentment, notice of dishonor and protest of all instruments included in or evidencing any Obligations or Collateral, and all other notices and demands whatsoever (except as expressly provided herein).

9.    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF).

10.    <u>SUBMISSION TO JURISDICTION: WAIVER OF TRIAL BY JURY, ETC.</u>

a.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, DEBTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  DEBTOR HEREBY IRREVOCABLY WAIVES, IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING, (I) TRIAL BY JURY, (II) ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS, AND (III) THE RIGHT TO INTERPOSE ANY SETOFF, NON-COMPULSORY COUNTERCLAIM OR CROSS-CLAIM.

b.    DEBTOR IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY A NATIONALLY RECOGNIZED OVERNIGHT DELIVERY SERVICE, TO DEBTOR AT ITS ADDRESS DETERMINED PURSUANT TO SECTION 11 HEREOF. NOTHING HEREIN SHALL AFFECT THE RIGHT OF SECURED PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST DEBTOR IN ANY OTHER JURISDICTION.

11.     <u>Notices; Business Days</u>.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement or any other shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight delivery service, or one (1) business day after being sent to the recipient by reputable overnight delivery service. All notices, demands and other communications shall be sent to the respective addresses indicated below:

If to Secured Party:

                                   Hal Luftig
                                   117 West 17th Street, Apt. 2C
                                   New York, NY 10011-5446

                                   With a copy to:

                                   Martin J. Foley, PLC
                                   601 S Figueroa St., Ste. 2050
                                   Los Angeles, CA 90017

If Debtor:                   Hal Luftig Company, Inc.
                                   117 West 17th Street, Apt. 2C
                                   New York, NY 10011-5446
                                   Attn:  Hal Luftig

                                   With a copy to:

                                   Ruskin Moscou Faltischek, P.C.
                                   East Tower, 15th Floor
                                   1425 RXR Plaza
                                   Uniondale, NY 11556-0109
                                   Attn:  Sheryl P. Giugliano

12.     <u>Security Interest Absolute</u>.  Except as otherwise set forth herein, all rights of Secured Party and the security interests granted herein, and all obligations of Debtor hereunder, shall be absolute and unconditional without regard to. (a) any lack of validity or enforceability of any agreement or instrument relating to the Obligations; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any agreement or instrument relating to the Obligations; (c) any exchange, release or non-perfection of any other collateral, for all or any of the Obligations; or (d) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Debtor or any other person or entity.

13.     <u>Amendments and Waivers: Partial Invalidity.  Acknowledgment of Receipt</u>.  No provision hereof shall be modified, altered, or limited except by a written instrument executed by the party to be charged.  If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

14.    <u>Benefit of Agreement: Continuing Security Interest</u>.    This Agreement and the Obligations shall be binding upon the heirs, executors, legal representatives, administrators, successors and assigns of Debtor and shall, together with the rights and remedies of Secured Party hereunder, inure to the benefit of Secured Party, its successors, endorsees, and assigns; <u>provided</u>, <u>however</u>, Debtor may not assign, transfer or delegate any of its rights or obligations hereunder without the express prior written consent of Secured Party.  This Agreement shall create a continuing security interest in the Collateral which shall remain in full force and effect until payment in full of the Obligations and termination of any commitment by Secured Party to make loans or other financial accommodations to or for the benefit of Debtor pursuant to the Loan Agreement.

15.    <u>Counterparts, Captions, Entire Agreement</u>.    This Agreement may be executed in any number of counterparts.  The captions of the Sections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.  This Agreement represents the agreement of Debtor with respect to the subject matter hereof and there are no promises or representations by Debtor or Secured Party relative to the subject matter hereof not reflected herein.

IN WITNESS WHEREOF, the undersigned have executed or caused this Agreement to be duly executed as of the date first above set forth.

DEBTOR:
HAL LUFTIG COMPANY, INC.


By: _____
        Hal Luftig, President


SECURED PARTY:


_____
        Hal Luftig

8