Sheryl P. Giugliano
Michael S. Amato
Ruskin Moscou Faltischek, P.C.
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, New York 11556-0190
(516) 663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Attorneys for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:                                                              Chapter 11 (Subchapter V)


HAL LUFTIG COMPANY, INC.,

                                                                    Case No. 22-11617 (JPM)

                                   Debtor.

-----------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF
CONFIRMATION OF DEBTOR'S SMALL BUSINESS PLAN OF
<u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

## <u>TABLE OF CONTENTS</u>

                                                                                    **PAGE**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

I.      BACKGROUND ..................................................................................................... 3

        A.      Plan Solicitation and Notification Process ................................................... 3

II.     ARGUMENT ........................................................................................................... 4

        A.      This Court Has Authority to Approve the Narrowly
                Tailored Luftig Release, an Essential Part of the
                Plan Offered in Exchange for a Substantial Contribution ............................... 4

        B.      The Luftig Release is a Nonconsensual Third-Party Release
                of a Derivative Claim ....................................................................................... 5

        C.      This Court Has Subject Matter Jurisdiction Over the
                FCP Claim ......................................................................................................... 6

        D.      The Court Has a Statutory Authority to Approve the
                Luftig Release ................................................................................................... 8

        E.      The Second Circuit's Seven Factor Test to Impose
                Nonconsensual Third-Party Releases ............................................................. 10

                (1)     There is Identity of Interest Between the Debtor
                        and Mr. Luftig ................................................................................... 11

                (2)     The Claims Against the Debtor and Mr. Luftig are
                        Factually and Legally Intertwined ..................................................... 11

                (3)     The Scope of the Luftig Release is Narrow and
                        Appropriate ........................................................................................ 12

                (4)     The Luftig Release is Essential to the Reorganization ...................... 12

                (5)     Mr. Luftig is Providing a Substantial Contribution to

i

   the Debtor's Reorganization ...................................................13

 (6) Approval by Creditors.................................................................14

 (7) The Plan Provides for the Fair Payment of Enjoined
   Claims .........................................................................................14

F. Equity Weighs in Favor of Confirming the Plan with
 the Luftig Release ...............................................................................15

G. The Plan Satisfies Bankruptcy Code §1190.......................................17

H. The Plan Satisfies the Confirmation Requirements for a
 Nonconsensual Plan Under Bankruptcy Code §1191(b) ...................18

I. The Plan Satisfies the Applicable Provisions of
 Bankruptcy Code §1129(a) ...............................................................19

J. The Plan Satisfies the Classification Requirements of
 Bankruptcy Code § 1122 ...................................................................20

K. The Plan Complies with Bankruptcy Code §1123.............................21

L. The Plan Complies with Bankruptcy Code §1129(a)(2)....................23

M. The Plan Complies with Bankruptcy Code §1129(a)(3)....................23

N. The Plan Complies with Bankruptcy Code §1129(a)(4)....................24

O. The Plan Complies with Bankruptcy Code § 1129(a)(5)...................25

P. The Plan Complies with Bankruptcy Code §1129(a)(7)....................26

Q. The Plan Complies with Bankruptcy Code §1129(a)(9)....................27

R. The Plan Complies with Bankruptcy Code §1129(a)(11)..................27

S. Bankruptcy Code §§ 1129(a)(6), (8), (10), (12), (13),
 (14), (15), and (16) Are Inapplicable ................................................29

T.    The Plan Meets All of the Requirements Under Bankruptcy
Code § 1191(b) ................................................................................................... 29

III.    CONCLUSION ............................................................................................................ 29

## **TABLE OF AUTHORITIES**

**PAGE(S)**

CASES

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.),*
  528 F.3d 162 (2d Cir. 2008)..................................................................... 23

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434 (1999)............................................................................... 26

*Boston Post Rd. L.P. v. F.D.I.C. (In re Boston Post Rd., L.P.),*
  21 F.3d 477 (2d Cir. 1994)...................................................................... 20

*Ditech Holding Corp.,*
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ....................................................... 7

*Frito-Lay v. LTV Steel Co. (In re Chateaugay Corp.),*
  10 F.3d 944 (2d Cir. 1993)...................................................................... 20

*In re 500 Fifth Ave. Assocs.,*
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ..................................................... 20

*In re Adelphia Bus. Solutions, Inc.,*
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ....................................................... 28

*In re Aegean Marine Petroleum Network Inc.,*
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ....................................................... 16

*In re Bally Total Fitness of Greater N.Y., Inc., No.,*
  07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)................. 20

*In re Cellular Info. Sys., Inc.,*
  171 B.R. 926 (Bankr. S.D.N.Y. 1994) ....................................................... 24

*In re Dow Corning Corp),*
  280 F.3d 648 (6th Cir. 2002)............................................................. 10, 11

*In re Drexel Burnham Lambert Group, Inc.,*
  960 F.2d 285 (2d Cir. 1992)...................................................................... 9

*In re Drexel Burnham Lambert Grp., Inc.,*
  138 B.R. 714 (Bankr. S.D.N.Y. 1992) ................................................. 21, 25

*In re Granite Broadcasting Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007) ................................................ 23

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................................ 19, 25

*In re Koelbl*,
   751 F.2d 137 (2d Cir. 1984) .......................................................... 23

*In re LATAM Airlines Group S.A.*,
   2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ........................ 11

*In re Leslie Fay Cos.*,
   207 B.R. 764 (Bankr. S.D.N.Y. 1997) .......................................... 24, 28

*In re Lightsquared Inc.*,
   513 B.R. 56 (Bankr. S.D.N.Y. 2014) ................................................ 20

*In re Lionel LLC*,
   2008 WL 905928 (Bankr. S.D.N.Y. Mar. 31, 2008) .......................... 24

*In re Master Mortg. Inv. Fund*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994) .................................. 10, 11, 12

*In re Metromedia Fiber Network*,
   416 F.3d 136 (2d Cir. 2005) .............................................. 9, 10, 11

*In re One Times Square Assocs. Ltd. P'ship*,
   159 B.R. 695 (Bankr. S.D.N.Y. 1993) ............................................ 28

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006) .............................................. 24

*In re Pearl Res. LLC*,
   622 B.R. 236 (Bankr. S.D. Tex. 2020) ............................................ 18

*In re Purdue Pharma L.P.*,
   2023 WL 3700458 (2d Cir. May 30, 2023) ............................ *in passim*

*In re Samurai Martial Sports, Inc.*,
   644 B.R. 667 (Bankr. S.D. Tex. 2022) ............................................ 18

*In re Spiegel, Inc.*,
   No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) ........ 24

*In re Stearns Holdings, LLC,*
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) ................................................................. 6

*In re Texaco, Inc.,*
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................................. 19, 23

*In re WorldCom,*
    2003 WL 23861928 (Bankr. S.D.N.Y. 2003) ...................................................... 25

*Johns-Manville Corp.,*
    843 F.2d 636 (2d Cir. 1988) ............................................................................. 19

*Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC),*
    740 F.3d 81 (2d Cir. 2014) ................................................................................. 5

*Pub. Fin. Corp. v. Freeman,*
    *(In re Pub. Fin. Corp.),* 712 F.2d 219 (5th Cir. 1983) ....................................... 24

*Sabine Oil & Gas Corp.,*
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ................................................................. 7

*Stern v Marshall.*
    564 U.S. 462 (2011) .......................................................................................... 9

*Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.),*
    855 F.3d 84 (2d Cir. 2017) ................................................................................. 5

*United States v. Energy Resources Co., Inc.,*
    495 U.S. 545 (1990) ........................................................................................ 15

*United States v. Reorganized CF&I Fabricators, Inc.,*
    518 U.S. 213 (1996) ........................................................................................ 26

*Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.),*
    392 B.R. 541 (S.D.N.Y. 2008) .......................................................................... 20

