**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

HAL LUFTIG COMPANY, INC.,

                                    Debtor.
-------------------------------------------------------------x

Chapter 11 (Subchapter V)

Case No. 22-11617 (JPM)

**DECLARATION OF HAL LUFTIG**
**IN SUPPORT OF CONFIRMATION OF DEBTOR'S**
**SMALL BUSINESS PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE (ECF DOC. NO. 55)**

Pursuant to 28 U.S.C. § 1746, I, Hal Luftig, declare as follows under penalty of perjury:

1.       I am the President and sole shareholder of Hal Luftig Company, Inc. (the "**Debtor**").  In that capacity, I am familiar with the Debtor's day-to-day operations, business, and financial affairs, as well as the Debtor's Subchapter V reorganization case.

2.       I respectfully submit this declaration (the "**Declaration**") in support of confirmation of the Debtor's *Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* dated March 1, 2023 (ECF Doc. No. 55) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**")[1] pursuant to §§ 1129 and 1191 of title 11, United States Code (the "**Bankruptcy Code**").

3.       Annexed hereto as **Exhibit "A"** is a true and correct copy of the Debtor's *Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 55).

4.       Attached hereto as **Exhibit "B"** is a true and correct copy of the Debtor's *Notice of Filing of Plan Supplement with Exhibits* (ECF Doc. No. 63).

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

5.      Attached hereto as **Exhibit "C"** is a true and correct copy of the proposed Employment Agreement.

6.      Attached hereto as **Exhibit "D"** is a true and correct copy of a press release announcing the opening of *Plaza Suite* in London's West End Theater.

7.      Attached hereto as **Exhibit "E"** is a true and correct copy of the *Declaration of Hal Luftig Under Local Rule 1007-2 in Connection with Chapter 11 Filing and Local Rule 9077-1 in Support of Certain First Day Motions* (ECF Doc. No. 5) together with all Exhibits annexed thereto.

8.      Attached hereto as **Exhibit "F"** is a true and correct copy of the *Supplemental Declaration of Hal Luftig* (Adv. Pro. No. 22-01176 (JPM), ECF Doc. No. 16) together with all Exhibits annexed thereto.

9.      Attached hereto as **Exhibit "G"** is a true and correct copy of the Stay Order (Adv. Pro. No. 22-01176 (JPM), ECF Doc. No. 23).

10.     Attached hereto as **Exhibit "H"** is a true and correct copy of the Interim Award.

11.     Attached hereto as **Exhibit "I"** is a true and correct copy of the Final Award.

12.     The Debtor seeks confirmation of the Plan which provides meaningful recoveries to the Debtor's creditors, and ends the acrimonious litigation with FCP (including likely aggressive and disruptive judgment enforcement) which has burdened the Debtor and me, its sole owner, for the last four (4) years.

13.     The Debtor commenced this voluntary Subchapter V small business reorganization case in direct response to the District Court's entry of the Memorandum and Order granting FCP's motion to confirm the Arbitration Award.  On the first day of the Debtor's case, the Debtor asked this Court to extend the automatic stay to me and enjoin FCP from any judgment enforcement

efforts against me, permitting me to focus on the Debtor's reorganization. This Court recognized that I am the lifeblood of the Debtor's business operations, and entered the Stay Order.

14.     The Stay Order enjoins FCP from taking any actions against me or my assets, allowing me to focus on the Debtor's reorganization and future projects stemming from legacy productions; and I have responded by dedicating the majority of my time (approximately sixty percent (60%)) and resources to the Debtor's legacy projects, and meaningfully participating in the Debtor's reorganization.

15.     I have attended nearly every hearing in the case, having actively participated in weekly Zoom meetings with the Subchapter V Trustee, and worked with Debtor's employees, the Subchapter V Trustee and the Debtor's professionals to timely file monthly operating reports, provide weekly cash flow projections, and gather and digest the information required by the Debtor's financial advisor to calculate the Debtor's net disposable income and create a liquidation analysis which demonstrates that creditors will receive more under the Plan than in a hypothetical chapter 7 liquidation.

16.     Under the Plan, I will make a significant contribution of money and money's worth in exchange for the Luftig Release which is significant and substantial in terms of the value of my personal assets and in terms of the amount being paid under the Plan by the Debtor.

**Bankruptcy Case Generally**

17.     On December 1, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court and elected to proceed under Subchapter V of the Bankruptcy Code as  a small business reorganization.

18.     On December 1, 2022, the Office of the U.S. Trustee for Region 2 appointed Charles N. Persing, CPA as the subchapter V trustee (the "**Subchapter V Trustee**"). No official committee of unsecured creditors or other statutory committee was appointed in the Debtor's case.

19.     On January 4, 2023, the Court entered an Order (ECF Doc. No. 33) authorizing the Debtor to retain and employ Ruskin Moscou Faltischek, P.C. as its counsel as of the Petition Date.

20.     On January 20, 2023, the Court entered the Amended Order (ECF Doc. No. 44) establishing February 27, 2023 as the deadline to file proofs of claim against the estate.

21.     On January 26, 2023, the Court entered an Order (ECF Doc. No. 46) authorizing the Debtor to retain and employ RK Consultants LLC as its financial advisor in order to: (a) draft a liquidation analysis for the Plan; (b) calculate the Debtor's net disposable income and financial projections for the Plan; and (c) estimate the unliquidated portion of FCP's claim.

22.     The Debtor timely filed Monthly Operating Reports during the case (ECF Doc. Nos. 41, 48, 62, 66, 77, and 83).

**Extension of the Automatic Stay**

23.     On December 1, 2022, the Debtor commenced an adversary proceeding (Adv. Pro. No. 22-01176 (JPM)) against FCP and filed an emergency motion (Adv. Pro. ECF Doc. Nos. 1, 3, 4) seeking entry of an order: (i)  extending the automatic stay under  Bankruptcy Code §362 to me, (ii) granting a temporary restraining order and preliminary injunction precluding FCP from any and all efforts and actions to enforce the Arbitration Award or any judgment, and (iii) scheduling an emergency hearing to consider the Debtor's request.  FCP opposed the Debtor's request (Adv. Pro. ECF Doc. Nos. 11 and 12), and the Debtor filed a reply brief and Supplemental Declaration by Mr. Luftig (Adv. Pro. ECF Doc. Nos. 15 and 16).

24.     On January 5, 2023, after a hearing and further briefing (Adv. Pro. ECF Doc. Nos. 19 and 20), the Court entered the *Memorandum Opinion and Order* (Adv. Pro. ECF Doc. No. 22) (the "**Stay Order**") granting the Debtor's motion to extend the automatic stay to me.

**Estimation of FCP's Claim**

25.     On February 16, 2023, the Debtor filed a motion (ECF Doc. No. 49) seeking entry of an order under Bankruptcy Code §502(c) authorizing estimation of the unliquidated portion of FCP's Claim, and establishing a schedule for estimation proceedings.  On March 10, 2023, the Court entered an Order (ECF Doc. No. 59) establishing estimation procedures, and scheduling a hearing for March 24, 2023.

26.     On March 10, 2023, the Debtor shared with FCP the Debtor's financial advisor's estimation of the unliquidated portion of FCP's claim, and the related supporting materials and information.  FCP agreed with the Debtor's estimation of the unliquidated portion of FCP's claim.

27.     On May 31, 2023, the Court entered and approved the *Stipulation and Order Allowing Unsecured Claim of FCP Entertainment Partners, LLC* (ECF Doc. No. 81) (the "**FCP Claim Stipulation and Order**") resolving the issues relating to the unliquidated portion of FCP's claim, granting FCP an allowed general unsecured claim against the Debtor's estate in the total aggregate amount of $2,862,776.00, confirming that the parties would not proceed with the remaining estimation procedures, and cancelling the hearing.

**My Proofs of Claim**

28.     On December 5, 2022, I flied an unliquidated proof of claim (P.O.C. No. 2) asserting a general unsecured claim against the Debtor's estate arising from the Debtor's obligation to indemnify me for certain liabilities related to my position as President and sole shareholder of

the Debtor. The basis for the indemnification claim is the Debtor's Bylaws and Section 722(a) of New York Business Corporation Law.

29.    On February 25, 2023, I filed a second proof of claim (P.O.C. No. 7) asserting a general unsecured claim in an unknown amount against the Debtor's estate arising from additional amounts owed to me by the Debtor for deferred and unpaid compensation for the period January 1, 2020 through the Petition Date.

**The Plan**

30.    On March 1, 2023, the Debtor timely filed the Plan. Under the Plan, holders of the Class 3 FCP Claim and holders of Allowed Class 4 General Unsecured Claims are the only claimholders entitled to vote on the Plan.

31.    The Luftig Release is described in Article V of the Plan, provides as follows:

> Under the Plan and pursuant to the Confirmation Order, in consideration of and on account of the Luftig Contribution, the Back-stop Commitment, and the agreement to subordinate in right of payment all of the Insider Claims in Class 5, Mr. Luftig shall receive the Luftig Release from the FCP Parties, and such release shall include all claims, judgments, causes of action held by the FCP Parties, their assigns and successors, against Mr. Luftig." Plan, Art. V.    The Luftig Release is contingent upon the following: "(i) the confirmation of the Plan; (ii) completion of all payments to FCP as required under the Plan; (iii) the delivery of the Luftig Contribution; (iv) execution of the Employment Agreement; (v) the provision of the Back-stop Commitment; and (vi) the subordination in right of payment of the Allowed Insider Claims.

Plan, Art. V.

32.    On March 27, 2023, the Debtor filed the *Notice of Filing of Plan Supplement* (ECF Doc. No. 63) (the "**Plan Supplement**") with the following documents: Exhibit A – Financial Projections (Disposable Income Analysis); Exhibit B – Liquidation Analysis; Exhibit C – Proposed Form of Employment Agreement with Hal Luftig; and Exhibit D – Proposed Form of

Secured Note and Security Agreement with Hal Luftig.   The Debtor did not file Exhibit E – Form

of Release Agreement, because FCP has not consented to the Luftig Release and advised it intends

to reject the Plan and file an objection to the Plan.   Updated versions of the Disposable Income

Analysis and Liquidation Analysis are attached to the Ryniker Declaration as Exhibits A-1 and B-1

respectively.

33.    On March 27, 2023, the Debtor filed the *Notice of Presentment of Debtor's*

*Proposed Scheduling Order: (i) for the Plan Confirmation Hearing; (ii) Setting an Objection*

*Deadline for the Plan; (iii) Approving Form of Notice Regarding Hearing on Plan Confirmation;*

*(iv) Approving Form of Ballot; and (v) Setting a Voting Deadline to Accept or Reject the Plan*

(ECF Doc. No. 64) together with a proposed Order scheduling a hearing to consider confirmation

of the Plan, setting related deadlines, and approving the form of Ballot to vote in favor of or reject

the Plan.

34.    On April 19, 2023, the Court entered the Order (ECF Doc. No. 67) (the "**Plan**

**Scheduling Order**"), which set the deadline to object to confirmation of the Plan (the "**Plan**

**Objection Deadline**"), the deadline for creditors entitled to vote to accept or reject the plan to

submit their ballots (the "**Voting Deadline**") and scheduled the Confirmation Hearing.

35.    On April 20, 2023, the Debtor filed and served the *Notice of Hearing to Consider*

*Confirmation of Debtor's Small Business Chapter 11 Plan of Reorganization* (ECF Doc. No. 68)

which provided a copy of the Plan Scheduling Order entered by the Court.

**FCP's Rejection of Standard Confidentiality Provisions**

36.    In early April 2023, FCP and the Debtor engaged in settlement discussions,

facilitated by the Subchapter V Trustee, concerning the Luftig Release and the Plan.  FCP advised

that my personal financial information was relevant and necessary for FCP to evaluate the Debtor's

and my offer under the Plan.

37.    On May 5, 2023, the Debtor filed a letter (ECF Doc. No. 71) requesting a

Conference as a result of the parties' inability to resolve a dispute arising from FCP's demand for

my personal financial disclosures as a condition precedent to substantive negotiations regarding

the Plan, FCP's wholesale rejection of a proposed Mediation Stipulation and Agreed Order

permitting such financial disclosures subject to reasonable confidentiality protections, and FCP's

stated opposition to adjourning the Confirmation Hearing.  FCP filed a letter in response (ECF

Doc. No. 74).

38.    The Court held a Conference on May 8, 2023, during which FCP's counsel advised

the Court that FCP would consider a two-party confidentiality agreement allowing FCP to review

my financial information.  Debtor's counsel and my counsel advised FCP that my personal

financial information establishes  that I am drawing upon exempt assets to make the Cash

Contribution, and that FCP will receive more under the Plan than it would pursuing judgment

enforcement collection efforts or as a creditor in my own potential personal bankruptcy case.

39.    On May 11, 2023, in the hopes of reaching a consensual resolution of the issues, the

Debtor adjourned the Confirmation Hearing to June 14, 2023 (ECF Doc. No. 76).

40.    Unfortunately, the parties were unable to resolve the dispute arising from FCP's

continued rejection of a proposed confidentiality agreement which would have permitted financial

disclosures by me subject to reasonable confidentiality protections.

41.    On May 22, 2023, at a second Conference held by the Court in response to a letter

filed by the Debtor (ECF Doc. No. 78), the parties advised the Court that: (i) they were unable to

resolve the issues related to my financial disclosures; (ii) FCP would not agree to any

confidentiality or other restrictions whatsoever related to my financial disclosures; and (iii) they would work together to agree to deadlines related to the Confirmation Hearing.

**The FCP Claim and the Luftig Release**

42.     FCP's claims in the arbitration as against me were rejected by the arbitrator[2]. Only the claims asserted against the Debtor resulted in the Final Award, nevertheless the arbitrator found me personally liable too.

43.     If the FCP Claim is not released, and the Luftig Release is not approved by the Court: (i) the Luftig Contribution will not be made; (ii) the Debtor's indemnification obligations to me under its Bylaws and applicable New York State law will be triggered and significantly decrease the amount available to creditors from the Debtor's estate;  (iii) the alleged preferential transfer against me will remain unresolved; and (iv) the Class 5 Insider Claims will no longer be subordinated in right of payment entitling the holders of such Allowed Claims to participate in the limited distribution to creditors.

44.     An additional significant consequence of the Court declining to approve the Luftig Release is the future expensive and protracted litigation with FCP that will continue in the U.S. Court of Appeals for the Second Circuit and in state courts and the distraction it will cause for me in my professional life, and its ultimate impact upon the Debtor.  By way of example, at the commencement of the Debtor's case, I testified by declaration that I was in the midst of pursuing the opening of *Plaza Suite* (a highly-successful and profitable limited engagement featuring Matthew Broderick and Sarah Jessica Parker) in both London and Los Angeles.  Upon entry of the Stay Order, I was unburdened and free to continue working for the Debtor and its legacy projects

---

[2] The sole claim asserted against me was breach of fiduciary duty, which was rejected by the arbitrator.  FCP did not seek to pierce the Debtor's corporate veil or allege alter ego claims.

without distraction. I am pleased to report that recently, a press release was issued confirming the opening of *Plaza Suite* in London, which is due in large measure to my efforts including travelling to London, meetings and fundraising.

**Disruption as a Result of FCP**

45.    I always have been and remain dedicated to ensuring the success of the Debtor, its legacy projects, and the proposed Plan. My ability to continue those efforts will be thwarted if I am distracted by judgment enforcement efforts by FCP, and my reputation in the industry as a producer and fundraiser could be tarnished. Since the Plan was filed, there have been three separate incidents previewing just how burdensome and disruptive judgment enforcement proceedings and collection efforts could be to my success and, therefore, the Debtor's success: (a) one of my well-known business partners in the live theater industry was contacted by a member of the press inquiring about the status of the Debtor's case despite that this partner has no involvement whatsoever in the case; (b) an individual that for years has invested in my projects without question suddenly contacted me and my counsel with concerns regarding FCP, the Judgment, and the stability of my future projects; and (c) a member of the press reached-out to me to respond to comments made by FCP's principal (Warren Trepp), and the preparation and response to that inquiry caused me to miss several important meetings relating to the Debtor's legacy projects. These incidents could have been (and may actually have been) extremely damaging to my future ability to develop and raise funds for future projects. At a minimum, the time, effort and resources expended by me addressing these incidents adversely affected my ability to act on behalf of the Debtor, and focus on its successful reorganization.

**There is Identity of Interest Between Me and the Debtor**

46.     I am the Debtor's founder, sole shareholder and sole officer.  My personal efforts, relationships and reputation in the live theater industry are the bedrock and lifeline of the Debtor's business.

**The Scope of the Luftig Release is Narrow and Appropriate**

47.     The Luftig Release is narrowly tailored to the claims asserted by FCP against me in the context of the Plan.

48.     As stated above, the Final Award granted damages to FCP based upon the Debtor's conduct, and found me jointly and severally liable.[3]

49.     I believe that the Luftig Contribution and the distributions to FCP throughout the life of the Plan are adequate compensation for resolving the FCP Claim as against the Debtor and me.

**The Luftig Release is Essential to the Reorganization**

50.     The Luftig Release is essential to the Plan's success, just as the Stay Order prevented significant adverse economic consequences for the Debtor and its estate.  If the Luftig Release is not approved: (a) the Luftig Contribution will not be made, resulting in a significant loss for all creditors; (b) I will incur significant costs and expenses defending judgment enforcement efforts by FCP resulting in substantial indemnification claims against the estate; (c) I will be unable to focus upon activities necessary for the success of the Debtor's legacy projects – *e.g.,* even with

---

[3] I appealed the District Court's confirmation of the Final Order, which appeal is pending in the U.S. Court of Appeals for the Second Circuit.

the Stay Order I missed key meetings, and was forced to address investor concerns and inquiries; and (d) the litigation related to the Appeal will continue.[4]

51.      The Debtor is a small, closely-held business reliant upon my relationships and experience in the live theater industry.

**I am Willing to Provide a Substantial Contribution to the Debtor's Reorganization**

52.      Upon approval of the Luftig Release, I will provide the Luftig Contribution which will have a significant impact on the Debtor's estate, and includes: (a) FCP will receive a larger distribution (increased  by $500,000) than under any other scenario, including full judgment enforcement collection efforts against me individually or my own personal bankruptcy filing; (b) subordination in right of payment of Allowed Insider Claims; (c) the Employment Agreement pursuant to which I will agree to a five-year employment period (the duration of the Plan) at a reduced salary; (d) to the extent required by the Bankruptcy Court, my agreement to the Back-stop Commitment; (e) settlement of the potential avoidance action against me resulting in  a twenty percent (20%) recovery with zero litigation costs; (f) dismissal of the Appeal upon entry of the final and non-appealable Confirmation Order; and (g) for the life of the Plan, I will not charge the Debtor rent for the space utilized in my home in New York City.

53.      The Luftig Cash Contribution funds are readily available to satisfy my obligations under the Plan.

**My Relevant Personal Financial Information**

54.      I do not have personal non-exempt assets sufficient to satisfy the FCP Claim.  The Luftig Cash Contribution will be drawn from exempt assets.

---

[4] If the Luftig Release is granted, as part of the Luftig Contribution I will dismiss the appeals to the Second Circuit ending additional expensive litigation.

55.     FCP was unwilling to review my personal financial disclosures subject to any confidentiality restrictions of any sort, and that was entirely unacceptable to me under the circumstances.  I believe certain of my personal financial information may be relevant to the Court's analysis of whether to approve the Luftig Release.  To that end, I want to describe my personal financial status.

56.     In terms of my assets, I have:

a.  All of the shares in the Debtor;

b.  Less than $100,000 in the bank in liquid cash;

c.  Unliquidated claims against the Debtor for indemnification including, but not limited to, professional fees, deferred compensation, and loans to the Debtor for operating expenses during COVID;

d.  Interests in a certain limited liability company and two limited partnerships with my husband, formed between 2002 and 2007, with less than $25,000 in the aggregate in bank accounts and no other liquid assets.  One of the limited liability companies owns interests in a management services company which was created in or about 2022 for future non-debtor productions.

e.  I am the beneficiary of an asset protection trust created in 2022 which owns all of the interests in two Delaware limited liability companies which have rights to interests in *Life of Pi* and *Here Lies Love.*  I am not the trustee of the Trust.  I am the non-member manager of the Delaware limited liability companies, but as set forth below I do not expect significant income from these entities.   No assets were transferred into this trust other than the interests in the newly created limited liability companies, for productions started after the termination of the Debtor's

agreement with FCP – *i.e.,* non-debtor projects, and neither trust presently holds any liquid assets.

f.  I am the beneficiary of a second asset protection trust created in 2022 which owns all of the interests in a Delaware limited liability company, which owns one-third of my primary residence. My husband owns the remaining two-third interest. We have owned our residence as tenants-in-common, one third my interest and two-thirds his interest since we purchased the residence in or about 2002. I estimate that one-third of the value of the residence is approximately $1.15 million.[5] For more than the last six (6) years the residence has been subject to a first lien mortgage and a second lien mortgage in the total aggregate amount of approximately $1 million. I am advised that I have a homestead exemption in the amount of $150,000;

g.  I am the holder of a term life insurance policy;

h.  I have approximately $2.2 million in qualified retirement plans;

i.  Together with my husband, we own a second home outside of New York as tenants by the entirety which is encumbered by a mortgage. I estimate that fifty percent (50%) of the fair market value of the home is approximately $500,000, and the mortgage has a total balance of approximately $300,000; and

j.  I own a 2015 Honda Pilot vehicle valued at approximately $15,000.

---

[5] As set forth below, my primary residence is subject to two (2) valid and perfected mortgages in the amount of approximately $1 million, which were taken by me and my husband, jointly and severally, more than six (6) years ago.

57.    In the four years prior to the Petition Date, the only transfer of assets that I effectuated was of my one-third interest in my personal residence (described above) into a Delaware limited liability company, which is owned entirely by an asset protection trust.  Even if that asset had not been transferred, it was (for more than the last six (6) years) and remains subject to two valid and perfected mortgages held by third-party institutional lenders.  I am advised that the remainder would be subject to a homestead exemption under applicable law and, therefore, would not be reachable by FCP in connection with judgment enforcement collection efforts.

58.    I estimate my liabilities as follows:

a.    Approximately $25,000 in outstanding legal and accounting fees;

b.    Approximately $30,000  in credit card balances;

c.    Approximately $317,000 to friends and family for personal loans to fund litigation and other expenses related to FCP and the Debtor's bankruptcy case;

d.    Approximately $14,000 per month to shared monthly expenses for taxes, mortgages, condominium fees and mortgage interest;

e.    Approximately $600,000 on a first lien mortgage on my primary residence;

f.    Approximately $500,0000 on a second lien mortgage on my primary residence; and

g.    Approximately $300,000 on a first lien mortgage on my second property.

59.    I am committing to use exempt assets to fund the Luftig Cash Contribution.  I used my personal assets and leveraged my home that I share with my husband to ensure the Debtor's survival during COVID, even foregoing salary for a year. Thus, I believe my contribution in exchange for the Luftig Release is substantial in terms of what I can afford to pay.

**FCP Is Not Economically Motivated**

60.    Over the last four years, FCP has refused to engage in good faith settlement negotiations and proven it is not economically motivated, but seemingly is motivated by a deep-seeded personal animus.

61.    FCP cannot reasonably believe that there is a more substantial recovery available pursuing me individually.  A creditor acting reasonably and negotiating in good faith would have utilized this opportunity to verify my financial position before rejecting the Plan, and agreed to standard confidentiality provisions.

**Settlement of the FCP Claim is Necessary for Reorganization**

62.    Settlement of the FCP Claim is necessary for the Debtor to successfully reorganize. The estimated value of unsecured claims in this case is approximately $4.2 million which far exceeds the total funds available from the Debtor as well as my personal assets.

63.    Extreme and extraordinary circumstances exist here that support approval of the Luftig Release, and demonstrate that the Luftig Release is essential and integral to the Debtor's reorganization.

64.    As recognized by this Court in the Stay Order, I am the lifeblood of the Debtor's business operations, and my personal relationships and reputation in the industry create valuable opportunities for the Debtor.

65.    I am willing to make a substantial contribution to the Plan from otherwise exempt assets in exchange for the Luftig Release, to permit the Debtor to emerge from Chapter 11, and finally resolve this ordeal with FCP.

66.     FCP will receive more under the Plan with the Luftig Release than it could expect to recover if the Luftig is not approved and FCP is permitted to prosecute its judgment enforcement rights.

67.     My cash contribution is more than I would be required to pay FCP in a personal bankruptcy case.

68.     If the Luftig Release is not approved, and I am left to defend against FCP's judgment enforcement, my ability to focus on the Debtor's successful reorganization and emergence from chapter 11 will be jeopardized.  The Debtor requires my complete attention and focus (which is a significant amount of time) to create value to enable the Debtor to make the payments due under the Plan.

69.     Contrary to FCP's allegations at the beginning of the case, my attention is not distracted by ongoing non-debtor projects, and my potential earnings from those active non-debtor projects have proven to be significantly less than FCP suggested.  Indeed, the Debtor's financial advisors have confirmed that over the life of the Plan my interest in *Life of Pi* is worth $0, and my interest in *Here Lies Love* is worth $215,000 in the aggregate under a best case scenario.

70.     With respect to *Life of Pi,* although the production was successful outside of the United States, and the reviews in New York were positive, the tickets did not sell sufficient numbers to generate profits for investors.  My ability to recoup funds from the production was subject to or conditioned upon investors first recouping their funds invested which did not occur.

71.     If my personal bank accounts are frozen, my wages are garnished, and subpoenas are served upon my business partners (all measures FCP has asserted it most certainly will take), my reputation in the industry as a trustworthy and reliable fundraiser will be ruined after decades of success.

72.     I have read the Memorandum of Law in Support of Confirmation of the Debtor's

Chapter 11 Plan submitted herewith and join in the statements and representations made therein.

73.     I respectfully submit that the Court should confirm the Plan with the Luftig Release

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2023


                                    _/s *Hal Luftig*_____
                                    Hal Luftig

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:                                                            Chapter 11 (Subchapter V)

   HAL LUFTIG COMPANY, INC.,                                Case No. 22-11617 (JPM)

           Debtor.
----------------------------------------------------------x

# SMALL BUSINESS PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**RUSKIN MOSCOU FALTISCHEK, P.C.**
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, New York 11556-0190
(516) 663-6600
Sheryl P. Giugliano
Michael S. Amato
sgiugliano@rmfpc.com
mamato@rmfpc.com

Attorneys for Hal Luftig Company, Inc.

Dated: March 1, 2023

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

This plan of reorganization (the "Plan") under Subchapter V of chapter 11 of title 11, United States Code (the "Bankruptcy Code") is submitted by Hal Luftig Company, Inc. (the "Debtor") the above-captioned debtor and debtor in possession, pursuant to Bankruptcy Code §§1189 and 1190. (Capitalized terms not otherwise defined herein shall have the meanings set forth in Article VIII of the Plan.)

Under Bankruptcy Code §§ 1191(c) and (d), the Debtor will fund the Plan payments to creditors utilizing its disposable income for a period of five (5) years. In addition, payments to creditors will be made from the Luftig Cash Contribution which shall be made by Hal Luftig ("Mr. Luftig"), or his designee. Mr. Luftig will make a contribution which will consist of the cash and other consideration, including: (i) a cash payment as further defined in the Plan Supplement to be made on the Effective Date; (ii) the subordination in right of payment of certain allowed claims held by Mr. Luftig; (iii) an employment agreement by and between Mr. Luftig and the Debtor which provides for Mr. Luftig's non-exclusive employment with the Debtor for a five-year period (the duration of the Plan); (iv) to the extent required by the Bankruptcy Court, Mr. Luftig's agreement to make the Back-stop Commitment; (v) upon entry of the Confirmation Order, dismissal of the appeal filed by Mr. Luftig in the Second Circuit Court of Appeals of the decision by the District Court confirming the Arbitration Award; and (vi) for the life of the Plan, Mr. Luftig will not charge the Debtor rent for the space utilized in his home in New York City.

The Luftig Contribution is conditioned upon confirmation of the Plan which includes the general release in favor of Mr. Luftig by the FCP Parties (the "Luftig Release") from any and all claims which the FCP Parties may have against the Debtor or Mr. Luftig, including without limitation, any claims under the Judgment entered by the District Court in favor of FCP Entertainment Partners, LLC ("FCP"), but excluding any claims FCP has under the Plan.

The Luftig Cash Contribution will be utilized first to pay Allowed Administrative Expenses, and second to pay the Allowed FCP Claim. The Plan provides for payment of Allowed Administrative Expenses, Allowed Priority Claims, including Priority Tax Claims, Allowed Secured Claims, and Allowed Other Priority Claims in accordance with the Bankruptcy Code, and provides for the payment of certain amounts to Allowed Unsecured Claims.

## ARTICLE I

## HISTORY OF THE DEBTOR'S BUSINESS OPERATIONS

Nature and History of the Debtor's Pre-Petition Business or Commercial Activities.

The Debtor is a New York corporation.  Mr. Luftig formed the Debtor in 2000 as a Broadway production company, and it has been in business in that capacity ever since.  The Debtor is a theatrical producing company that develops, acquires, presents and promotes theatrical plays, musicals, and similar works of theater on stage and in other media.

Mr. Luftig is an award-winning Broadway producer who has worked in theatrical productions for over 30 years.  His many successful shows include George Wolf's Jelly's Last

Jam, Tony Kushner's Angels in America, Twyla Tharp and Billy Joel's Movin' Out, and Tony Award-winning musicals like Thoroughly Modern Millie and Kinky Boots. Mr. Luftig has produced over 30 Broadway shows that collectively have garnered over 80 Tony Awards, and Mr. Luftig has won four Tony Awards, including two as lead producer.

Between 2001 and 2022, the Debtor produced several hit Broadway and off-Broadway shows including, but not limited to: Fiddler on the Roof in Yiddish; American Utopia; Plaza Suite starring Matthew Broderick and Sarah Jessica Parker; Becoming Nancy; Legally Blonde the Musical; Evita; Catch Me If You Can the Musical; and Come Fly Away.

Legal Structure and Ownership of the Debtor. The Debtor is a corporation organized under the State laws of New York. Mr. Luftig is the 100% owner of the equity interests in the Debtor. Mr. Luftig holds all offices of the Debtor.

### Events Leading to the Debtor's Bankruptcy Filing and the Plan Process

### The Arbitration Award and Judgment

The filing of the Debtor's chapter 11 case (the "Case") on December 1, 2022 (the "Petition Date") in the Bankruptcy Court was precipitated by the entry of an order confirming an unfavorable arbitration award against the Debtor and Mr. Luftig. On August 12, 2019, FCP initiated an arbitration against the Debtor for breach of contract, and against Mr. Luftig for breach of fiduciary duty. On April 1, 2022, the arbitrator issued his final award (the "Arbitration Award"). The Arbitration Award assigned damages to the breach of contract claim in the amount of $2,638,925.78, to be born jointly and severally by the Debtor and Mr. Luftig, and also found that Kinky Boots was a "vested project" under a prior agreement between the Debtor and FCP and, as a result, FCP was entitled to fifty-five percent (55%) of the Debtor's income from Kinky Boots. On October 26, 2022, the District Court entered a Memorandum and Order granting FCP's motion to confirm the Arbitration Award.

On December 7, 2022, after the Petition Date, the District Court entered the Final Judgment in favor of FCP.

### The SBA is the Debtor's Only Secured Creditor

The Debtor has one (1) secured claim. On or about June 2, 2020, the Debtor executed and delivered a promissory note and other loan documents in connection with a COVID-19 Economic Injury Disaster Loan ("EIDL") from the U.S. Small Business Administration (the "SBA") in the principal amount of $150,000.00, which accrues interest at 3.75% per annum with a 30-year repayment term. The EIDL program provides for a 30-month payment deferment period from the date of the original note, during which time interest accrues. On or about June 11, 2020, the SBA filed a UCC-1 Financing Statement. On or about December 16, 2022, the SBA filed a proof of claim (POC No. 3-1) against the Debtor's estate on account of the EIDL in the amount of $163,946.92.

On February 1, 2022, the Bankruptcy Court approved the Stipulation and Order Providing Adequate Protection and Related Relief With Respect to Secured Claim of the U.S. Small Business Administration (ECF Doc. No. 47), pursuant to which the SBA consented to the

Debtor's use of cash collateral under Bankruptcy Code § 363, and the Debtor agreed to make monthly payments to the SBA, and to provide the SBA with a valid, enforceable, fully-perfected security interest effective as of the Petition Date, among other things.

**FCP's Unliquidated Claim**

The amount of the Judgment and, therefore FCP's claim, is unliquidated, because of the share of income due to FCP from Kinky Boots is unknown.

On January 20, 2023, the Bankruptcy Court entered an Amended Order (ECF Doc. No. 44) establishing February 27, 2023 as the general bar date, and on February 20, 2023, FCP filed a proof of claim (POC No. 6) asserting a liquidated unsecured claim in the amount of $2,638,925.78, and an unliquidated claim for the share of income due from Kinky Boots.

On February 16, 2023, the Debtor filed a motion, pursuant to Bankruptcy Code §502(c) seeking to: (i) establish a procedure for estimating the unliquidated portion of FCP's claim, and (ii) estimating the unliquidated portion of FCP's claim for the purposes of distributions under the Plan (ECF Doc. No. 49). A hearing on that motion presently is scheduled for March 10, 2023, at 11:00 a.m.

**The Extension of the Stay to Mr. Luftig**

On January 13, 2023, the Bankruptcy Court entered an order granting, among other relief, the Debtor's motion to extend the automatic stay of Bankruptcy Code §362(a) to Mr. Luftig and enjoining FCP from taking any actions against Mr. Luftig or his assets (Adv. Pro. 22-01176 (JPM), ECF Doc. No. 23) (the "Stay Order").