*Winstar Holdings, LLC v. Blackstone Grp. L.P.,*
    2007 WL 4323003 .............................................................................................. 6

## STATUTES

11 U.S.C. § 1123(b)(3)(A) ....................................................................................... 5

11 U.S.C. § 1129 .............................................................................................. 1, 3

11 U.S.C. § 1129(a)(5)(A) ................................................................... 25

11 U.S.C. § 1190(1)-(2) ...................................................................... 17

11 U.S.C. § 1191 ........................................................................... 1, 3

11 U.S.C. § 1191(c) ...................................................................... 18, 19

11 U.S.C. § 1191(c)(3)(B) .................................................................. 19

Bankruptcy Code § 105(a) ................................................................. 2, 9

Bankruptcy Code § 507(a)(1) ............................................................... 27

Bankruptcy Code § 507(a)(2) .................................................. 21, 26, 27, 28

Bankruptcy Code § 507(a)(3) ...................................................... 21,26, 28

Bankruptcy Code § 507(a)(4) .......................................................... 21, 27

Bankruptcy Code § 507(a)(5) ............................................................... 27

Bankruptcy Code § 507(a)(6) ............................................................... 27

Bankruptcy Code § 507(a)(7) ............................................................... 27

Bankruptcy Code § 507(a)(8) ...................................................... 21, 27, 28

Bankruptcy Code § 1122  ......................................................... 19, 20, 21

Bankruptcy Code § 1123 .............................................................. 19, 20

Bankruptcy Code § 1123(a) ....................................................... 21, 22, 23

Bankruptcy Code § 1123(a)(1) .............................................................. 21

Bankruptcy Code § 1123(a)(2) .......................................................... 21, 22

Bankruptcy Code § 1123(a)(3) .............................................................. 22

Bankruptcy Code § 1123(a)(4) .............................................................. 22

Bankruptcy Code § 1123(a)(5) .............................................................. 22

Bankruptcy Code § 1123(a)(6) .............................................................. 22

Bankruptcy Code § 1123(a)(7) ............................................................ 22

Bankruptcy Code § 1123(a)(8) ............................................................ 22

Bankruptcy Code § 1123(b) ................................................................ 23

Bankruptcy Code § 1123(b)(6) .......................................................... 2, 9

Bankruptcy Code § 1126 ...................................................................... 3

Bankruptcy Code § 1129(a) ....................................... 18, 19, 27, 29

Bankruptcy Code § 1129(a)(1) ............................................................ 19

Bankruptcy Code § 1129(a)(2) ............................................................ 23

Bankruptcy Code § 1129(a)(3) ...................................................... 23, 24

Bankruptcy Code § 1129(a)(4) ...................................................... 25, 26

Bankruptcy Code § 1129(a)(5) ............................................................ 25

Bankruptcy Code § 1129(a)(6) ............................................................ 29

Bankruptcy Code § 1129(a)(7) ............................................................ ii, 26

Bankruptcy Code § 1129(a)(8) ............................................................ 29

Bankruptcy Code § 1129(a)(9) ...................................................... 26, 27

Bankruptcy Code § 1129(a)(11) ..................................................... 27, 29

Bankruptcy Code §1129(a)(12) ........................................................... 29

Bankruptcy Code § 1129(a)(13) ........................................................... 29

Bankruptcy Code § 1129(a)(14) ........................................................... 29

Bankruptcy Code § 1129(a)(15) ........................................................... 29

Bankruptcy Code § 1129(a)(16) ........................................................... 29

Bankruptcy Code §1190 ................................................................. 3, 17

Bankruptcy Code §1191(b)........................................................ 4, 18, 19, 29

Bankruptcy Code §1191(d)................................................................................................. 17

## OTHER AUTHORITIES

7 COLLIER ON BANKR., (16th ed. 2011) ......................................................................29

H.R. Rep. No. 95-595 ................................................................................................... 19

S. Rep. No. 95-989......................................................................................................... 19

Hal Luftig Company, Inc. (the "**Debtor**"), the above-captioned debtor and debtor in possession, respectfully submits this memorandum of law (the "**Memorandum**") in support of confirmation of the Debtor's *Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* dated March 1, 2023 (as amended, supplemented, or otherwise modified from time to time, the "**Plan**")[1] (ECF Doc. No. 55) pursuant to §§ 1129 and 1191 of title 11, United States Code (the "**Bankruptcy Code**").  In further support of confirmation of the Plan, the Debtor has also simultaneously filed the Declaration of Hal Luftig dated June 30, 2023 (the "**Luftig Declaration**"), and the Declaration of Brian Ryniker dated June 30, 2023 (the "**Ryniker Declaration**"), each of which are incorporated herein by reference.   In support of confirmation of the Plan, the Debtor respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

The Debtor seeks confirmation of the Plan which provides meaningful recoveries to creditors and ends the acrimonious litigation with FCP (including aggressive and disruptive judgment enforcement) which has burdened the Debtor and Hal Luftig for the last four (4) years.

The Debtor commenced this voluntary Subchapter V small business reorganization case after the District Court's entry of the Memorandum and Order granting FCP's motion to confirm the Arbitration Award.  On the first day of the Debtor's case, the Debtor asked this Court to extend the automatic stay to Mr. Luftig and enjoin FCP from any judgment enforcement efforts against Mr. Luftig allowing him to focus on the Debtor's reorganization. This Court recognized that Mr. Luftig is the lifeblood of the Debtor's business operations, and entered the Stay Order.  The Stay Order enjoins FCP from taking any actions against Mr. Luftig or his assets, allowing him to focus on the Debtor's reorganization and future projects stemming from legacy productions; and Mr.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan.

1

Luftig responded by dedicating the majority of hi time (approximately 60%) to the Debtor's reorganization – with his personal effort, time and money.

Mr. Luftig attended nearly every hearing in the case, having actively participated in weekly Zoom meetings with the Subchapter V Trustee, and worked with Debtor's employees, the Subchapter V Trustee and the Debtor's professionals to timely file monthly operating reports, provide weekly cash flow projections, and gather and digest the information required by the Debtor's financial advisor to calculate the Debtor's net disposable income and create a liquidation analysis which demonstrates that creditors will receive more under the Plan than in a hypothetical chapter 7 liquidation. Perhaps most importantly, under the Plan Mr. Luftig will make a substantial contribution of money and money's worth in exchange for the Luftig Release, which is significant and substantial in terms of the value of his assets and the amount being paid by the Debtor.

The Plan provides for, among other things: (i) the distribution of one hundred percent (100%) of the Debtor's projected future net disposable income over the next five (5) years, and (ii) that in exchange for the Luftig Release (a release from FCP to Mr. Luftig), Mr. Luftig will contribute $550,000.00 in cash, enter into an employment agreement with the Debtor for the life of the Plan, and to the extent required by the Court, back-stop the payments due to creditors. In exchange, the Plan provides a release to Mr. Luftig only with respect to claims (including the Judgment) held by FCP and its direct and indirect officers, members and affiliates.

In light of the recent seminal decision by the U.S. Court of Appeals for the Second Circuit in *In re Purdue Pharma L.P.,* 69 F.4th 45 (2d Cir. 2023), 2023 WL 3700458 (2d Cir. May 30, 2023) ("*Purdue*" all citations are to the Westlaw version), (a) this Court has the statutory authority under Bankruptcy Code §§ 105(a) and 1123(b)(6) to approve a plan containing a nonconsensual third-party release, and (b) the facts and circumstances of the Debtor's case and the terms of the

Plan satisfy the necessary requirements for this Court to exercise that authority in this case and approve the Plan with the Luftig Release.

Under the Plan, holders of Allowed General Unsecured Claims are projected to receive distributions over the life of the Plan of not less than 24% in the case of Class 4 General Unsecured Creditors, and 36% in the case of the Class 3 FCP Claim. This amount is greater than the recovery those claimants would receive in a hypothetical chapter 7 liquidation (11%).