Mr. Luftig has filed an appeal of the Judgment to the Second Circuit Court of Appeals (the "Appeal"). The Appeal is pending.

**The Debtor's Financial Advisor**

On January 26, 2023, the Bankruptcy Court entered an Order (ECF Doc. No. 46) authorizing the Debtor's retention and employment of RK Consultants, LLC ("RKC") as the Debtor's financial advisor effective as of December 19, 2022. The Debtor retained RKC to assist with: (a) estimating the unliquidated portion of FCP's claim, (b) formulating financial projections to serve as a basis for the Plan and to determine the Debtor's ability to make distributions to creditors over time, and (c) creating a liquidation analysis for the Plan.

**The Debtor's Plan Process**

The Debtor's financial projections are based largely on the financial projections of certain legacy productions in which the Debtor owns interests. The Debtor's financial advisor's ability to produce reliable and reasonable financial projections which serve as the basis for the Plan is based on the quality and timeliness of the information provided by third-parties which are not controlled by the Debtor. Unfortunately, notwithstanding the efforts of the Debtor and RKC to the contrary, certain productions have not yet provided the requested financial information in time for RKC to complete its analysis with respect to the projections and FCP's unliquidated claim. To be clear, those productions have been cooperative and are working to provide the information needed by the Debtor, however, they were unable to do so within the time frames needed by a debtor in a Subchapter V reorganization case. Accordingly, the Debtor is timely filing the Plan, and will subsequently file the Plan Supplement which will include additional financial information as provided by RKC.

Summary of Debtor's Historical Financial Condition.[1]

### Asset Summary

| | |
|---|---|
| Fixed Assets | $1,300.00 |
| Intellectual Property | Unknown |
| Cash and Deposits | $106,000.00 |
| Accounts Receivable | $0 |
| **TOTAL** | **$106,300.00** |

### Liability Summary

| | |
|---|---|
| Secured Debt | $163,946.92[2] |
| Priority Unsecured Debt | $17,181.00[3] |
| Nonpriority Unsecured Debt | $328,628.92 |
| FCP Claim Estimate | $2,638,925.78 + Unliquidated claim |
| **TOTAL DEBT[4]** | **$3,148,682.62** |

### Gross Revenue History

---

[1] These figures are taken from the Debtor's Schedules of Assets and Liabilities (ECF Doc. No. 23) and Statement of Financial Affairs (ECF Doc. No. 22).

[2] This is the SBA's Secured Claim which was noted as unsecured in the Debtor's Schedules of Assets and Liabilities (ECF Doc. No. 23).

[3] This amount includes the Proof of Claim filed by the Internal Revenue Service (P.O.C. No. 5), as amended, in the amount of $3,452.99.

[4] This does not include the unliquidated portion of FCP's claim which the Debtor is seeking to estimate, but it does include the $2,638,925.78 liquidated portion of FCP's claim.

| 2019 | $1,022,715.00 |
| 2020 | $426,219.89[5] |
| 2021 | $150,443.00[6] |
| 2022[7] | $1,099,146.59 |

## ARTICLE II

### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

As required by Bankruptcy Code §§ 1122 and 1123, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive under the Plan. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity interest can be impaired if the Plan alters the legal, equitable or contractual rights to which a Claimant is otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

The Plan provides for payment of "Allowed" claims which are defined in Section 8.03. Allowed Claims generally are claims that: (a) are allowed by final order of the Court, (b) estimated by final order of the Bankruptcy Court, or (c) claims that are listed on the Debtor's Schedules and are not listed as disputed, contingent, or unliquidated.

Unclassified Claims.

Administrative Expenses and Priority Tax Claims have not been classified and are excluded from the Classes of Claims in accordance with Bankruptcy Code §1123(a)(1).

Administrative Expenses.

The Debtor must pay all Allowed Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date shall be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the holder of an Allowed Administrative Expense or court order. If the Administrative Expense is disputed, payment will be made promptly after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

---

[5] This amount does not include non-business revenue in the amount of $66,915.00 received in connection with a forgiven Paycheck Protection Program loan and a Shuttered Venue Operations Grant, as disclosed in the Debtor's Statement of Financial Affairs (ECF Doc. No. 22).

[6] This amount does not include non-business revenue in the aggregate amount of $680,983.77 received in connection with a forgiven Paycheck Protection Program loan and a Shuttered Venue Operations Grant, each as disclosed in the Debtor's Statement of Financial Affairs (ECF Doc. No. 22).

[7] This is for the period January 1, 2022 through November 30, 2022, the date before the Petition Date.

(a)      Debts that the Debtor incurred after the Petition Date for goods and services related to the customary operation of the Debtor's business. These obligations will be paid on an ongoing basis in accordance with the Debtor's customary business practices and the terms between the Debtor and the applicable counterparties.

(b)      The value of the goods received by the Debtor in the ordinary course of business within twenty (20) days prior to Petition Date, is an Administrative Expense.

(c)      Administrative Expenses also include any postpetition fees and expenses owed to professionals, including the allowed claim of the Subchapter V Trustee for fees incurred and reimbursement of expenses, and for the Debtor's attorney, financial advisor, and accountants employed during the Chapter 11 Case.

(d)      The Subchapter V Trustee shall be paid for services rendered and expenses incurred in the Case as an Administrative Expense Claim under Bankruptcy Code §503(b)(2). All fees and expenses requested by the Debtor's professionals and the Subchapter V Trustee are subject to review and approval by the Court under Bankruptcy Code §§ 329 and 330.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|------|----------------------|--------------------|
| Professional fees (subject to Bankruptcy Court approval) | $198,000.00 | Paid with cash on hand and/or the Luftig Contribution |
| Subchapter V Trustee | $13,500.00 | Paid with cash on hand and/or the Luftig Contribution |

Priority Tax Claims.

The only Priority Tax Claim is the claim of the Internal Revenue Service in the amount of $3,452.99, represented by amended Proof of Claim No. 5-2 filed with the Court. The Priority Tax Claim is not impaired. The Priority Tax Claims shall be paid promptly after the Effective Date, or over a five (5) year period in accordance with Bankruptcy Code §1129(a), at the prime rate of interest as published by the Wall Street Journal, or similar publication. The holder of Priority Tax Claim shall not be entitled to vote on the Plan.

Classes of Claims and Interests.

A.  Priority Claims (Class 1)

Class 1 consists of a Priority wage Claim under Bankruptcy Code § 507(a)(4) in the amount of $13,650.00 which was listed in the Debtor's Schedules, and shall be paid in cash promptly after the Effective Date and, therefore, the holder of the Class 1 Claim is conclusively

presumed to have accepted the Plan pursuant to Bankruptcy Code §1126(f). Therefore, the holder of the Class 1 Claim is not entitled to vote to accept or reject the Plan.

**B.  Secured Claims (Class 2)**

Class 2 consists of the Allowed Secured Claim of the SBA in the amount of $163,946.92. The holder of the Class 2 Claim, the SBA, shall continue to receive payments in accordance with the pre-Petition Date agreement between the SBA and the Debtor in connection with the EIDL, and is therefore unimpaired under the Plan. Therefore, the holder of the Class 2 Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code §1126(f) and is not entitled to vote to accept or reject the Plan.

**C.  FCP Claim (Class 3)**

Class 3 consists of the Allowed FCP Claim, as determined by an Estimation Order, the Confirmation Order, or by other Final Order of the Court. The Allowed Class 3 Claim shall be paid as follows: (i) promptly after the Effective Date the Class 3 Claimant shall receive the portion of the Luftig Cash Contribution remaining after payment of all Allowed Administrative Expenses and Allowed Priority Tax Claims; and (ii) its Pro Rata Share of the Debtor's Disposable Income over the life of the Plan. After receiving its portion of the Luftig Cash Contribution, the remaining unpaid portion of the FCP Claim shall be treated as an Allowed Class 4 Claim. The holder of the FCP Claim is impaired under the Plan and is entitled to vote to accept or reject the Plan.

**D.  General Unsecured Claims (Class 4)**

Class 4 consists of the Allowed Claims of non-priority unsecured creditors, other than the FCP Claim. The Class 4 Claims are estimated to total $328,628.92. The holders of Allowed Class 4 Claims will receive their Pro Rata Share of the Disposable Income over the life of the Plan, and the portion, if any, of the Luftig Cash Contribution remaining after payment of Allowed Administrative Expense Claims, the Priority Tax Claim, and a portion of the Allowed FCP Claim. The unpaid portion of the Allowed FCP Claim shall be treated as an allowed Class 4 Claim for distribution purposes and shall receive its Pro Rata Share of the Disposable Income. The holders of Allowed Class 4 Claims are impaired and are entitled to vote to accept or reject the Plan.

The Debtor estimates that holders of Class 4 Claims will receive distributions equal to approximately 15% - 25% of their Allowed Claims, which estimate shall be confirmed in the Plan Supplement.

**E.  Insider Claims (Class 5)**

Class 5 consists of the Insider Claims which will be liquidated as set forth in the Plan Supplement. The Debtor expects that as part of the Luftig Contribution each of the Class 5 Claims shall be subordinated in right of payment to the Debtor's obligations to make payments and distributions under the Plan to holders of higher priority claims.

The holders of Class 5 Claims will receive no distribution under the Plan and are deemed to have rejected the Plan. Therefore, Holders of Class 5 Claims will not vote to accept or reject the Plan.

F.  Equity Interests (Class 6)

Class 6 consists of the holder of the equity interests in the Debtor, Mr. Luftig. The holder of the Class 6 Interest will receive no distributions under the Plan on account of his equity interest in the Debtor. However, Mr. Luftig will retain his equity interest in the Debtor after the confirmation of the Plan. The holder of the Class 6 Interest is unimpaired under the Plan and is deemed to accept the Plan.

## ARTICLE III

### IMPLEMENTATION OF THE PLAN

Means for Implementation of the Plan.

The Plan will be funded with the Debtor's Disposable Income, the Luftig Cash Contribution, the Luftig Settlement Payment, and to the extent necessary, the Backstop Commitment. The Luftig Contribution is conditioned upon confirmation of the Plan, which must include the Luftig Release. The Luftig Contribution also includes execution of the Employment Agreement and delivery of the Luftig Settlement Payment. The Luftig Contribution shall be made within ten (10) days after entry of the Final Confirmation Order.

On the Effective Date, all property of the Debtor, tangible and intangible, will revert to the Debtor, free and clear of all Claims, except as provided in the Plan. Upon the Effective Date, pursuant to Bankruptcy Code §1181(a), Mr. Luftig shall continue to own the Interests in the Debtor as the Reorganized Debtor.

Mr. Luftig will continue to serve as the President of the Debtor after confirmation of the Plan pursuant to the terms of the Employment Agreement. If the Plan is confirmed under Bankruptcy Code §1191(a) or (b), except as otherwise provided in the Plan or the Confirmation Order, the Debtor shall make all Plan payments under the Plan.

The Luftig Cash Contribution will be memorialized by the Luftig Secured Note which shall be an enforceable obligation of the Reorganized Debtor, but the payment of the Luftig Secured Note will be subordinated in right of payment.

Claim Objections.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtor shall have the sole authority to: (a) file, withdraw, or litigate to judgment, any objections to Claims or Interests; and (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Avoidance Actions.

Any objections to Claims or Interests shall be filed on or before the Claims Objection Bar Date.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtor or any party in interest.

Avoidable Transfers; Settlement of Claims and Interests.

Avoidance Actions will not be pursued by the Debtor or the Reorganized Debtor, except as set forth herein.

On October 17, 2022, the Debtor transferred $250,000.00 to Mr. Luftig in partial repayment of a $414,505.74 loan made by Mr. Luftig to the Debtor, which was memorialized by a promissory note dated August 19, 2022.  Mr. Luftig has asserted certain defenses that the payment was made in the ordinary course of the Debtor's business and in accordance with the terms of the promissory note. In light of the defenses asserted, and the cost and risk of litigation, the Plan will seek Bankruptcy Court approval of the settlement of that potential claim in exchange for a one-time payment in the amount of $50,000.00 by Mr. Luftig to the Debtor promptly after the Effective Date (the "Luftig Settlement Payment").  The Luftig Settlement Payment   is in addition to, and not included in the Luftig Cash Contribution .Mr. Luftig will receive the Luftig Settlement Claim which shall be an Allowed Class 5 Claim in the amount of $50,000 pursuant to Bankruptcy Code §502(h), which will be subordinated in right of payment along with Mr. Luftig's other allowed claims against the Debtor as a Class 5 Claim.

Pursuant to Bankruptcy Code § 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Avoidance Actions (including the potential avoidance action against Mr. Luftig described above), and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Avoidance Actions, and controversies pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Code §1123 and Bankruptcy Rule 9019 of all such Claims, Interest, Avoidance Actions, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtor, its Estate, and holders of all Claims and Interests.

Treatment of Executory Contracts and Unexpired Leases.

All executory contracts and unexpired leases, not otherwise assumed or rejected by the Debtor during the case, shall be assumed.  Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or any other party that any contract or lease is an executory contract or unexpired lease or that the Debtor has any liability thereunder.

Effect of Confirmation of the Plan.

After entry of the Confirmation Order and upon the Effective Date, all debts of the Debtor shall be deemed fixed and adjusted according to the Plan, and the Debtor and the Reorganized Debtor shall have no liability on account of any Claims, except as set forth in the Plan and the Confirmation Order.

Projections in Support of the Plan.

The Debtor has shared with FCP's counsel and Mr. Luftig's counsel financial information including financial projections calculating Disposable Income prepared by RKC in connection with preparing the Plan.   The Debtor will share its financial projections and related relevant financial information in the Plan Supplement. **You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

## ARTICLE IV

### FEASIBILITY OF THE PLAN

Pursuant to Bankruptcy Code §§ 1129(a)(11) and 1191(a), the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. The Debtor believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date. The Debtor's financial projections will demonstrate that the Debtor will have the Disposable Income to make the required payments under the Plan.

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. The liquidation analysis annexed to the Plan Supplement demonstrates that Claimants will receive more under the Plan compared to a liquidation.

## ARTICLE V

### DISCHARGE, EXCULPATION AND RELEASE

Discharge. If the Plan is confirmed under Bankruptcy Code §1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the Court shall grant the Debtor a discharge of all debts provided in Bankruptcy Code §1141(d)(1)(A), and all other debts allowed under Bankruptcy Code §503 and provided for in this Plan, except any debt: (a) on which the last payment is due after the first three (3) years of the Plan, or such other time not to exceed five (5) years fixed by the Court; or (b) if applicable, of the kind specified in Bankruptcy Code §523(a).

Binding Effect. Except as provided in Bankruptcy Code §§ 1141 or 1192, as applicable, the provisions of this Plan shall, upon entry of the Confirmation Order, bind the Debtor, each and every Claimant and holder of an Interest, and each party in interest, whether or not the Claim of such Claimant or Interests of such holder or party is provided for by the Plan and whether or not such Claimant or Interest holder, or party has accepted or has rejected the Plan. All payments made under the Plan will be in full and final satisfaction of the Allowed Claims of creditors.

Injunction.    EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE CONFIRMATION DATE, ALL PERSONS, INCLUDING WITHOUT LIMITATION, THE FCP PARTIES, ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE DEBTOR'S PROPERTY, OR THE ESTATE BASED ON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED ON OR BEFORE THE CONFIRMATION DATE, INCLUDING RELATED TO

10

THE JUDGMENT OR THE FCP CLAIM AND ANY CLAIMS THAT ARE PROPERTY OF THE DEBTOR'S BANKRUPTCY ESTATE (COLLECTIVELY, THE "RELEASED CLAIMS"); PROVIDED THAT NOTHING IN THE PLAN OR THE CONFIRMATION ORDER SHALL ENJOIN THE UNITED STATES GOVERNMENT OR ANY OF ITS AGENCIES OR ANY STATE OR LOCAL AUTHORITY, FROM BRINGING ANY CLAIM, SUIT, ACTION OR OTHER PROCEEDINGS (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) AGAINST THE DEBTOR, OR ANY OF THE DEBTOR'S OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, ADVISORS, AGENTS, REPRESENTATIVES AND ASSIGNS, OR THE DEBTOR'S PROPERTY, FOR ANY LIABILITY, INCLUDING UNDER THE INTERNAL REVENUE CODE, THE ENVIRONMENTAL LAWS OR ANY CRIMINAL LAWS OF THE UNITED STATES, OR ANY STATE OR LOCAL AUTHORITY. IN ADDITION, THE INJUNCTION PROVIDED FOR IN THE PLAN SHALL NOT RELEASE ANY ATTORNEY FROM ANY OBLIGATIONS OWED UNDER RULE 1.8(h) OF THE NEW YORK STATE RULES OF PROFESSIONAL CONDUCT FOR MALPRACTICE LIABILITY.

Release by the Debtor. PURSUANT TO BANKRUPTCY CODE §1123(b), AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, UPON THE EFFECTIVE DATE, THE DEBTOR SHALL RELEASE UNCONDITIONALLY, AND HEREBY IS DEEMED TO FOREVER RELEASE UNCONDITIONALLY: (A) THE SBA AND ITS COUNSEL; (B) THE DEBTOR'S ADVISORS INCLUDING ATTORNEYS, ACCOUNTANTS AND FINANCIAL ADVISORS; (C) THE SUBCHAPTER V TRUSTEE; AND (D) MR. LUFTIG AND HIS COUNSEL AND FINANCIAL ADVISORS (COLLECTIVELY, THE "RELEASED PARTIES"), FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, RIGHTS, CAUSES OF ACTION AND LIABILITIES WHATSOEVER, INCLUDING THE RELEASED CLAIMS (EXCEPT FOR THE RIGHT TO ENFORCE THE PERFORMANCE OF THEIR RESPECTIVE OBLIGATIONS, IF ANY, UNDER THE PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE, EXCEPT FOR THOSE CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION THAT CONSTITUTES GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF FIDUCIARY DUTY, CRIMINAL CONDUCT, ULTRA VIRES ACTIONS, OR THE DISCLOSURE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES. IN ADDITION, THE RELEASE PROVIDED FOR IN THE PLAN SHALL NOT RELEASE ANY ATTORNEY FROM ANY OBLIGATIONS OWED UNDER RULE 1.8(h) OF THE NEW YORK STATE RULES OF PROFESSIONAL CONDUCT FOR MALPRACTICE LIABILITY.

Exculpation. TO THE EXTENT PERMISSIBLE UNDER BANKRUPTCY CODE §1125(e), NEITHER THE DEBTOR, NOR ITS RETAINED ADVISORS, ACCOUNTANTS, AND ATTORNEYS, NOR THE SUBCHAPTER V TRUSTEE SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR INTEREST FOR ANY ACT OR OMISSION DURING THE PENDENCY OF THE CHAPTER 11 CASE IN CONNECTION WITH, OR ARISING OUT OF, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE PROPERTY OR CASH TO BE DISTRIBUTED UNDER THE PLAN; PROVIDED,

HOWEVER, THAT THE FOREGOING EXCULPATION SHALL HAVE NO EFFECT ON THE LIABILITY OF AN ENTITY WHICH RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE RESULTED FROM GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF FIDUCIARY DUTY, CRIMINAL CONDUCT, ULTRA VIRES ACTIONS, OR THE DISCLOSURE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES, AND, IN ALL RESPECTS, THE DEBTOR AND ITS OFFICER SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. IN ADDITION, THE EXCULPATION PROVIDED FOR IN THE PLAN SHALL NOT RELEASE ANY ATTORNEY FROM ANY OBLIGATIONS OWED UNDER RULE 1.8(h) OF THE NEW YORK STATE RULES OF PROFESSIONAL CONDUCT FOR MALPRACTICE LIABILITY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES AND SETTLEMENTS CONTAINED IN THE PLAN.

The Luftig Release.  Under the Plan and pursuant to the Confirmation Order, in consideration of and on account of the Luftig Contribution, the Back-stop Commitment, and the agreement to subordinate in right of payment all of the Insider Claims in Class 5, Mr. Luftig shall receive the Luftig Release from the FCP Parties, and such release shall include all claims, judgments, causes of action held by the FCP Parties, their assigns and successors, against Mr. Luftig. The Luftig Release shall be conditioned upon: (i) the confirmation of the Plan; (ii) completion of all payments to FCP as required under the Plan; (iii) the delivery of the Luftig Contribution; (iv) execution of the Employment Agreement, (v) the provision of the Back-stop Commitment; and (vi) the subordination in right of payment of the Allowed Insider Claims. In addition to the foregoing, the Luftig Release includes an agreement by and among the FCP Parties and Mr. Luftig, as well as their respective parents, affiliates, subsidiaries, officers, directors, employees, shareholders, agents and representatives, as applicable, not to disparage the other, in writing or orally, in any manner likely to be harmful to them or their business, business reputations or personal reputations.

Good Faith. Entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Released Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among others, Bankruptcy Code §§ 1125€ and 1129(a)(3), with respect to the foregoing.

## ARTICLE VI

## CONFIRMATION AND EFFECTIVE DATE

Conditions Precedent to Confirmation.  The following are conditions precedent to Confirmation of the Plan: (a) delivery of the Luftig Contribution, including the Luftig Cash Contribution, to the Debtor; (b) all terms, conditions and provisions of the Plan are approved in the Confirmation Order, including the FCP Release; (c) the proposed Confirmation Order shall be in form and substance acceptable to the Debtor, the SBA, the Subchapter V Trustee and the U.S. Trustee; (d) the Estimation Order shall be entered by the Bankruptcy Court and become a Final Order; and (e) the Debtor shall have sufficient Cash, including use of the Luftig Cash

12

Contribution, to pay in full all Allowed Administrative Expenses, including Professional Fee Claims (except to the extent that holders of such Allowed Claims agree to different treatment), all Allowed Priority Claims, including Priority Tax Claims, and the portion of the FCP Claim entitled to payment from the Luftig Cash Contribution, which shall be paid promptly reasonably practicable after the Effective Date, or upon such other terms as may be agreed to by the holder thereof and the Debtor. The conditions precedent set forth above may be waived by the Debtor, only upon reasonable notice to the Subchapter V Trustee and the U.S. Trustee.

Conditions Precedent to the Effective Date. The following are the conditions precedent to the Effective Date of the Plan: the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order.

Title to Assets.

If the Plan is confirmed under Bankruptcy Code §1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims of Creditors of the Debtor.

If the Plan is confirmed under Bankruptcy Code §1191(b), property of the estate includes, in addition to the property specified in under Bankruptcy Code §541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the Petition Date but before the Case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. Except as provided in under Bankruptcy Code §1185, the Plan, or the Confirmation Order, the Debtor shall remain in possession of all property of the Debtor's estate.

Binding Effect. If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

Retention of Jurisdiction by the Bankruptcy Court. The Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under Bankruptcy Code §1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, including the estimation of Claims, and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

Corporate Existence. As the Effective Date, the certification of incorporation, bylaws, or articles of organization, as applicable, of the Debtor shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtor to take or cause to be taken all actions (including, if applicable, corporation actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, or after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized under the appliable law, order, rule,

or regulation, including without limitation, such authorization to wind down, sell, or otherwise liquidation any and all remaining Assets, and take further action to dissolve the Debtor upon or after the filing of a Final Decree.

Final Decree. Once the Debtor's estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## ARTICLE VII

### ATTACHMENTS

The following documents shall be included in the Plan Supplement:

Exhibit "A" Financial Projections

Exhibit "B" Liquidation Analysis

Exhibit "C" Proposed Form of Employment Agreement with Hal Luftig

Exhibit "D" Proposed Form of Secured Note and Security Agreement with Hal Luftig

Exhibit "E" Form of Release Agreement

## ARTICLE VIII

### DEFINITIONS

For purposes of the Plan, the following terms shall have the meanings set forth below. Terms used in this Plan which are defined in the Bankruptcy Code, or the Bankruptcy Rules shall have the meaning set forth in the Bankruptcy Code or the Bankruptcy Rules unless defined in this Plan. The meaning of the defined terms shall be equally applicable to the singular and plural forms of the terms defined, unless a different meaning is clearly required by and explained in the text.

"Administrative Expense" means any cost or expense of administration of the Case entitled to priority in accordance with the provisions of Bankruptcy Code §§ 503(b) and 507(a)(1), including, without limitation: (i) Claims for fees and expenses of the Debtor's professionals and the Subchapter V Trustee; (ii) Claims relating to goods received by the Debtor within twenty (20) days before the Petition Date in the ordinary course of the Debtor's business; and (iii) any actual, necessary costs and expenses of preserving the Debtor's Estate and of operating the Debtor's business (but only to the extent they are due or payable on or before the Effective Date).

"Administrative Expense Bar Date" means the deadline for filing requests for payment of Administrative Expenses (other than requests for payment of Administrative Expenses arising under section 503(b)(9) of the Bankruptcy Code) which: (a) with respect to Administrative Expenses other than Professional Fee Claims, shall be thirty (30) days after the Effective Date;

and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

"Allowed" means a Claim, other than an Administrative Expense or Interest in the Debtor, which is: (i) listed in the Debtor's Schedules filed in the Chapter 11 Case as of the Effective Date, and not listed in the Schedules as disputed, contingent, unliquidated or unknown and as to which no objection to the allowance thereof is filed on or prior to the Objections Bar Date; (ii) set forth in a proof of Claim timely and properly filed in the Chapter 11 Case on or before the date fixed by the Bankruptcy Court (or by applicable rule or statute) as the last day for filing such proof of Claim, or late filed with leave of the Bankruptcy Court after notice and opportunity for hearing given to counsel to the Debtor, and as to which no objection to the allowance thereof is filed on or prior to the Objections Bar Date; or (iii) determined to be allowed by a Final Order of the Bankruptcy Court. To the extent permitted under Bankruptcy Code §506(b), an Allowed Claim shall include unpaid interest on the Claim and any reasonable unpaid fees, costs or charges provided for under the agreements under which such Claim arose. Any Claim which has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely filed, is not considered an Allowed Claim and shall be expunged without further action by the Debtor, or the Reorganized Debtor.

"Allowed Administrative Expense" means all or that portion of any Administrative Expense which has been Allowed by a Final Order of the Bankruptcy Court.

"Allowed General Unsecured Claim" means any Allowed Claim that is not an Allowed Administrative Expense, Allowed Secured Claim, Allowed Priority Claim, Allowed FCP Claim, or Insider Claim.

"Allowed Priority Claim" means any Allowed Claim or portion thereof entitled to priority under Bankruptcy Code §§507(a)(3) through (a)(6).

"Allowed Secured Claim" means that the Allowed Secured Claim of the SBA pursuant to the Stipulation and Order approved by the Bankruptcy Court (ECF Doc. No. 47).

"Allowed Priority Tax Claim" means any Allowed Claim or portion thereof entitled to priority under Bankruptcy Code §507(a)(8).

"Avoidance Actions" means any and all claims, suits and causes of action held by the Debtor (a) under Bankruptcy Code §§544, 547, 548, 549 or 550, and (b) any transferee of a transfer avoidable under Bankruptcy Code §549 received from the Debtor from and after the Petition Date, but prior to the Effective Date.

"Back-stop Commitment" means the agreement by Mr. Luftig to contribute up to an aggregate of $100,000.00 on the Effective Date, but only to the extent the Bankruptcy Court determines it is necessary to satisfy Bankruptcy Code §1191(c)(2)(B), in the event the Debtor cannot make the payments required by the Plan.

"Bankruptcy Code" means title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, in which the Chapter 11 Case is pending.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

15

"Chapter 11 Case" means the Debtor's chapter 11 case filed in the Bankruptcy Court, Case No. 22-11617 (JPM).

"Claim" shall mean a claim against the Debtor, as defined in Bankruptcy Code §101(5).

"Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Expenses (other than Professional Fee Claims and Administrative Claims arising under Bankruptcy Code § 503(b)(9)), sixty (60) days after the Administrative Expenses Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date, and (b) such other period of limitation as may be specifically fixed by the Debtor, as approved by an order of the Bankruptcy Court for objecting to such Claims.

"Claimant" means the holder of a Claim.

"Confirmation Date" means the date the Confirmation Order is entered in the Case.

"Confirmation Hearing" means the hearing or hearings held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"Confirmation Order" means an order of the Bankruptcy Court confirming the Plan in accordance with Bankruptcy Code § 1191 and other application sections.

"Creditor" shall have the meaning set forth in Bankruptcy Code §101(10).

"Debtor" means Hal Luftig Company, Inc., as debtor and debtor-in-possession in the Chapter 11 Case.

"Disposable Income" shall have the meaning given to it in Bankruptcy Code § 1191(d), as calculated and projected by RKC and set forth in the Plan Supplement.

"Disputed Claim" means any Claim, proof of which was timely and properly filed, and (a) which is listed on the Schedules as unliquidated, disputed, or contingent, and which has not been resolved by written agreement between the Debtor and the Claimant or by an order of the Bankruptcy Court, (b) which is subject to a dispute to the extent that the Debtor or the Reorganized Debtor has asserted a claim against the holder of the Disputed Claim, or (c) as to which the Debtor has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.  Prior to the filing of an objection to a Claim, or the expiration of the time within which to object to such Claim set forth in the Plan or otherwise established by order of the Bankruptcy Court, for purposes of the Plan, a Claim shall be considered a Disputed Claim if (x) the amount of the Claim specified in the proof of Claim exceeds the amount of the Claim scheduled by the Debtor as other than disputed, contingent or unliquidated, or (y) the Claim is not listed on the Schedules.

"District Court" means the United States District Court for the Southern District of New York (Judge Lewis A. Kaplan).

"Effective Date" means the first day on which the Confirmation Order has become a Final Order and on which all the conditions to the Effective Date in the Plan have been satisfied or waived.

16

"Employment Agreement" means the employment agreement between the Debtor and Mr. Luftig which shall provide, among other things, for Mr. Luftig's continued, non-exclusive, employment by the Debtor as the Debtor's president for a term at least as long as the period of time required for the Debtor to make all of the payments under the Plan.

"Estimation Order" means an order of the Bankruptcy Court estimating for distribution purposes under the Plan, under Bankruptcy Code §502(c), the allowed amount of any Claim in the Case, including without limitation the FCP Claim. An Estimation Order may include the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

"FCP" means FCP Entertainment Partners, LLC.

"FCP Claim" means the Allowed Claim of FCP under the Judgment, which as of the filing of the Plan is partially unliquidated but will be fully liquidated pursuant to the Estimation Order, and reduced by the $6,250.00 owed to the Debtor under the terms of the Judgment.

"FCP Parties" means FCP, its officers, directors, members, agents, parents, subsidiaries, affiliates, successors, assigns, and attorneys, including, but not limited to its principal (directly or indirectly)Warren Trepp.

"Final Order" means: (a) an order or a judgment of the Bankruptcy Court; or (b) a stipulation or other agreement entered into which is "so ordered" by the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended and as to which (i) any appeal that has been taken has been finally determined or dismissed, or (ii) the time to appeal or seek reconsideration has expired by reason of statute or otherwise and as to which no appeal or petition for review, certiorari or reconsideration has been taken or is pending (or if such appeal or petition has been granted, it has been finally decided), as a result of which such order, judgment, stipulation or agreement shall have become final in accordance with applicable law.

"General Unsecured Claim" means an Allowed Claim that is not an Administrative Expense, a Priority (Non-Tax) Claim, Priority Tax Claim, FCP Claim, Affiliate Claim, or Secured Claim.

"Insider Claims" means the following Claims which shall be determined to be Allowed Claims under the Plan without any further action, and the Debtor anticipates that the Claims shall be subordinated in right of payment to the payment of all other Allowed Claims under the Plan: (i) the Luftig Note Claim; (ii) the Luftig Settlement Claim; (iii) the Luftig Indemnification Claim; and (iv) the Luftig Deferred Compensation Claim.

"Judgment" means the Order and Final Judgment, dated December 7, 2022, of the District Court in the cases titled, FCP Entertainment Partners, LLC v. Hal Luftig Co., Inc., et al. (Civil Action No. 22-cv-02768-LAK), and Hal Luftig v. FCP Entertainment Partners, LLC (Civil Action No. 22-cv-03697-LAK).

"Luftig Contribution" means the contribution of Mr. Luftig, or his designee, of cash and other consideration to the Plan consisting of: (i) the Luftig Cash Contribution; (ii) the subordination in right of payment of any and all Allowed Insider Claims; (iii) Mr. Luftig's willingness to enter into the Employment Agreement; (iv) Mr. Luftig's agreement to provide the Back-stop Commitment; and (v) Mr. Luftig's agreement not to charge the Debtor rent for the space utilized in his home.

"Luftig Cash Contribution" means the cash portion of the Luftig Contribution in the amount of $500,000.00, to be paid to the Debtor's estate.

"Luftig Deferred Compensation Claim" means Mr. Luftig's general unsecured claim for unpaid and deferred compensation owed to him as of the Petition Date.

"Luftig Indemnification Claim" means the unliquidated claim for indemnification as provided for under the Debtor's By-Laws, filed by Mr. Luftig in the Chapter 11 Case identified as POC No. 2 on the Bankruptcy Court's claims register.

"Luftig Note Claim" means Mr. Luftig's $164,505.74 unsecured claim on account of the Debtor's promissory note, dated August 19, 2022, in the principal amount of $414,505.74.

"Luftig Release" means the release by the FCP Parties of all claims against Mr. Luftig, except for any claim or right to payment FCP is entitled to under the Plan. The Luftig Release shall be conditioned upon: (i) confirmation of the Plan, (ii) completion of all payments to FCP as required under the Plan, (iii) delivery of the Luftig Contribution, and (iv) the subordination in right of payment of the Allowed Insider Claims. The Luftig Release shall include a mutual non-disparagement provision which will bind the Debtor, Mr. Luftig, and the FCP Parties.