The deadline for votes accepting or rejecting the Plan is July 5, 2023. Except for FCP, the Debtor believes that all or substantially all unsecured creditors will vote to accept the Plan.

Last, the Plan provides that the Debtor will pay in full: Administrative Expenses; Priority Claims (including Priority Tax Claims); and Allowed Secured Claims.

As demonstrated herein, the Plan satisfies the requirements for confirmation under Bankruptcy Code §§ 1190, 1191 and 1129 (as applicable), and is in the best interests of the Debtor's estate, creditors and all parties in interest. Accordingly, the Debtor respectfully requests that the Plan be confirmed.

## I.    BACKGROUND

The facts of this matter are set forth in the Plan, the Luftig Declaration, and Ryniker Declaration, each of which are incorporated herein by reference, and will not be repeated here but will be referred to below as appropriate.

### A.  Plan Solicitation and Notification Process

Pursuant to Bankruptcy Code §1126, only holders of claims in an impaired class (*i.e.* Classes 3 and 4) are entitled to vote on the Plan. 11 U.S.C. § 1126. The voting results will be reflected in a tabulation summary filed on or about July 6, 2023. The following table summarizes

the Classes of Claims and Interests under the Plan and whether holders of Allowed Claims and

Interests such Classes are entitled to vote to accept or rejected the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority (Non-Tax) Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Secured Claim | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | FCP Claim | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Insider Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

Because Class 3 (FCP) will reject the Plan, the Debtor seeks to confirm the Plan pursuant

to Bankruptcy Code §1191(b).  As demonstrated herein, and in the Luftig Declaration and the

Ryniker Declaration: (a) the Court should approve the Luftig Release because (i) the Court has the

statutory authority to do so, (ii) it is narrowly tailored, and is an essential part of the Plan, and (iii)

Mr. Luftig is offering an objectively substantial contribution; and (b) the Plan satisfies Bankruptcy

Code §1191(b), because it does not "discriminate unfairly, and is fair and equitable, with respect

to each class of claims . . . that is impaired under, and has not accepted, the [P]lan," and thus

satisfies the statutory requirements for confirmation and should be confirmed. 11 U.S.C. §1191(b).

## II.    ARGUMENT

The Luftig Release should be approved and the Plan should be confirmed, because they

satisfy the requirements under Chapter 11 of the Bankruptcy Code and applicable case law.

### A. This Court Has Authority to Approve the Narrowly Tailored Luftig Release, An Essential Part of the Plan Offered in Exchange for a Substantial Contribution

The Luftig Release is described in Article V of the Plan, provides as follows:

> Under the Plan and pursuant to the Confirmation Order, in
> consideration of and on account of the Luftig Contribution, the
> Back-stop Commitment, and the agreement to subordinate in right

4

of payment all of the Insider Claims in Class 5, Mr. Luftig shall receive the Luftig Release from the FCP Parties, and such release shall include all claims, judgments, causes of action held by the FCP Parties, their assigns and successors, against Mr. Luftig." Plan, Art. V.  The Luftig Release is contingent upon the following: "(i) the confirmation of the Plan; (ii) completion of all payments to FCP as required under the Plan; (iii) the delivery of the Luftig Contribution; (iv) execution of the Employment Agreement; (v) the provision of the Back-stop Commitment; and (vi) the subordination in right of payment of the Allowed Insider Claims.

Plan, Art. V.

## B. The Luftig Release is a Nonconsensual Third-Party Release of a Derivative Claim

Mr. Luftig is seeking a release from a derivative claim held by FCP against the Debtor and Mr. Luftig.  "[D]erivative claims are 'ones that arise from harm done to the estate and that seek relief against [the] third part[y] that pushed the debtor[s] into bankruptcy.'" *Id.* (quoting *Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC),* 740 F.3d 81, 89 n.9 (2d Cir. 2014) (*Madoff*); *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.),* 855 F.3d 84, 100-04 (2d Cir. 2017).

"[I]t is well-settled law that a bankruptcy court may approve not only third-party releases which are consensual, but also third-party releases of derivative claims because those claims really belong to the estate of the debtor." *Purdue*, *13 (noting derivative claims seek to recover from the bankruptcy estate indirectly on the basis of the debtor's conduct, as opposed to a non-debtor's conduct) (citing 11 U.S.C. §1123(b)(3)(A); *Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC),* 740 F.3d 81, 88 (2d Cir. 2014) (*Madoff*)).

The FCP Claim is derivative because it is based upon the Debtor's conduct. FCP's claims in the arbitration against Mr. Luftig individually were rejected by the arbitrator.[2] Only the claims asserted against the Debtor resulted in derivative claims against Mr. Luftig.

Even if the FCP Claim is determined to be a direct claim against Mr. Luftig, the Court can nevertheless exercise its authority and approve a nonconsensual third-party release of a direct claim where the debtor's conduct is "legally relevant." *See Purdue,* *14.  In light of the fact that the underlying claims resulting in the Final Award and the Judgement stem from the Debtor's conduct, not Mr. Luftig's, the Debtor's conduct is at the very least "legally relevant." *Id.*

### C. This Court Has Subject Matter Jurisdiction Over the FCP Claim

In order to approve a nonconsensual third-party release, a bankruptcy court must have subject matter jurisdiction over the released claims, which turns on whether the claims "might have any conceivable effect" on the bankruptcy estate. *In re Stearns Holdings, LLC,* 607 B.R. 781, 787 (Bankr. S.D.N.Y. 2019). *See also Purdue,* *14 ("A bankruptcy court's subject-matter jurisdiction under the Code is broad."). "A third-party claim has a 'conceivable effect' on the estate if the outcome could alter the debtor's rights, liabilities, options, or freedom of action and 'affect the handling and administration of the bankruptcy estate.'" *Id.* (quoting *Winstar Holdings, LLC v. Blackstone Grp. L.P.,* 2007 WL 4323003, at *1, n. 1 (S.D.N.Y. Dec. 10, 2007).

In *Purdue,* the Second Circuit held that a bankruptcy court has "related to" subject matter jurisdiction to approve a release of direct third-party claims as part of a plan because: (1) any civil proceedings asserted against the non-debtors might have had a conceivable impact on the *res* of the estate; (2) a pursuit of such third-party claims threatened to unravel the plan's intricate

---

[2] The sole claim asserted against Mr. Luftig was breach of fiduciary duty, which was rejected by the arbitrator.  FCP did not seek to pierce the Debtor's corporate veil or allege alter ego claims. Luftig Decl., ¶42, n.2.

settlements, to alter liabilities of the estate, and to change amounts available for distribution to

other creditors; (3) the claims had a high degree of interconnectedness with lawsuits against the

debtors and non-debtors; and (4) it was likely that the debtors' litigation of their indemnification,

contribution, and/or insurance obligations to the non-debtors who served as directors, officers, or

managers would burden estate assets. *Purdue*, *14-15.  *See also* *Ditech Holding Corp.*, 606 B.R.

544, 627 (Bankr. S.D.N.Y. 2019) (holding the claims to be released could have a conceivable

effect on the administration of the chapter 11 cases and assets, or the *res* of the estate, because

many of the released parties had indemnification rights against the debtors' estates); *Sabine Oil &*

*Gas Corp.*, 555 B.R. 180, 289 (Bankr. S.D.N.Y. 2016) (holding that the bankruptcy court had

jurisdiction over the challenged third-party releases and noting that "a contingent indemnification

obligation can be sufficient to satisfy the 'conceivable effect' test").

This Court has subject matter jurisdiction over the proposed released claims held by FCP.

If the Luftig Release is not approved, there will be a significant (not just conceivable) effect on the

administration of the Debtor's reorganization, including but not limited to the following: (i) Mr.