"Luftig Secured Note" means the secured promissory note in the amount of $[1 million] to be executed by the Debtor in favor of Mr. Luftig in connection with the confirmation of the Plan which will provide Mr. Luftig with a security interest in all of the Debtor's assets, subject and subordinated to the Allowed Secured Claim held by the SBA and the payment of all Allowed Claims under the Plan. The Luftig Secured Note will be given by the Debtor to Mr. Luftig on account of amounts due to Mr. Luftig under the Plan: (i) the Luftig Cash Contribution; (ii) the Luftig Indemnification Claim; (iii) the Luftig Settlement Claim; (iv) the Luftig Note Claim; (v) the Luftig Deferred Compensation Claim; and (vi) to the extent it is relied upon, the Back-stop Commitment.

"Luftig Settlement Claim" means Mr. Luftig's Allowed Claim in the amount of $50,000 on account of the Luftig Settlement Payment in connection with the Debtor's claim against Mr. Luftig regarding a disputed potential preferential transfer under Bankruptcy Code §547, without the need for Mr. Luftig to file any further proofs of claim.

"Luftig Settlement Payment" means the $50,000.00 payment Mr. Luftig will make on or as soon as reasonably practicable after the Effective Date to resolve the Debtor's claim against Mr. Luftig regarding a disputed potential preferential transfer under Bankruptcy Code §547.

"Petition Date" means December 1, 2022.

"Plan" means the Debtor's Small Business Plan of Reorganization, as it may be amended or modified.

"Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be filed by the Debtor as soon as reasonably practicable after the filing of the Plan, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

"Professional Fee Claim" means any Administrative Expense by a professional retained by the Debtor by Final Order of the Bankruptcy Court, and any Claim held by the Subchapter V

Trustee for purposes of this Plan, for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expense have not been paid pursuant to an order of the Bankruptcy Court.

"Pro Rata Share" means the proportion that the Allowed Claim bears to the sum of all Allowed Claims, Disputed Claims and Undetermined Claims of that particular Class. In the case of the FCP Claim, after receiving its portion of the Luftig Cash Contribution, any unpaid portion of the FCP Claim shall be treated as a Class 4 Claim for purposes of distributions of Disposable Income under the Plan.

"Released Parties" shall have the meaning set forth in Article V of the Plan.

"Released Claims" means the claims released under Article V of the Plan.

"Reorganized Debtor" means the Debtor after the Effective Date.

"Schedules" means the Debtor's Schedules of Assets and Liabilities filed with the Bankruptcy Court (ECF Doc. No. 23) and Statement of Financial Affairs (ECF Doc. No. 22), as they may be amended pursuant to the Bankruptcy Rules.

"Stay Order" shall have the meaning provided in Article 1.03 of the Plan.

"Subchapter V Trustee" means Charles N. Persing, in his capacity as the Subchapter V Trustee in the Chapter 11 Case appointed on the Petition Date by the U.S. Trustee (ECF Doc. No. 9).

"U.S. Trustee" means the Office of the United States Trustee for Region 2.

## ARTICLE IX

Modification of Plan. The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to Bankruptcy Code section 1193(a). However, the Bankruptcy Court may require additional items including revoking on the Plan. If the Plan is confirmed under Bankruptcy Code section 1191(a), the Debtor may also seek to modify the Plan at any time after entry of the Confirmation Order only if: (a) the Plan has not been substantially consummated; and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing. If the Plan is confirmed under Bankruptcy Code section 1191(b), the Debtor may seek to modify the Plan at any time only if: (a) it is within three (3) years of the Confirmation Date, or such longer time not to exceed five (5) years, as fixed by the Bankruptcy Court; and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

Notices. Notices shall be deemed given when received.  All notices, requests or demands described in or required to be made in accordance with the Plan shall be in writing and shall be delivered by overnight mail and email transmission as follows:

If to the Debtor:
Ruskin Moscou Faltischek P.C.
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, New York 11556-0190

(516) 663-6600
Sheryl P. Giugliano
Michael S. Amato
sgiugliano@rmfpc.com
mamato@rmfpc.com

If to the SBA:
U.S. Small Business Administration
Attn: SBA Disaster Loan Service Center
2 North 20th Street, Suite 320
Birmingham, AL 35203

U.S. Small Business Administration
National Disaster Loan Resolution Center
200 West Santa Ana Blvd.
Santa Ana, CA 92701
Attn: Officer, manager, authorized agent

Jeffrey H. Schervone, Esq.
U.S. Small Business Administration
26 Federal Plaza, Room 3100
New York, NY 12078

Alyssa B. O'Gallagher
Assistant U.S. Attorney
Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007
Alyssa.O'Gallagher@usdoj.gov

If to FCP:
Lippes Mathias
Attn: John A. Mueller, Esq.
50 Fountain Plaza 1700
Buffalo, NY 14202
jmueller@lippes.com

If to Mr. Luftig:
Adam L. Rosen PLLC
1051 Port Washington Blvd.
PO Box 552
Port Washington, NY 11050
adam.rosen@alrcounsel.com

Martin J. Foley, PLC
601 South Figueroa Street, Suite 2050

20

Los Angeles, CA 90017
martin@mjfoleylaw.com

If to the U.S. Trustee:
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004-1408
Attn: Paul Schwartzberg, Esq.
paul.schwartzberg@usdoj.gov

If to the Subchapter V Trustee:
Charles N. Persing, CAP/CFF, CVA, CIRA, CFE
c/o Bederson LLP
100 Passaic Avenue, Suite 310
Fairfield, NJ 07004
cpersing@bederson.com

If to a holder of a Claim or Interest, at the address set forth in its proof of Claim or proof of Interest field with and allowed by the Court, or, if none, at its address set forth in the Schedules.

Reservation of Rights. Nothing contained herein shall prohibit the Debtor or the Reorganized Debtor from prosecuting or defending any of the rights of the Debtor's estate.

Severability. Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

Successors and Assigns. The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

Governing Law.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

Section and Article References.  Unless otherwise specified, all references in the Plan to Sections and Articles are to Sections and Articles of the Plan.

Captions. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

Dated: New York, New York
       March 1, 2023

                              **HAL LUFTIG COMPANY, INC.**


                              /s Hal Luftig_____
                              Name:  Hal Luftig
                              Title:    President

# EXHIBIT B

Sheryl P. Giugliano
Michael S. Amato
RUSKIN MOSCOU FALTISCHEK, P.C.
1425 RXR Plaza
East Tower, 15th Floor
Uniondale, New York 11556
Telephone:  516-663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Counsel to Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:                                                                  Chapter 11 (Subchapter V)

HAL LUFTIG COMPANY, INC.,                          Case No. 22-11617 (JPM)

                                        Debtor.
------------------------------------------------------------x

<u>**NOTICE OF FILING OF PLAN SUPPLEMENT**</u>

**PLEASE TAKE NOTICE** that Hal Luftig Company, Inc. (the "Debtor") the debtor and

debtor in possession in the above-captioned Subchapter V reorganization case hereby files this

plan supplement (the "Plan Supplement") in support of the *Chapter 11 Small Business Subchapter*

*V Plan* (ECF Doc. No. 55) filed March 1, 2023 (the "Plan") as contemplated by the Plan.

**PLEASE TAKE FURTHER NOTICE** that as contemplated by the Plan, the Plan

Supplement includes the following documents:[1]

Exhibit A – Financial Projections

Exhibit B – Liquidation Analysis

Exhibit C – Proposed Form of Employment Agreement with Hal Luftig

Exhibit D – Proposed Form of Secured Note and Security Agreement with Hal Luftig

---

[1] The Debtor anticipates filing Exhibit E upon reaching an agreement with FCP with respect to the Plan.

990282

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in the Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtor and interested parties with respect thereto.  The Debtor reserves the right to alter, amend, modify, or supplement any document in this Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; provided, however, that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of a hearing to consider confirmation of the Plan, the Debtor will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that you may obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein, or by contacting counsel to the Debtor.

Uniondale, New York
March 27, 2023

**RUSKIN MOSCOU FALTISCHEK, P.C.**

**By:** __/s Sheryl P. Giugliano_____
Sheryl P. Giugliano
Michael Amato

1425 RXR Plaza
East Tower, 15th Floor
Uniondale, New York 11556
Telephone:  516-663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Counsel to Debtor and Debtor in Possession*

2

990282

# EXHIBIT A

**Hal Luftig Company**
*Disposable Income*

| | 23-27 TOTAL | 2023 Q1 | Q2 | Q3 | Q4 | 2024 Q1 | Q2 | Q3 | Q4 | 2025 Q1 | Q2 | Q3 | Q4 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assumptions:** | | | | | | | | | | | | | | | |
| Expense Applied | | 100% | 50% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 50% | 50% | 50% | 50% | 50% |
| Deferred Compensation | | 46% | 23% | 11% | 11% | 11% | 11% | 11% | 11% | 11% | 23% | 23% | 23% | 23% | 23% |
| Opening cash | $89,771 | $89,771 | $62,329 | $13,968 | $81,716 | $46,646 | $21,575 | $6,405 | $51,334 | $16,264 | $226,193 | $155,832 | $233,571 | $216,310 | $300,966 |
| Cash Receipts | $1,964,000 | $309,000 | $21,000 | $124,000 | $9,000 | $9,000 | $34,000 | $84,000 | $9,000 | $244,000 | $9,000 | $147,000 | $57,000 | $347,000 | $561,000 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Payroll, Payroll taxes and related costs (Applied) | $928,043 | $106,062 | $53,031 | $26,516 | $26,516 | $26,516 | $26,516 | $26,516 | $26,516 | $26,516 | $53,031 | $53,031 | $53,031 | $212,124 | $212,124 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Other Operating Expenses | $84,525 | $14,700 | $7,350 | $3,675 | $3,675 | $3,675 | $3,675 | $3,675 | $3,675 | $3,675 | $7,350 | $7,350 | $7,350 | $7,350 | $7,350 |
| | $168,500 | $1,675 | $6,775 | $6,675 | $11,675 | $1,675 | $16,775 | $6,675 | $11,675 | $1,675 | $16,775 | $6,675 | $11,675 | $34,050 | $34,050 |
| Total Operating Cash Disbursements | $1,181,068 | $122,437 | $67,156 | $36,866 | $41,866 | $31,866 | $46,966 | $36,866 | $41,866 | $31,866 | $77,156 | $67,056 | $72,056 | $253,524 | $253,524 |
| Net operating cash flow | $782,933 | $186,563 | $(46,156) | $87,135 | $(32,866) | $(22,866) | $(12,966) | $47,135 | $(32,866) | $212,135 | $(68,156) | $79,944 | $(15,056) | $93,476 | $307,476 |
| **Restructuring Cash Disbursements** | | | | | | | | | | | | | | | |
| Restructuring Costs | $211,800 | $211,800 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Priority Claims (Class 1) | $17,181 | $- | $- | $17,181 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| SBA Loan (Class 2) | $44,100 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $8,820 | $8,820 |
| FCP Entertainment Partners LLC (Class 3) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| General Unsecured Claims (Class 4) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Total Restructuring Cash Disbursements | $273,081 | $214,005 | $2,205 | $19,386 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $8,820 | $8,820 |
| Net operating and restructuring cash flow | $509,852 | $(27,442) | $(48,361) | $67,749 | $(35,071) | $(25,071) | $(15,171) | $44,930 | $(35,071) | $209,930 | $(70,361) | $77,739 | $(17,261) | $84,656 | $298,656 |
| Ending cash | $599,622 | $62,329 | $13,968 | $81,716 | $46,646 | $21,575 | $6,405 | $51,334 | $16,264 | $226,193 | $155,832 | $233,571 | $216,310 | $300,966 | $599,622 |
| Deferred Compensation (Cumulative) | $230,580 | $26,352 | $39,528 | $46,116 | $52,704 | $59,292 | $65,880 | $72,468 | $79,056 | $85,644 | $98,820 | $111,996 | $125,172 | $177,876 | $230,580 |

It has been determined by Management, payroll and direct employee expenses will be applied for services needed based on expected operations during a given quarter.

The above 5-year forecast of disposable income reflects $1.96 million in cash receipts, aggregate operating costs of $1.18 million, deferred compensation from the owner of $230,000 for net operating cash flow of $783,000. To forecast the disposable income for the Company, the net loss of $783,000 was adjusted for payments related to bankruptcy professionals and the secured lender. **The resulting disposable income for the forecasted 5 year period is $550,000.**

Hal Luftig Company
*Disposable Income Including Proposed Reorganization Distributions*

| | 23-27 TOTAL | 2023 Q1 | 2023 Q2 | 2023 Q3 | 2023 Q4 | 2024 Q1 | 2024 Q2 | 2024 Q3 | 2024 Q4 | 2025 Q1 | 2025 Q2 | 2025 Q3 | 2025 Q4 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assumptions:** | | | | | | | | | | | | | | | |
| Expense Applied | | 100% | 50% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 50% | 50% | 50% | 50% | 50% |
| Deferred Compensation | | 46% | 23% | 11% | 11% | 11% | 11% | 11% | 11% | 11% | 23% | 23% | 23% | 23% | 23% |
| | | | | | | | | | | | | | | | |
| Opening cash | $89,771 | $89,771 | $62,329 | $563,968 | $131,716 | $96,646 | $71,575 | $56,405 | $101,334 | $66,264 | $126,193 | $55,832 | $133,571 | $116,310 | $50,966 |
| Settlement and Contribution | $550,000 | $- | $- | $550,000 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| | | | | | | | | | | | | | | | |
| Cash Receipts | $1,964,000 | $309,000 | $21,000 | $124,000 | $9,000 | $9,000 | $34,000 | $84,000 | $9,000 | $244,000 | $9,000 | $147,000 | $57,000 | $347,000 | $561,000 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Payroll, Payroll taxes and related costs (Applied) | $928,043 | $106,062 | $53,031 | $26,516 | $26,516 | $26,516 | $26,516 | $26,516 | $26,516 | $26,516 | $53,031 | $53,031 | $53,031 | $212,124 | $212,124 |
| Other Operating Expenses (Applied) | $84,525 | $14,700 | $7,350 | $3,675 | $3,675 | $3,675 | $3,675 | $3,675 | $3,675 | $3,675 | $7,350 | $7,350 | $7,350 | $7,350 | $7,350 |
| Other Operating Expenses | $168,500 | $1,675 | $6,775 | $6,675 | $11,675 | $1,675 | $16,775 | $6,675 | $11,675 | $1,675 | $16,775 | $6,675 | $11,675 | $34,050 | $34,050 |
| Total Operating Cash Disbursements | $1,181,068 | $122,437 | $67,156 | $36,866 | $41,866 | $31,866 | $46,966 | $36,866 | $41,866 | $31,866 | $77,156 | $67,056 | $72,056 | $253,524 | $253,524 |
| Net operating cash flow | $782,933 | $186,563 | $(46,156) | $87,135 | $(32,866) | $(22,866) | $(12,966) | $47,135 | $(32,866) | $212,135 | $(68,156) | $79,944 | $(15,056) | $93,476 | $307,476 |
| **Restructuring Cash Disbursements** | | | | | | | | | | | | | | | |
| Restructuring Costs | $211,800 | $211,800 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Priority Claims (Class 1) | $17,181 | $- | $- | $17,181 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| SBA Loan (Class 2) | $44,100 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $8,820 | $8,820 |
| FCP Entertainment Partners LLC (Class 3) | $1,070,000 | $- | $- | $500,000 | $- | $- | $- | $- | $- | $142,500 | $- | $- | $- | $142,500 | $285,000 |
| General Unsecured Claims (Class 4) | $30,000 | $- | $- | $- | $- | $- | $- | $- | $- | $7,500 | $- | $- | $- | $7,500 | $15,000 |
| Insider (Class 5) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Total Restructuring Cash Disbursements | $1,373,081 | $214,005 | $2,205 | $519,386 | $2,205 | $2,205 | $2,205 | $2,205 | $2,205 | $152,205 | $2,205 | $2,205 | $2,205 | $158,820 | $308,820 |
| Net operating and restructuring cash flow | $(590,149) | $(27,442) | $(48,361) | $(432,252) | $(35,071) | $(25,071) | $(15,171) | $44,930 | $(35,071) | $59,930 | $(70,361) | $77,739 | $(17,261) | $(65,344) | $(1,344) |
| | | | | | | | | | | | | | | | |
| Ending cash | $49,622 | $62,329 | $563,968 | $131,716 | $96,646 | $71,575 | $56,405 | $101,334 | $66,264 | $126,193 | $55,832 | $133,571 | $116,310 | $50,966 | $49,622 |
| | | | | | | | | | | | | | | | |
| Deferred Compensation (Cumulative) | $230,580 | $26,352 | $39,528 | $46,116 | $52,704 | $59,292 | $65,880 | $72,468 | $79,056 | $85,644 | $98,820 | $111,996 | $125,172 | $177,876 | $230,580 |

Disposable income exceeds the liquidation value of the assets, accordingly, the Debtor has projected the distribution of $550,000 to creditors.  In addition, the Debtor is projecting settlements with Mr. Luftig and FCP Entertainment Partners, LLC.  The results of those settlements are reflected in the distributions above.

# EXHIBIT B

**Hal Luftig Company**
*Liquidation Analysis*
*Estimated as of Effective Date - March 26, 2023*

| | Est Liquidation % | Value | Estimated Liquidation Value | Note |
|---|---|---|---|---|
| Cash | 100% | 62,329 | $ 62,329 | A |
| Affiliate Business Sales | 75% | 1,293,468 | 972,061 | B |
| FF&E | 25% | 1,300 | 325 | C |
| Deposits | 100% | - | - | D |
| Other Assets (Including Intellectual Property) | | - | - | E |
| Other - Potential Causes of Action | 10% | 416,066 | 41,607 | F |
| **Estimated Proceeds from Liquidation of Assets** | | **1,773,162** | **1,076,321** | |
| | | | | |
| **Administrative Claims** | | | | |
| Chapter 7 Trustee Fees | | 32,290 | 32,290 | G |
| Chapter 7 Trustee Professional Fees | | 100,000 | 100,000 | G |
| Operational Winddown Costs | | 40,000 | 40,000 | H |
| **Net Proceeds Available after Administrative Claims** | | | **904,031** | |
| | | | | |
| **Secured Claims** | | | | |
| SBA Loan (excluding interests and fees) (Class 2) | | 163,947 | 160,000 | I |
| **Net Proceeds Available to Priority Creditors** | | | **744,031** | |
| | | | | |
| **Chapter 11 Admin and Priority Claims** | | | | |
| Accounts Payable Post-Petition | 100% | 40,000 | 40,000 | H |
| Chapter 11 Professional Fees and Sub V Trustee | | 211,800 | 211,800 | J |
| Priority Claims (Class 1) | | 17,181 | 17,181 | I |
| **Net Proceeds Available to Unsecured Creditors** | | | **$ 475,050** | |
| | | | | |
| Unsecured Claims (as of the Filing Date) | | | | |
| FCP Entertainment Partners LLC (Class 3) | | $ 2,862,776 | $ 324,465 | I |
| General Unsecured Claims (Class 4) | | 114,123 | 12,935 | I |
| Insider Claims (Class 5) | | 1,214,506 | 137,651 | I |
| | | $ 4,191,405 | $ 475,050 | |
| | | | | |
| **Percentage Return to Unsecured Creditors** | | | **11%** | |
| **Net Proceeds Available to Equity** | | | **$ -** | |

A.  Cash and Cash Equivalents - The cash balances are estimated as of the effective date.

B.  Affiliate Business Sales - The Debtor's schedules of assets and liabilities reflect minority investment in 13-active entities.  In addition, we noted 5 additional closed entities which could distribute funds in the future.  RKC valued each of the investments using both the cost and income approach, for purposes of the liquidation analysis, we assumed the highest value prior to applying a liquidation discount.

C.  FF&E - As of the Petition Date of 12/1/2022, the Debtor's Schedules (ECF Doc. No. 23) indicate approximately $1,300 of furniture and computer equipment.

D.  Deposits - The Debtor does not represent to have any deposits.

E.  Other Assets (Including Intellectual Property) - The Debtor's Schedules reflect intellectual property including its website and domain, RKC determined there is limited value.

F.  Other - Potential Causes of Action- Estimated recoveries from avoidance actions and other assigned litigation claims.  Specifically, The Debtor notes $416,000 in potential preferential transfers.  Based on our experience, the net recovery to the Debtor for these types of litigation assets is approximately 10% of the gross amount transferred.

G.  Chapter 7 Trustee Fee - A recovery estimate of 3% of gross proceeds is assumed for trustee fees.  The Trustee Professional Fees are estimated based on the complicated assets for liquidation and recovery to the creditors.

H.  Based on the cash flow presented, two weeks of operating expenses total approximately $40,000.

I.  Per the schedule of assets and liabilities filed by the Debtor as well as the proofs of claims filed to date.

J.  Estimated fees due bankruptcy professionals and the Sub V Trustee related to the Chapter 11 process.

# EXHIBIT C

*RMF DRAFT 3202023*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT, effective as of _____2023 (the "Effective Date"), is hereby entered into by and between Hal Luftig, an individual ("Executive"), and Hal Luftig Company, Inc., a company organized and existing under the laws of the State of New York (the "Company").

### WITNESSETH:

WHEREAS, Executive is currently employed by the Company as its President;

WHEREAS, on December 1, 2022, the Company filed a Chapter 11 case under Subchapter V of the Bankruptcy Code (the "Case") in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on March 1, 2023, the Company filed a chapter 11 plan (the "Plan") in the Case which provided, among other things, that if the Plan is confirmed in its current form with the Luftig Contribution and the Luftig Release (each as defined therein), then the Company and Executive shall execute an employment agreement with a term that coincides with the period of time during which the Company will make payments to creditors under the Plan;

WHEREAS, the Plan provides that the Company will make certain distributions to the creditors holding allowed claims against the Company;

WHEREAS, in furtherance of the purposes of the Plan, and to ensure that the Executive is available to continue to perform services on behalf of the Company, the Company agrees to continue to employ Executive and Executive agrees to continue to be employed by the Company on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1)      **EMPLOYMENT OF EXECUTIVE**: The Company hereby employs Executive, and Executive hereby accepts employment with the Company, in each case pursuant to the terms and conditions of this Agreement.  The Company and the Executive acknowledge and agree that the Executive's employment under this Agreement is non-exclusive and that the Executive will be entitled to work on projects unrelated to the Company and its business in the Executive's sole discretion.

2)      **DUTIES**: Executive shall continue his position as President of the Company under this Agreement and shall have the authority, functions, duties, powers and responsibilities normally associated with such position. Executive agrees to devote the time and effort necessary to fulfill his duties under this Agreement, which the Executive and the Company agree is approximately 50% of his business time and efforts, except for customary vacations and reasonable absences due to illness or other incapacity as set forth herein, and to perform all of his duties to

*RMF DRAFT 3202023*

the best of his professional ability and comply with such reasonable policies, and standards of the Company. Notwithstanding the foregoing, nothing contained herein shall be construed so as to prohibit or prevent Executive from working for other companies and businesses, regardless of whether he holds an interest in those entities, so long as such activities do not interfere with the performance of his duties hereunder. By entering into this Agreement, Executive represents that he is not a party to any restrictive covenants, or other agreement or understanding which would conflict or interfere with the performance of any of his duties hereunder.

3)      <u>TERM</u>: The term of employment under this Agreement shall commence on the Effective Date and shall continue until all of the Company's payments under the Plan have been completed or otherwise satisfied, or pursuant to an order of the Bankruptcy Court (the "Term").

4)      <u>PLACE OF EMPLOYMENT</u>: Executive's principal work location shall be the Company's office located in New York, New York. Executive shall travel to such other locations, at the Company's expense, as reasonably necessary in his sole discretion to carry out his duties hereunder on an as-needed basis.

5)      <u>COMPENSATION</u>:

(a)      For all services rendered to the Company by Executive, Executive agrees to accept as total compensation a sum computed as set forth in this Section 5. All payments of compensation (whether under this Section 5 or under any other section of this Agreement) shall be subject to all applicable withholdings, deductions, and other authorized deductions in accordance with applicable law and Company policies and procedures.

(b)      <u>Base Salary</u>. The Company shall pay Executive an annual base salary at the rate of Two Hundred and Ten Thousand Dollars ($210,000.00) per year ("Base Salary") during the Term, in accordance with the customary payroll practices of the Company. In addition, the Company shall advance to the Executive distributions equal to the Executive's tax liability on a quarterly basis. During the Term, the Base Salary shall not be increased. If any part of the Base Salary is not paid to the Executive, then the Company will record the unpaid compensation as deferred compensation ("Deferred Compensation") on the Company's books and records and shall pay the Deferred Compensation when sufficient cash becomes available. The Executive's Deferred Compensation will be paid to the Executive only if the Company is able to make the required payments to creditors under the Plan.

6)      <u>VACATION/SICK TIME</u>: Executive shall be entitled to **[four] (4) weeks** of paid vacation during each year of Executive's employment. The scheduling of any vacation shall be coordinated with the Company so that the staffing needs of the Company are met to the extent reasonably possible. The Executive shall be granted sick time in accordance with the Company's policies then in effect from time to time.

7)      <u>REIMBURSEMENT OF BUSINESS EXPENSES</u>: The Company agrees to pay, either directly or indirectly by payment to Executive, for all of Executive's reasonable research, entertainment, travel and other miscellaneous business expenses incurred by him which are directly related to the performance of his services under this Agreement, in accordance with the

2

*RMF DRAFT 3202023*

Company's policies regarding such reimbursements. As a prerequisite to any reimbursement by the Company for business expenses, Executive shall submit receipts of all such expenses to the Company; and the Company's obligation to effect payment or reimbursement of such expenses shall be only to the extent of such receipts.

8)    <u>ADDITIONAL BENEFITS</u>: Executive shall be eligible to participate in the Company's medical and dental insurance plans in accordance with the terms and conditions of such plans.  The Company shall make any payments to any third-parties necessary to keep such benefits in effect.

9)    <u>COMPANY PROPERTY</u>: Executive understands and agrees that Company files, intellectual property and other work product or property, and all copies thereof (collectively, "Company Property") are the sole and exclusive property of the Company.

10)    <u>DISPOSITION OF PROPERTY UPON TERMINATION OF EMPLOYMENT</u>: In the event that Executive's employment with the Company is terminated for any reason, Executive agrees and understands that all Company Property in his possession or control shall be, at the Company's option, promptly destroyed or returned to the Company, and Executive shall have no right, title or interest in the same.

11)    <u>TERMINATION OF EMPLOYMENT</u>: Upon the Executive's termination of employment for any reason, he shall automatically be deemed to have stepped down from all positions and offices held with the Company.  The employment of Executive may be terminated as follows:

(a)    <u>Termination upon Death or Disability</u>.  This Agreement and Executive's employment hereunder shall automatically terminate on the date on which Executive dies or becomes permanently incapacitated. Executive shall be deemed to have become "permanently incapacitated" on the date that is thirty (30) days after the Company has determined that Executive has suffered a Permanent Incapacity (as defined below) and so notifies Executive. For purposes of this section, "Permanently Incapacitated" shall mean: (i) Executive's actual or anticipated inability, due to physical or mental incapacity, to substantially perform his duties and responsibilities under this Agreement with or without reasonable accommodation for four (4) months out of any twelve (12) month period; or (ii) Executive is receiving income benefits for a period of ninety (90) days under any long-term disability plan by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of four (4) months or more.

(b)    <u>Termination by the Company</u>.  The Company may terminate this Agreement and Executive's employment hereunder with or without cause, upon at least thirty (30) days prior written notice to Executive; provided, however, the Company will not terminate the Executive prior to the end of the Term without an appropriate order of the Bankruptcy Court.

12)    <u>PAYMENTS UPON TERMINATION</u>.  In the event of the termination of this Agreement and Executive's employment hereunder, Executive (or Executive's estate or beneficiaries in the case of the death of Executive) shall be entitled to: (a) receive any unpaid Base

3

RMF DRAFT 3202023

Salary, Deferred Compensation, and benefits earned and accrued under this Agreement prior to the date of termination (and reimbursement under this Agreement for expenses incurred prior to the date of termination) in accordance with any applicable Company plan or policy; and (b) indemnification in accordance with the Company's Bylaws and applicable law, and any vested rights pursuant to any insurance plan, benefit plan or retirement plan.

13)    <u>INDEMNIFICATION</u>: During and after the period of Executive's employment by the Company, the Company shall indemnify Executive to the maximum extent permitted by the Company's Bylaws and applicable law, in either case against all liabilities, losses, damages and expenses actually and reasonably incurred by Executive, including reasonable attorney's fees, in connection with any claim or proceeding arising out of, or relating to, his services for the Company, other than (a) any claim or proceeding by the Company against Executive, and (b) any claim or proceeding by Executive against the Company, except if such claim or proceeding is to recover pursuant to this Section 13 of the Agreement.

14)    <u>NOTICES</u>: Any notice required or permitted to be given pursuant to this Agreement shall be sufficient if in writing, and if personally delivered to the party to be notified or if sent by nationally recognized overnight delivery service to said party at the following addresses, or such other address as provided by the parties in writing:

| | |
|---|---|
| If to the Company: | Hal Luftig Company, Inc.<br>117 West 17th Street, #2C<br>New York, NY 10011-5446<br>Attn: Hal Luftig |
| With a copy to: | Ruskin Moscou Faltischek, P.C.<br>1425 RXR Plaza<br>East Tower, 15th Floor<br>Uniondale, New York 11556<br>Attn: Sheryl P. Giugliano |
| If to Executive: | Hal Luftig<br>117 West 17th Street, #2C<br>New York, NY 10011-5446 |
| With a copy to: | Martin J. Foley, PLC<br>601 S. Figueroa Street<br>Ste. 2050<br>Los Angeles, CA 90017 |

*RMF DRAFT 3202023*

15)    <u>SEVERABILITY</u>: In the event any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion or provision shall not affect any other provision hereof and this Agreement shall be construed and enforced as if the invalid provision had not been included.

16)    <u>BINDING EFFECT</u>: This Agreement shall inure to the benefit of and shall be binding upon the Company and upon any person, firm or corporation with which the Company may be merged or consolidated or which may acquire all or substantially all of the Company's assets through sale, lease, liquidation or otherwise.  Except as otherwise specifically provided herein, the rights and benefits of Executive are personal to him, and no such rights or benefits shall be subject to assignment or transfer by Executive.

17)    <u>GOVERNING LAW AND VENUE</u>: This Agreement shall be construed and interpreted in accordance with the laws of the State of New York, without regard to its conflict of laws provisions. Any legal proceeding arising out of or relating to this Agreement will be instituted in a state or federal court in New York, and Executive and the Company hereby consent to the personal and exclusive jurisdiction of such court(s) and hereby waive any objection(s) that they may have to personal jurisdiction, the laying of venue of any such proceeding and any claim or defense of inconvenient forum.

18)    <u>ENTIRE AGREEMENT</u>: This Agreement constitutes the entire agreement between the parties and merges, integrates and supersedes any prior agreement in its entirety; and there are no other agreements between the parties with respect to the subject matter contained herein except as set forth herein.

19)    <u>AMENDMENT AND MODIFICATION</u>: All terms, conditions and provisions of this Agreement shall remain in full force and effect unless modified, changed, altered or amended, in writing, executed by both parties.

20)    <u>NON-WAIVER</u>. No waiver of any breach of any term or provision of this Agreement shall be construed to be, or shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

21)    <u>SURVIVAL</u>.  Unless otherwise provided elsewhere in this Agreement, the following provisions shall survive the termination or expiration of this Agreement: 9; 10; 12; 13; 15; 16; 17; 18; and 20.

22)    <u>CAPTIONS</u>. Captions of the sections or paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

*RMF DRAFT 3202023*

23)    <u>COUNTERPARTS</u>.  This Agreement may be executed electronically, by email or facsimile, and in counterparts, and shall be fully binding and enforceable upon the parties when so executed.


HAL LUFTIG COMPANY, INC.


By: _____          Date: _____2023
Name:  Hal Luftig
Title:   President



BY SIGNING BELOW, EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT AS OF THE DATE SET FORTH BELOW.


_____          Date: _____2023
        Hal Luftig

# <u>EXHIBIT D</u>

## GENERAL SECURITY AGREEMENT

**GENERAL SECURITY AGREEMENT** ("Agreement") dated as of March __, 2023 between **HAL LUFTIG COMPANY, INC.** (the "Debtor"), with an address at 117 West 17th Street, Apt. 2C, New York, New York 10011, and **HAL LUFTIG**, having an address at c/o Martin J. Foley, PLC, 601 S Figueroa St., Ste. 2050, Los Angeles, CA 90017 ("Secured Party").

It is agreed as follows:

1.     Grant of Security Interest.  In accordance with the Debtor's small business chapter 11 plan of reorganization, dated March 1, 2023 (the "Plan") filed in the U.S. Bankruptcy Court for the Southern District of New York (the "Court") in the Debtor's Subchapter V reorganization case, No. 22-11617 (JPM), the Confirmation Order entered by the Court (ECF Doc. No. ____) confirming the Plan, and the Secured Promissory Note, dated **March [•],** 2023 (the "Note") between the above parties, the Debtor is granting the subordinated security interest described in this Agreement to secure the payment, performance and observance of all indebtedness, obligations, liabilities and agreements of any kind of Debtor to Secured Party, in connection with the Debtor's obligations under Plan and the Note (all of the foregoing collectively referred to as the "Obligations"). The effectiveness of this Agreement is conditioned upon the approval of the Plan by the Court in the form of a final and non-appealable Confirmation Order which includes the Luftig Contribution and the Luftig Release. Pursuant to the terms of this Agreement, the Debtor hereby grants to Secured Party a lien and interest, subordinate to the rights of the U.S. Small Business Administration (the "Senior Secured Party") until the Debtor's loan is paid in full and such senior lien is released, and the payments due under the Plan pursuant to the Confirmation Order, in and right of setoff against, the following property (the "Collateral"):

   a.   Substantially all of the Debtor's assets related to the Debtor's business, including, without limitation (i) personal property, including equipment and furniture, and (ii) the Debtor's interest in and right to receive distributions, royalties and payments relating to the Debtor's interest in theatrical productions; and

   b.   Any and all products and proceeds of any of the foregoing, in any form (including, without limitation, any insurance proceeds or claims by Debtor against third parties for loss or damage to or destruction of any or all of the foregoing property.