Luftig will not make the Luftig Contribution (resulting in a loss of $500,000 to FCP); (ii) the

Debtor's indemnification obligations to Mr. Luftig under its Bylaws and applicable New York

State law will be triggered and significantly decrease the amount available to creditors from the

Debtor's estate; (iii) Mr. Luftig will not settle the alleged preferential transfer against him creating

an opportunity for litigation, the need for conflicts' counsel, and the loss of $50,000.00 on the

Effective Date for zero litigation costs; and (iv) the Class 5 Insider Claims will no longer be

subordinated in right of payment entitling the holders of such Allowed Claims to participate in the

limited distribution to creditors.

Another significant consequence of the Court declining to approve the Luftig Release is the future expensive and protracted litigation with FCP that will continue, and the distraction it will cause for Mr. Luftig who is essential to the Debtor's successful reorganization. By way of example, at the beginning of the Debtor's case Mr. Luftig testified by declaration that he was in the midst of pursuing the opening of *Plaza Suite* (a highly-successful and profitable limited engagement featuring Matthew Broderick and Sarah Jessica Parker) in both London and Los Angeles. Once the Stay Order was entered, Mr. Luftig was free to continue working for the Debtor and its legacy projects without distraction. Recently, a press release was issued confirming the opening of *Plaza Suite* in London, which is due in large measure to Mr. Luftig's efforts by way of trips to London, meetings and fundraising. Luftig Decl., ¶¶7 and 44, Ex. D.

Mr. Luftig always has been and remains dedicated to ensuring the success of the Debtor, its legacy projects, and the proposed Plan. Mr. Luftig's ability to continue those efforts will be thwarted if he is distracted by judgment enforcement efforts by FCP, and his reputation in the industry as a fundraiser could be tarnished. Since the Plan was filed there were three incidents previewing how disruptive judgment enforcement proceedings and collection efforts could be to Mr. Luftig's and the Debtor's success: (a) one of Mr. Luftig's well-known business partners in the live theater industry was contacted by a member of the press inquiring about the status of the Debtor's case despite having no involvement whatsoever in the case; (b) an individual that has for years invested in Mr. Luftig's projects without question suddenly contacted Mr. Luftig and his counsel with concerns regarding FCP, the Judgment, and the stability of Mr. Luftig's future projects; and (c) a member of the press reached-out to Mr. Luftig to respond to comments made by FCP's principal (Warren Trepp) in an interview, and the preparation and response to that inquiry caused Mr. Luftig to miss several important meetings to select venues for the Debtor's legacy

8

projects.  These incidents could have been (and may have been) extremely damaging to Mr. Luftig's future ability to develop and raise funds for future projects.  Luftig Decl., ¶45.

In sum, this Court has subject matter jurisdiction to approve the Luftig Release.

### D.  The Court Has Statutory Authority to Approve the Luftig Release

Bankruptcy courts have constitutional authority to finally approve a third-party release which releases a "core" claim under *Stern v Marshall.* 564 U.S. 462, 471 (2011).  "*Stern* defines core claims as those stemming 'from the bankruptcy itself' or those which 'would necessarily be resolved in the claims allowance process.'" *Purdue* (quoting *Stern v. Marshall,* 564 U.S. at 499)).[3]

The FCP Claim is a "core" claim because it stems from the bankruptcy itself – it was allowed under the FCP Claim Stipulation and Order, is against the Debtor and Mr. Luftig, and FCP fully consented to this Court's adjudication of its claim.  Indeed, as of the Petition Date, a portion of FCP's general unsecured claim was unliquidated.

Also, bankruptcy courts in the Second Circuit maintain statutory authority to approve a plan containing a nonconsensual third-party release under Bankruptcy Code §§ 1123(b)(6) and 105(a). *See Purdue,* *16 ("[W]e now . . . conclude that § 1123(b)(6), with § 105(a), permit bankruptcy courts' imposition of third-party releases.").

The Second Circuit long has held that "[i]n bankruptcy cases, a [c]ourt may enjoin a creditor from suing a third party, provided the injunction plays an important part in the [d]ebtor's reorganization plan." *Purdue,* *17 (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 293 (2d Cir. 1992) (*Drexel*).  *See also In re Metromedia Fiber Network,* 416 F.3d 136, 141

---

[3] In *Purdue,* the Second Circuit held that the bankruptcy court lacked constitutional authority to finally approve the releases because the claims at issue were not "core" claims, but rather were "direct claims, arising under state law, against non-debtors held by third parties who ha[d] not sought to recover on those claims in bankruptcy, or otherwise consented to a bankruptcy court's adjudication of those claims." *Id*

(2d Cir. 2005) (*Metromedia*).  This authority is not limited to the mass tort or asbestos context. *See Purdue,* *18 ("[T]his Court's opinion in *Metromedia* flatly rejects a restrictive interpretation of the Bankruptcy Code by stating that third-party releases can be valid outside of the asbestos context.") (citing *Metromedia,* 416 F.3d at 141).

### E. The Second Circuit's Seven Factor Test to Impose Nonconsensual Third-Party Releases

The Second Circuit in *Purdue* seized an opportunity to clarify that bankruptcy courts in this Circuit may impose nonconsensual third-party releases of claims against non-debtors, and listed seven (7) non-exclusive factors for courts to consider.  *Purdue,* *19 – 20.

"*First* . . . whether there is an identity of interests between the debtors and released third parties . . . 'such that suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate.'" *Id.* (quoting *In re Dow Corning Corp),* 280 F.3d 648, 658 (6th Cir. 2002) (citing *In re Master Mortg. Inv. Fund,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)). This is intended to cover non-debtor releases of claims that "'would indirectly impact the debtor's reorganization by way of indemnity or contribution.'" *Id.* (quoting *Metromedia,* 416 F.3d at 142)).

"*Second* . . . whether claims against the debtor and non-debtor are factually and legally intertwined, including whether the debtors and the released parties share common defenses, insurance coverage, or levels of culpability." *Id,* *20.

"*Third* . . . whether the scope of the releases is appropriate." *Id.* ("[A] release is proper in scope when its 'breadth' is 'necessary to the [p]lan'") (citing *Metromedia,* 416 F.3d at 142).

"*Fourth* . . . whether the releases are essential to the organization . . . .  [I]t must be the case that, without the releases, 'there is little likelihood of [a plan's] success.'" *Purdue,* at *20 (quoting *Master Mortg. Inv. Fund,* 168 B.R. at 935).

10

"*Fifth* . . . whether the non-debtor contributed substantial assets to the reorganization." *Purdue,* at \*20 (citing *Metromedia,* 416 F.3d at 142-43; *Dow Corning,* 280 F.3d at 658; and *Master Mortg. Inv. Fund,* 168 B.R. at 935).  The "primary focus . . . is on the impact of the financial contribution" and not on whether the proposed releasee could contribute more.  *Purdue,* \*22 (rejecting argument from U.S. Trustee that if Sacklers declared bankruptcy "they would have had to dedicate substantially all of their net worth").  *See In re LATAM Airlines Group S.A.*, 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) (approving non-debtor releases as contributions were instrumental to debtors' ability to prosecute cases in manner that preserved value for estates).

"*Sixth* . . . [in the context of a settlement] whether the impacted class of creditors 'overwhelmingly' voted in support of the plan with the releases."  *Purdue,* at \*20 (citing *Master Mortg. Inv. Fund,* 168 B.R. at 935)).

"*Seventh* . . . whether the plan provides for the fair payment of enjoined claims."  *Purdue,* at \*20.  The focus should be on the fairness of the payment, rather than the amount, recognizing that "the amount of the payment does not necessarily indicate its fairness."  *Id.*

### (1) There is Identity of Interest Between the Debtor and Mr. Luftig

There is identity of interest between the Debtor and Mr. Luftig, its founder, sole shareholder and sole officer.  His personal efforts, relationships and reputation in the live theater industry are the bedrock of the Debtor's business, which all together is more than sufficient to constitute an identity of interests. *See Purdue*, \*21 (holding non-debtor directors and officers of the debtor, a closely held corporation, was enough to constitute a sufficient identity of interests because the non-debtors took a major role in corporate decision-making).