2.     Representations, Warranties and Covenants.  Debtor represents, warrants and covenants that:

   a.   Debtor will not assign, transfer, sell, lease or otherwise dispose of or abandon any Collateral, nor will Debtor suffer or permit any of the same to occur with respect to any Collateral, without prior written notice to and consent of Secured Party;

   b.   Debtor will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances and regulations;

c.   Debtor will, at its sole cost and expense, perform all acts and execute all documents
requested by Secured Party from time to time to evidence, perfect, maintain or
enforce Secured Party's security interest granted herein, and to effectuate or maintain
the priority thereof, or otherwise to carry out the provisions and purposes of this
Agreement, including, without limitation, the execution and delivery of financing
statements pursuant to the UCC, and Debtor hereby authorizes Secured Party to
execute and file at any time and from time to time one or more financing statements
or copies thereof or of this Agreement with respect to the Collateral signed only by
Secured Party and/or signed by Secured Party as attorney-in-fact of Debtor;

d.   Debtor will pay Secured Party for any sums, costs, and expenses which Secured Party
may pay or incur pursuant to the provisions of this Agreement or in negotiating,
executing, perfecting, amending, defending, protecting or enforcing this Agreement
or the security interest granted herein or in enforcing payment of the Obligations or
otherwise in connection with the provisions hereof, including but not limited to court
costs, collection charges, travel expenses, and reasonable attorneys' fees, all of
which, together with interest at the highest rate then payable on any of the
Obligations, shall be part of the Obligations and be payable on demand;

e.   Debtor will protect and insure the Collateral in accordance with prudent business
management;

f.   Debtor has made, and will continue to make, payment or deposit, or otherwise has
provided and will provide for the payment, when due, of all taxes, assessments or
contributions or other public or private charges which have been or may be levied or
assessed against Debtor, whether with respect to any Collateral, to any wages or
salaries paid by Debtor, or otherwise, and will deliver to Secured Party, on demand,
certificates or other evidence satisfactory to Secured Party attesting thereto; and

g.   Secured Party shall at reasonable times and upon reasonable notice have access to
and right of inspection of the Collateral and any records pertaining thereto (and the
right to make extracts from and to receive from Debtor originals or true copies of
such records and any papers and instruments relating to any Collateral upon request
therefor).

3.      Events of Default.  Each of the following events shall constitute an event of default
("Event of Default") under this Agreement:

a.   if Debtor shall default in the timely payment of any sum payable with respect to, or in
the observance or performance of any of the terms and conditions of any Obligations
or this Agreement beyond any applicable cure period as set forth in the applicable
agreement;

2

b. if the Debtor shall default in the timely payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of the Confirmation Order beyond any applicable cure period;

c. if any warranty or representation made to Secured Party at any time by Debtor is false or misleading in any material respect when made and Debtor fails to cause such warranty or representation to cease to be false or misleading within ten 10 days after written notice thereof from Secured Party; or

d. if there shall be any loss, theft, substantial damage to or diminution of value of any Collateral. or the making or filing of any lien, levy, or execution on, or seizure, attachment of or garnishment of, any Collateral which is not discharged within thirty (30) days.

4.    <u>Remedies Upon Default</u>.  Upon the occurrence and during the continuance of an Event of Default, Secured Party may, without notice to or demand upon Debtor, declare any Obligations immediately due and payable and Secured Party shall have the following rights and remedies (to the extent permitted by applicable law), in addition to all rights and remedies of a secured party under the UCC, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently:

a. Secured Party may take the necessary steps to take possession of the Collateral, and/or dispose of any Collateral, and/or remove any Collateral for the purpose of effecting sale or other disposition thereof, and/or sell, resell, lease, assign and deliver, grant options for or otherwise dispose of any Collateral in its then condition or following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels, at the same or different times, with or without having the Collateral at the place of sale or other disposition, pursuant to applicable law. Secured Party may buy any Collateral at any public sale and, if any Collateral is of a type customarily sold in a recognized market or is of the type which is the subject of widely distributed standard price quotations, Secured Party may buy such Collateral at private sale and in each case may make payment therefor by any means.

b. Secured Party may apply the cash proceeds actually received from any sale or other disposition of Collateral to the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like, to reasonable attorneys' fees and all legal, travel and other expenses which may be incurred by Secured Party in attempting to collect the Obligations or enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; and then to the Obligations in such order and as to principal or interest as Secured Party may desire; and Debtor shall remain liable and will pay Secured Party on demand any deficiency remaining after the application of such cash proceeds, together with interest thereon at die highest rate then payable on the Obligations, and the balance of any expenses unpaid, with any surplus to be paid to Debtor, subject to any duty of Secured Party

3

imposed by law to the holder of any subordinate security interest in the Collateral known to Secured Party.

c.   Secured Party may appropriate, set off and apply to the payment of the Obligations, any Collateral in or coming into the possession of Secured Party or its agents, without notice to Debtor and in such manner as Secured Party may in its discretion determine.

5.   <u>Subordination</u>.

a.   Notwithstanding the foregoing, the Debtor agrees, and the Secured Party also agrees, that the Obligations and Note are and shall be subordinate, to the extent and in the manner hereafter set forth, to the prior payment in full in cash of all obligations due to the Senior Secured Party and that the subordination is for the benefit of and enforceable by the Senior Secured Party.

b.   The Senior Secured Party shall first be entitled to receive payment in full of all amounts due or in respect of amounts due by the Debtor to the Secured Party, before the Secured Party shall be entitled to receive any payment under the Note with respect to the Obligations, except that the Secured Party may receive and maintain a permitted junior security interest in the Collateral, including in the event of any distribution to creditors of the Debtor in (a) any liquidation or dissolution of the Debtor, (b) any bankruptcy, reorganization, insolvency, receivership  or similar proceeding relating to the Debtor or its property, (c) any assignment by the Debtor for the benefit of its creditors, or (d) any marshaling of the Debtor's assets and liabilities.

c.   The Debtor shall not make any payment under the Note in respect of the Obligations if: (i) a payment default has occurred with respect to amounts due to the Senior Secured Party; (ii) the maturity date under the Senior Secured Party's loan documents is accelerated due to the occurrence of an event of default thereunder; or (iii) any other default occurs and is continuing that permits the Senior Secured Party to accelerate its maturity and the Debtor receives a notice of such default.

d.   If payment under the Note is accelerated because of an Event of Default, the Debtor shall promptly notify the Senior Secured Party of the acceleration.  If any amounts are due to the Senior Secured Party, the Debtor may not make any payments under the Note until five (5) business days after the Senior Secured Party receives notice of such acceleration and, thereafter, may pay the Note if permitted under this Agreement.

e.   If a payment is made to the Secured Party that because of this Section of the Agreement should not have been made to it, then the Secured Party shall hold it in trust for the Senior Secured Party, segregated from other funds and property held by the Secured Party, and pay it over to the Senior Secured Party.

4

    f.   The Debtor and the Secured Party will, at any time and from time to time and at the Debtor's expense, promptly execute and deliver all further instruments, documents, and agreements, and take all further action, that may be necessary or desirable, or that the Senior Secured Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable such Senior Secured Party to exercise its rights and remedies hereunder.

6.    <u>Power of Attorney</u>.

    a.   To the limited extent necessary to effectuate the terms and provisions of this Agreement, Debtor hereby designates and appoints Secured Party and each of its designees or agents as attorney-in-fact of Debtor, irrevocably and with power of substitution, with authority to: (i) endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, instruments or other evidences of Collateral that may come into Secured Party's possession; (ii) sign the name of Debtor on any invoices, documents, drafts against and notices to account debtors or obligors of Debtor, assignments and requests for verification of accounts; (iii) execute proofs of claim and loss; (iv) execute endorsements, assignments or other instruments of conveyance or transfer; (v) adjust and compromise any claims under insurance policies or otherwise; (vi) receive, open and dispose of all mail addressed to Debtor and, upon the occurrence of an Event of Default, notify the Post Office authorities to change the address for delivery of mail addressed to Debtor to such address as Secured Party may designate; (vii) file UCC financing statements and/or amendments thereto; and (viii) do all other acts and things necessary or advisable in the sole discretion of Secured Party to carry out and enforce this Agreement or the Obligations. All acts done under the foregoing authorization are hereby ratified and approved and neither Secured Party nor any designee or agent thereof shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law, provided that Secured Party or any designee or agent thereof shall not be relieved of liability to the extent it is determined by a final judicial decision that its act, error or mistake constituted gross negligence or willful misconduct. This power of attorney being coupled with an interest is irrevocable while any Obligations shall remain unpaid.

    b.   Debtor hereby authorizes Secured Party to file Financing Statements as required to evidence or perfect the security interest granted herein.

7.    <u>Care of Collateral</u>. Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any Collateral in its possession, which duty shall be fully satisfied if Secured Party accords such Collateral treatment substantially the same as that which it accords similar property owned by it. Except for any claims, causes of action or demands arising out of Secured Party's failure to perform its agreements set forth in the preceding sentence, Debtor releases Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Agreement, the Obligations, the Collateral and its use and/or any actions taken or omitted to be taken by Secured Party with respect thereto, and Debtor hereby agrees to hold Secured

5

Party harmless from and with respect to any and all such claims, causes of action and demands. Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations.

8.    <u>Waivers</u>.  No act, omission or delay by Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise.  No single or partial waiver by Secured Party of any Event of Default or right or remedy which it may have shall operate as a waiver of any other Event of Default, right or remedy or of the same Event of Default, right or remedy on a future occasion. Debtor hereby waives presentment, notice of dishonor and protest of all instruments included in or evidencing any Obligations or Collateral, and all other notices and demands whatsoever (except as expressly provided herein).

9.    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF).

10.    <u>SUBMISSION TO JURISDICTION: WAIVER OF TRIAL BY JURY, ETC.</u>

a.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, DEBTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  DEBTOR HEREBY IRREVOCABLY WAIVES, IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING, (I) TRIAL BY JURY, (II) ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS, AND (III) THE RIGHT TO INTERPOSE ANY SETOFF, NON-COMPULSORY COUNTERCLAIM OR CROSS-CLAIM.

b.    DEBTOR IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY A NATIONALLY RECOGNIZED OVERNIGHT DELIVERY SERVICE, TO DEBTOR AT ITS ADDRESS DETERMINED PURSUANT TO SECTION 11 HEREOF. NOTHING HEREIN SHALL AFFECT THE RIGHT OF SECURED PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST DEBTOR IN ANY OTHER JURISDICTION.

11.    <u>Notices; Business Days</u>.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement or any other shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight delivery service, or one (1) business day after being sent to the recipient by reputable overnight delivery service. All notices, demands and other communications shall be sent to the respective addresses indicated below:

If to Secured Party:

                Hal Luftig
                117 West 17th Street, Apt. 2C
                New York, NY 10011-5446

                With a copy to:

                Martin J. Foley, PLC
                601 S Figueroa St., Ste. 2050
                Los Angeles, CA 90017

If Debtor:           Hal Luftig Company, Inc.
                117 West 17th Street, Apt. 2C
                New York, NY 10011-5446
                Attn:  Hal Luftig

                With a copy to:

                Ruskin Moscou Faltischek, P.C.
                East Tower, 15th Floor
                1425 RXR Plaza
                Uniondale, NY 11556-0109
                Attn:  Sheryl P. Giugliano

12.    <u>Security Interest Absolute</u>.  Except as otherwise set forth herein, all rights of Secured Party and the security interests granted herein, and all obligations of Debtor hereunder, shall be absolute and unconditional without regard to. (a) any lack of validity or enforceability of any agreement or instrument relating to the Obligations; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any agreement or instrument relating to the Obligations; (c) any exchange, release or non-perfection of any other collateral, for all or any of the Obligations; or (d) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Debtor or any other person or entity.

13.    <u>Amendments and Waivers: Partial Invalidity.  Acknowledgment of Receipt</u>.  No provision hereof shall be modified, altered, or limited except by a written instrument executed by the party to be charged.  If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

14.    <u>Benefit of Agreement; Continuing Security Interest</u>.  This Agreement and the Obligations shall be binding upon the heirs, executors, legal representatives, administrators, successors and assigns of Debtor and shall, together with the rights and remedies of Secured Party hereunder, inure to the benefit of Secured Party, its successors, endorsees, and assigns; <u>provided</u>, <u>however</u>, Debtor may not assign, transfer or delegate any of its rights or obligations hereunder without the express prior written consent of Secured Party.  This Agreement shall create a continuing security interest in the Collateral which shall remain in full force and effect until payment in full of the Obligations and termination of any commitment by Secured Party to make loans or other financial accommodations to or for the benefit of Debtor pursuant to the Loan Agreement.

15.    <u>Counterparts, Captions, Entire Agreement</u>.  This Agreement may be executed in any number of counterparts.  The captions of the Sections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.  This Agreement represents the agreement of Debtor with respect to the subject matter hereof and there are no promises or representations by Debtor or Secured Party relative to the subject matter hereof not reflected herein.

IN WITNESS WHEREOF, the undersigned have executed or caused this Agreement to be duly executed as of the date first above set forth.

DEBTOR:
HAL LUFTIG COMPANY, INC.


By: _____
        Hal Luftig, President


SECURED PARTY:


_____
        Hal Luftig

# EXHIBIT C

*RMF DRAFT 3202023*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT, effective as of _____ **2023** (the "Effective Date"), is hereby entered into by and between Hal Luftig, an individual ("Executive"), and Hal Luftig Company, Inc., a company organized and existing under the laws of the State of New York (the "Company").

## WITNESSETH:

WHEREAS, Executive is currently employed by the Company as its President;

WHEREAS, on December 1, 2022, the Company filed a Chapter 11 case under Subchapter V of the Bankruptcy Code (the "Case") in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on March 1, 2023, the Company filed a chapter 11 plan (the "Plan") in the Case which provided, among other things, that if the Plan is confirmed in its current form with the Luftig Contribution and the Luftig Release (each as defined therein), then the Company and Executive shall execute an employment agreement with a term that coincides with the period of time during which the Company will make payments to creditors under the Plan;

WHEREAS, the Plan provides that the Company will make certain distributions to the creditors holding allowed claims against the Company;

WHEREAS, in furtherance of the purposes of the Plan, and to ensure that the Executive is available to continue to perform services on behalf of the Company, the Company agrees to continue to employ Executive and Executive agrees to continue to be employed by the Company on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1)      <u>EMPLOYMENT OF EXECUTIVE</u>: The Company hereby employs Executive, and Executive hereby accepts employment with the Company, in each case pursuant to the terms and conditions of this Agreement.  The Company and the Executive acknowledge and agree that the Executive's employment under this Agreement is non-exclusive and that the Executive will be entitled to work on projects unrelated to the Company and its business in the Executive's sole discretion.

2)      <u>DUTIES</u>: Executive shall continue his position as President of the Company under this Agreement and shall have the authority, functions, duties, powers and responsibilities normally associated with such position. Executive agrees to devote the time and effort necessary to fulfill his duties under this Agreement, which the Executive and the Company agree is approximately 50% of his business time and efforts, except for customary vacations and reasonable absences due to illness or other incapacity as set forth herein, and to perform all of his duties to

*RMF DRAFT 3202023*

the best of his professional ability and comply with such reasonable policies, and standards of the Company.  Notwithstanding the foregoing, nothing contained herein shall be construed so as to prohibit or prevent Executive from working for other companies and businesses, regardless of whether he holds an interest in those entities, so long as such activities do not interfere with the performance of his duties hereunder. By entering into this Agreement, Executive represents that he is not a party to any restrictive covenants, or other agreement or understanding which would conflict or interfere with the performance of any of his duties hereunder.

3)    TERM: The term of employment under this Agreement shall commence on the Effective Date and shall continue until all of the Company's payments under the Plan have been completed or otherwise satisfied, or pursuant to an order of the Bankruptcy Court (the "Term").

4)    PLACE OF EMPLOYMENT: Executive's principal work location shall be the Company's office located in New York, New York.  Executive shall travel to such other locations, at the Company's expense, as reasonably necessary in his sole discretion to carry out his duties hereunder on an as-needed basis.

5)    COMPENSATION:

(a)    For all services rendered to the Company by Executive, Executive agrees to accept as total compensation a sum computed as set forth in this Section 5. All payments of compensation (whether under this Section 5 or under any other section of this Agreement) shall be subject to all applicable withholdings, deductions, and other authorized deductions in accordance with applicable law and Company policies and procedures.

(b)    Base Salary. The Company shall pay Executive an annual base salary at the rate of Two Hundred and Ten Thousand Dollars ($210,000.00) per year ("Base Salary") during the Term, in accordance with the customary payroll practices of the Company. In addition, the Company shall advance to the Executive distributions equal to the Executive's tax liability on a quarterly basis. During the Term, the Base Salary shall not be increased. If any part of the Base Salary is not paid to the Executive, then the Company will record the unpaid compensation as deferred compensation ("Deferred Compensation") on the Company's books and records and shall pay the Deferred Compensation when sufficient cash becomes available. The Executive's Deferred Compensation will be paid to the Executive only if the Company is able to make the required payments to creditors under the Plan.

6)    VACATION/SICK TIME: Executive shall be entitled to **[four] (4) weeks** of paid vacation during each year of Executive's employment. The scheduling of any vacation shall be coordinated with the Company so that the staffing needs of the Company are met to the extent reasonably possible. The Executive shall be granted sick time in accordance with the Company's policies then in effect from time to time.

7)    REIMBURSEMENT OF BUSINESS EXPENSES: The Company agrees to pay, either directly or indirectly by payment to Executive, for all of Executive's reasonable research, entertainment, travel and other miscellaneous business expenses incurred by him which are directly related to the performance of his services under this Agreement, in accordance with the

*RMF DRAFT 3202023*

Company's policies regarding such reimbursements. As a prerequisite to any reimbursement by the Company for business expenses, Executive shall submit receipts of all such expenses to the Company; and the Company's obligation to effect payment or reimbursement of such expenses shall be only to the extent of such receipts.

8) <u>ADDITIONAL BENEFITS</u>: Executive shall be eligible to participate in the Company's medical and dental insurance plans in accordance with the terms and conditions of such plans. The Company shall make any payments to any third-parties necessary to keep such benefits in effect.

9) <u>COMPANY PROPERTY</u>: Executive understands and agrees that Company files, intellectual property and other work product or property, and all copies thereof (collectively, "Company Property") are the sole and exclusive property of the Company.

10) <u>DISPOSITION OF PROPERTY UPON TERMINATION OF EMPLOYMENT</u>: In the event that Executive's employment with the Company is terminated for any reason, Executive agrees and understands that all Company Property in his possession or control shall be, at the Company's option, promptly destroyed or returned to the Company, and Executive shall have no right, title or interest in the same.

11) <u>TERMINATION OF EMPLOYMENT</u>: Upon the Executive's termination of employment for any reason, he shall automatically be deemed to have stepped down from all positions and offices held with the Company. The employment of Executive may be terminated as follows:

(a) <u>Termination upon Death or Disability</u>. This Agreement and Executive's employment hereunder shall automatically terminate on the date on which Executive dies or becomes permanently incapacitated. Executive shall be deemed to have become "permanently incapacitated" on the date that is thirty (30) days after the Company has determined that Executive has suffered a Permanent Incapacity (as defined below) and so notifies Executive. For purposes of this section, "Permanently Incapacitated" shall mean: (i) Executive's actual or anticipated inability, due to physical or mental incapacity, to substantially perform his duties and responsibilities under this Agreement with or without reasonable accommodation for four (4) months out of any twelve (12) month period; or (ii) Executive is receiving income benefits for a period of ninety (90) days under any long-term disability plan by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of four (4) months or more.

(b) <u>Termination by the Company</u>. The Company may terminate this Agreement and Executive's employment hereunder with or without cause, upon at least thirty (30) days prior written notice to Executive; provided, however, the Company will not terminate the Executive prior to the end of the Term without an appropriate order of the Bankruptcy Court.

12) <u>PAYMENTS UPON TERMINATION</u>. In the event of the termination of this Agreement and Executive's employment hereunder, Executive (or Executive's estate or beneficiaries in the case of the death of Executive) shall be entitled to: (a) receive any unpaid Base

Salary, Deferred Compensation, and benefits earned and accrued under this Agreement prior to the date of termination (and reimbursement under this Agreement for expenses incurred prior to the date of termination) in accordance with any applicable Company plan or policy; and (b) indemnification in accordance with the Company's Bylaws and applicable law, and any vested rights pursuant to any insurance plan, benefit plan or retirement plan.

13)    <u>INDEMNIFICATION</u>: During and after the period of Executive's employment by the Company, the Company shall indemnify Executive to the maximum extent permitted by the Company's Bylaws and applicable law, in either case against all liabilities, losses, damages and expenses actually and reasonably incurred by Executive, including reasonable attorney's fees, in connection with any claim or proceeding arising out of, or relating to, his services for the Company, other than (a) any claim or proceeding by the Company against Executive, and (b) any claim or proceeding by Executive against the Company, except if such claim or proceeding is to recover pursuant to this Section 13 of the Agreement.

14)    <u>NOTICES</u>: Any notice required or permitted to be given pursuant to this Agreement shall be sufficient if in writing, and if personally delivered to the party to be notified or if sent by nationally recognized overnight delivery service to said party at the following addresses, or such other address as provided by the parties in writing:

| | |
|---|---|
| If to the Company: | Hal Luftig Company, Inc.<br>117 West 17th Street, #2C<br>New York, NY 10011-5446<br>Attn:  Hal Luftig |
| With a copy to: | Ruskin Moscou Faltischek, P.C.<br>1425 RXR Plaza<br>East Tower, 15th Floor<br>Uniondale, New York 11556<br>Attn:  Sheryl P. Giugliano |
| If to Executive: | Hal Luftig<br>117 West 17th Street, #2C<br>New York, NY 10011-5446 |
| With a copy to: | Martin J. Foley, PLC<br>601 S. Figueroa Street<br>Ste. 2050<br>Los Angeles, CA 90017 |

*RMF DRAFT 3202023*

15)    <u>SEVERABILITY</u>: In the event any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion or provision shall not affect any other provision hereof and this Agreement shall be construed and enforced as if the invalid provision had not been included.

16)    <u>BINDING EFFECT</u>: This Agreement shall inure to the benefit of and shall be binding upon the Company and upon any person, firm or corporation with which the Company may be merged or consolidated or which may acquire all or substantially all of the Company's assets through sale, lease, liquidation or otherwise.  Except as otherwise specifically provided herein, the rights and benefits of Executive are personal to him, and no such rights or benefits shall be subject to assignment or transfer by Executive.

17)    <u>GOVERNING LAW AND VENUE</u>: This Agreement shall be construed and interpreted in accordance with the laws of the State of New York, without regard to its conflict of laws provisions. Any legal proceeding arising out of or relating to this Agreement will be instituted in a state or federal court in New York, and Executive and the Company hereby consent to the personal and exclusive jurisdiction of such court(s) and hereby waive any objection(s) that they may have to personal jurisdiction, the laying of venue of any such proceeding and any claim or defense of inconvenient forum.

18)    <u>ENTIRE AGREEMENT</u>: This Agreement constitutes the entire agreement between the parties and merges, integrates and supersedes any prior agreement in its entirety; and there are no other agreements between the parties with respect to the subject matter contained herein except as set forth herein.

19)    <u>AMENDMENT AND MODIFICATION</u>: All terms, conditions and provisions of this Agreement shall remain in full force and effect unless modified, changed, altered or amended, in writing, executed by both parties.

20)    <u>NON-WAIVER</u>. No waiver of any breach of any term or provision of this Agreement shall be construed to be, or shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

21)    <u>SURVIVAL</u>.   Unless otherwise provided elsewhere in this Agreement, the following provisions shall survive the termination or expiration of this Agreement: 9; 10; 12; 13; 15; 16; 17; 18; and 20.

22)    <u>CAPTIONS</u>. Captions of the sections or paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

*RMF DRAFT 3202023*

23)    <u>COUNTERPARTS</u>.  This Agreement may be executed electronically, by email or facsimile, and in counterparts, and shall be fully binding and enforceable upon the parties when so executed.


HAL LUFTIG COMPANY, INC.


By: _____        Date: _____2023
Name:  Hal Luftig
Title:   President



BY SIGNING BELOW, EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT AS OF THE DATE SET FORTH BELOW.


_____        Date: _____2023
        Hal Luftig

# EXHIBIT D

<u>PRESS RELEASE</u>

**Comedy is easy.**
**Marriage is hard.**

**TWO ICONS. THREE COUPLES. ONE PERFECT EVENING OF COMEDY.**

**<u>TWO-TIME TONY AWARD® WINNER & TWO-TIME EMMY AWARD® WINNER</u>**
# <u>MATTHEW BRODERICK               SARAH JESSICA PARKER</u>
**<u>TO STAR IN</u>**
## <u>NEIL SIMON'S</u>
**<u>CLASSIC COMEDY</u>**
# <u>PLAZA SUITE</u>
**<u>DIRECTED BY TONY AWARD WINNER</u>**
## <u>JOHN BENJAMIN HICKEY</u>
**<u>AT THE</u>**
## <u>SAVOY THEATRE</u>
**<u>FOR A STRICTLY LIMITED SEASON FROM</u>**
## <u>15 JANUARY TO 31 MARCH 2024</u>

## <u>PRODUCTION TO MARK PARKER'S LONG-AWAITED WEST END DEBUT</u>

## <u>TICKETS GO ON SALE (DATE)</u>

Following a sell-out Broadway run, ATG Productions are delighted to announce that two-time Tony Award® winner **Matthew Broderick** and two-time Emmy Award® winner **Sarah Jessica Parker,** will lead the cast in the West End transfer of **Neil Simon**'s classic comedy **PLAZA SUITE.** Directed by Tony Award® winner **John Benjamin Hickey, PLAZA SUITE** will play a strictly limited season at the **Savoy Theatre** from **15 January to 31 March 2024** with tickets on sale on (DATE). WEBSITE

**Matthew Broderick** returns to the West End stage following his acclaimed run in The Starry Messenger in 2019. **PLAZA SUITE** will mark **Sarah Jessica Parker**'s West End debut.

In New York, **PLAZA SUITE** became the must-have ticket for theatre-going audiences. The production played to sold-out houses and shattered multiple box-office records at the Hudson Theatre, becoming the third-highest grossing play revival in Broadway history during its limited 19-week engagement.

In **PLAZA SUITE**, these two world-class actors play three different couples in one famous hotel room. **Matthew Broderick** plays *Sam Nash/Jesse Kiplinger/Roy Hubley* and **Sarah Jessica Parker** plays *Karen Nash/Muriel Tate/Norma Hubley*.

Karen and Sam are a long-married pair whose relationship may be headed for an early checkout. Muriel and Jesse are former high school sweethearts who seem destined for an extended stay. And Norma and Roy are the mother and father of the bride, ready to celebrate their daughter's nuptials – if only they can get her out of the bathroom.

The creative team includes two-time Tony Award® winner **John Lee Beatty** (set design), Tony Award® winner **Jane Greenwood** (costume design), five-time Tony Award® winner **Brian MacDevitt** (lighting design), Tony Award® winner **Scott Lehrer** (sound design), Tony Award® winner **Marc Shaiman** (incidental music), and **Jim Carnahan** (casting director).

**PLAZA SUITE** is produced by Ambassador Theatre Group Productions, Gavin Kalin Productions, Hal Luftig, with James L. Nederlander, Douglas L. Meyer, Elizabeth Armstrong, Hunter Arnold, Caitlin Clements, Eilene Davidson Productions, Jeffrey Finn, Terry Schnuck, Smith and Brant Theatricals, Sherry and Kirk Wright, and Mike Isaacson.

**For further press information please contact Simon Raw, Emily Webb or Daniel O'Carroll**
**simon@rawpr.co.uk, emily@rawpr.co.uk, daniel@rawpr.co.uk**

**Neil Simon** (*Playwright*. 1927-2018) has been represented on Broadway by *Come Blow Your Horn; Little Me; Barefoot in the Park; The Odd Couple* (1965 Tony Award); *Sweet Charity; The Star-Spangled Girl; Plaza Suite; Promises, Promises; Last of the Red Hot Lovers; The Gingerbread Lady; The Prisoner of Second Avenue; The Sunshine Boys; The Good Doctor; God's Favorite; California Suite; Chapter Two; They're Playing Our Song; I Ought to Be in Pictures; Fools; Brighton Beach Memoirs; Biloxi Blues* (1985 Tony Award); the female version of *The Odd Couple; Broadway Bound; Rumors; Lost in Yonkers* (1991 Pulitzer Prize, Tony Award); *Jake's Women; The Goodbye Girl; Laughter on the 23rd Floor; Proposals; The Dinner Party;* and *45 Seconds From Broadway*. His Off-Broadway credits include *London Suite*. His films include *Barefoot in the Park, The Odd Couple, The Out-of-Towners, Plaza Suite, The Heartbreak Kid, The Prisoner of Second Avenue, Murder by Death, The Sunshine Boys, The Goodbye Girl, The Cheap Detective, California Suite, Chapter Two, Seems Like Old Times, Only When I Laugh, I Ought to Be in Pictures, Max Dugan Returns, Brighton Beach Memoirs, Biloxi Blues* and *Lost in Yonkers*.

**John Benjamin Hickey** (*Director*). Director: *Bad Dates* (Playwrights Horizons, Huntington Theatre, Dallas Theater Center). Actor: Broadway: *The Inheritance* (Tony Award nomination*), Six Degrees of Separation, The Normal Heart* (Tony Award), *Mary Stuart, The Crucible, Cabaret, Love! Valour! Compassion!*. London: *The Inheritance* (West End, Young Vic). Off-Broadway: *Dada Woof Papa Hot* (Lincoln Center), *Love! Valour! Compassion!* (Obie Award), *Blue Window* (MTC), *The End of the Day* (Playwrights Horizons), *The Autumn Garden* (Williamstown). Film: *Sublet, Mapplethorpe, Truth, Pitch Perfect, The Anniversary Party, Infamous, Flags of Our Fathers, The Taking of Pelham 123, Transformers 2: Revenge of the Fallen*. Television: "In Treatment," "Manh(a)ttan," "The Good Wife," "The Good Fight," "The Big C" (Emmy nomination ). Training: Juilliard.

**Matthew Broderick** (*Sam Nash/Jesse Kiplinger/Roy Hubley*). Broadway: *Brighton Beach Memoirs* (Tony, OCC, Theatre World Awards), *Biloxi Blues, How to Succeed in Business…* (Tony, DD, OCC Awards), *Night Must Fall, Taller Than a Dwarf, The Producers* (Tony, DD, OCC nominations), *The Foreigner, The Philanthropist, The Odd Couple, Nice Work If You Can Get It, Sylvia*, and *It's Only a Play*. Off-Broadway: *The Seafarer, The Closet, Evening at the Talk House, Shining City* (Obie Award), *Torch Song Trilogy* (OCC, Villager awards), *The Widow Clair,* and *Valentine's Day*. Television: "The Music Man," "'Master Harold'…and the Boys." Films include: *Max Dugan Returns, WarGames, Ladyhawke, On Valentine's Day, Ferris Bueller's Day Off, Biloxi Blues, Glory, The Freshman, The Lion King, The Cable Guy, Infinity, Election, You Can Count on Me, Wonderful World, Margaret, Tower Heist, Rules Don't Apply, Manchester by the Sea* and *To Dust*. Broderick starred in *The Starry Messenger* in London and will next be seen in *Painkiller* for Netflix.

**Sarah Jessica Parker** (*Karen Nash/Muriel Tate/Norma Hubley*) made her Broadway debut in 1976 in *The Innocents* directed by Harold Pinter. Other Broadway: *Annie, How to Succeed in Business…* and *Once Upon a Mattress*. Off-Broadway: *Sylvia* (Drama Desk nomination), *The Substance of Fire, The Heidi Chronicles, To Gillian on Her 37th Birthday, April Snow,* and *The Commons of Pensacola*. She starred in HBO's "Sex and the City" (two Emmys, four Golden Globe Awards). Film: *Sex and the City* and *Sex and the City 2, Here and Now, I Don't Know How She Does It, Smart People, Failure to Launch, The Family Stone, State and Main, 'Til There Was You, Mars Attacks!, Extreme Measures, The First Wives Club, If Lucy Fell, Miami Rhapsody, Ed Wood, Hocus Pocus, Honeymoon in Vegas, L.A. Story, Footloose,* and the upcoming *Hocus Pocus 2*. TV: "And Just Like That", HBO's "Divorce" (Golden Globe nomination), "Equal Justice," and "Square Pegs." Parker currently serves on the board of directors for the New York City Ballet.

**Ambassador Theatre Group Productions** is the award-winning producing and general management arm of the Ambassador Theatre Group.

Current & Upcoming Productions: the seven-time Olivier Award-winning *Cabaret* at the Kit Kat Club starring Maude Apatow and Mason Alexander Park; *A Doll's House* starring Jessica Chastain (Hudson Theatre, Broadway); *The Curious Case of Benjamin Button* (Southwark Playhouse Elephant); *The* Doctor (Duke of York's Theatre/ UK Tour/ Park Avenue Armory, New York) and *Pretty Woman The Musical* (Savoy and UK Tour).