11

Further, as a result of the Debtor's indemnification obligations, as well as Mr. Luftig's essential role in the Debtor's business, any enforcement of the Judgment against Mr. Luftig will have significant adverse economic consequences for the Debtor's estate and its reorganization.

### (2) The Claims Against the Debtor and Mr. Luftig are Factually and Legally Intertwined

FCP's claim against Mr. Luftig is factually and legally intertwined with FCP's claim against the Debtor – they are based upon the Judgment. Any claims asserted by FCP against Mr. Luftig are premised upon the Debtor's conduct, and thus, there is factual and legal overlap between claims against the Debtor and Mr. Luftig by FCP.

### (3) The Scope of the Luftig Release is Narrow and Appropriate

The Luftig Release is narrowly tailored to the claims asserted by FCP against Mr. Luftig in the context of the Plan. As stated above, the Final Award granted damages to FCP based upon the Debtor's conduct, and found Mr. Luftig jointly and severally liable.[4] FCP actively participated in this Subchapter V reorganization, so it is aware of the relief sought and the consideration being offered. The Debtor and Mr. Luftig believe that the Luftig Contribution and the distributions to FCP throughout the life of the Plan are adequate compensation for resolving the FCP Claim as against the Debtor and Mr. Luftig.

### (4) The Luftig Release is Essential to the Reorganization

Absent approval of the Luftig Release, "there is little likelihood of [the P]lan's success." *See Id.* (quoting *Master Mortg. Inv. Fund*, 168 B.R. at 935). The Luftig Release is essential to the Plan's success, just as the Stay Order prevented significant adverse economic consequences for the Debtor and its estate. If the Luftig Release is not approved: (a) Mr. Luftig will not make the Luftig Contribution resulting in a significant loss for all creditors; (b) Mr. Luftig will incur

---

[4] Mr. Luftig appealed the District Court's confirmation of the Final Order, which appeal is pending.

significant cost and expense defending judgment enforcement efforts by FCP resulting in substantial indemnification claims against the estate; (c) Mr. Luftig will be unable to focus upon activities necessary for the success of the Debtor's legacy projects – *e.g.,* even with the Stay Order Mr. Luftig missed key meetings, and was forced to address investor concerns and press inquiries; and (d) the Appeal will continue.  *Purdue* at \*21-22 (finding releases are essential because they ensure that the valuation of the *res* is settled by avoiding indemnification litigation by non-debtors).

This particular conclusion is not based on the notion that Mr. Luftig's financial contribution to the Plan renders the Luftig Release essential.  *See Purdue,* \*22.  The Debtor is a closely-held business reliant upon Mr. Luftig's relationships and experience.  Mr Luftig is essential to the Plan, and he cannot dedicate himself to its success absent the Luftig Release.

### (5) Mr. Luftig is Providing a Substantial Contribution to the Debtor's Reorganization

Upon approval of the Luftig Release, Mr. Luftig will provide a substantial contribution which will have a significant impact on the Debtor's estate: (a) FCP will receive a larger distribution (by $500,000) than under any other scenario, including full judgment enforcement collection efforts against Mr. Luftig individually or his own personal bankruptcy filing;[5] (b) subordination in right of payment of Allowed Insider Claims; (c) the Employment Agreement pursuant to which Mr. Luftig will agree to a five-year period at a reduced salary (the duration of the Plan); (d) to the extent required, Mr. Luftig's agreement to the Back-stop Commitment; (e) settlement of the potential avoidance action against Mr. Luftig for a twenty percent (20%) recovery with zero litigation costs; (f) dismissal of the Appeal upon entry of a final and non-appealable

---

[5] Mr. Luftig does not have non-exempt assets sufficient to satisfy the FCP Claim.  The Luftig Cash Contribution will be drawn from exempt assets.  Luftig Decl., ¶54.

Confirmation Order; and (g) for the life of the Plan, Mr. Luftig will not charge the Debtor rent for the space utilized in his home in New York City.  Further, the $500,000 payment to FCP is readily available and can be made timely under the Plan.

The "primary focus" is on the impact of that contribution on the Debtor's estate – *i.e.,* not what Mr. Luftig can afford to pay. However, it is worth noting that Mr. Luftig is committing to use exempt assets to fund the Luftig Cash Contribution.  Mr. Luftig used his personal assets and leveraged his home that he shares with his husband to ensure the Debtor's survival during COVID, even foregoing a salary for a year.  Luftig Decl., ¶59.  Thus, although it is not the focus, the Luftig Contribution is certainly substantial in terms of what he can afford to pay.

### (6) Approval by Creditors

The Debtor expects that all creditors other than FCP and the U.S. Trustee are in favor of the Plan including the Luftig Release, and this case is factually distinguishable from *Purdue* in ways that are relevant to this factor. *Purdue,* *5 (proposed third-party release was "overwhelmingly accepted" by third-party mass tort claimants in a global settlement). The Luftig Release is a nonconsensual third-party release the Debtor seeks to impose on a single judgment creditor – not thousands of mass tort claimants, some of whom are terminally ill or representing future claimants – and FCP is unwilling to engage in meaningful settlement discussions. *Id.*

This Court should not be persuaded by FCP's objection to the Luftig Release, because it is not made in good faith.  Over the last four years, FCP has refused to engage in good faith settlement negotiations and proven it is not economically motivated, but seemingly is motivated by a deep-seeded personal animus.  FCP cannot reasonably believe that there is a more substantial recovery available pursuing Mr. Luftig individually.  A creditor acting reasonably and negotiating in good

faith would have utilized this opportunity to verify Mr. Luftig's financial position before rejecting

the Plan, and agreed to standard confidentiality provisions.

Last, this Court should not give any deference to the U.S. Trustee's likely objection which

stems from a policy position rather than a financial stake in the outcome. *Purdue,* *22.

### (7) The Plan Provides for the Fair Payment of Enjoined Claims

The Debtor submits that the proposed settlement of the FCP Claim is fair and equitable

because FCP will receive a distribution of thirty-seven percent (36%) on its Allowed Claim (over

$1 million), of which, approximately fifty percent (50%) will be paid on the Effective Date. The

allocation of the Cash Contribution is fair because FCP will receive one hundred percent (100%)

of the funds, without incurring significant legal fees or costs in connection with the Appeal or

collection efforts (FCP was separately classified in part to achieve the goal of allocating as much

as possible to its recovery).

Finally, a settlement is necessary for the Debtor to successfully reorganize. The estimated

value of unsecured claims in this case is approximately $4.2 million which far exceeds the total

funds available from the Debtor as well as Mr. Luftig's personal assets. Luftig Decl., ¶62.

### F. Equity Weighs in Favor of Confirming the Plan with the Luftig Release

In *Purdue,* the Second Circuit encouraged bankruptcy courts to consider application of the

facts of a particular case beyond the seven factor test, "against a backdrop of equity." *Purdue,* *21

(citing *United States v. Energy Resources Co., Inc.,* 495 U.S. 545, 549 (1990)).

Extreme and extraordinary circumstances exist here that support approval of the Luftig

Release, and demonstrate that the Luftig Release is essential and integral to the Debtor's

reorganization. There are several important facts which warrant the Court's exercise of its

equitable powers in this case, and sufficiently quash any allegation that the Luftig Release is even

remotely related to the type of nonconsensual third-party release denied by this Court in *In re Aegean Marine Petroleum Network Inc.* 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019).

First, as recognized in the Stay Order, Mr. Luftig is the lifeblood of the Debtor's business, and his relationships and reputation create valuable opportunities for the Debtor.