 Recent UK Productions & Co-productions: *9 to 5 the Musical* (Savoy, UK Tour, Australia and Korea); *A Streetcar Named Desire* starring Paul Mescal (Phoenix Theatre) *Mother Goose* starring Ian McKellen and John Bishop (UK Tour); *Mad House* starring David Harbour and Bill Pullman (West End); the Olivier Award-winning *Cyrano de Bergerac* starring James McAvoy (Playhouse Theatre/ Pinter Theatre/ Theatre Royal Glasgow/ Brooklyn Academy of Music, New York) and *The Seagull* starring Emilia Clarke (Pinter Theatre) via The Jamie Lloyd Company; *Dear Evan Hansen* (Noël Coward Theatre); *Fatal Attraction* (UK Tour); *Ian McKellen On Stage* (West End and UK tour); *Betrayal* starring Tom Hiddleston (Harold Pinter Theatre); *Touching The Void* (Duke of York's Theatre); *Ghost Stories* (Ambassadors Theatre); *Pinter at the Pinter Season* (Harold Pinter Theatre); *King Lear* starring Ian McKellen (Duke of York's Theatre); the Olivier Award-winning *Caroline, or Change* starring Sharon D. Clarke (Playhouse Theatre); the Tony Award-winning *Oslo* (Harold Pinter Theatre); *Glengarry Glen Ross* starring Christian Slater (Playhouse Theatre/ UK tour); *Baskerville* (Beijing and Nanjing, China); *Abigail's Party* (UK Tour), *Strangers on a Train* (UK Tour), *Gaslight* (UK Tour), *Buried Child* starring Ed Harris (Trafalgar Studios); *Big Fish* starring Kelset Grammar (The Other Palace); *Hamlet* starring Andrew Scott (Harold Pinter Theatre); *The Maids* (Trafalgar Studios); *The Homecoming* (Trafalgar Studios); *Doctor Faustus* starring Kit Harington (Duke of York's Theatre); *Oresteia* (Trafalgar Studios); and *Dirty Rotten Scoundrels* (Savoy Theatre/ UK Tour).

Recent Broadway Productions: *Plaza Suite* starring Sarah Jessica Parker and Matthew Broderick (Hudson Theatre); Tony Award-winning David Byrne's *American Utopia* (St. James Theatre); *Some Like It Hot* (Shubert Theatre), *Caroline, Or Change* starring Sharon D. Clarke (Roundabout); American Buffalo starring Sam Rockwell (Circle in the Square Theatre); *The Lehman Trilogy* (Nederlander Theatre; Tony Award); *Betrayal* starring Tom Hiddleston; *Sea Wall/A Life* starring Jake Gyllenhaal and Tom Sturridge; *Burn This* starring Adam Driver; *Pretty Woman*; the Tony award-winning *Oslo*; *Dear Evan Hansen* (Tony Award); *A Doll's House Part 2*; *Sunday in the Park with George* starring Jake Gyllenhaal and Annaleigh Ashford.

# EXHIBIT E

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:                                                          Chapter 11 (Subchapter V)

HAL LUFTIG COMPANY, INC.,                       Case No. 22-_____ (____)


                                    Debtor.
------------------------------------------------------------x

## DECLARATION OF HAL LUFTIG UNDER LOCAL RULE
## 1007-2 IN CONNECTION WITH CHAPTER 11 FILING, AND
## <u>LOCAL RULE 9077-1 IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS</u>

Pursuant to 28 U.S.C. § 1746, I, Hal Luftig, declare as follows under penalty of perjury:

## <u>BACKGROUND</u>

1.      I am the President and sole shareholder of Hal Luftig Company, Inc. (the "Debtor").

In that capacity, I am familiar with the Debtor's day-to-day operations, business, and financial

affairs.

**Nature of the Debtor's Business**

2.      The Debtor is a New York corporation with its principal place of business at 117

West 17th Street, New York, New York 10011.

3.      I formed the Debtor in 2000 as a Broadway production company, and it has been in

business in that capacity ever since.

4.      The Debtor is a theatrical producing company that develops, acquires, presents and

promotes theatrical plays, musicals, and similar works of theater on stage and in other media.

**The Debtor's Chapter 11 Filing**

5.       On December 1, 2022 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in this Court

DEBTOR'S EXHIBIT E

and elected to proceed under Subchapter V of the Bankruptcy Code as a small business reorganization case. The Debtor is authorized to continue to operate and manage its business and property as a debtor in possession under Bankruptcy Code §§ 1107(a) and 1108.

6. As explained below, in April 2022 an unfavorable arbitration award based on breach of a contract was entered against me and the Debtor, jointly and severally, despite the fact that I was not a party to the underlying agreement, in the amount of approximately $2.6 million.

7. The arbitration was based on certain breach of contract claims asserted by Warren Trepp ("Trepp") through his wholly owned entity FCP Entertainment Partners, LLC ("FCP"), a former business partner and investor in the Debtor.

8. After efforts to vacate the Final Award (defined below) were denied by the District Court (defined below), a final judgment was entered against me and the Debtor.

9. The Debtor commenced this voluntary Subchapter V small business reorganization case in response to entry of that final judgment in order to propose a plan to restructure its debts and satisfy the FCP obligation and certain other obligations.

10. I am jointly and severally liable under that final judgment and have filed a notice of appeal of the judgment. During the pendency of the appeal I expect that FCP will seek to enforce the judgment against me. Because the success of the Debtor's case largely rests on my ability to give adequate attention to the operation of the Debtor's business, and to this chapter 11 case, the Debtor will be asking this Court to extend the bankruptcy stay to me so that I can focus on the Debtor's reorganization and successful emergence from chapter 11.

11. I am informed by the Debtor's attorneys that extending the bankruptcy stay for my benefit is only granted in extraordinary situations. I respectfully submit that in these circumstances, extending the stay is critical to provide the Debtor with the best chance to promptly negotiate with

987691

the relevant parties, including the Subchapter V trustee, and propose a confirmable chapter 11

plan. My personal efforts, relationships and reputation in the entertainment industry are the

bedrock of the Debtor's business, and my efforts and attention must be focused on working on the

Debtor's existing projects and identifying and pursing new opportunities which might flow from

the Debtor's legacy productions to generate revenue to fund a plan of reorganization.

12.     For example, Kinky Boots recently opened in Tokyo and Seoul, and the film rights

to Kinky Boots that might be exploited would flow through Kinky Boots LLC, the "mother

company" of the Kinky Boots production.[1]  *See* Exhibit A and Exhibit B annexed hereto.  I did

extensive press and promotion for those Asian revivals, and I believe that my work contributed to

the success of those projects.   In addition, the production company for Plaza Suite starring

Matthew Broderick and Sarah Jessica Parker, Suite 719 LLC, is considering launching shows in

London and Los Angeles.[2] Both of those productions would require significant time and

commitment from me with respect to hands-on producing and marketing efforts.  The Debtor has

only two (2) employees other than me. Therefore, my time and attention are essential to the

Debtor's successful reorganization.

---

[1] With respect to the Kinky Boots production, Kinky Boots LLC as the "mother company," is the producing entity for Kinky Boots the musical on Broadway, receives and distributes all profits in connection with the production, enters into license agreements for future related projects, and serves as a parent company or affiliate for related productions.   The Debtor is the "General Partner" of Kinky Boots LLC and owns 15.7315% of the interests in Kinky Boots LLC.   Under the Final Award, the arbitrator found that in addition to compensatory damages, FCP is entitled to 55% of the profits generated from the Debtor's 15.7315% interest in Kinky Boots LLC.

[2] Suite 719 LLC is the producing entity for the Broadway revival of Neil Simon's Plaza Suite starring Matthew Broderick and Sarah Jessica Parker, and will serve as the "mother company" for all future

3

**Hal Luftig and the Debtor's Broadway and Off-Broadway Productions**

13.    I am an award-winning Broadway producer who has worked in theatrical productions for over 30 years. My many successful shows include George Wolf's *Jelly's Last Jam,* Tony Kushner's *Angels in America,* Twyla Tharp and Billy Joel's *Movin' Out,* and Tony Award-winning musicals like *Thoroughly Modern Millie* and *Kinky Boots.* I have produced over 30 Broadway shows that collectively have garnered over 80 Tony Awards, and I personally have won four Tony Awards, including two as lead producer.

14.    Between 2001 and 2022, the Debtor produced several hit Broadway and off-Broadway shows including, but not limited to: *Fiddler on the Roof in Yiddish*; *American Utopia*; *Plaza Suite* starring Matthew Broderick and Sarah Jessica Parker; *Becoming Nancy*; *Legally Blonde the Musical*; *Evita*; *Catch Me If You Can the Musical*; and *Come Fly Away*.

15.    Much of the Debtor's success is as a result of, or related to, my reputation in the Broadway and theatrical production community.

**The Business of Theatrical Production Companies**

16.    There are two potential revenue streams for a theatrical production company: (a) producer income; and (b) investor income.

    a.    **Producer Income.**  Generally, a theatrical production company works with other third parties to co-produce shows and those entities form joint ventures through partnerships or limited liability companies. Those joint ventures and the companies' roles therein are similar or identical to those one would expect to see in a corporate structure.  For example, when theatrical production companies are

---

subsidiaries. The Debtor is the General Partner for Suite 719 LLC, and owns 11.5% of the interests in Suite 719 LLC.

4

organized as limited partnerships, the general partner, by definition, is liable for the obligations of the production company. And even when theatrical production companies are organized as limited liability companies, it is customary for managing members to fund expenses to the extent needed so as to maintain a good reputation in the Broadway community. Theatrical production companies like the Debtor then work together with their partners to raise money to produce a show.

b. **Investor Income**. Sometimes, the theatrical production company will not take an active role in production, but rather makes an investment in a theatrical production. Once the production opens, if it is a success (critically and financially), the goal is to recoup the investors' investment and generate profits. Essentially, investor income from a theatrical project depends on the project's financial performance. Once a project "recoups" investors' initial investment and returns those funds, the project may achieve a profit.

### FCP, Warren Trepp, and the 2001 and the 2007 Agreements

17.    I first started doing business with Warren Trepp in 1988. At that time, I had recently received my M.F.A. in Commercial Theatre Management from Columbia University. Warren Trepp was a wealthy man, having made a fortune as Michael Milken's right-hand man and chief trader at Drexel Burnham Lambert in the 1980s before the firm collapse into bankruptcy.

18.    In or about 2000, Trepp decided that it would be beneficial for one of his business entities, FCP, to undertake roles as a general partner or managing member of a production company, rather than simply continuing as an investor in live theater productions.

19.    On or about January 14, 2000, I formed the Debtor to transact business with FCP in connection with live theatre productions.

5

20.     On or about August 16, 2001, FCP and the Debtor entered into an agreement (the "2001 Agreement") to, among other things, identify potential theatrical properties for investment and possible production. Under the terms of the 2001 Agreement, I did not personally guarantee any of the Debtor's obligations to FCP, or Trepp.

21.     Effective as of January 1, 2007, FCP and the Debtor entered into a new agreement (the "2007 Agreement"), which amended and restated the 2001 Agreement in its entirety. Under the terms of the 2007 Agreement, I did not personally guarantee any of the Debtor's obligations to FCP, or Trepp.

22.     FCP and the Debtor mutually agreed to terminate the 2007 Agreement effective January 1, 2015.

**The Debtor's Continued Success After the FCP Agreement**

23.     Since termination of the 2007 Agreement, the Debtor continued producing award-winning Broadway shows under my leadership and guidance, and based upon my relationships in the industry and my reputation as a theatrical producer.[3]

**The Lawsuit by FCP and Trepp**

24.     On July 23, 2019, FCP filed a complaint in Los Angeles Superior Court (the "Superior Court Action") against the Debtor claiming for the first time that FCP had not received certain income from *Kinky Boots* and *Elephant Man* to which it claimed to be entitled.  Despite the fact that the 2007 Agreement required mediation in the first instance and then confidential arbitration, FCP filed a public lawsuit.

---

[3] In addition to my role as president and sole shareholder of the Debtor, I am also involved, in my individual capacity, in other projects and joint ventures, and directly and indirectly own and/or benefit from investments and interests in other partnerships in the theatrical production industry.

987691

25.     On August 5, 2019, after the Debtor's lawyers insisted that alternative dispute resolution was required under the 2007 Agreement, FCP filed a request for dismissal of the Superior Court Action.[4]

**The Arbitration**

26.     On August 12, 2019, FCP initiated an arbitration with the American Arbitration Association against the Debtor for breach of contract, and against me for breach of fiduciary duty (AAA Case No. 01-19-0002-5183).

27.     On or about July 21, 2021, the arbitrator issued an interim award (the "Interim Award") determining certain issues of liability and noting that various issues remained to be determined and that a final award would be forthcoming.

28.     On April 1, 2022, the arbitrator issued his final award (the "Final Award") incorporating the Interim Award and holding that the Debtor and I, as an individual, were jointly and severally liable for breach of contract for the damages set forth in the Final Award.

29.     The Final Award assigned damages to the breach of contract claim in the amount of $2,638,925.78, to be born jointly and severally by the Debtor and me, but the Final Award does not set forth any legal basis for finding me individually liable for breach of the 2007 Agreement to which I am not a party.  Indeed, in the arbitration, FCP only sought relief against me individually on a breach of fiduciary duty claim; however, the arbitrator ruled *against* FCP on that breach of fiduciary duty claim and in my favor.

---

[4] I do not believe that FCP's filing of the Superior Court Action in violation of the 2007 Agreement's mandatory arbitration provision was an innocent mistake.  By filing the Superior Court Action, FCP succeeded in publicly smearing me through an article on the entertainment gossip website, www.theblast.com.  The Blast published an article naming me and prominently featuring my photo along with the salacious headline "'Kinky Boots' Producer Sued for $10 Million for Allegedly Screwing Over Business Partner." https://www.yahoo.com/entertainment/kinky-boots-producer-sued-10-154102493.html.

7

30.    The Final Award also found that *Kinky Boots* was a "vested project" under the 2007 Agreement and, as a result, the Debtor and I had both breached the 2007 Agreement by failing to pay FCP the 55% share of income due to FCP (above and beyond the $2.6 million in compensatory damages) under the relevant payment provisions of the 2007 Agreement in relation to the production of *Kinky Boots.*

**District Court Actions to Confirm and Vacate the Final Award**

31.    On April 4, 2022, FCP filed a petition to confirm the Final Award with the U.S. District Court for the Southern District of New York (the "District Court"), Case No. 22-02768 (LAK).  The Debtor and I both opposed FCP's petition.

32.    On May 6, 2022, I filed in my individual capacity a "Petition to Vacate the Final Award" with the District Court, Civ. Case No. 22-03697 (LAK).  It seems impossible to me that I could be jointly and severally liable for a breach of contract claim when I was not a party to the 2007 Agreement, FCP made no election under the applicable "Inducement Letter" annexed to the 2007 Agreement as a basis for FCP to hold me liable, there were no allegations of piercing the corporate veil or alter ego, and the Arbitrator explicitly rejected FCP's breach of fiduciary duty claim against me.  FCP opposed my petition to vacate the Final Award.

33.    On October 26, 2022, the District Court entered a Memorandum and Order in both actions granting FCP's petition to confirm the Final Award and denying my petition to vacate the Final Award (Civ. Case No. 22-cv-02768-LAK, ECF No. 33).

**Final Judgment and Automatic Stay**

34.    On October 31, 2022, FCP filed a Motion for Judgment with the District Court and submitted a proposed Final Judgment.

35.     On November 2, 2022, the District Court entered the Clerk's Final Judgment, not FCP's proposed final judgment.  The Court also rejected FCP's proposed abstract of judgment as deficient and premature, and closed both related cases before the District Court.

36.     On November 15, 2022, FCP submitted a proposed judgment in the action to confirm the Final Award, which was reviewed and approved by the District Court as to form on November 16, 2022 but has not yet been entered.

37.     On November 22, 2022, FCP filed a letter motion to reopen the case in which it moved to confirm the Final Award to address FCP's motion for entry of an amended final judgment.

38.     I am advised that under Rule 62 of the Federal Rules of Civil Procedure there is a 30-day automatic stay imposed upon judgment enforcement proceedings, which stays FCP's judgment enforcement efforts through December 2, 2022, or 30 days from entry of the amended final judgment when one is entered, whichever is later.   I am informed that FCP plans on actively pursuing collection actions on the date that the Rule 62 stay expires, including notifying my investors in other projects.

**Appeal by Hal Luftig**

39.     On November 23, 2022, I timely filed a Notice of Appeal with respect to the District Court's October 26, 2022 Order in both U.S. District Court cases.

40.     The Debtor did not appeal the District Court's Order.

**Debtor's Other Liabilities and COVID Operations**

41.     As a theatrical production company operating during a global pandemic and government shutdown, while also defending a sizeable arbitration, the Debtor was subject to financial setbacks over the last few years.  Between March 2020 and December 2021, as a result

987691

of the COVID-19 global pandemic, the Debtor received modest income from its theatrical productions.

42.     In response, the Debtor implemented various cost-saving measures, and the Debtor and I incurred additional liabilities in order to ensure the Debtor's survival. For example, (a) I stopped taking a salary during that time period, (b) the Debtor applied for and was granted two (2) forgivable Paycheck Protection Program grants through the federal government in the amounts of $66,915 in 2021 and $66,915 in 2020, as well as an Economic Injury Disaster Loan in 2020 in the amount of $150,000 (for which repayment starts in December 2022), (c) in 2021, the Debtor applied for and received $614,068.77 as a forgivable grant from the federal government under the Shuttered Venue Operators' Grant program,[5] and (d) my spouse and I borrowed funds from a bank secured by our home, and loaned those funds in the amount of approximately $450,000 to the Debtor pursuant to a promissory note.

43.     Notwithstanding these challenges, during this time period, the Debtor paid its employees and continued to provide full benefits through my membership in the Broadway League.[6]

**Debtor's Employees**

44.     The Debtor has two (2) employees besides me: Kevin Connor and Eli Cohen.

45.     I am the lead producer and principal of the Debtor.  I produce all of the projects (*i.e.,* shows, live productions, and collaborations) and lead the entire organization.  I lead the Debtor's

---

[5] These grants provided emergency assistance for eligible venues affected by COVID-19. The SVOG program was established by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, and amended by the American Rescue Plan Act.  The Debtor was an eligible applicant, because SVOG provides emergency assistance for eligible performing arts businesses affected by COVID-19.

efforts to raise funds on behalf of various live theater projects for legacy productions by attending

meetings with various business contacts and potential investors (locally in New York and around

the world), and I collaborate with other producers to create new revenue-generating projects from

the Debtor's legacy productions.

46.    Eli Cohen began working for the Debtor on January 27, 2022 as a Producing

Assistant.  In that capacity, Mr. Cohen is responsible for the Debtor's bookkeeping, attending and

taking notes during all meetings, and providing advice and guidance in connection with ongoing

projects and productions.

47.    Kevin Connor began working for the Debtor in or about October 2016.  Mr. Connor

is the Debtor's Managing Producer, and in that capacity, he produces and project manages all the

Debtor's productions.  Mr. Connor also supervises Mr. Cohen.

**Debtor's Subchapter V Reorganization**

48.    I understand that Subchapter V of the Bankruptcy Code offers a streamlined path

towards reorganization for eligible small businesses, and I believe it is in the best interests of the

Debtor and its creditors to follow that approach under the circumstances.

49.    Through this Subchapter V small business chapter 11 case, the Debtor intends to

propose a plan of reorganization that will satisfy the Debtor's obligations to its creditors, including

FCP, and allow the Debtor to emerge from bankruptcy and continue with projects associated with

its legacy productions.

50.    With the assistance of the Debtor's professionals and the Subchapter V Trustee

appointed to the Debtor's case, the Debtor will use financial projections to determine how much it

---

[6] The Broadway League is the national trade association for the Broadway industry.  The Broadway League
has 700-plus members including theatre owners and operators, producers, presenters, and general managers

987691

can pay to creditors over time under a plan of reorganization and continue to maintain its business operations in the ordinary course.

51.     The Debtor had little choice in filing this case and seeking the protection of the automatic stay because, for reasons unknown to me, FCP and Trepp are engaged in a vendetta to destroy the Debtor, me, and my reputation.  The Debtor and I were unsuccessful in our attempts to settle with Trepp and FCP during the arbitration.  Accordingly, the only rational way to proceed is to pursue this Subchapter V reorganization and propose a plan which will satisfy the Debtor's obligations to creditors, including FCP, over time.

**First Day Motion & Adversary Proceeding to Extend the Automatic Stay**

52.     On the Petition Date, the Debtor filed certain "First Day" motions seeking emergency interim relief.  As set forth below, I believe that obtaining the relief requested in each of the First Day motions is critical to avoid irreparable harm to the Debtor, its business, and its prospects for maximizing the value of its business as a going concern.

**Motion to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms**

53.     The motion seeking authority to continue using the Debtor's pre-Petition Date cash management system and to maintain its existing pre-Petition Date bank accounts and business forms is critical to ensure the Debtor's compliance with certain guidelines promulgated by the Office of the U.S. Trustee, without disrupting the Debtor's business operations, interfering with its obligations to business partners in connection with revenue from legacy productions, and jeopardizing the Debtor's chance for success in this case.

---

in North American cities, as well as suppliers of goods and services to the commercial theatre industry.

987691

54.     I understand that the Office of the U.S. Trustee issued guidelines for debtors in chapter 11 which, among other things, would require the Debtor to close its existing bank accounts, open new accounts and immediately obtain new checks with "Debtor in Possession" designated on them.

55.     The Debtor maintains three (3) bank accounts at two different banks.  The Debtor maintains a primary business account which serves as the initial depository for all checks received by the Debtor for itself and The Catch Me LLC (the "Catch Me LLC").[7]  Funds for the Debtor's payroll then are transferred to a separate second account, which utilizes "Gusto" as a third-party, cloud-based payroll service to distribute payroll and pay associated tax and insurance obligations, and to pay my salary. All checks for The Catch Me LLC are transferred to a third separate account which holds income to the now closed "Catch Me If You Can General Partnership" for the benefit of the former limited partners/investors.

56.     If the Debtor is required to strictly comply with the U.S. Trustee guidelines, its continued operations in chapter 11 will be negatively impacted by the disruption, confusion and delay which would most certainly result.   For example, the Debtor receives periodic but unpredictable distributions from license agreements for *Catch Me If You Can the Musical,* which the Debtor holds on behalf of other investors in the show.  If the Debtor is forced to close that account and move the funds, future periodic deposits may be lost.

---

[7]  The Debtor was the general partner of the "Catch Me If You Can the Musical" general partnership until the partnership was closed in 2021.   As the general partner, the Debtor had full discretion as to when disbursements would be made from funds received on account of show profits and future projects from various license agreements. Now that the partnership is closed, the Debtor serves as an agent holding funds which belong to the former limited partners/ investors.

987691

57.     The Debtor's bank accounts are located at JPMorgan Chase Bank, N.A. and City

National, N.A., which are approved depositories under the Guidelines for Region 2 of the U.S.

Trustee's Office.

58.     For these reasons, and as more fully described in the Debtor's motion, the Debtor

seeks authority to continue utilizing its existing cash management system.

**Debtor's Adversary Proceeding and Emergency Request to Extend the Stay**

59.     As stated above, the extension of the automatic stay to me, individually, is not only

appropriate under the circumstances, it is crucial to the Debtor's success in this case. The Debtor

intends to file a plan of reorganization within the guidelines set forth in the Bankruptcy Code, but

without an extension of the automatic stay to me, I will be forced to defend myself in connection

with FCP's judgment enforcement efforts – something FCP has made clear it intends to pursue –

and my ability to focus on the Debtor's efforts to propose a confirmable chapter 11 plan will be

compromised.

60.     Trepp has made it clear to me and my counsel that he intends to immediately upon

the expiration of the stay imposed by the Federal Rules of Civil Procedure, and without delay,

proceed with judgment enforcement and collection efforts against me personally.

61.     The Debtor's professionals and my personal lawyers have advised me that the

30-day stay available under the Federal Rules of Civil Procedure which prohibit judgment

enforcement collection efforts during that time, is due to expire December 2, 2022, or a few weeks

later if FCP's proposed amended judgment is entered by the District Court.

62.     Additionally, I am entitled to be indemnified by the Debtor for any amounts that I

am obligated to pay to satisfy the judgment, plus attorneys' fees.   In that regard, my interests and

the Debtor's interests are aligned, and an extension of the stay will protect the Debtor's estate with

respect to my indemnity claim.

63.     Accordingly, on the Petition Date, the Debtor is commencing an adversary

proceeding seeking on an emergency basis immediate entry of an order by this Court extending the

automatic stay to me in my individual capacity, as well as a temporary, preliminary and permanent

injunction precluding FCP and Trepp from enforcing the Clerk's Final Judgment.  As stated above,

if I cannot focus on the Debtor's business operations and generating revenue to pay creditors,

including FCP, the Debtor's ability to successfully propose and confirm a plan of reorganization

will be seriously and perhaps irreparably compromised.

**Local Bankruptcy Rule 1007-2 Required Information**

64.     It is my understanding that Local Rule 1007-2 requires the Debtor to disclose

certain information relating to the Debtor's assets, liabilities, and financial condition.   That

information is set forth below and in the attached exhibit as described below. In compliance with

Local Bankruptcy Rule 1007-2(a):

   a.  attached as Exhibit C to this Declaration is a list of the Debtor's twenty (20) largest

       unsecured creditors, excluding insiders;

   b.  the Debtor does not have any secured creditors;

   c.  as of the Petition Date, the Debtor has approximately $150,000.00 in assets and

       $2,800,000.00 in liabilities;

   d.  I am the sole shareholder and President of the Debtor;

   e.  the Debtor does not have any property in the possession or custody of any

       custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor,

       or agent for any such entity;

15

987691

    f.    the Debtor operates its business from my primary residence located at 117 West 17th Street, #2B/C; there has never been, and there is currently no lease agreement between the Debtor and me and my spouse, and the Debtor has never, and does not currently, pay any rent to me or my spouse;

    g.    the Debtor's physical assets, and books and records are located at 117 West 17th Street, #2B/C;

    h.    the Final Judgment was entered by the District Court against the Debtor and me in my individual capacity, and I am advised that once the automatic stay afforded by Rule 62 of the Federal Rules of Civil Procedure terminates, FCP will aggressively pursue judgment enforcement and collection efforts against me and the Debtor; and

    i.    I am the only member of the Debtor's "existing senior management," I formed the Debtor in 2000 and I have worked for the Debtor since 2000.  The Debtor has two (2) full-time employees: Kevin Connor and Eli Cohen.

65.    In compliance with Local Bankruptcy Rule 1007-2(b), I am providing the Court and interested parties with additional information because the Debtor intends to continue its business operations:

    a.    the estimated amount of weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty (30) day period following the Petition Date is $2,403.85 for payroll, plus $1,316.00 for insurance costs, which is consistent with pre-Petition Date amounts;

    b.    the amount paid and proposed to be paid for services for the thirty (30) day period following the Petition Date to myself, the sole officer and shareholder of the Debtor, is $19,500.00, which is consistent with pre-Petition Date amounts;

16

c.  attached as <u>Exhibit D</u> is a schedule, for the thirty (30) day period following the

Petition Date of estimated cash receipts and disbursements, net cash gain or loss,

obligations and receivables expected to accrue but remain unpaid, other than

professional fees, and any other information relevant to an understanding of the

foregoing.


[*remainder of this page is intentionally blank*]


17

987691

## <u>CONCLUSION</u>

66.    I believe that under the protection of this Court and the Bankruptcy Code, the

Debtor will be able to maximize the value of its business and assets for the benefit of creditors and

other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 30, 2022

_*s/ Hal Luftig*_____
Hal Luftig

18

# [Interview] Hal Luftig "The message of 'Kinky Boots' is 'embracing'...it sounds good in Korea too"

Registration 2022.09.30 11:09:01Edited 2022.09.30 11:12:43

## Article Summary

original producer...Active for 35 years, including 5 Tony Awards

In the early stages of work development, fierce discussion from the perspective of Charlie vs Lola

New York Off-Broadway production…Reflecting the changing times



[Seoul=Newsis] Reporter Kim Geum-bo = Broadway original producer of the rough musical 'Kinky Boots' is interviewing Newsis at Grand Hyatt Seoul, Yongsan-gu, Seoul on the afternoon of the 26th.2022.09.30.kgb@newsis.com

[Seoul=Newsis] Reporter Jinah Kang = "'Kinky Boots' is a story about embracing yourself and others as they are. If you change your mind, you can change the world. That message resonated in Korea.

Think about it."

When asked why the musical 'Kinky Boots' is loved beyond Broadway in Korea, Hal Luftig, the original producer, answered: 'Kinky Boots' won 6 Tony Awards in the US and 3 Olivier Awards in the UK, and was recognized for its work and box office performance.The Korean production, which entered its fifth season, is thriving at the box office, recording sold out tickets. After visiting Korea, I met him at a hotel in Yongsan-gu, Seoul on the 26th.

5 Tony Awards for 'Kinky Boots', 'Annie Get Your Gun' and 'Angels in America', and Olivier Award for 'Legally Blonde' He is a multi award-winning producer. Having dreamed of a career in theatre since he was 7-years-old, he now is a veteran of 35 years on Broadway and Off-Broadway.

The main commonality of the works he has produced is 'growth' and 'change'. 'Kinky Boots' was also attractive on that point.It is the story of 'Charlie', a novice boss who struggles to protect a shoe factory that is facing a crisis of business closure, and 'Lola', a drag queen who stands up to prejudice, and creates a special 80cm tall boot.

"It premiered in 2013 (on Broadway), but I think it is needed more now in 2022. It shows the growth of accepting others in a world where misunderstanding and prejudice are prevalent."

◆The 5th season Korean performance "Fantastic...Keeping the original while feeling Korean"



[Seoul=Newsis] A photo of the musical 'Kinky Boots' performance.Choi Jae-rim as 'Lola'.(Photo courtesy of CJ ENM) 2022.09.30.photo@newsis.com *Resale and DB prohibited

When I saw the Korean performance this season, I said, "Fantastic" with a warm smile. It's been a long time since the Korean premiere in 2014."The actors and the production were both excellent. It was impressive because it had a Korean feel while maintaining the originality. "It is based on the true story of a shoe factory in Northampton, England. Broadway's renowned director Jerry Mitchell's sensuous direction and world-famous pop star Cindy Roper's sophisticated music enhanced the level of perfection.Hal Luftig praised, "The power of the creative team, such as Cindy Lauper's music, Greg Barnes' costume, and Jerry Mitchell's choreography and direction, was great. They created attractive elements that bonded well. "Drag queen Lola and the Angels are popular characters. Wearing 18cm heels, she shows off her charms with sexy gestures in colorful outfits."Lola and the Angels became a new character in theatre. It is a true story that a shoe factory went through bankruptcy and made avant-garde shoes. In the play, the factory employees' models are real people. I asked. "'Will it be Charlie's story or Lola's story?' At the beginning of the development of the work, we fiercely debated whose story to focus on. Debates continued, and in the end, Charlie's point of view was chosen. "Lola is important, but Charlie grows a lot. We did a tryout in Chicago in 2012 before Broadway. At that time, Lola had two more numbers and it was much more central. The audience reaction was good. I got feedback that people were curious about the story of the two characters,



[Seoul=Newsis] Reporter Kim Geum-bo = Broadway original producer of the rough musical 'Kinky Boots' is

interviewing Newsis at Grand Hyatt Seoul, Yongsan-gu, Seoul on the afternoon of the

26th.2022.09.30.kgb@newsis.com

The reaction of the audience is the best milestone for him. "Sometimes they fidget and correct their posture, and sometimes they do other things. The feeling comes from their body movements," he said.

"There is a quiet number by Lola, and it came right after an exciting number, and the audience felt uncomfortable. They said that it suddenly became quiet after applauding, and that the over 6 minute number felt long. I was wondering if I should shorten the song or change it. But since the song itself

should be uncomfortable, I decided that uncomfortable reactions were also part of the work, so I left it as it is.

◆"Seeing the sold-out Korean performance and looking forward to the recovery of the New York performance industry"

On Broadway, the show ended after 6 years of long-term performance until April 2019.Since last August, he has been performing at New York Stage 42, an off-Broadway. Next year will mark the 10th anniversary of the original premiere, so it is undergoing a little change according to the times.The initial line 'Ladies and Gentlemen and those who have not yet decided between them' was changed to 'Ladies, Gentlemen, and this, that, and everyone else'.It was also reflected in this Korean performance.

"New York's gender sensitivity has become more sensitive. We reflected that. We modified the lines so that they are not limited to gentlemen and ladies. Also, we excluded the part where there was a gag about the difference between a drag queen and a transvestite. I ruled out categorizing it into a specific category, because 'Kinky Boots' is a show that to provides pleasure, not to find fun by hurting someone."



[Seoul=Newsis] Reporter Kim Geum-bo = Broadway original producer of the rough musical 'Kinky Boots' poses during an interview with Newsis held at Grand Hyatt Seoul, Yongsan-gu, Seoul on the afternoon of the 26th.2022.09.29.kgb@newsis.com

Broadway, which was closed due to COVID-19, said it is recovering like the Korean performance industry."It wasn't like this during the war or 9/11, but it was the longest shutdown in history. It was a terrifying time. New York originally had a high proportion of foreign tourists, so it hasn't fully resolved yet, but the recovery trend is clear. 'Kinky Boots', all sold out watching the Korean performance, I felt good thinking that New York would be like that soon."