Second, FCP is the sole creditor subject to the Luftig Release.

Third, Mr. Luftig is offering to make a substantial contribution to the Plan from otherwise exempt assets in exchange for the Luftig Release.

Fourth, FCP will receive more under the Plan with the Luftig Release than it could hope to recover if the Luftig Release is not approved.[6]  Luftig Decl., ¶66. Although under *Purdue* the measure of whether a contribution is substantial is not with respect to the proposed releasee's personal assets, it is a key equitable consideration because Mr. Luftig's cash contribution is more than he would be required to pay FCP in a personal bankruptcy case. *Purdue,* *22.

Fifth, if the Luftig Release is not approved, Mr. Luftig's ability to focus on the Debtor's successful reorganization and emergence from chapter 11 will be jeopardized.  The Debtor requires Mr. Luftig's complete attention and focus to create value to enable the Debtor to make the payments due under the Plan.[7] If Mr. Luftig's personal bank accounts are frozen, his wages are

---

[6] Mr. Luftig attempted to share his personal financial information with FCP on a confidential basis to verify that his non-exempt personal assets are insufficient to make the Luftig Cash Contribution let alone satisfy the Judgment, but FCP refused to engage in any exchange of information with any confidentiality restrictions whatsoever.  A non-confidential exchange with FCP of Mr. Luftig's personal financial information is unacceptable in light of FCP's past behavior, the appearance of members of the Broadway press at the Debtor's hearings, and inquiries to the Debtor and Mr. Luftig regarding minute details of the Debtor's case Luftig Decl., ¶45.

[7] Contrary to FCP's allegations at the beginning of the case, Mr. Lufitg's attention is not distracted by ongoing non-debtor projects, and his potential earnings from those active non-debtor projects have proven to be significantly less than FCP suggested.  Indeed, the Debtor's financial advisors have confirmed that Mr. Luftig's interest over the life of the Plan in *Life of Pi* is worth $0, and Mr. Luftig's interest in *Here Lies Love* over time is worth $215,000 in the aggregate.

garnished, and subpoenas are served on his business partners (all measures FCP has stated it will take), his reputation in the industry as a trustworthy and reliable fundraiser will be ruined after decades of success.

In light of the foregoing, the Court should approve the Luftig Release as part of the Plan.

### G. The Plan Satisfies Bankruptcy Code §1190

The Plan satisfies the disclosure requirements of Bankruptcy Code §1190. 11 U.S.C. § 1190(1)-(2). First, Article I of the Plan provides a history of the Debtor and its business operations. Second, Article VII of the Plan references the Exhibits, including the updated Liquidation Analysis, and the updated Disposable Income Analysis.  Ryniker Decl., ¶8, Exs. A-1, B-1.

Holders of Allowed Claims in Classes 3 and 4 are projected to receive distributions far in excess of the estimated distribution in a hypothetical chapter 7 liquidation. The Liquidation Analysis shows that in a liquidation scenario creditors will receive an 11% distribution on account of Allowed Claims.  The Disposable Income Analysis provides that under the Plan (if the Luftig Release is approved) FCP (Class 3) is projected to receive an immediate distribution of $500,000 on the Effective Date and in the aggregate 36% of its Allowed Claim over the life of the Plan (including that initial payment), and Holders of Allowed Class 4 Claims are projected to receive an amount equal to 24% of their Allowed Claims.  Ryniker Decl. ¶17, Ex. A-1.

Third, Article III of the Plan provides that the Debtor will fund the payments under the Plan with Disposable Income over a period of five (5) years, plus the Luftig Cash Contribution (if the Luftig Release is approved). "Disposable Income" is defined as "the meaning given to it in Bankruptcy Code §1191(d), as calculated and projected by RKC and set forth in the Plan Supplement."  Plan, Art. VIII. The Disposable Income Analysis provides sufficient evidence of

the Debtor's ability to make the projected payments under the Plan; thus, satisfying the feasibility requirement.  Ryniker Decl., ¶¶15-17.

Thus, the Plan satisfies Bankruptcy Code §1190 and should be confirmed.

### H. The Plan Satisfies the Confirmation Requirements for a Nonconsensual Plan Under Bankruptcy Code §1191(b)

Under Bankruptcy Code § 1191(b), a Subchapter V plan can be confirmed or "crammed down" notwithstanding the rejection of the plan by an impaired class of creditors, if: (i) all of the applicable requirements of section 1129(a), other than subsections 1129(a)(8), (10), and (15) are satisfied, and (ii) "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. §1191(b).  *See In re Samurai Martial Sports, Inc.,* 644 B.R. 667 (Bankr. S.D. Tex. 2022) (noting debtor may "cramdown" a plan under Section 1191(b)).

The "fair and equitable" requirement in Section 1191(b) requires under Section 1191(c) that (1) as of the effective date of the plan, such plan includes the debtor's contribution of all of its projected disposable income over the life of the plan (three to five years), and (2) either the debtor will make all payments under the plan or, if there is a "reasonable likelihood" that the debtor will able to do so, then the plan provides for "appropriate remedies." 11 U.S.C. §1191(c).

"The feasibility requirement for confirmation under §1191(c) requires a showing that the debtor can realistically carry out its plan." *In re Samurai Martial Sports, Inc.,* 644 B.R. 667, 699 (Bankr. S.D. Tex. 2022) (citing *In re Pearl Res. LLC,* 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020)). "Though a guarantee of success is not required, the court should be satisfied that the reorganized debtor can stand on its own two feet." *Id.*

18

Here, the Plan is "fair and equitable" with respect to Class 3 (FCP), because: (1) as of the Effective Date, the Debtor is contributing all of its Disposable Income to fund the Plan; and (2) the Debtor will make all payments under the Plan.  Ryniker Decl. ¶14.

The Plan is feasible under Section 1191(c) as set forth in the Ryniker Declaration and supported by the Disposable Income Analysis.  *See* Ryniker Decl. ¶14 (confirming working capital needs and deferred compensation for Mr. Luftig will allow for payments under the life of the Plan).

Based on the Ryniker Declaration, there is more than a reasonable likelihood that the Debtor will be able to make the payments under the Plan, and therefore the Debtor submits that the Back-stop Commitment is unnecessary.  In the event the Court finds under Section 1191(c)(3)(B) that there is only a "reasonable likelihood" that the Debtor will be able to make the payments under the Plan, the Plan provides for "appropriate remedies" in the form of the Back-stop Commitment.  *See* Plan, Art. VIII.

## I.    The Plan Satisfies the Applicable Provisions of Bankruptcy Code §1129(a)

As required by Bankruptcy Code §1191(b), the Plan satisfies Section 1129(a)(1), which requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]" - notably, those governing classification of claims and interests and the contents of a plan. 11 U.S.C. § 1129(a)(1). The legislative history of Bankruptcy Code § 1129(a)(1) explains that this provision encompasses the requirements of Bankruptcy Code §§ 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986); *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Texaco, Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988).

19

Here, the Plan complies with all of the applicable provisions of the Bankruptcy Code, including Sections 1122 and 1123 and, therefore, it should be confirmed.

### J. The Plan Satisfies the Classification Requirements of Bankruptcy Code § 1122

Under Bankruptcy Code § 1122, claims or interests within each class must be "substantially similar" to the other claims or interests in the class. 11 U.S.C. § 1122; *see In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the . . . Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification.") (collecting cases); *see also Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 556 (S.D.N.Y. 2008) ("[A] plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.") (internal citation omitted). Such claims may be placed in separate classes, provided a rational basis exists for doing so. *See Boston Post Rd. L.P. v. F.D.I.C. (In re Boston Post Rd., L.P.)*, 21 F.3d 477, 483 (2d Cir. 1994); *Frito-Lay v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956-57 (2d Cir. 1993); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993), *aff'd*, Case No. 93-844, 1993 WL 316183 (S.D.N.Y. May 21, 1993).