CJ ENM participated as a global co-producer for 'Kinky Boots' from the development stage."I was moved by the fact that the show would resonate in Korea, which is on the other side of the world" he recalled. He pointed out that universal sentiment is the key to entering Broadway for Korean shows.

"It's natural that a show would have Korean flavor but if it's an emotion that only Koreans understand, it won't succeed in the US or the world. The movie 'Parasite' is a Korean story with characters, but it was recognized around the world as a universal theme. Korean storytelling And universal sentiment, that's the key to success. This is the key to Korean creative musicals."

◎ Press News akang@newsis.com

닫기 ⊠

# Musical 'Kinky Boots' American producer "There is a possibility of a K-content as a Broadway musical"



Broadway producer Hal Luftig of the musical 'Kinky Boots' poses with boots symbolizing 'Kinky Boots' at a studio in Itaewon, Yongsan-gu, Seoul on the 23rd. Kwon Hyuk-jae, photo reporter

**"What is the biggest difference from the Korean premiere? It is the reaction of the Korean audience that has changed enthusiastically."**

Hal Luftig, a 65-year-old original producer who visited Korea to watch the Korean version of the musical 'Kinky Boots', which opened its 5th season in July, was surprised by the enthusiastic musical culture. It is his first visit to Korea in 7 years after seeing the Korean premiere in January 2015.

On the 23rd, he met at a studio in Yongsan-gu, Seoul, and said, "At the premiere, the audience was so quiet before the curtain call that I thought the show was a failure, but yesterday's performance was enthusiastic from the start. I felt that the audience became more accustomed to 'Kinky Boots'." He said, "The Korean actors and staff were also excellent. Even though I have seen this show countless times, I was again moved to tears many times."

He is a veteran producer who has produced hit musicals 'Too Blonde' and the play 'Angels in America' for 35 years on and off Broadway in the United States.

'Kinky Boots' is a major hit in 18 countries around the world, including the UK, Japan, and Canada, after its Broadway premiere in 2013. The story of a failing men's shoe factory in Northampton, England, developing high-heeled boots for drag queens . The British film of the same name (2005) based on a true story in 1979 has gained new life as a classic musical. Pop star Cindy Lauper, who was in charge of the musical's music, won the Tony Award for Best Music Award, the Grammy Award, 6 Tony Awards, and 3 Olivier Awards.

## A drag queen musical that culls the prejudice of the world with an 80cm heel

In Korea, CJ ENM participated in the Broadway as a co-producer and presented the world's first non-English language licensed production in 2014. The cumulative number of viewers who have watched so far until season 4 (2020), which was held during the corona period, is 350,000. Season 5, which will be performed at the Chungmu Art Center until the 23rd of next month, is also full every day.

Charlie, is a novice boss who overturns tradition to revive a family owned shoe factory, and Lola, is a drag queen who stamps the prejudices of the world with an 80cm heel. Korean musical theater lovers are in love with the dance and the change that the two protagonists create with the conservative factory workers.

There are many reviews that say they were comforted by Lola's number 'Hold Me in Your Heart', "Just Be" and 'Raise You Up', the ensemble ending songs with the lyrics "I'll be by your side in difficult times"



In the fifth season performance of the musical 'Kinky Boots', which opened in July, the lead drag queen Lola (in the front blue dress) is singing the representative number 'Sex Is in the Heel'. This is a scene in which actor Jae-rim Choi plays the role of Lola during the triple casting. photo CJ ENM

Hal Luftig said, "As our society grows more and more hatred and conflict and as tolerance and patience decrease, the Korean version of 'Kinky Boots' seems to strike a good balance between fun and serious themes." It is the story of children who disappoint their father's expectations. And it states 'Let's accept ourselves and everyone else for who they are. The main message is that if you change your mind, you can change the world."

**Q: -During the Chicago tryout in 2012, everything was a new challenge. From the title 'Kinky Boots', there were many difficulties.**

"The original is a British movie, and in the UK, 'Kinky' means 'odd', but in the US, there are perverted nuances. With the title of 'Kinky Boots', everyone said they wouldn't be able to sell tickets. (Laughs) It was also difficult to find a male actor who would dance on the factory conveyor belt in heels. Casting was confirmed after a three-week high heel workshop to those who passed the first audition. Even in Korea, Korean designers now make their own costume boots, but at the premiere, there was no shoe designer who could make high heels that men could wear, so I remember making them based on a model from the United States."

**Q: -What was the most rewarding moment while playing 'Kinky Boots'?**

"It was when CJ ENM proposed to be a co-producer in 2012. It was made with the American audience in mind, and I was happy to hear them say that it would do well in Korea. It meant that there was appeal from a universal point of view. In New York, as the performances went   on, the more the audience came in various costumes like Lola. In the past, when they came dressed like that, they were looked at like strange people, but now the audience compliment them. I am proud to have contributed to a culture that embraces each other so that we can wear the clothes we want to wear and feel comfortable with each other."



Hal Luftig, the Broadway producer of the musical "Kinky Boots," cited the biggest change since the 2012 Chicago tryout as "the balance between the characters of Charlie and Lola." "The Chicago tryout was completely different in the beginning. On the 2nd floor of the factory, whenever Charlie fired his employees one by one, on the 1st floor, Lola would create a drag show where she put a knife into a magic box, but the audience was so focused on the magic show that they missed the story, so we cut it all out. It's the version of the story that we've been choosing and focusing on to get to the heart of the story." Photo by Kwon Hyuk-jae Photographic Journalist

He cited the biggest change over the past 10 years as the development of the Internet, which has made musical cultures of different countries influence each other across borders.

"Congratulations" on the success of the movie 'Parasite' and the drama 'Squid Game', he saw the possibility that K-content, which has risen rapidly beyond the barrier of subtitles, will be made into a musical. "When I went to the

cinema to see 'Parasite,' it was foreign at first, so it took me a while to get used to it, but seeing what a family did to live and eat together but gradually falling into a quagmire, I felt it was a unique and yet universal topic that could be resonant throughout the world. The person who made it was a genius," he said. "If K-content has a well-made story base, it can be made into a Broadway musical." As an element for judging the possibility of musicalization, he picked that as the first condition.

"In the end, it's all about how well you can empathize. Another important thing is that the character change process is clear, whether the main character learns something or makes people change. Also, before deciding to produce, I always ask, 'Do I want to see this work? Do you want to take your family to see you?' I ask myself. If I am not confident in this area, I will boldly put it down."



In the musical 'Kinky Boots', confrontation between conservative factory workers and drag queens takes place in a traditional British shoe factory. The picture is a scene of singing the musical number 'In This Corner'. Seo Kyung-soo as Lola and Jeon Jae-hyun as Don, a factory worker. photo CJ ENM

Wonjeong Na (na.wonjeong@joongang.co.kr)

22-16167-jpm   Doc 55-3   Filed 06/30/22   Entered 06/30/22 19:40:44   Main Document
Pg 110 of 161

**EXHIBIT C**

**List of Creditors Holding 20 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2, the following is a list of those creditors holding the 20 largest unsecured claims against the Debtor. This list has been prepared from the books and records of the Debtor, and in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure in connection with the filing of the Debtor's Subchapter V chapter 11 petition. This list does not include (a) persons who come within the definition of "insider" set forth in 11 U.S.C. §101, (b) secured creditors unless the value of the collateral is less than the total amount of such creditor's claim or (c) claims held by any of the Debtor's employees.

The information set forth on this Schedule shall not constitute an admission of liability by, nor is binding on, the Debtor, and the failure to list a claim as contingent, disputed or subject to setoff shall not be a waiver of the Debtor's rights related hereto.

| | Name of Creditor | Amount | Contingent, Unliquidated, Disputed or Subject to Setoff | Nature of the Debt |
|---|---|---|---|---|
| 1. | FCP Entertainment Partners, LLC c/o Robison, Belaustegui, Sharp & Low Attn: Frank Gilmore, Esq. 71 Washington Street Reno, Nevada 89503 fgilmore@rssblaw.com 775-329-7941 | $2,638,925.78 | Disputed Unliquidated | Arbitration award and Judgment |
| 2. | U.S. Small Business Administration Attn: SBA Disaster Loan Service Center 2 North 20th Street, Suite 320 Birmingham, AL 35203 Disastercustomerservice@sba.gov targetedadvance@sba.gov 888-853-5638 | $150,000.00 | | Economic Injury Disaster Loan |
| 3. | Amy Deutsch 4511 South Ocean Blvd., Apt. 703 Boca Raton, FL 33487 abd12457@aol.com 917-681-4034 | $75,000.00 | | Unsecured loan – promissory note |

# Hal Luftig Company

## Statement Of Cash Flows                    12/1/2022

### November through December 2022

|  | Dec '22 |
|---|---|
| **OPERATING ACTIVITIES** |  |
| **Income** |  |
| Six on Broadway Profit Participation | 2,500.00 |
| **Total Income** | **2,500.00** |
| **Expenses** |  |
| Payroll (Taxes and Payments) | 62,041.76 |
| Insurance | 5,680.76 |
| Bank Service Charges | 55.00 |
| Dues and Subscriptions | 600.00 |
| Postage and Delivery | 460.00 |
| Supplies | 400.00 |
| Meals and Entertainment | 4,102.00 |
| **Total Expenses** | **73,339.52** |
| **Net Income** | **-70,839.52** |
| Net cash provided by Operating Activities | -70,839.52 |
| FINANCING ACTIVITIES |  |
| DISTRIBUTIONS TO S/H | -19,500.00 |
| Net cash provided by Financing Activities | -19,500.00 |
| Net cash increase for period | -90,339.52 |
| Cash at beginning of period | 106,694.37 |
| Cash at end of period | 16,354.85 |

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

In re:

HAL LUFTIG COMPANY, INC.,

                                Debtor.

Chapter 11 (Subchapter V)

Case No. 22-11617 (JPM)

-----------------------------------------------------------------------X

HAL LUFTIG COMPANY, INC.,

                                Plaintiff,

Adv. Pro. No. 22-01176 (JPM)

              v.

FCP ENTERTAINMENT PARTNERS, LLC,

                                Defendant.

-----------------------------------------------------------------------X

## SUPPLEMENTAL DECLARATION OF HAL LUFTIG
## UNDER BANKRUPTCY RULE 9077 AND LOCAL BANKRUPTCY RULE 9077-1

Pursuant to 28 U.S.C. § 1746, I, Hal Luftig, declare as follows under penalty of perjury:

      1.      I am the President and sole shareholder of Hal Luftig Company, Inc. (the "Debtor"). In that capacity, I am familiar with the Debtor's day-to-day operations, business, and financial affairs.

      2.      On December 1, 2022, I submitted the *Declaration of Hal Luftig Under Local Rule 1007-2 in Connection with Chapter 11 Filing, and Local Rule 9077-1 in Support of Certain "First Day" Motions* (ECF Doc. No. 5) (the "Luftig Declaration").[1]

      3.      On December 1, 2022, the Debtor commenced this adversary proceeding against FCP by filing the Complaint (Adv. Pro. ECF Doc. No. 1), and also filed the (a) *Declaration of Michael S. Amato, Esq.* (Adv. Pro. ECF Doc. No. 2), (b) *Memorandum of Law in Support of*

---

[1] All capitalized terms used but not otherwise described herein shall have the meanings given to them in the Luftig Declaration, the Complaint, or the Debtor's Reply.

DEBTOR'S EXHIBIT F

*Debtor's Motion Pursuant to 11 U.S.C. §§ 362(a) and 105(a): (I) To Extend the Automatic Stay Under 11 U.S.C. §§ 362(a) to Hal Luftig; (II) For a Temporary Restraining Order and Preliminary Injunction; (III) Setting Emergency Hearing Date on Debtor's Motion; and (IV) Fixing the Form and Manner of Notice* (Adv. Pro. ECF Doc. No. 3) (the "Motion") seeking emergency relief.

4.      I submit this supplemental declaration (the "Supplemental Declaration") in further support of the Debtor's Motion and in support of the Debtor's *Memorandum of Law in Further Support of Debtor's Motion Pursuant to 11 U.S.C. §§ 362(a) and 105(a): (I) To Extend the Automatic Stay Under 11 U.S.C. §§ 362(a) to Hal Luftig; (II) For a Temporary Restraining Order and Preliminary Injunction; (III) Setting Emergency Hearing Date on Debtor's Motion; and (IV) Fixing the Form and Manner of Notice,* filed simultaneously with this Supplemental Declaration.

**The Final Judgment and Order**

5.      On December 7, 2022, the District Court entered the Final Judgment and Order.  A copy of the Final Judgment and Order are annexed hereto as Exhibit A.

**My Daily Work for the Debtor and the Legacy Projects**

6.      It requires a daily, consistent effort for the Debtor to produce and keep running a successful show – legacy or otherwise – and I am the only person capable of doing so.  I dedicate many hours each day to the Debtor's legacy projects, including hands-on producing and marketing efforts in order to generate revenue for the Debtor, which are essential to the Debtor's reorganization.  If I am instead focused on repairing business relationships and defending judgment enforcement collection efforts by FCP, I cannot possibly continue the daily work that is necessary for the Debtor's successful reorganization.

7.      The Debtor has nine (9) projects stemming from legacy projects.  The Debtor's nine (9) current projects stemming from legacy productions are: (1) Plaza Suite; (2) Fiddler on the Roof

2

in Yiddish; (3) Kinky Boots ; (4) Legally Blonde; (5) Thoroughly Modern Millie; (6) Catch Me If

You Can; (7) David Byrne's American Utopia; (8) Rent North American Tour; and (9) Becoming

Nancy.   They include critical and financial hits with a proven track record of revenue streams.

New shows – if they are successful at all – typically take years to generate a profit for investors

and producers. New projects stemming from proven legacy productions, which have already

recouped funds for investors and have moved on to disbursing profits, are far more lucrative for

producers like the Debtor.  Experienced and successful producers like me understand and thrive

with that knowledge.

8.      The Debtor is the General Partner of, and owns 15.7315% of the interests in Kinky

Boots LLC, the holding company for all Kinky Boots project.  Profits for Kinky Boots on any new

projects flow up to the holding company and are disbursed to its investors and producers, including

the Debtor.   Kinky Boots grossed over $318 million during its run on Broadway.  As of 2021,

Kinky Boots has distributed over $40 million in profits to its shareholders, not including

distributions from international companies.

9.      Between April 2022 and November 2022, there was a running Off Broadway

revival of "Kinky Boots," which distributed royalty and other fees to Kinky Boots LLC.   I worked

approximately six (6) hours a day on marketing, advertising, and responding to issues with an Off

Broadway revival production opening and running during a global pandemic such as not having

enough cast members due to illnesses and working creatively to ensure that the show continued. I

worked tirelessly with the show's marketing team to pivot the message to potential customers.

10.     Recently, I have been working on a potential new U.S. tour of Kinky Boots. Some

cities outside New York invested money in the Kinky Boots revival.  I spend time daily speaking

and meeting, both in-person and remotely, with representatives from those cities to explain how and why the show could be a success in their respective cities.

11.     I am currently negotiating theater availability in Seoul for another return of Kinky Boots in 2024/2025, as well as deal negotiations for further returns of Kinky Boots in Japan in 2025, all of which would result in additional revenue to the Debtor (if successful).

12.     I recently received a call from someone interested in producing Kinky Boots in the United Kingdom as a "non replica" show.  A "non replica" show means producing a show that uses the exact music and words from Kinky Boots, but not the same direction, staging, costumes, sets, or lights – that is, nothing else can mirror the Broadway show. I take those types of calls.  I am the person who reviews the relevant agreements and contracts for the show rights, speaks to parties and conducts negotiations necessary for exceptions or waivers, confirms that there will be no violations, and then visits the performances to watch and verify that the non replica show is not copying what was on Broadway. There is no other person in the Kinky Boots production team, at the Debtor or otherwise, who could or would be able or willing to do that work.

13.     The Debtor is also the General Partner for and owns 11.5% of the interests in Suite 719 LLC, the production company for "Plaza Suite" a limited engagement on Broadway starring Matthew Broderick and Sarah Jessica Parker.  Plaza Suite grossed almost $29 million on Broadway after playing for only 20 weeks. As of November 2022, Plaza Suite has distributed 236% of capitalization to shareholders with further distributions planned for December 2022 and the first half of 2023.  The Debtor became General Partner and was entrusted with that position because of me.  I am tasked with making all management decisions for Suite 719 and am responsible for its failures, if any.  Plaza Suite is exploring the possibility of launching shows in London and Los Angeles, which requires significant lead work by its producer, the Debtor (which really means

me).  I am the sole person responsible for, trusted with, and capable of identifying suitable venues, negotiating contracts and agreements with talent and support teams, and working with marketing and advertising specialists to ensure that the shows are promoted with an effective message.

14.     Suite 719 obtained $10 million from the Shuttered Venue Operators Grant program (part of the CARES Act), and is in the midst of a government audit concerning its use of government funds.  I am responsible for responding to audit requests, and I am the only person who can do so, because I am the person who ensured that Suite 719 used the funds appropriately.

15.     "Fiddler on the Roof in Yiddish" is another of the Debtor's "legacy" productions. I am working to bring this show back to life in New York, which means identifying a suitable theater, creating marketing materials and messages, and implementing the marketing campaign. This is a project which could generate significant revenue, but will only transpire if I can commit a significant portion of my time and attention to the project.

16.     I am the sole individual who can fulfill the roles described above.

17.     Since termination of the 2007 Agreement on January 1, 2015, I have invested in shows and/or produced shows through the Debtor, in my individual capacity, and though other joint business ventures.

**Contributing to the Plan**

18.     I will contribute personal assets to help fund a plan of reorganization which finally resolves all of FCP's claims, and provides me with a third party release (limited to FCP's judgment) and claims.  My counsel has informed me that a third party release is not routinely granted and requires a significant contribution to the plan.

**The Debtor's By-Laws**

19.     Attached as Exhibit B is a copy of the relevant sections of the Debtor's By-Laws.

**No Adequate Remedy at Law**

20.    I am not able to post bond for a $2.6 million judgment for a stay pending appeal, and I am certainly not able to do so and also make a substantial contribution to the Debtor's plan of reorganization.

21.    I respectfully request that the Court enter an Order extending the Debtor's automatic stay to me so that I can focus on the Debtor's successful reorganization, and not be distracted on a daily basis by aggressive judgment enforcement collection efforts by FCP.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 14, 2022

_____*s/ Hal Luftig*_____
Hal Luftig

989265

6

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-7-2022

—————————————————————

FCP ENTERTAINMENT PARTNERS, LLC,                )
                                                )
        Petitioner,                             )
                                                )
    v.                                          )        Civil Action No. 22-cv-02768-LAK
                                                )
HAL LUFTIG COMPANY, INC. and                    )        Action No. 1
HAL LUFTIG,                                     )
                                                )
        Respondents.                            )
—————————————————————

—————————————————————

HAL LUFTIG,                                      )
                                                )
        Petitioner,                             )
                                                )
    v.                                          )
                                                )        Civil Action No. 22-cv-03697-LAK
FCP ENTERTAINMENT PARTNERS, LLC                 )
                                                )        Action No. 2
        Respondent.                             )
—————————————————————

## [~~PROPOSED~~] FINAL JUDGMENT

LEWIS A. KAPLAN, District Judge:

In accordance with the orders filed during the pendency of the above-captioned case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

**IT IS ORDERED, ADJUDGED, AND DECREED** that for the reasons set forth in the Court's Opinion and Order dated October 26, 2022 ((Action No. 1, Dkt 33; Action No. 2, Dkt 28)), final judgment is hereby entered for FCP Entertainment Partners, LLC ("FCP") and against Hal Luftig Company, Inc. ("HLC") and Hal Luftig, ("Luftig") recognizing and confirming in all respects the April 1, 2022 final arbitration award (the "Final Award") rendered by the arbitrator in

1

in the arbitration captioned *as FCP Entertainment Partners v. Hal Luftig Company*, Inc. and Hal

Luftig, AAA Case No. 01-19-0002-5183 (Action No. 1, Dkt 13-10).

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that FCP's Amended

Verified Petition to Confirm the Arbitration Award (Action No. 1, Dkt 21) is hereby **GRANTED**.

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Luftig Amended

Verified Petition to Vacate the Arbitration Award (Action No. 2, Dkt 14) is hereby **DENIED**.

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECLARED**, as found in the Final

Award, that HLC and Luftig, jointly and severally, shall pay $2,638,925.78 to FCP.

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECLARED**, as found in the

Award, that FCP shall pay $6,250.00 to HLC/Luftig.

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECLARED**, as found in the Final

Award, that FCP is entitled to 55% share of future net income in in relation to the production of

*Kinky Boots* (i.e., beyond the $2,638,925.78 which is currently due pursuant to paragraph 1 of the

Award (Action No. 1, Dkt 13-10, at p. 4)).

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECLARED**, as found in the Final

Award (Action No. 1, Dkt 13-10, at pp. 4-5), that FCP is entitled to 55% share of future net income

in relation to the production of *Kinky Boots* (i.e., beyond the $2,638,925.78 which is currently due

pursuant to paragraph 1 of the Final Award), calculated under the Waterfall Provision of paragraph

6 of the 2007 Agreement and shall be paid to the Claimant directly from the source pursuant to the

following letter of direction ("LOD"):

      "FCP Entertainment Partners, LLC, a Nevada limited liability company
("FCP") and Hal Luftig Company, Inc., a New York corporation ("HLC") do
hereby instruct the managers of Kinky Boots, LLC, Kinky Boots Tour, LLC, Kinky
Boots, LLC and KB Licensing, LLC and all other Kinky Boots associated entities
(collectively, the "Companies" and each is a "Company") to which HLC holds any
membership units, equity (if any) and/or is entitled to any revenue source

2

whatsoever related to Kinky Boots, whether it be fees, royalties, or otherwise (collectively referred to here as "Membership Interests") that as of January 1, 2022 HLC does irrevocably assign to FCP : (i) Fifty-Five percent (55%) of HLC's Membership Interest including any financial equity interests in the Companies, including all rights, title and interest associated therewith including the right to Adjusted Net Profits and (ii) Fifty-Five percent (55%) of HLC's Producer Entitlements including all rights to fees, advances, distributions and royalties with respect to each of the Companies. As used herein, "Producer Entitlements" shall mean all payments to which HLC is entitled to receive from all Companies other than those arising from HLC's ownership of Membership Units in any Company. HLC hereafter shall be considered to own a Forty-Five percent (45%) interest in HLC's Membership Interests and a Forty-Five percent (45%) interest in HLC's Producer Entitlements.

Similarly, all tax allocations shall be made in accordance with such relative proportions, and K-1s, 1099s or other reports shall be issued to HLC and FCP to reflect their respective proportions of the Companies' net income, net loss, payments, distributions and other tax effects. The parties hereby so instruct the managers of the Companies and agree that such instructions will be irrevocable absent written instructions signed by both HLC and FCP or a court order. For the avoidance of uncertainty, notwithstanding the foregoing, (i) all management rights associated with Membership Interests shall remain with HLC, and (ii) the financial equity interests and corresponding distributions described herein will be net of currently existing co-producer obligations. For clarity, to the extent HLC previously assigned 55% of portions of its financial equity interests to FCP, those arrangements are to remain in place, and HLC retained financial equity interests are not to be further divided pursuant hereto.

Each manager of the Companies is hereby requested and instructed to: (i) direct all communications including, but not limited to, appropriate year-end tax forms to FCP at P.O. Box 19688, Reno, NV 89511 and to HLC at: 117 West 17th Street, Suite #2C, New York, NY 10011 or such other address as the officers of FCP or HLC may direct."

**IT IS FURTHER ORDERED, ADJUDGED, AND DECLARED**, as found in the Final Award (Action No. 1, Dkt 13-10, at p. 5), that HLC and Luftig shall immediately send a copy of the LOD to the Companies specified in the LOD by certified mail return receipt requested or by such other carrier (e.g., Federal Express) which can provide proof of service, all copies of which shall be immediately provided to FCP.

3

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

SO ORDERED.

Dated: ~~November~~ ___, 2022
December 7

_____
LEWIS A. KAPLAN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FCP ENTERTAINMENT PARTNERS, LLC,

                              Plaintiff,

                -against-                                22-cv-2768 (LAK)

HAL LUFTIG COMPANY, INC., et ano.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HAL LUFTIG,

                              Plaintiff,

                -against-                                22-cv-3697 (LAK)

FCP ENTERTAINMENT PARTNERS, LLC,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-7-2022

**ORDER**

LEWIS A. KAPLAN, *District Judge*.

          Plaintiff's letter motion (Dkt 39) is granted to the extent that the clerk shall (1) enter the amended judgment signed by the Court under even date and (2) close the case.

          Plaintiff's motions for judgment (Dkt 34) and to alter judgment (Dkt 42) are denied as moot.

          SO ORDERED.

Dated:          December 7, 2022

                                                    Lewis A. Kaplan
                                              United States District Judge

# EXHIBIT B

# BY-LAWS

## OF

## HAL LUFTIG COMPANY, INC.

and/or statement which may be required by Section 510, 511, 515, 516, 517, 519 and 520 of the Business Corporation Law or by any other applicable statute.

Section 2.    <u>Fiscal Year</u>

The fiscal year of the Corporation shall be fixed by the Board of Directors by resolution duly adopted, and, from time to time, by resolution duly adopted, the Board of Directors may alter such fiscal year.

Section 3.    <u>Corporate Seal</u>

The Corporate seal shall have inscribed thereon the name of the Corporation, the year of its incorporation and the words "Corporate Seal" and "New York" and shall be in such form and contain such other words and/or figures as the Board of Directors shall determine.   The Corporate seal may be used by printing, engraving, lithographing, stamping or otherwise making, placing or affixing, or causing to be printed, engraved, lithographed, stamped or otherwise made, placed or affixed, upon any paper or document, by any process whatsoever, an impression, facsimile or other reproduction of said Corporate seal.

Section 4.    <u>Books and Records</u>

(a)    There shall be maintained at the principal office of the Corporation books of account of all the Corporation's business and transactions.

(b)    There shall be maintained at the principal office of the corporation or at the office of the Corporation's transfer agent a record containing the names and addresses of all shareholders, the number and class of shares held by such and the dates when they respectively became the owners of record thereof.

Section 5.    <u>Indemnification of Directors and Officers</u>

Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or intestate, then, is, or was a director or officer of the Corporation, or then serves or has served on behalf of the corporation in any capacity at the request of the Corporation, shall be indemnified by the Corporation against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, including attorney's fees actually and necessary incurred as a result of such action, to the fullest extent permissible by the laws of the State of New York if such director or officer acted in good faith, for a purpose which he reasonably believed to be in, or, not opposed to, the best interests of the Corporation, and in criminal actions, had no reasonable cause to believe that his conduct was unlawful. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
In re:

HAL LUFTIG COMPANY, INC.,                                    Chapter 11 (Subchapter V)

                                        Debtor.              Case No. 22-11617 (JPM)
------------------------------------------------------------------------X
HAL LUFTIG COMPANY, INC.,

                                        Plaintiff,
                                                             Adv. Pro. No. 22-01176 (JPM)
v.

FCP ENTERTAINMENT PARTNERS, LLC,

                                        Defendant.
------------------------------------------------------------------------X

## ORDER GRANTING DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 362(a) AND 105(a): (I) TO EXTEND THE AUTOMATIC STAY TO NON-DEBTOR HAL LUFTIG; (II) FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; (III) SETTING HEARING DATE; AND (IV) FIXING THE FORM AND MANNER OF NOTICE

Upon the motion ("Motion") of plaintiff Hal Luftig Company, Inc. ("Debtor") pursuant to

§§ 105(a) and 362 of title 11, United States Code (the "Bankruptcy Code") requesting: (i) an order

extending the automatic stay to Hal Luftig; (ii) a temporary restraining order ("TRO") and

preliminary injunction ("Preliminary Injunction") precluding FCP Entertainment Partners, LLC

("FCP") and its officers, directors, members, agents, parents and affiliates from any and all efforts

and actions to enforce the Final Award,[1] the Clerk's Final Judgment and/or any judgment or

judgments entered with respect to the Final Award and the Clerk's Final Judgment; (iii) scheduling

a hearing or hearings to consider entry of the TRO and Preliminary Injunction; and (iv) fixing the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Complaint filed
December 1, 2022 ("Complaint" Dkt. No. 1).

form, manner and extent of notice of the hearing to consider the Motion, including, the Declaration of Michael S. Amato and the Exhibits annexed thereto (Dkt. No. 2), the Debtor's Memorandum of Law in Support of the Motion (Dkt. No. 3) and the Declaration of Hal Luftig under Rule 1007-2 and Local Rule 9007-1 and the Exhibits annexed thereto (Bankr. Dkt. No. 5); and the Court having held an emergency hearing on December 1, 2022 ("Emergency Hearing"), the transcript of which is incorporated herein by reference; and upon the Stipulation and Order entered into by and among the Debtor, FCP and Mr. Luftig, and approved by the Court maintaining the *status quo*, setting a briefing schedule and scheduling a hearing to consider the Motion for December 16, 2022 (Dkt. No. 7); and upon the defendant FCP filing its opposition to the Motion including FCP's Memorandum of Law in Opposition to the Motion (Dkt. No. 11), the Declaration of John A. Mueller and the Exhibits annexed thereto (Dkt. No. 12), and the Declaration of Warren Trepp and the Exhibits annexed thereto (Dkt. No. 13) (collectively, the "Opposition"); and upon Debtor's Reply including Debtor's Memorandum of Law in Further Support of the Motion (Dkt. No. 15) and the Supplemental Declaration of Hal Luftig and the Exhibits annexed thereto (Dkt. No. 16) (together, the "Reply"); and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that Debtor provided adequate and appropriate notice of the Motion under the circumstances and that no other or further notice is required; and upon the hearing held on December 16, 2022 and the arguments made therein, the transcript of which is incorporated herein by reference; and the Court having reviewed the Motion, the Opposition, and the Reply, and determined that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor; and the Court

having rendered its Memorandum Opinion and Order (Dkt. No. 22) which is incorporated by

reference herein, and a copy of which is attached hereto as Exhibit "A", **it is HEREBY**

**ORDERED THAT**:

1.      The Motion is **GRANTED.**

2.      Pursuant to 11 U.S.C. §§ 105 and 362, the automatic stay is hereby extended to

non-debtor Hal Luftig.

3.      FCP and its officers, directors, members, agents, parents and affiliates shall refrain

from taking any actions against Mr. Luftig, and/or his assets, including but not limited to any

enforcement actions with respect to the Final Award, the Clerk's Final Judgment and/or any order

or judgments entered in connection therewith.

4.      Notwithstanding the foregoing: (i) this Order shall not extend the automatic stay to any

appeal related to the Final Award, the Clerk's Final Judgment, and/or any order or judgments

entered in connection therewith, (ii) nothing contained herein shall prevent FCP or Mr. Luftig from

opposing or otherwise responding to any filings in the District Court or Court of Appeals related

to the Final Award, the Clerk's Final Judgment and/or any order, judgment or judgments entered

in connection therewith, and (iii) nothing contained herein shall impact, stay or enjoin any appeal

of the Final Award, Clerk's Final Judgment and/or any order, judgment or judgments entered in

connection therewith.


Date:   January 13, 2023                          /s/John P. Mastando III
        New York, New York                        Hon. John P. Mastando III
                                                  United States Bankruptcy Judge

# EXHIBIT H

**American Arbitration Association**
**Commercial Arbitration Tribunal**

Case Number:  01-19-0002-5183

In the Matter of the Arbitration between
FCP Entertainment Partners, LLC

vs.

Hal Luftig Company, Inc: and Hal Luftig,
an individual

**Interim Award of Arbitrator**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with Paragraph
16 of the Amended and Restated Agreement between the above-named parties dated January 1,
2007, and having been duly sworn and having heard the proofs and allegations of Claimant FCP
Entertainment Partner, LLC, represented by Frank Gilmore, and Respondent Hal Luftig
Company, Inc. and Hal Luftig, represented by Martin Foley and Kevin Vick, and having
reviewed and considered the written documents submitted to me, do hereby make the following
Interim Award:

## I.    FACTUAL BACKGROUND.

1.     Pursuant to the Stipulated Statement of Undisputed Facts submitted by the parties
on May 22, 2021, the parties agree that:

a)     FCP Entertainment Partners, LLC ("FCP" or "LLC" or "Claimant") was
organized as a Nevada limited liability company on May 29, 2001.  Warren Trepp ("Trepp") is
the sole Managing Member.  Hal Luftig Company, Inc. ("HLC" or "Respondent") was
incorporated as a New York corporation on January 14, 2000.  Hal Luftig ("Luftig") is the sole
shareholder.

b)     Prior to 2001, Trepp had hired Luftig to identify and present suitable live
theater production opportunities for Trepp's investment.

c)     In 2001, Luftig and Trepp agreed that it would be beneficial for FCP to
undertake roles as a general partner or managing member of a production company, rather than
simply continuing with passive investments in live theater productions.

d)     On August 16, 2001, FCP and HLC "f/s/o Luftig" entered into an
Agreement ("2001 Agreement").

e)     Effective as of January 1, 2007, Trepp and HLC executed the Amended
and Restated Agreement (" 2007 Agreement").

## II.    RESPONDENTS' AFFIRMATIVE DEFENSES TO CLAIMANT'S CLAIMS.

The affirmative defenses asserted by Respondents at the conclusion of the Arbitration were a focal point of post-Arbitration briefing. They also raise threshold issues that are dispositive to the claims made in this case. Therefore, I will address Respondents' affirmative defenses first.