Courts in this District have identified several grounds justifying the separate classification of claims, including: (a) where members of a class possess different legal rights; and (b) where the debtor has good business reasons for separate classification. *See In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996); *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL

2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) (same); *In re Drexel Burnham Lambert Grp., Inc.* (*Drexel I*), 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992), aff'd, 140 B.R. 347 (S.D.N.Y. 1992.

As set forth in Article II of the Plan, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the others within such Class. Plan Art. II.  The Plan provides for the following Classes of Claims and Interests: (i) Class 1 consists of priority claims under Bankruptcy Code § 507(a)(4); (ii) Class 2 Secured Claims consists of the Allowed Secured Claim of the SBA; (iii) Class 3 consists of the Allowed FCP Claim; (iv) Class 4 consists of the Allowed Claims of non-priority unsecured creditors, other than the FCP Allowed Claim; (v) Class 5 consists of the Insider Claims; and (vi) Class 6 consists of Interests.

Each of the six Classes are dissimilar and therefore are properly classified separately under the Plan. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  The Debtor separately classified FCP from General Unsecured Claims because: (i) FCP holds a final judgment against the Debtor and Mr. Luftig, jointly and severally, which could result in a significant indemnification claim against the estate; and (ii) the Debtor is seeking approval of the Luftig Release.

The Debtor submits the Plan complies with Section 1122 and should be confirmed.

### K.  The Plan Complies with Bankruptcy Code § 1123

The Plan complies with the applicable provisions of Bankruptcy Code §1123(a).

Pursuant to Bankruptcy Code §1123(a)(1), a plan must designate classes for all claims and interests, other than the types of claims specified in Sections 507(a)(2), 507(a)(3) and 507(a)(8). 11 U.S.C. § 1123(a)(1). Article II of the Plan expressly classifies all Claims and Interests against the Debtor, other than Administrative Claims and Priority Tax Claims, which are unclassified.

Bankruptcy Code §1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Article II of the Plan identifies as unimpaired Classes 1, 2 and 6. Accordingly, Bankruptcy Code § 1123(a)(2) is satisfied.

Bankruptcy Code §1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. §1123(a)(3). Article II of the Plan specifies the treatment of Classes 3 and 4, which are the only impaired Classes under the Plan.

Bankruptcy Code §1123(a)(4) requires that a plan provide that each claim or interest in a particular class receive the same treatment as other members of the same class. 11 U.S.C. § 1123(a)(4). Article II of the Plan satisfies this requirement by providing that each Claim or Interest that is classified in a particular Class under the Plan will receive the same treatment as the other Claims and Interests included in such Class.

Bankruptcy Code §1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth examples of typical means for implementing a plan. 11 U.S.C. § 1123(a)(5). As set forth in Article III of the Plan titled "Implementation of the Plan," the Plan will be funded with the Debtor's Disposable Income, the Luftig Cash Contribution (if the Luftig Release is approved), the Luftig Settlement Payment, and to the extent necessary, the Back-stop Commitment. The Luftig Contribution is conditioned upon approval of the Luftig Release, and if approved, will be made within ten (10) days after entry of the Final Confirmation Order. The Plan also provides for the procedures governing Allowed Claims and related Distributions. Based on the foregoing, the Plan complies with the requirements of Bankruptcy Code §1123(a)(5).

The Plan does not seek to appoint any new officer, director, or trustee, and Mr. Luftig will continue to serve as President. As such, the Plan complies with Bankruptcy Code §1123(a)(7).

Bankruptcy Code §§ 1123(a)(6) and (8) are inapplicable in this case.

In addition to the provisions required by Bankruptcy Code §1123(a), the Plan also contains discretionary provisions permitted by section 1123(b). Among other things, the Plan provides for the: (a) impairment of certain Claims; (b) settlement of various claims and controversies; and (c) release, injunction and/or exculpation of certain parties. See Plan Art. V. Each of these provisions of the Plan is consistent with Bankruptcy Code §1123(b) and permissible under applicable law.

### L.  The Plan Complies with Bankruptcy Code § 1129(a)(2)

Bankruptcy Code § 1129(a)(2) requires that the proponent of a plan "compl[y] with the applicable provisions" of the Bankruptcy Code, which is generally intended to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code governing the solicitation of acceptances of a plan. *See In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988).

In accordance with the Plan Scheduling Order, the Debtor: (a) served copies of the Plan to holders of Claims and Interests; (b) provided holders of Claims and Interests, as applicable, with notice of the Confirmation Hearing, Voting Deadline and Plan Objection Deadline; and (c) provided ballots for claimholders entitled to vote. In addition, pursuant to the Plan Scheduling Order, the Debtor will tabulate the ballots submitted by creditors and timely file its Plan Tabulation Summary. The Debtor submits Bankruptcy Code §1129(a)(2) has been satisfied.

### M. The Plan Complies with Bankruptcy Code § 1129(a)(3)

Bankruptcy Code § 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Courts in the Second Circuit have found that the good faith standard requires "a showing that the plan was proposed with honesty, good intentions and with a basis for expecting that a reorganization can be effected." *In re Granite Broadcasting Corp.*, 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007) (internal citation omitted); *see Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008) (citing *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984));

*Manville*, 843 F.2d at 649 (quoting *In re Koelbl*, 751 F.2d at 139); *see also, In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("[A] plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code") (internal quotations omitted).

Additionally, good faith is to be determined "in light of the totality of the circumstances surrounding" formulation of the plan. *Pub. Fin. Corp. v. Freeman (In re Pub. Fin. Corp.)*, 712 F.2d 219, 221 (5th Cir. 1983); *see In re Oneida Ltd.*, 351 B.R. 79, 85 (Bankr. S.D.N.Y. 2006) ("Good faith should be evaluated 'in light of the totality of the circumstances surrounding confirmation.'") (citing *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994)); *see also In re Lionel LLC*, 2008 WL 905928, at *6 (Bankr. S.D.N.Y. Mar. 31, 2008) (looking to the totality of the circumstances in order to determine a plan was proposed in good faith under section 1129(a)(3)); *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *6 (Bankr. S.D.N.Y. May 25, 2005) (stating that determination of "good faith" under section 1129(a)(3) of the Bankruptcy Code was made after "examin[ing] the totality of the circumstances surrounding the filing of the chapter 11 cases and the formulation of the plan.").

The objective of the Debtor in filing this Subchapter V case was to propose a chapter 11 plan which provides meaningful and fair distributions to creditors, allows for the successful reorganization of an entity in an industry plagued by low attendance during and post COVID, and finally resolves the FCP litigation. The Plan provides for the fair allocation of the Debtor's assets and meaningful recoveries to creditors consistent with the requirements of the Bankruptcy Code and other applicable law. The Plan formulation process was conducted in good faith with all participants in that process (except the Subchapter V Trustee) represented by experienced and competent counsel. Accordingly, the Plan satisfies Bankruptcy Code § 1129(a)(3).

24

### N. The Plan Complies with Bankruptcy Code § 1129(a)(4)

Bankruptcy Code §1129(a)(4) requires that payments "for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case," be approved by the Court as reasonable. 11 U.S.C. § 1129(a)(4). *See In re WorldCom*, 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. 2003) ("Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court.") (citing *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992)); *see also In re Johns-Manville Corp.*, 68 B.R. at 632.

Pursuant to Articles II and VIII of the Plan, each estate professional must file and serve a properly noticed fee application and, only fees allowed by the Bankruptcy Court will be paid.  The Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtor for retained professionals satisfies the objectives of Bankruptcy Code § 1129(a)(4).