### A.    Cal. Bus. & Prof. Code § 16600.

Respondents assert that all of Claimant's alleged breaches of contract are based on two provisions in the 2007 Agreement that are void and unenforceable under Section 16600 of the California Business & Professions Code ("Section 16600"). (*See* Respondents' Post Arbitration Brief ("RPAB") at pp. 3-6.) Counsel for Respondents summarized their Section 16600 defense, raised for the first time in closing argument, as follows:

> Under California law, FCP's construction of the exclusive services non-compete provision in paragraph 1, coupled with its construction of the LLC income provision in paragraph 6 to reach all HLC income from 2011 to 2014, render those provisions of the 2011 [sic] Agreement void and unenforceable.

(June 2 Closing Argument Transcript, p. 81.) Relying on *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945 (2008) and related cases, Respondents assert that every contract that restrains someone from engaging in a "lawful profession, trade or business," including the 2007 Agreement at issue in the case, is *per se* void as a matter of law under 16600. (*See* RAPB, p. 3.)

#### 1.    The 2007 Agreement Is Not *Per Se* Void Under Section 16600.

Respondents' reliance on *Edwards* is misplaced. *Edwards* is not controlling law in California regarding the type of agreements that are *per se* void under Section 16600, as opposed to agreements that are subject to a factual inquiry under Section 16600 regarding "reasonableness." In *Edwards* the California Supreme Court held that Section 16600 prohibits all employee post-term non-competition agreements unless they fall in one of the enumerated categories of Section 16600. *Edwards*, *supra*, 44 Cal. 4th at 955. However, *Edwards* did not address the question whether non-compete provisions in commercial contracts between businesses are subject to the same prohibitive scope of the *per se* rule applicable to post-term restrictions following termination of employment or the sale of a business. *Id.*

In 2020 the California Supreme Court in *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020) answered that inquiry in response to a certified question from the Ninth Circuit. The Court in *Ixchel* held that, while Section 16600 does apply to restrictive covenants in commercial contracts between businesses, the enforceability of such non-compete provisions are assessed under a "Rule of Reason" standard. *Id.* at 1139-40. The Court determined that "[i]n certain circumstances, contractual limitations on the freedom to engage in commercial dealings can promote competition." *Id.* at 1160. The Court determined that businesses routinely enter into

2

legitimate partnerships or exclusive dealing relationships, and while such relationships limit the parties' freedom to engage in commerce with third parties, they can also help businesses leverage capabilities, ensure stability in supply or demand, and protect their research, development and marketing efforts from being exploited by contractual partners. *Id.* at 1161.

Based on the foregoing, the *Ixchel* Court ruled that, "[i]n context, Section 16600 is best read not to render void *per se* all contractual restraints on business dealings, but rather subject such restraints to a rule of reason." *Id.* at 1150. *See also Quidel Corp. v. Superior Ct. of San Diego Cty.*, 57 Cal. App. 5th 155 (2020) (applying "rule of reason" analysis to non-compete between businesses). Specifically, the reasonableness standard asks whether the agreement unreasonably suppresses competition by considering the circumstances, details and logic of the restraint. *Ixchel*, *supra*, 9 Cal. 5th at 1159.  In rendering its decision, the Court in *Ixchel* declined to "disturb the holding of *Edwards* and other decisions strictly interpreting Section 16600 to invalidate non-competition agreements following the termination of employment or the sale of interest in a business." *Id.* at 1158-59.

Based on the controlling authority of *Ixchel* and the evidence presented at arbitration, I conclude that the restrictions contained in the 2007 Agreement between FCP and HLC are governed by the "reasonableness" standard set forth in *Ixchel*.  First, the Inducement Letters, incorporated by reference in the agreement between FCP and HLC in August 2001 (the "2001 Agreement") and in the 2007 Agreement, make clear that Luftig was at all times throughout the relationship an employee of HLC, not FCP. (*See* Ex. C-8, 2007 Agreement at pp. 10-11.)  It was Luftig, not FCP, who incorporated HLC on January 14, 2000. (*See* Stipulated Statement of Undisputed No. 1(a), *supra*).  It was Luftig, not FCP, who used the HLC entity to act as his Lender sixteen months later in the August 2001 agreement, and again almost seven years later in the 2007 Agreement. (*See* Ex. C-8, 2007 Agreement at pp. 10-11.)  Consistent with HLC's right to provide Luftig's exclusive services, FCP paid HLC, not Luftig.  HLC in turn paid its employee Luftig, and Respondents acknowledged that Luftig paid income taxes on all income paid to him by HLC. (Tr. 5/27 at 116.)  For Luftig to now claim that the HLC employment language in the Inducement Agreement somehow renders the restrictions in the 2007 Agreement between FCP and HLC as *per se* void, is rejected. *See also Techno Lite, Inc. v. Emcod, LLC*, 44 Cal. App. 5th 462, 471-74 (2020) (Section 16600 does not invalidate agreements not to compete with one's employer while employed by that employer).

Second, the 2007 Agreement involves restrictions related to a certain defined "Business" (i.e., finding theatrical properties "suitable" for investment). (*See* C -8, 2007 Agreement at pp. 10-11.)  While the 2007 Agreement restricted certain in-term activities, it also allowed HLC (and its employee Luftig) to work on other matters that were not "competitive" with the services to be provided to and paid for by FCP.  It appears that Luftig did, in fact, work on various theatrical productions during the term of the 2007 Agreement for which HLC received payments that were distinct from the payments received by HLC as part of its participation in the Waterfall Provisions of paragraph 6 of the 2007 Agreement.  (*See* references to *Evita*, *Legally Blonde* at Tr. 5/24 at pp. 52-53 and *West Side Story* at Tr. 5/24 at p. 153).  Given how closely Trepp and his Assistant Su Perez monitored his investments, it is inconceivable that Luftig could have participated in these shows separate and apart from his LLC obligations without the knowledge and consent of Trepp.

Finally, it is undisputed that the 2007 Agreement does not provide for post-term restrictions following termination of employment or the sale of a business.  Following termination of the 2007 Agreement and thereafter, Luftig has been free to operate in the theatrical production and financing market unencumbered by the restrictions contained in the 2007 Agreement. *Compare Edwards* and *Techno Lite*, *supra*.

Based on the foregoing, I conclude that the restrictions contained in paragraphs 1 and 6 of the 2007 Agreement are governed by the "reasonableness" standard set forth in *Ixchel*.

2.    The 2007 Agreement Is Not Unreasonable Under The "Rule Of Reason" Test Of Section 16600.

Before addressing whether the 2007 Agreement is an unreasonable restraint on trade, I must first address the objection of Claimant to the timing of Respondents' assertion of the Section 16600 defense.  Following a review of the record, it is apparent that at no time prior to closing arguments did Respondents raise the Section 16600 defense, as follows:

- In Respondents' Answer and Affirmative Defenses to Arbitration Demand dated March 6, 2020 ("Answer"), Respondents raised thirty-two (32) affirmative defenses, including one under the California Code.  However, Respondents did not raise or identify illegality under Section 16600 as an affirmative defense. *See* Answer.

- In Respondents' Response to Claimant's List of Allegations of Breach dated August 25, 2020 ("Response"), Respondents addressed each alleged breach as barred by the statute of limitations and, in nine (9) instances, asserted the alleged breaches were not properly before the Arbitrator because they were not raised in the Claimant's First Amended Arbitration Demand and Complaint dated September 21, 2020 (the "Complaint"). *See* Response.  However, the Response did not raise or identify illegality under Section 16600 as an affirmative defense. *Id.*

- There is no evidence in the record that Respondents served answers to interrogatories or other discovery responses that disclosed the Section 16600 affirmative defense or provided discoverable information about the reasonableness of the restrictions in the 2007 Agreement.

- In Respondents' Pre-Arbitration Brief dated May 14, 2021 ("RPREAB"), Respondents did not disclose or identify illegality under Section 16600 as an affirmative defense.

While the impact of Respondents non-disclosure in discovery is problematical for Respondents, it is not for the reasons cited by Claimant.  The 2007 Agreement has been admitted into evidence; it will not be excluded because Respondents failed to identify the Section 16600 defense in its sworn discovery responses. *See* Cal. Civ. Proc. Code § 2023.030; *see also Saxena*

4

*v. Goffney*, 159 Cal. App. 4th 316 (2008) (sanctions for misuse of discovery process are limited to process and categories under California Civil Procedure Code).

However, the penalty for Respondents' late disclosure in closing argument is not to exclude evidence, but rather to underscore that Respondents failed to offer any evidence at arbitration to support the factual inquiry into whether that the restrictions in the 2007 Agreement were "unreasonable restraints on trade" under *Ixchel*. In this regard, the party asserting the Section 16600 defense bears the burden of showing that the agreement: (1) tends to restrain trade more than promote it; (2) is not necessary to protect the respective parties in dealing with each other; or (3) forecloses a substantial share of a line of commerce. *See Quidel*, *supra*, 57 Cal. App. 5th at 171.

Respondents clearly did not meet their burden. Respondents offered no evidence that the restrictions in the 2007 Agreement restrain trade in the live theater financing market. To the contrary, the point of the restrictions was to identify opportunity for investments in live theater productions. *See Ixchel*, *supra*, 9 Cal. 5th at 1160-61 ("contractual limitations on the freedom to engage in commercial dealings can promote competition" and "can also help businesses leverage capabilities"). There is also no evidence in the record that the restrictions foreclosed a substantial share of a line of commerce in the live theater market, whether financing or otherwise. Finally, the exclusivity and non-compete restrictions in the 2007 Agreement were reasonable and necessary to protect FCP's investment in the significant yearly compensation paid to HLC for Luftig's exclusive services.

Based in the foregoing, I find that the exclusivity and non-compete restrictions in the 2007 Agreement to be valid and enforceable under Section 16600. All other Affirmative Defenses cited by Respondents which are not addressed directly in this Interim Award are denied.

### B. <u>California Labor Code</u>

For the reasons stated above and based on the evidence submitted at arbitration, I deny Respondents' contention that Claimant misclassified Luftig as an independent contractor. I also find nothing in the California labor codes that invalidates a commercial agreement between businesses such as the 2007 Agreement in this matter.

## III. CLAIMS IN RELATION TO *KINKY BOOTS*.

In Section IV which follows, I will address the eleven separate counts of breach of contract and breach of fiduciary duty which Claimant cited at pages 7-8 of Claimant's Amended Pre-Arbitration Statement dated May 1, 2021 ("CAB"). However, I would like to begin with those issues which relate to the production of the show entitled *"Kinky Boots."* This is the predominant issue of this Arbitration as evidenced by the fact that the vast majority of testimony during the five days of Hearings was devoted to this subject, in addition to the sheer number of claims which relate to this show. (*See* Complaint, ¶¶ 26-28, 30, 32-34, 40, 46, 49, 51-52, 72-73 and 83.)

A.    **Background**

Until the commencement of the lawsuit in Los Angeles Superior Court on July 23, 2019, followed by the initiation of this Arbitration, *Kinky Boots* appeared to be yet another Broadway show in a long line of Broadway shows produced by Warren Trepp and Hal Luftig pursuant to the agreements (i.e. the 2001 Agreement and the 2007 Agreement) under which they had successfully operated for more than a decade.  The 2007 Agreement was signed by Hal Luftig Company, Inc., a New York Corporation that furnished the services of its sole shareholder Hal Luftig through an Inducement Letter dated January 1, 2007.  The other party to the 2007 Agreement was FCP Entertainment Partners, LLC a Nevada Limited Liability Company with Warren Trepp as its sole Managing Member.

Claimant alleges that, "[u]nder the Contract, Claimant retained HLC to furnish full time exclusive services of Luftig as the President of Claimant FCP Entertainment Partners LLC." (Complaint, ¶ 6.)  Claimant cited Respondent's "Scope of Duties" (as described in paragraph 2 of the 2007 Agreement) and included "[s]eek out and attempt  to secure rights in literary and other properties suitable to be the basis for stage plays and musicals and/or literary or other properties." (Complaint, ¶¶ 20-22.)

In 2005, producer Daryl Roth approached Luftig about doing a Broadway show based on the *Kinky Boots* movie.  (Tr. 5/27 at p. 135.)  Luftig then approached Trepp who agreed to provide some of the show's early funding.  Between 2009 and 2011, Trepp invested $335,000 in this show. (C-49.)  Trepp chose to withdraw his investment and his money was returned to him as follows: $125,000 on 5/18/12; $5,000 on 3/5/1; and $160,000 on 3/5/13. (C-49.) Because the show was fully funded by the time Trepp was repaid in mid-March 2013 (Tr. 5/26 at p. 224), Luftig was able to instantly replace Trepp's investment with funds from other investors and the show open a month later.

On January 1, 2015, Respondents formally terminated that 2007 Agreement.  Based upon their interpretation of the 2007 Agreement, Respondents have taken the position that they are not required to pay any post-termination *Kinky Boots'* income to Claimant.  The Claimant alleges failure to do so is a breach of the 2007Agreement by Respondents and a breach of Respondent's fiduciary obligations

B.    **The 2007 Agreement**

Several provisions of the 2007 Agreement have been cited and interpreted by the parties in support of their *Kinky Boots*' claims, including the following:

1.    **Exclusivity**

Paragraph 1 of the 2007 Agreement provides:

> The LLC hereby retains the Lender to furnish the full time, exclusive services of Luftig, and Lender agrees to furnish the services of Luftig on a full-time exclusive basis, as the President of the LLC.  Nothing contained in this agreement shall prevent Luftig from engaging in management of his personal affairs or

> investments, or his involvement in activities on his own time that
> are not competitive with the Business.

The "Business" is defined in an introductory paragraph, as follows:

> [T]o engage in the business of seeking out, developing, financing,
> producing and/or co-producing live theatrical stage attractions and
> properties suitable to become live theatre stage attractions.

Any issues implicated under California Law in relation to exclusivity of employment regarding HLC or Luftig are specifically addressed in Section II above.

In return for making this commitment, FCP paid HLC annual compensation of $150,000 (paragraph 3(a)) as well as an annual payment of $60,000 "to defray the cost of maintaining an office in New York City." (2007 Agreement, ¶ 3(b).)  There was also a provision for the payment by FCP of additional expenses incurred by HLC with the prior approval of Trepp. (*Id.*, ¶3(c).)

In this capacity, Luftig presented FCP with a number of investment opportunities. According to Trepp, he never refused to invest in any show offered to him by Luftig from 2007 to 2014.  It was abundantly clear that in this relationship, Luftig was the creative partner and Trepp was the investor partner.  However, Trepp never invested in these shows through FCP.  As stated in Respondent's Pre-Arbitration Brief, Paragraph 5(a) of the 2007 Agreement provides for certain Investor Income streams paid to Trepp and his affiliates (denominated as "Investment Entities") to the extent they held investments in theatrical properties.  In Paragraph 5(a) of the 2007 Agreement, Trepp, in his capacity as Managing Member of FCP, reserved for himself and his affiliates all investor income streams resulting from investments made by any of them, with the exception, however, of investments by FCP.  If Trepp invested in a project through FCP, he would have to share any resulting profits with HLC.  If, however, he invested through a non-FCP Investment Entity, he would not have to share.  The 2007 Agreement also allowed HLC and Luftig to benefit from their own investment activity in the same manner as Trepp and his Investment Entities." (*See* RPAB p. 3, lines 23-28 and p. 4, lines 1-3).  Respondents state the previous statement describes the term "Investor Income" as that term was used by the parties to delineate certain forms of income.

As previously stated in Section II (A)(1) above, it appears that Luftig did, in fact, work on various theatrical productions during the term of the 2007 Agreement for which HLC received payments which were distinct from the payments received by HLC as part of its participation in the Waterfall Provisions of paragraph 6 of the 2007 Agreement. (*See* references to *Evita*, *Legally Blonde* (Tr. 5/24 at pp. 52-53) and *West Side Story* (Tr. 5/25 p. 153).)  Given how closely Trepp and his Assistant Su Perez monitored his investments, it is inconceivable that Luftig could have participated in these shows separate and apart from his LLC obligations without the knowledge and consent of Trepp.  So even through paragraph 1 of the Agreement contained "exclusive basis" language, I conclude that Trepp either regarded these HLC/Luftig activities as those which involved "engaging in management of his personal affairs or investments, or his involvement in activities on his own time that are not competitive with the Business." (*See* 2007 Agreement paragraph 1.)  Trepp's allegations that he only became aware of

Respondents' participation in non-LLC Income solely as a consequence of the much-discussed Fox Theatrical letter dated June 27, 2019 (*see* Complaint, Ex. 4) lacks credibility.

## 2.    Approved Project

Paragraph 4 of the 2007 Agreement defines an "Approved Project" as follows:

> At such time as the Managing Member determines in its sole discretion that the LLC should become involved with a particular property, stage play and/or musical (such as, by way of example only, the acquisition of rights in a property and/or the financing in whole or in part of the development, production and for further exploitation of any such property (an "Approved Project")….

Respondent has acknowledged "From 2009 through 2011, Trepp initially decided to invest $335,000 in *Kinky Boots* through two Investment Entities he controlled (Freemont Trust and Friendly Capital Partners, LP)." (RPREAB, p. 6 at pp. 22-23.) In an email Luftig wrote to Jale Trepp on June 7, 2011, Luftig stated, "Warren can invest as much as he likes but actually put in zero and still get all the same stuff…same with *Kinky Boots*." (C-23.)  However, in this Arbitration Respondents now have now reversed this position and allege that the act of cashing out its investments in *Kinky Boots* meant that the Claimant was no longer entitled to post termination income distributions.

Respondents now allege that "*Kinky Boots* ceased to be an Approved Project once Trepp decided to cash out and withdrew Freemont Trust's and Friendly Capital Partners' entire investment in *Kinky Boots*." (RPAB, p. 11 at lines 24-25.)  Claimant counters that "when a live theater opportunity is presented to FCP, Trepp has exclusive discretion 'to become involved,' which includes 'by way of example only, the acquisition of rights in a property and for the financing in whole or part of the development, production and/or further exploitations of such property.'" (CAB, p. 5 at pp. 9-12.)  Claimant also contends, "[a] project becomes an Approved Project as soon as FCP becomes involved with a particular property, stage play and/or musical." (2007 Agreement, ¶ 4).  It is undisputed that FCP "became involved" in *Kinky Boots* and Luftig signed the co-production agreement while acting as the President of FCP." (CAB, p. 6 at lines 20-23.)  I agree.

Trepp not only invested $335,000 in *Kinky Boots* – he invested some of that amount in the earliest (…and therefore riskiest) stages in the development of this property.  In an e-mail Hal Luftig writes to Warren Trepp dated September 30, 2011, he states: "…here is an overview of what we have paid recently in option payments." (C-27.)  Luftig then describes option payments made to "Disney" and "*Kinky Boots* Authors."  I would point out that Luftig's use here of the pronoun "we" to describe himself (and HLC) and Trepp (and FCP) is but one of many times that he does use to characterize their business relationships both prior to and after Trepp had withdrawn his investment funds from *Kinky Boots*.  I believe that it was Trepp's money and Trepp's reputation as an experienced Broadway investor that is likely to have enabled Luftig to convince other people to invest in *Kinky Boots*.  By the time that Trepp received the final return of his money on March 5, 2013, *Kinky Boots* was already fully subscribed and Luftig had no

trouble replacing Trepp's investment. For all the reasons stated above, I find that *Kinky Boots* should be deemed an Approved Project for FCP.

### 3.   <u>Vested Project</u>

Paragraph 8(e) of the 2007 Agreement states, in part:

> If at any time the following the expiration of the term of this Agreement or the termination of this Agreement any LLC income is earned with respect to any Approved Project for which a Co-Production Agreement has been signed by the LLC (a "Vested Project"), such net income shall continue to be treated as set forth in paragraph 6 thereof…

Respondents allege that Claimant is not entitled to share in any LLC Income for *Kinky Boots* under the so-called "Waterfall Provisions" of paragraph 6 of the Agreement for the following reasons:

1. "Paragraph 6(a)'s Waterfall distribution applied only to income realized by FCP resulting for (1) FCP's acting as a general partner or managing member, i.e. the lead Producer or Co-Producer or a project-not just one of the often dozens of credited "producers" whose role is limited to investing money; or (2) FCP's acting as an "introducer" or a project in which it was not a general partner or managing member. (RPREAB, p. 4 at lines 27-28 and p. 5 at lines 1-3.)  In other words, Respondents are claiming that *Kinky Boots* cannot be a "Vested Project" for FCP because HLC (… and not FCP) signed the *Kinky Boots* Co-Producer agreements.

2. Respondents allege "Trepp's declining appetite for risk and Broadway investments manifested itself in two other important ways:  <u>First</u>, starting in 2009, Trepp sought to hold himself and FCP from potential liability by having HLC – not FCP – act as General Partner/Managing Member on projects and sign the Co-Production agreements for those projects." (RPREAB, p. 5 at lines 16-19.)  I find this allegation without credibility because Trepp's formation of FCP would have afforded him all of the insulation from liability he needed. In my estimation the likelihood of someone piercing the so-called "corporate veil" to attach Trepp's personal assets was exceedingly unlikely. Furthermore, Respondents never introduced any credible proof that this was the reason for using HLC instead of FCP on the *Kinky Boots'* production documents.

3. Respondents also state "Trepp specifically instructed Luftig to have HLC act as General Partner and sign Co-Production Agreements…" (RPREAB, p. 17 at lines 20-21).  After acknowledging that HLC did indeed sign the *Kinky Boots'* production agreements which they believe helps to prove that this is an HLC property – Respondents seem to be relying on this provision paragraph 17 of the Agreement, which provides that "[n]o amendments or additions to this Agreement may shall be binding unless in writing and signed by both parties except as herein may otherwise be provided."  Respondents state California law is clear, as follows: "It is not the province of the court to alter a contract by construction or

to make  new contract for the parties." (RPAB at p. 10 (citing *Constr. Mach. Co. v. Willard & Rodman, Inc.*, 208 Cal. App. 2d 31, 38 1962).)

During the 13 years that Trepp and Luftig worked together under the provisions of the 2001 Agreement and the 2007 Agreement, there were numerous incidents where the provisions of Paragraph 17 were never followed – and until the commencement of this Arbitration, there doesn't appear to have been any objections – from either party.  Respondents acknowledge "Trepp subsequently instructed Luftig's to have HLC act as a Managing Members/General Partner and sign the Co-Producer agreements starting in the later 2000's with *Catch Me if You Can* and continuing in the early 2010s with *Evita* and *Kinky Boots*." (RPREAB, p. 5 at lines 22-25.)  The parties had obviously developed a course of performance under the 2 agreements that worked for both sides and neither of them felt it was necessary to paper these decisions with written amendments as was technically required under the 2007 Agreement.

California case law supports this position.  "Where the subsequent conduct of the parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied."  *Diamond Works, Inc. v. Agreement Insurance,* 109 Cal.App.4th 1020, 1038 (2003) (citing *Darrison v. Edward Brown Sons,* 25 Cal.2d. 473, 479 (1944) ("Before a contract modifying a written contract can be implied, the conduct of the parties according to the findings of the trial court must be inconsistent with written contract so as to warrant the conclusion that the parties intended to modify the written contract").  *See also* Cal. Comm. Code §§ 1303(f), 2209(4) (course of performance is relevant to show a waiver or modification of any term  inconsistent with the course of performance.)  It's clear to me that the manner in which the *Kinky Boots*' production contracts were signed by HLC was entirely consistent with the manner in which HLC and FCP had been doing business together at that point for several years.  I find *Kinky Boots* was an FCP "Approved Project" and "Vested Project" the 2007 Agreement.

### C.    Additional Indicia that FCP is Entitled to Participate in the Waterfall Provisions in Relation to Kinky Boots Income

In characterizing why their client paid FCP considerable sums in *Kinky Boots* income during the period following the termination of the 2007 Agreement, Counsel for Respondents stated: "Thus, FCP was not entitled to any post-termination income from *Kinky Boots*.  Nonetheless, Luftig and HLC mistakenly believed that FCP was and, as a result, FCP has received more than $1.3 million in post-termination income from *Kinky Boots* from January 1, 2015 to present." (RPREAB, p.11 at lines 20-22).  Luftig didn't make this "mistake" on just one occasion, but rather he repeatedly assured Trepp that he would be entitled to his Waterfall Provision share of *Kinky Boots*' post-termination income.

In a June 7, 2011 e-mail to Jale Trepp, Luftig stated: "I know over the years Warren has put SIGNIFICANT money into many many shows and now we are at the point where he can reap all the benefits of doing so.  Because we now have all those great relationships and can raise money from outside sources, he will get billing, tony Awards (if we win), royalties, office fees, producer fees, etc. while not having to invest any funds…he can if he wants, but doesn't have to…which is a great thing for us, don't you think." (C-23.)

10

On August 18, 2015 Luftig wrote this to Trepp: "At that time, FCP will again receive a full 55% of Kinky Boots profit distributions as direct payments. I am delighted to report that Kinky Boots continues to generate profits, and is likely to do so for the foreseeable future. I expect to be able to send you profit distributions in the near future, and look forward greatly to doing so." (C-81.)

On February 12, 2015, Luftig wrote this to Trepp: "To be clear our ongoing relationships relates only to exiting projects – at this point, consisting almost entirely of Broadway and U.S. Touring companies of Kinky Boots – and our ongoing split is 55/45 in your favor without you having any further obligations." (C-78.)

It appears that it was clear to Luftig that HLC had a legal obligation to pay Trepp his 55% share of net income from *Kinky Boots* paid through the Waterfall Provisions of the Paragraph 6 of the 2007 Agreement. It is clear to this Arbitrator that the Respondents are legally obligated to do so. By failing to do so, I find that the Respondents have breached the Agreement.

## IV.    CLAIMANT'S CLAIMS FOR RELIEF

In the Complaint Claimant raised two claims for relief: (1) breach of contract; and (2) breach of fiduciary duty. In Claimant's Amended Pre-Arbitration Statement dated May 1, 2021 ("CAB"), it referenced the Arbitrator's Order dated October 19, 2020 and cited the following eleven separate counts of breach of contract and breach of fiduciary duty:

1.    Kinky Boots West End/European Tour Income (Claimant's Complaint ¶ 26)

2.    Subsequent Kinky Boots United States non-equity Tours Income (¶ 27)

3.    Elephant Man Production and Investment Income (¶ 29)

4.    Kinky Boots World Tour Income (¶ 32)

5.    Retention of Salary Not Justly Earned (¶ 32, 41)

6.    Modern Millie Alteration and Direction Payments to HLC (¶ 35-36)

7.    Miscalculation of Distribution Waterfall to the Investment Entities (¶ 37)

8.    Miscalculation of Distribution Waterfall Regarding Prior Losses (¶ 38)

9.    The Kinky Boots Cast Album (¶ 40)

10.    Failure to Secure Trepp's Production Credit (¶ 41, 42, 44)

11.    The Kick-Back Allegation (¶ 48)

11

1.    __Kinky Boots West End/European Tour Income__

In its Complaint the Claimant states in late 2014 that Luftig secured an investment opportunity related to a European tour of *Kinky Boots* (the "European Tour")." (Complaint, ¶ 26.)  "Rather than present The European Tour for Claimant's consideration, Luftig accepted the European Tour for his own, personal investment and refused to present the opportunity to Claimant, as he was contractually bound to do." (*Id.*, ¶ 28.)

These charges were directly refuted by the testimony at the 5/28/21 Hearing when Luftig credibly testified that he did not have any personal investments in the world tours or the London West End tours and nor did FCP. (Tr. 5/28, p. 75.)  Luftig goes on to explain that Kinky Boot LLC (an entity frequently referred to as the "mother company" ("KB Mother Company") receives "a fee a profit participation and royalties (Tr. 5/28, p. 75 ) from these various touring companies which will in turn find it way to FCP and HLC." (*Id.* at line 25.)

Claimant's claim that Respondents breached the 2007 Agreement by withholding investment opportunities for itself that it should have offered to Claimant is without proof and is denied.  Respondents are ordered to account to and pay Claimant all *Kinky Boots* West End/European Tour Income received by HLC from the KB Mother Company and to which Claimant is entitled under the 55%(FCP)/45% (HLC) Waterfall Provision in paragraph 6 of the 2007 Agreement and my findings as stated in paragraph 1, page 21 of this Interim Award.

2.    __Subsequent *Kinky Boots*' United States non-equity Tour Income__

In the Complaint Claimant alleged that "Luftig found an investment opportunity related to an additional United States tour of Kinky Boots." (Complaint, ¶ 27.)  In his testimony at the 5/26/21 Hearing, Luftig credibly acknowledged that all non-equity licensing tour income was paid into the KB Mother Company. (Tr. 5/26, pp. 82-83.)  Claimant's claim that Respondents breached the Agreement by withholding for their sole benefit investment opportunities relating to United States non-equity tour income is without proof and is denied.  Respondents are ordered to account to and pay Claimant all *Kinky Boots*' United States non-equity tour income received by HLC from the KB Mother Company and to which Claimant is entitled to under the 55% (FCP)/45% (HLC) Waterfall Provision in paragraph 6 of the 2007 Agreement as stated in paragraph 1, page 21 of this Interim Award.

3.    __*Elephant Man* World Tour Income__

In the Complaint Claimant alleged:

> [I]n 2014 prior to the termination of the Contract (here the " 2007 Agreement"), Luftig secured an investment opportunity in the 2014 Broadway revival of the *Elephant Man*. In contradiction of his Contractual obligations to Claimant, Luftig did not present the opportunity to Claimant.  Instead Luftig secreted the opportunity from Claimant for his own personal gain.  On information and belief, Luftig participated in the production of *Elephant Man* in

2014 and 2015 which generated significant income (and resulted in a Tony Award for Best Actor). Luftig and HLC usurped the *Elephant Man* opportunity and in doing so breached Contractual obligations owed to Claimant. (Complaint, ¶ 29.)

*Elephant Man* opened on Broadway on December 7, 2014. Because the star of the show (Bradley Cooper) was also a major Hollywood film star, *Elephant Man* received a great deal of attention from the entertainment media. On December 17, 2014, Trepp's wife Jale sent an e-mail to Luftig expressing surprise that we were producers of this show. (R 182.) In fact, they were not producers of *Elephant Man* either directly through the LLC or by virtue of money which Claimants had invested in this show through its Investment Entities which in this case was zero.

On three occasions prior to the Hearing (7/23/20, 10/5/20 and 5/5/21), Respondents made a Motion for Summary Judgment or Partial Summary Judgment which included a demand to find that Claimant's claims regarding *Elephant Man* were time barred due to the running of the statute of limitations. I denied Respondents' motions but in each instance I specifically did so "without prejudice" so they could continue to re-introduce these claims if they chose to do so. I believed that in this instance the resolution of this statute of limitations issue could only be appropriately determined after all relevant testimony was concluded at the Hearing. After watching and listening to Trepp testify over the course of many hours, it became absolutely clear that he was a sophisticated investor and buttoned-up businessman. By 2014 he had been investing in theater projects with Luftig for more than 13 years. He knew exactly how the business of Broadway theater was conducted. He received regular financial statements from Claimant, and he knew or should have known FCP's status in relation to *Elephant Man* in December of 2015. If he truly believed that he was entitled to rights in *Elephant Man* pursuant to his Agreement with HLC, he should have initiated a claim under the alternative dispute resolution provisions of paragraph 16 of the 2007 Agreement at that time. However, Trepp took no such action.

Under California law, Claimant was required to bring its claims in relation to *Elephant Man* within a three (3) year statute of limitations period for Respondents' alleged breach of fiduciary duty (*see* California Code of Court Procedure, § 338 (d)) and within a four-year statute of limitations period for a breach of a written contract (*see* California Code of Civil Procedure, § 337 (a), (d)). Claimants did not introduce these claims until the commencement of this Arbitration in August, 2019. As a result, Claimants claims in relation to *Elephant Man* are time-barred and therefore are denied.

### 4.   *Kinky Boots***' World Tour Income**

Claimant's Claim regarding *Kinky Boots*' World Tour Income is comparable to Claimant's claim cited above in paragraph 1 for Kinky Boot West End/European Tour Income. Therefore, I repeat my finding there that Claimant's claim that Respondents' breached the 2007 Agreement by withholding investment opportunities for itself that it should have offered to Claimant is denied. Respondents are ordered to account and pay Claimant all *Kinky Boots*' World Tour Income which is received by HLC from KB Mother Company and to which

Claimant is entitled under the 55% (FCP)/45% (HLC) Waterfall Provision of paragraph 6 of the 2007 Agreement and my findings as stated in paragraph 1, page 21 of the Interim Award.

### 5.    Retention of Salary Not Justly Earned

In the Complaint Claimant alleges that "Luftig failed to devote his full time and exclusive services to FCP" and "[t]his included his production of the Elephant Man presentation, the various World Tours of Kinky Boots, the non-equity United States tour of Kinky Boots, and likely includes other productions which FCP is not yet aware of." (Complaint, ¶ 32.)  I have already determined that Claimant's claim regarding *Elephant Man* in time-barred (see paragraph 3 above).  I have also denied Claimant's claims regarding a breach of the 2007 Agreement resulting from Respondents withholding for their own benefit opportunities relating to *Kinky Boots* World Tours and non-equity United States tours (see paragraphs 1 and 2 above).

Paragraph 41 of Claimant's Complaint alleges that "Luftig executed various productions agreements and operating agreements on behalf of HLC without the consent of Trepp (Managing Member of FCP) which Luftig used as a means to secure revenues and credit for himself, which he was obligated to provide to FCP, all while being paid a $150,000 annual salary plus $60,000 a year in expenses and a 45% profit split with Trepp." (Complaint, ¶ 41.)  Claimant's Complaint, amended pleadings and the documentary and testimony evidence which were offered during the Hearing all failed to convincingly demonstrate how and when Respondents retained salary was not justly earned.  Claimant's claim here is denied.