### O. The Plan Complies with Bankruptcy Code § 1129(a)(5)

Bankruptcy Code §1129(a)(5) requires a plan proponent to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor, or a successor to the debtor, under the plan. See 11 U.S.C. § 1129(a)(5)(A). Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and/or directors be consistent with the interests of creditors and equity security holders and with public policy. 11 U.S.C. §1129(a)(5)(A)(ii). Finally, section 1129(a)(5)(B) requires the plan proponent to disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

Mr. Luftig will continue to serve as President of the Debtor after Confirmation of the Plan. *See* Plan, Art. III.   If the Luftig Release is approved, Mr. Luftig will serve pursuant to the terms of the Employment Agreement, and his proposed compensation (set forth therein) is further

reduced from prior to the Petition Date.  As noted in the Ryniker Declaration, Mr. Luftig agreed to defer a portion of his compensation over the life of the Plan.  Ryniker Decl. ¶14.  There are no other officers or directors of the Debtor, and there are no other insiders that will be employed or retained by the reorganized Debtor.  Accordingly, the Plan satisfies Bankruptcy Code § 1129(a)(4).

**P.   The Plan Complies with Bankruptcy Code §1129(a)(7)**

Bankruptcy Code §1129(a)(7) requires that, with respect to each class of impaired claims or interests under a plan, every holder of a claim or interest in such impaired class either: (i) accept the plan, or (ii) receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7). This is often referred to as the "best interests test." Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated [under chapter 7 of the Bankruptcy Code]." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999); *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996).

The Debtor has put forth affirmative evidence establishing that general unsecured creditors (Classes 3 and 4) will fare better under the Plan than in a chapter 7 liquidation. The Liquidation Analysis demonstrates that holders of Classes 3 and 4 are projected to receive under the Plan distributions equal to at least 36% and 24%, respectively, of their Allowed Claims, which is greater than the distribution they would expect to receive in a hypothetical chapter 7 liquidation of approximately 11%. Ryniker Decl., Ex. A-1. The Plan satisfies the best interest of creditors test.

### Q.  The Plan Complies with Bankruptcy Code §1129(a)(9)

Bankruptcy Code §1129(a)(9) provides that, unless the holder of a claim has agreed to a different treatment, then: (A) the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash equal to the allowed amount of its claim on the effective date of the plan; (B) the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6), or (7) must receive either cash in the allowed amount of such claim on the effective date of the plan or deferred cash payments of a value, as of the effective date, equal to the allowed amounts of such claim; and (C) the holder of a tax claim entitled to priority under section 507(a)(8) must receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of a plan, equal to the allowed amount of such claim. 11 U.S.C. § 1129(a)(9).

The Plan and its proposed treatment of Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims satisfy the requirements of Section 1129(a)(9). The Plan provides that all Allowed Administrative Expenses will be paid in full on the Effective Date or as soon as practicable thereafter once the Administrative Expense is allowed by the Court. *See* Plan, Art. II. The only Priority Tax Claim is the claim of the Internal Revenue Service in the amount of $3,452.99, and it shall be paid promptly after the Effective Date.  Plan, Art. II. Class 1 consists of a Priority wage Claim under Bankruptcy Code §507(a)(4) in the amount of $13,650.00, and shall be paid promptly after the Effective Date. The Debtor submits that the Plan satisfies Bankruptcy Code § 1129(a)(9).

### R.  The Plan Complies with Bankruptcy Code §1129(a)(11)

Bankruptcy Code § 1129(a)(11) requires that the Bankruptcy Court find that the Plan is feasible, as a condition precedent to confirmation. 11 U.S.C. § 1129(a)(11). To demonstrate that a

plan is feasible, it is not necessary that success be guaranteed. *See Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success."). "In making determinations as to feasibility . . . a bankruptcy court does not need to know to a certainty or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success.*" In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003); *see In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) (same); *see also Leslie Fay Cos.*, 207 B.R. at 788- 89 (same).

There are two important aspects of a feasibility analysis. The first aspect considers whether the debtor will have sufficient cash on hand on the effective date to pay all the claims and expenses which are entitled to be paid on such date. This aspect of feasibility is satisfied as demonstrated by the Disposable Income Analysis.  Ryniker Decl. ¶14. The Debtor's payment obligations on or immediately following the Effective Date are as follows: (a) Allowed Administrative Claims estimated to require approximately $211,800, subject to Bankruptcy Court approval; (b) Allowed Priority Tax Claims estimated to require approximately $3,452.99 (which may be paid sooner in the ordinary course); (c) Allowed Priority Non-Tax Claims estimated to require approximately, $13,650.00; (d) Allowed Secured Claims in accordance with the pre-Petition Date agreement between the SBA and the Debtor in connection with the EIDL, estimated to require approximately $2,205; and (e) to the extent the Luftig Release is approved, $500,000 to FCP.

The second aspect of feasibility considers whether the Debtor will have sufficient cash under the Plan to make the required Plan payments. As set forth in the Disposable Income Analysis and the Ryniker Declaration, the Debtor anticipates having sufficient funds to make distributions equaling at least 36% to FCP (Class 3) and 24% to holders of Allowed General Unsecured Claims in Class 4.  Ryniker Decl., Ex. B-1. The Plan will be funded from Disposable Income (over the

life of the Plan, $550,000) and the Luftig Contribution (if the Luftig Release is approved, $550,000). The Debtor will have sufficient proceeds to meet its various obligations under the Plan on or after the Effective Date. Ryniker Decl., Ex. B-1.

Based upon all of the foregoing, the Debtor submits the feasibility requirements of Bankruptcy Code §1129(a)(11) are satisfied.

### S. Bankruptcy Code §§ 1129(a)(6), (8), (10), (12), (13), (14), (15), and (16) Are Inapplicable

Bankruptcy Code §§ 1129(a)(6), (8), (10), (12), (13), (14), (15), and (16)[8] are inapplicable.

### T. The Plan Meets All of the Requirements Under Bankruptcy Code § 1191(b)

The Plan satisfies applicable provisions of Bankruptcy Code § 1129(a), and thus, the Plan satisfies the "cram down" provisions of section 1191(b).

## III.    CONCLUSION

The Debtor seeks confirmation of the Plan which provides meaningful recoveries to creditors, including FCP.  In light of the Second Circuit's ruling in *Purdue*, and the compelling facts and circumstances of this case, the Court should, and has the authority, to approve the Luftig Release.  The Luftig Release should be approved because (a) Mr. Luftig is clearly committed and integral to the success of the Debtor and the Plan, (b) the Luftig Release is narrowly tailored in scope, and (c) the Luftig Contribution is substantial. Finally, this Memorandum demonstrates that

---

[8] Bankruptcy Code §1129(a)(16) requires that transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. While a "plausible reading can be put forward that the provision seems to apply to all transfers, and then imposes on all such transfer the same restrictions place on transfers by nonprofit entities, Congress was clear that this provision was meant to 'restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust.'" 7 COLLIER ON BANKR., ¶ 1129.02 (16th ed. 2011). "It keeps in place the state law restrictions on such nonprofit entities and buttresses this rule by giving standing to state attorneys general to raise this issue." *Id*. This Section is inapplicable as the Plan calls for no such transfers.

the Plan satisfies all necessary statutory requirements for confirmation.

**WHEREFORE,** for the reasons set forth above the Debtor respectfully requests that this Court:

    i.       enter an order confirming the Plan including the Luftig Release;

   ii.       overrule any objections to the Plan; and

  iii.       grant the Debtor such other and further relief as is just and proper.

Dated: Uniondale, New York
       June 30, 2023

RUSKIN MOSCOU FALTISCHEK, P.C.
*Attorneys for Debtor in Possession Hal Luftig Company, Inc.*

By:    /s *Sheryl Giugliano*
         Sheryl P. Giugliano
         Michael S. Amato
         1425 RXR Plaza
         East Tower, 15th Floor
         Uniondale, NY 11556-1425
         (516) 663-6600