### 6.    Modern Millie Equity Alteration and Direction of Payments to HLC.

In the Complaint Claimant alleged that "Luftig instructed the production company for Modern Millie LLC to unilaterally alter the ownership percentage of the LLC by reducing FCP's percentage and increased HLC's which resulted in a change in the calculation of the amounts of revenue that should have been paid to FCP and distributed in accordance with the 2007 Agreement." (Complaint, ¶ 35.)  Although there was no mention of *Thoroughly Modern Mille* production ("TMM") in their initial filing, I allowed Claimant to include it in its Amended Complaint.  Claimant alleges that there was a reduction of FCP's capital and profit percentage from 25% in 2009 to 20% in 2010 and that the Respondents were the beneficiaries of this 5% change.

Claimant alleges that it only became aware of this change because of a letter from John O'Brien at Fox Theatrical dated June 27, 2019 which was inadvertently sent to Claimant. (*See* Complaint, Ex 4.)  As they did in relation to the previously described *Elephant Man* claim (see paragraph 3 above), the Respondents made three Motions for Summary Judgment or Partial Summary Judgment which focused on this issue.  Respondents alleged that this claim should be dismissed because it was also time-barred.  In support of this position, Respondents allege that: (i) "Luftig repeatedly told Trepp in later 2014 and early 2015 that HLC would be receiving its share of payments directly from the company managers of theatrical productions.  The June 27, 2019 letter merely reflected that arrangement with respect to Millie (Respondents and Counterclaimants Hal Luftig Company Inc.'s and Hal Luftig's Renewed Motion for Summary Judgment or in the alternative Partial Summary Judgment dated October 5, 2020 ("10/5/20

MSJ") (p.7 at 11-14); (ii) that the percentages were ascertainable from the K-1 tax forms that
were sent to Claimant for the years 2009 to 2017 (C-7); and (iii) an arrangement was made
without objection from Claimants that HLC and PCP would be paid their shares of revenues
directly from the company managers for TMM.  "In August 2016 an HLC representative stated
'In terms of Millie, they are not able to issue separate K-1s but said to look at the second page of
FCP's K-1s where is [sic] has a line for "transferred capital" which represents the Hal Luftig
Company portion of the Millie profit.'"  In response, Su Perez for FCP stated: "that's all very
well and fine.  But Warren had a point when he said he understands Hal taking his portion of the
distribution but is Warren claiming and paying all the taxes involved in the K-1?  Shouldn't this
be shared also?"  (10/5/20 MSJ p. 8 at 17-22.)  Just as I did when I ruled on the Respondents
previously mentioned Summary Judgment Motions, I denied the motions on this claim but
intentionally provided that I did so "without prejudice." As was the case with the motions
regarding the *Elephant Man*, I felt I needed more information than was provided by the pleadings
in the Respondents' motions.

I have now had the opportunity to consider the testimony of Trepp and Luftig in relation
to this claim.  I have also had a chance to evaluate the documentary evidence presented by both
sides in support of their positions.  My finding is that Trepp could have availed himself of his
rights under the "Books and Records" clauses of the 2007 Agreement and the 2001 Agreement to
inspect the books and records of the LLC, but never chose to do so.  Claimant is a sophisticated
investor who utilized the services of a knowledgeable assistant (Su Perez).  Either of them could
have objected to the K-1s they received starting in 2010 but never did.  It is evident to the
Arbitrator that Claimant was clearly given the appropriate information to recognize the alteration
of the TMM shares from 25% to 20% for at least five year before receiving the June 27, 2019
letter from Fox Theatrical.  I rule that Claimant's claims in relation to TMM are time-barred
because they were not brought within a three (3) year statute of limitations period for
Respondents alleged breach of fiduciary duty (California Code of Civil Procedure Section, §
338(d)) and within a four (4) year statute of limitations period for breach of written contract
(California Code of Civil Procedure, §§ 337(a) and (d)).  Accordingly, Claimant's claim here is
denied.

### 7.    Miscalculation of the Distribution Waterfall to the Investment Entities.

Section 5(a) of the 2007 Agreement provides, in part:

> Any sums realized by any entity ("Investment Entity") owned or
> controlled by the Management Member (other than the LLC) or by
> the Managing Member himself, by reason of an investment in a
> theatrical property, shall be such investor's sole property, shall not
> constitute LLC income (as defined below) and shall not be subject
> to this Agreement.

Paragraph 8, which is part of the Waterfall Provision, provides:

> The next 20% of the LLC Income from office fees, producer fees,
> executive producer fees and "introducer' fees only (specifically

> excluding any share of adjusted net profits allocable to producer
> activities) shall be paid pro-rata to the Investment Entities
> investing in an Approved Project (the "Investor Entity Fee
> Income").

Claimant's evidence is in support of this claim was totally unconvincing.  In addition, the Investment Entities are not parties to this Arbitration.  Accordingly, I rule that Claimant's claim here is denied.

### 8.   <u>Miscalculation of Distribution Waterfall Regarding Prior Losses</u>

Claimant's claim that:

> Luftig miscalculated and misapplied the distribution waterfall for
> reimbursement to FCP for expenses in accordance with Section
> 6(a)(i), contending that the "all losses" provision was limited to
> annual losses and not multi-year losses, and in doing so
> misappropriated at least $136,475.  Luftig contended that, contrary
> to the parties' previous practices, the Contract provided that
> expenses under Section 3 were only recoverable on an annual
> basis, and the recoupment of Section 3.  Expenses as set forth in
> Section 6(a)(ii)(A) of the Contract did not apply to cumulate
> losses. (Complaint, ¶¶ 38-39.).

The 2001 Agreement and the 2007 Agreement were nearly identical.  One of the few alterations was Paragraph 6 which was entitled "LLC Income" in both agreements.  The definition of "LLC' income in paragraph 6(a) is identical in both agreements.  In the 2001 Agreement, Paragraph 6(a)(i) states: " First, the net income of the LLC shall be retained by the LLC until an amount of cumulative net income has been retained by the LLC equal to the cumulative net losses of the LLC.  For these purposes, net income shall mean its taxable income for federal income tax purposes and net losses shall be calculated taking into account all operational losses and investment losses related to investments made by the LLC in losses which are realized from its passive investments".  Paragraph 6(a)(i) of the 2007 Agreement states "First, 100% of all LLC Income shall be equal to $63,483.19 has been retained by the LLC to cover all losses prior to the date of this Agreement."

On December 18, 2014, Luftig sent an email to Su Perez with a copy to Trepp which contained what he described as "the yearly breakdown of income and expenses from 2007 up to end of year 2014. (C-67.)  On February 5, 2015, Luftig sent another copy of the financials with his explanation of deductions and monies that were owed to him by Trepp.  (C-76.)  Luftig wrote to Trepp again (this time sent both by Federal Express and by e-mail on February 12, 2015).  This time Luftig provided a very detailed explanation of his position:

> In a conversation I had recently with Su, there seems to be confusion about
> expenses and payments that are accounted for on a CALENDAR basis and those
> on a CUMULATIVE basis.  As written by Doug Frye in 2007, paragraphs 4(a)

16

and 4(b), specifically refer to the payments accounted for on a CALENDAR year basis that are to be made to me for $210,000 per year, with the next $75,000 to be paid to FCP (which presumably for tax purposes, Doug characterized as an expense reimbursement rather than an allocation of profit to FCP). Accordingly, loss from any one particular year is NOT carried forth into the next calendar year. This is in direct contrast to the contract that call for CUMULATIVE accounting, in which profits and losses are accordingly accumulated from the inception of the contract (2007) to its termination (2014). So, even though there may be a loss to FCP prior to 2014 due to expenses exceeding income, because those losses are on a CALENDAR year basis, they are not contractually recoupable. Therefore, the only year that is relevant and that we should be looking at now is 2014. Wouldn't you agree that if the intent were to carry forward shortfalls, we would expect the agreement to clearly say so? But, in fact it says nothing of the sort. (C 78.)

I find that the position taken here by Luftig is absolutely correct. Claimant's claim here is denied.

### 9.    The *Kinky Boots*' Cast Album

Claimant abandoned its previously stated claim in relation to the *Kinky Boots*' Cast Album.

### 10.    Failure to Secure Trepp's Production Credit

Claimant alleges "Luftig refused and neglected to ensure that Trepp receive the appropriate credit and billing as required in the Agreement." (Complaint, ¶ 42.) Paragraph 9 of the Agreement provides: "Unless the Managing Member and Luftig agree otherwise, production credit to which the LLC is entitled shall include the names of Hal Luftig and Warren Trepp." This paragraph goes on to explain that the production credit that they previously received for the Broadway Production of *Legally Blonde* should be used as the model for future credits for the LLC. I find that Trepp received billing credit for all LLC productions to which it was legally entitled. Claimant's claim here is denied.

### 11.    The Kick Back Allegation

Claimants allege that "Luftig personally benefitted by accepting 'kick-backs' from producers who paid Luftig large sums of money to secure Claimant's investments in productions. The acceptance of a kick-back as finder's fee violated the terms of the Agreement and breached his fiduciary duty to Claimant." (Complaint, ¶ 48.) Claimant presented no credible evidence or testimony to support its claim. Accordingly, Claimant's claim here is denied.

## V.    RESPONDENTS' COUNTERCLAIMS.

In their Answer Respondents asserted the following counterclaims:

1.    Breach of Contract (Answer ¶53)

2.      Breach of Implied Covenant of Good Faith and Fair Dealing (¶58)

3.      Unjust Enrichment (¶63)

4.      Quantum Meruit (¶66)

5.      Accounting (¶73)

6.      Defamation Per Se Under New York Law (¶77)

7.      Prima Facie Tort Under New York Law (¶83)

**1.      Breach of Contract**

a)      Respondents allege that "FCP breached Paragraph 3 of the 2007 Agreement by failing to pay $45,000.00 owed to HLC." ( RPAB p. 16 at 22-23.)  The $45,000.00 referenced here was part of $150,000.00 payment which FCP was required to pay each year to HLC pursuant to the provisions of paragraph 3(a) of the 2007 Agreement.  In his testimony at the Hearing on May 25, 2021, Trepp was asked, "Did you, in fact, cut Mr. Luftig's salary for a period of time?" to which Trepp replied, "Yes.  You're calling it a salary, I'm calling it compensation.  Does it matter?" (Tr. 5/25 at p. 100.)  Just previous to this exchange, Trepp claimed that the actual amount was not $45,000.00: "I knew it was $30,000.00." (Tr. 5/25 at p 100.)

Whether the actual amount was $30,000.00 or $45,000.00, it's clear that the parties had a dispute in relation to this issue.  If Respondent was dissatisfied with this reduction in compensation, Respondent could have triggered the alternative dispute resolution opportunities provided under paragraph 16 of the 2007 Agreement or terminated the Term under paragraph 7.  The Respondents chose to do neither and instead continued its usual business relationship with FCP.  For those reasons, I find there have been no breach of contract here and Respondents' counterclaim is denied.

b)      Respondents allege that FCP breached paragraph 16 by violating the mandatory arbitration provision.  Paragraph 16 of the 2007 Agreement is clear:

In the event of any dispute or controversy arising under or in connection with this Agreement, the parties hereto shall first promptly try in good faith to settle such dispute or controversy by non-binding mediation under the applicable rules of the American Arbitration Association before resorting to arbitration.

Instead, Claimant chose to commence a litigation against Respondents on July 23, 2019 in the Los Angeles Superior Court.  Claimant's explanation for doing so as a "placeholder" (Tr. 5/28 at p. 24) was totally lacking in credibility.  In a letter to Respondents' attorney on July 24, 2019, Claimant's attorney acknowledged its awareness of the requirements of paragraph 16 when Mr. Gilmore wrote "…and the Agreement contained mandatory mediation and arbitration clause."  As a result, I find that said actions did constitute a breach of the 2007 Agreement and I

find for the Respondent in relation to this counterclaim. Damages in relation to this claim will be calculated as provided in paragraph 2 , page 21 of this Interim Award

### 2.    Breach of Implied Covenant at Good Faith and Fair Dealing

Respondents allege that FCP breached the implied covenant of good faith and fair dealing in the 2007 Agreement by failing "to provide investments for theatrical projects (through themselves or other parties they located) while the Luftig parties were tasked with providing Broadway know-how and day-to-day production skills." (RPAB, p. 16 at lines 26-28.)  The essence of the Respondents' allegations and testimony was the Claimant's "core responsibilities." (RPPB, p. 17 at line 7.)  In support of this position, Respondents introduced documents and testimony to demonstrate how Trepp's investments had diminished during term of the 2001 Agreement and the 2007 Agreement. (R-230.)

Respondents' counterclaim here misinterprets the Agreement.  Paragraph 4 of the 2007 Agreement states:

> At such time as the Managing Member determines in its sole discretion that the LLC shall become involved with a particular property, stage play, and/or musical (such as, by way of example only, the acquisition of rights in a property and/or financing in whole or in part of the development, production, and/or further explanation of any such property (an "Approval Project") the LLC shall make available such funds as the Managing Member, after consultation with Luftig, determines in its sole discretion is needed in connection with such Approval Project.  (Emphasis added.)

Trepp alone determines when, if, and how much he will invest in productions. If Respondents truly believed this was a breach of the Agreement, they could have used the alternative dispute resolution opportunities provided in paragraph 16 of the 2007 Agreement.  Not only did Respondents fail to do so but they carried on with business as usual long after Trepp's investments had started to diminish.  Even more dispositive was Luftig's own e-mail on June 7, 2011, where he wrote about Trepp:  "while not having to invest any funds…he can if he wants to, but doesn't have to." (C-23.)  For these reasons, I find that there has been no  breach of the 2007 Agreement here and Respondents counterclaim is denied.

### 3.    Unjust Enrichment

Respondents allege that FCP has been unjustly enriched by more than $1.3 million. (*See* RPAB at p. 17.)  Respondents state that "FCP has received $1.3 million in post-termination Kinky Boots payments to which FCP was not entitled because it was not a Vested Project. (*Id.*)  The Arbitrator has previously determined that Kinky Boots in fact was an "Approved Projected" and a "Vested Project" and that Claimant was and is entitled to receive its 55% share of net income pursuant to the Waterfall Provision of paragraph 6 of the 2007 Agreement. (*See* paragraph 1, page 21 of the Interim Award.)  Accordingly, Respondent's counterclaim here is denied.

19

4.      **Quantum Meruit**

In their Answer Respondents asserted a counterclaim for Quantum Meruit.  This claim is based on their allegation that "HLC and Luftig perform valuable services for FCP Entertainment and Trepp's and that were rendered at FCP Entertainment and Trepp's request" and "FCP Entertainment and Trepp failed to pay HLC and Luftig for such services." (Answer, ¶¶ 67, 70).  I find no evidence to support these allegations.  In fact, it appears that Respondents were paid well and paid fairly for their services under the 2007 Agreement.  Respondents' counterclaim here is denied.

5.      **Accounting**

In their Answer Respondents allege that "Counterclaim Defendants have received and/or retained money, a portion of which is due to Counterclaimants from Counterclaim Defendants" and "[t]he amount of money due…cannot be ascertained without an accounting of books and records of Counterclaim Defendants, and each of them." (Respondents' Answer, ¶¶ 74-75).  Since I have made no finding that Claimant has received or retained any money rightfully owing to Respondents – there is no need for an accounting.  Respondents' counterclaim here is denied.

6.      **Defamation *Per Se***

Respondents allege that FCP and Trepp committed Defamation *Per Se* against Luftig and HLC by commencing the previously described lawsuit within Los Angeles Superior Court "to publicly smear Hal Luftig, which they achieved through an article on a gossip website on The Blast." (*See* RPAB, p. 18.)  In Respondents' Pre-Arbitration Brief they assert that "Luftig and HLC defamation and *prima facie* claims are brought under New York law, and that is where Luftig and HLC reside and suffered damage to their reputations and related harm." (RPREAB, p. 24.)  I agree that this counterclaim must be considered under the laws of the State of New York.

The elements Respondents must prove to support a claim for defamation are : "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm."  *3P-733,3 LLC in Towan Davis*, 187 A.D.3d  626, 627-28, 135 N.Y.S 3d 27, 29-30 (2020).

Respondents contend that the Claimant's filing of the previously discussed Los Angeles Superior Court lawsuit, which directly led to the alleged defamatory article published by The Blast on July 22, 2019, occurred one day before the lawsuit was filed.  Claimant has presented evidence that it filed the Complaint on July 19, 2019, but the filing was rejected by the clerk's office for technical reasons. (C-137 and C-138.)  Respondents counter that if the filing was rejected, it wouldn't have appeared on the Superior Court's website and therefore would have been unavailable to the media.  While I am sympathetic to the Respondents' position here, I don't believe that they have demonstrated sufficient evidence to conclusively demonstrate that the alleged defamatory information came from the Claimant rather from information provided to the Court or other sources. Given the fact that the Respondents have not met their burden of proof here, it will not be necessary to address the Claimant's position as to the truthfulness of the

20

statements contained in The Blast article or if statements made in the course of judicial or quasi-judicial proceedings are privileged.  Respondent's counterclaim for Defamation *Per Se* is denied.

### 7.    *Prima Facie* Tort

Respondents allege that FCP and Trepp committed a *prima facie* Tort against Luftig and HLC.  Respondents cite two cases in support of its position. (*See* RPAB, p. 20) (*citing Burns Jackson Miller Summit & Spitzer v. Lidner*, 464 N.Y.S. 2d 712, 720-721 (1983) and *Halperin v. Salvan*, 117 A.D. 2d 544, 546-47, 499 N.Y.S. 2d 53 (1986).)  Respondents cite that a *prima facie* tort "was conceived as a means of avoiding a hardening of categories by providing redress for an act, even though otherwise lawful and not encompassed by a traditional tort, done solely for an improper or evil motive."  But in this matter, the Respondents have not demonstrated that "as Halperin shows, *prima facie* tort applies to FCP's misuse of legal processes for malicious and improper purposes." (*See* RPAB, p. 20.)  In Section V paragraph 1(b) of this Interim Award, I made a finding that Claimant had breached the 2007 Agreement by commencing a lawsuit in Los Angeles Superior Court before pursing the alternative dispute resolution requirements of paragraph 16 of the Agreement.  However, the Respondents have not demonstrated that said lawsuit was undertaken for malicious and improper purposes.  Accordingly, Respondents' counterclaim for prima facie tort is denied.

### INTERIM AWARD

As specified in my Order dated May 31, 2021, the parties have agreed to a bifurcated Award.  This Interim Award has focused on my findings of fact and analysis of law in relation to the Claimant's claims and the Respondent's counterclaims.  My findings which implicate an award of damages are as follows:

1.    Respondents breached the Agreement by failing to pay the 55% share of LLC income due to FCP under the so-called "Waterfall Provisions" of paragraph 6 of 2007 Agreement in relation to the production of *Kinky Boots*.  The calculation of such share shall not include so-called "Investor Income."  As stated in Claimant's Opposition To Motion For Partial Summary Judgement dated May 12, 2021: "However, FCP is not seeking damages under the "Investor Income" entitlement under Paragraph 5.  FCP seeks entitlement to damages from Luftig for Kinky Boots' "LLC Income" under Paragraph 6 of the Agreement, which includes all the entitlements to net adjusted revenues earned as a result of Luftig's "producer activities."  I concur with this position.

Accordingly, Respondents should make immediately available to Claimant a comprehensive accounting statement showing all non "Investor Income" monies received by HLC in relation to Kinky Boots through to the present date so that Claimant can properly ascertain the amount which it believes is currently owed to Claimant pursuant to my Interim Award as described in paragraph 1 above.

The parties should prepare a mutually acceptable Letter of Direction to Kinky Boots, LLC (the so-called "KB Mother Company") which will direct them to pay FCP's 55% share of future net income (i.e. beyond the amounts currently due

hereunder) as calculated under the Waterfall Provision of paragraph 6 of the 2007 Agreement.

2.    Claimants breached the Agreement by commencing a lawsuit in Los Angeles Superior Court on July 23, 2019 in violation of the provisions of paragraph 16 of the Agreement. Accordingly, Respondents will immediately provide Claimant with an accounting for all reasonable attorney's fees and court costs which they incurred as a result of this action.

3.    All administrative fees and expenses of the American Arbitration Association shall be borne equally by the Claimant and Respondents.

4.    There shall be no Award for interest payments or other damages.

5.    All other claims or counterclaims not specifically described herein are deemed denied.

6.    The parties shall have until August 2, 2021 to submit a mutually agreed upon proposed Final Award which incorporates the terms of paragraph 1-4 above. Upon receipt, the hearings will be closed and a Final Award will be rendered pursuant to the Rules.

7.    In the event that the parties are unable to agree upon a mutually acceptable proposed Final Award, they will so advise the AAA Case Manager no later than August 2, 2021. Whereupon, I will schedule a Hearing solely limited to the calculation of damages described in paragraphs 1-4 above. This Hearing will be scheduled as soon as possible after August 2, 2021 and will be done as a so-called "Zoom Hearing" unless both parties request an in-person Hearing. Following, the hearings will be re-closed and a Final Award will be rendered pursuant to the Rules.

This Interim Award shall remain in full force and effect until such time as a Final Award is rendered.

Dated:  July 21, 2021

Bob Donnelly

124311594.1

# EXHIBIT I

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Case Number: 01-19-0002-5183

FCP Entertainment Partners, LLC                    **FINAL AWARD**
-vs-
Hal Luftig Company, Inc.; Hal Luftig an
individual,

      I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 1, 2007, and having been duly sworn, and having heard the proofs and allegations of Claimant FCP Entertainment Partners, LLC, represented by Frank Gilmore Esq. and Respondent Hal Luftig Company, Inc. and Hal Luftig, represented by Martin Foley Esq. and Kevin Vick Esq., and having previously rendered an Interim Award dated July 21, 2021 (a copy of which is attached hereto and made a part hereof) hereby AWARD as follows:

    1.   <u>Additional Findings</u>

      During the process of resolving the damage issues in this matter, both parties asserted claims that needed to be resolved. In the interest of providing a full record of my findings in relation to all salient issues, I am including my Order dated February 5, 2022 which shall now be considered part of my Final Award:

      "This Order will address the issues which were raised in relation to the Hearing which was held on December 13, 2021. I will use the Issues To Be Decided section on page one of Claimant/Counterdefendants Damages Pre-Hearing Statement dated December 8, 2021 ("Claimant's Statement") because I believe it represents a comprehensive statement of all issues to be determined including those raised by the Respondent.

    1.   Is HLC entitled to retain an undivided 8.58% of the Kinky Boots Adjusted Net Profits as "handling fees/back-end points"?

      In a Stipulation of Facts dated December 10, 2021, the parties agreed on the role of a "Bundler." The issue to be decided here is: are the Respondents entitled to be treated as a so-called "Bundler." I find that Respondents are not entitled to be treated in this way.

      The Respondents presented no convincing evidence that Respondents had ever raised the issue of serving as a Bundler on the Kinky Boots project. They did not provide a single piece of documentary evidence on this subject. Instead they allege that such activity was authorized by the last sentence of Paragraph 1 of the

2007 Agreement (the "Agreement"), which states "Nothing contained in this agreement shall prevent Luftig from engaging in management of his personal affairs or investments, or his involvement in activities on his own time that are not competitive with the Business."

In my Interim Award dated July 21, 2021, I found that Mr. Luftig's activities here were undertaken in relation to his obligations to FCP pursuant to the Agreement. Luftig was paid a salary and given reimbursements for his office costs for many years by FCP precisely to locate opportunities like Kinky Boots for them. Paragraph 6(a) of the Agreement states quite clearly "Any accumulative income realized by the LLC by reason of its acting as a general partner, managing member and/or "introducer," including, without limitation any allocable to producer activities, any cash office charge and any producer royalty, including sums which would normally be retained by an introducer and not paid over to the introducer's investors shall be deemed "LLC Income."

Paragraph 17 of the Agreement provides: "This Agreement sets forth the entire understanding of the parties hereto with respect to the Lender's and Luftig's engagement, and supersedes any and all prior agreements, whether oral or written, between them. No amendments or additions to this Agreement shall be binding unless in writing and signed by both parties, except as herein may otherwise be provided." The Respondents have provided no evidence that a novation occurred here which demonstrated that the Claimant had given their approval to Respondents intention to act as a Bundler here and be compensated for acting in this capacity.

I find that Respondent had no right to receive bundling points amounting to 8.5808% as a Bundler for Kinky Boots. Accordingly, the entire 15.7315% share of Adjusted Net Profits (which amount was previously acknowledged and agreed to by both parties) should be split 55% to Claimant and 45% to Respondent.

2.    Do Sections 6(a)(ii)(C) and 6(a)(ii)(D) of the Agreement ("the Waterfall") apply to the post-termination LLC Income?

I rule that Waterfall provisions of the Agreement do apply here because pursuant to the findings of my Interim Award Kinky Boots is a Vested Project.

I accept the position on this issue taken in Claimants Statement (page 7 lines 8–20): "Thus, the Waterfall provisions of Paragraph 6 still apply to post-termination revenue, subject to the slight modification of Paragraph 8(e). Paragraph 8(e) modifies the Waterfall distribution requirements (paragraph 6(a)(ii)) in only four ways, leaving the remainder of the Waterfall intact. First, the requirement for Luftig to continue to provide services to the LLC is removed. Second, the LLC is no longer required to pay Luftig's salary and office expenses. Third, paragraph 6(a)(ii)(A) is amended to entitle Luftig to reimbursement of only those actual out-of-pocket Paragraph 3(c) expenses. And, fourth, Paragraph 6(a)(ii)(B) was altered to permit the LLC to reimbursement of only the actual

2

amount of out-of-pocket expenses incurred by the LLC (instead of the annual $75,000). Other than these alterations, the Waterfall remains intact. As such, before the post-termination LLC Income is to be distributed 55%/45%, the first $75,000 is to be divided 75% to FCP and 25% to HLC (paragraph 6(a)(iii)(C)) and the next $100,000 is to be divided 60% to FCP and 40% to HLC."

3.     Do HLC revenues from Kinky Boots Tour, LLC, KB Licensing LLC, and Kinky Boots Australia qualify as Approved and Vested Project income subject to the Waterfall division?

At the December 13, 2021 Hearing I ruled that all three entities would be treated as Vested Projects and subject to the Waterfall division of income.

4.     Should FCP be entitled to Post-Interim Award interest as of the date of the Interim Award?

In my Order dated December 15, 2021 I provided that "Claimant's application for "Post-Judgment Interest" is denied. I have determined that the parties are mutually responsible for any delays that have transpired since the issuance of my Interim Award. Therefore, no interest payments are warranted at this time."

5.     Should HLC be ordered to assign 55% of the Kinky Boots equity to FCP to protect against interruption of FCP's right to future revenue?

In my Order dated December 15, 2021 I provided that "It is my understanding that the Claimant and Respondents have agreed to provide a mutually agreed upon Letter of Direction which will be attached to and made a part of my Final Award. The Letter of Direction will provide that the percentage of interest in Kinky Boots which I determine that each party is entitled to receive in my Final Award shall be considered an ownership interest as well as an income interest and Respondents will agree to include an irrevocable assignment of any interests so awarded to Claimant in my Final Award. Claimant will provide a copy of this Letter of Direction to Kinky Boots LLC (the so-called "KB Mother Company") as well as all other entities responsible for the payment of royalties and fees to the owners/investors of Kinky Boots within one week after receipt of my Final Award."

Based upon my decision in paragraph 1 of this Order, the percentage of interest in Kinky Boots to which each of the parties is entitled has now been determined. Based upon an agreement between the parties which was discussed at the Hearing held on January 28, 2022, the Claimant and Respondent will provide the above-described mutually agreed upon Letter of Direction by February 11, 2022.

3

This Order is not intended to address the damages issues raised during the Hearing held on January 28, 2022. Those issues will be determined in my Final Award."

I also issued an order on November 4, 2022 in which I ruled that both Respondents (i.e. Hal Luftig Company, Inc. and Hal Luftig, as an individual, are jointly and severally liable for the damages described in the Interim Award and therefore also in the Final Award.

2.    <u>Damages Claim</u>

After months spent reviewing their books, tax returns and accounting statements, the parties were able to agree that Claimant's full entitlement from all Kinky Boots revenue sources amounted to $5,379,724.14. What the parties could not agree upon was the amount which FCP has already received. Claimant alleges that the amount was $2,278,805.36. Respondents allege that the amount was $2,740,798.00. Not surprisingly, the evidence offered by each side was contradictory. The burden of proof in relation to damage claims lies with the Claimant. After a thorough review of the documents submitted and the testimony offered, I find that the information provided by the Respondents, particularly those materials offered by Marks Paneth, to be the most credible. Accordingly, I find that Claimant received $2,278,805.36 from Kinky Boots Broadway and $461,993.00 from Kinky Boots US Tour. Together they total $2,740,798.36 which when deducted from the previously stated Claimant full entitlement amount of $5,379,724.14 leaves a balance of $2,638,925.78 as the total amount owed by the Respondents to the Claimant in the form of compensatory damages.

<u>FINAL AWARD</u>

The following is my final Award in this matter. I have incorporated and restated the findings originally contained on pages 21 and 22 of my Interim Award:

1.    Respondents breached the Agreement by failing to pay the 55% share of LLC income due to FCP under the so-called "Waterfall Provisions" of paragraph 6 of 2007 Agreement in relation to the production of *Kinky Boots*. The calculation of such share shall not include so-called "Investor Income." As stated in Claimant's Opposition To Motion For Partial Summary Judgement dated May 12, 2021: "However, FCP is not seeking damages under the "Investor Income" entitlement under Paragraph 5. FCP seeks entitlement to damages from Luftig for Kinky Boots' "LLC Income" under Paragraph 6 of the Agreement, which includes all the entitlements to net adjusted revenues earned as a result of Luftig's "producer activities." I concur with this position.

Accordingly, Respondents shall pay Claimant the amount of $2,638,925.78 in the form of compensatory damages. Said amount shall be paid in full within thirty (30) days from the date of this Final Award.

4

2.    The above-cited 55% share of future net income (i.e., beyond the $2,638,925.78 which is currently due pursuant to paragraph 1 hereof) shall be calculated under the Waterfall Provision of paragraph 6 of the 2007 Agreement and shall be paid to the Claimant directly from the source pursuant to the following letter of direction ("LOD"):

"FCP Entertainment Partners, LLC, a Nevada limited liability company ("FCP") and Hal Luftig Company, Inc., a New York corporation ("HLC") do hereby instruct the managers of Kinky Boots, LLC, Kinky Boots Tour, LLC, Kinky Boots, LLC and KB Licensing, LLC and all other Kinky Boots associated entities (collectively, the "Companies" and each is a "Company") to which HLC holds any membership units, equity (if any) and/or is entitled to any revenue source whatsoever related to Kinky Boots, whether it be fees, royalties, or otherwise (collectively referred to here as "Membership Interests") that as of January 1, 2022 HLC does irrevocably assign to FCP :  (i) Fifty-Five percent (55%) of HLC's Membership Interest including any financial equity interests in the Companies, including all rights, title and interest associated therewith including the right to Adjusted Net Profits and (ii) Fifty-Five percent (55%) of HLC's Producer Entitlements including all rights to fees, advances, distributions and royalties with respect to each of the Companies.  As used herein, "Producer Entitlements" shall mean all payments to which HLC is entitled to receive from all Companies other than those arising from HLC's ownership of Membership Units in any Company.  HLC hereafter shall be considered to own a Forty-Five percent (45%) interest in HLC's Membership Interests and a Forty-Five percent (45%) interest in HLC's Producer Entitlements.

Similarly, all tax allocations shall be made in accordance with such relative proportions, and K-1s, 1099s or other reports shall be issued to HLC and FCP to reflect their respective proportions of the Companies' net income, net loss, payments, distributions and other tax effects. The parties hereby so instruct the managers of the Companies and agree that such instructions will be irrevocable absent written instructions signed by both HLC and FCP or a court order.  For the avoidance of uncertainty, notwithstanding the foregoing, (i) all management rights associated with Membership Interests shall remain with HLC, and (ii) the financial equity interests and corresponding distributions described herein will be net of currently existing co-producer obligations.  For clarity, to the extent HLC previously assigned 55% of portions of its financial equity interests to FCP, those arrangements are to remain in place, and HLC retained financial equity interests are not to be further divided pursuant hereto.

Each manager of the Companies is hereby requested and instructed to:  (i) direct all communications including, but not limited to, appropriate year end tax forms to FCP at P.O. Box 19688, Reno, NV 89511 and to HLC at:  117 West 17th Street, Suite #2C, New York, NY 10011 or such other address as the officers of FCP or HLC may direct."

Respondents shall send a copy of this LOD within seven (7) days of the date of this Final Award to the Companies specified in the LOD by certified mail return receipt requested or by such other carrier (e.g., Federal Express) which can provide proof of service, a copy of which shall be immediately supplied to Claimant.

3.    Claimants breached the Agreement by commencing a lawsuit in Los Angeles Superior Court on July 23, 2019 in violation of the provisions of paragraph 16 of the Agreement.

Accordingly, Respondents shall pay Claimant the amount of $6,250.00 in the form of compensatory damages.  Said amount shall be paid in full within thirty (30) days from the date of this Final Award.

4.      The administrative fees and expenses of the American Arbitration Association totaling $49,675.00 shall be borne as incurred, and the compensation and expenses of the arbitrator totaling $72,292.50 shall be borne as incurred.

5.      There shall be no Award for interest payments or other damages.

6.      This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All other claims or counterclaims not specifically described and expressly granted herein are deemed denied.

7.      This Final Award may be executed in any number of counterparts, each of which shall constitute together one and the same instrument.

Dated:  April 1, 2022

_____
Bob Donnelly

6