**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | **FOR PUBLICATION** |
| In re: | Chapter 11 (Subchapter V) |
| HAL LUFTIG COMPANY, INC., | Case No. 22-11617 (JPM) |
| Debtor. | |

**MEMORANDUM OPINION AND ORDER ON CONFIRMATION**
**OF SMALL BUSINESS PLAN OF REORGANIZATION UNDER CHAPTER 11**

*A P P E A R A N C E S:*

**RUSKIN MOSCOU FALTISCHEK, P.C.**
*Counsel for Debtor Hal Luftig Company, Inc.*
East Tower, 15th Floor, 1425 RXR Plaza
Uniondale, NY 11556
By:     Michael S. Amato, Esq.
          Sheryl P. Giugliano, Esq.

**ADAM L. ROSEN PLLC**
*Counsel for Hal Luftig*
1051 Port Washington Blvd. PO Box 562
Port Washington, NY 11050
By:     Adam L. Rosen, Esq.

**MARTIN J. FOLEY, PLC**
*Counsel for Hal Luftig*
601 S. Figueroa Street, Suite 2000
Los Angeles, CA 90017
By:     Martin J. Foley, Esq.

**LIPPES MATHIAS LLP**
*Counsel for FCP Entertainment Partners, LLC*
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202–2216
By:     John A. Mueller, Esq.

**BEDERSON, LLP**
*Subchapter V Trustee*
347 Mount Pleasant Avenue
West Orange, NJ 07052
By:     Charles N. Persing, CPA

**WILLIAM K. HARRINGTON**
*United States Trustee*
One Bowling Green, Room 534
New York, NY 10004
By:     Paul Schwartzberg, Esq.

I.     INTRODUCTION ....................................................................................................1

II.    JURISDICTION .....................................................................................................3

III.   BACKGROUND .....................................................................................................3

    A. The Debtor and its Subchapter V Bankruptcy ....................................................3

    B. Summary of the Plan ...........................................................................................7

    C. Results of Voting on the Plan ............................................................................10

    D. The Parties' Confirmation briEfs .......................................................................11

        1.   The Debtors' Memorandum of Law in Support of Confirmation .................11

        2.   The U.S. Trustee Objection ........................................................................12

        3.   The FCP Objection .....................................................................................13

        4.   The Debtor's Reply .....................................................................................13

    E. Testimony at the Hearing ...................................................................................14

IV.    LEGAL ANALYSIS .............................................................................................18

    A. The Uncontested Confirmation Requirements ..................................................18

    B. The Luftig release .............................................................................................21

        1.   The Law on Non-Consensual Third-Party Releases ...................................21

        2.   Claims Released by the Plan ......................................................................30

        3.   The Court's Subject Matter Jurisdiction .....................................................33

        4.   The Court's Authority to Approve the Luftig Release ..................................35

        5.   The Purdue Test .........................................................................................38

            a)   First Purdue Factor: Whether There is Identity of Interest ........................40

            b)   Second Purdue Factor: Whether Claims are Factually and Legally Intertwined ........41

            c)   Third Purdue Factor: Whether Scope is Proper .......................................43

            d)   Fourth Purdue Factor: Whether the Release is Essential ........................46

            e)   Fifth Purdue Factor: Whether Contribution is Substantial .......................50

            f)   Sixth Purdue Factor: Whether Support is Overwhelming ........................53

            g)   Seventh Purdue Factor: Whether Payment is Fair ..................................54

            h)   Weighing the Purdue Factors ...................................................................56

            i)   Equitable Considerations ..........................................................................58

    C. the Luftig Indemnification Claim & the Adversary Proceeding ..........................61

**V.    CONCLUSION**................................................................................................................................**64**

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

This case presents the difficult question of whether, under *In Re Purdue Pharma L.P.* ("**Purdue III**"), 69 F.4th 45 (2d Cir. 2023), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (U.S. Aug. 10, 2023) and other relevant caselaw, this Court should grant a non-consensual third-party release to a non-debtor (the Debtor's president and sole shareholder) as part of the confirmation of the Debtor's Small Business Plan of Reorganization under Chapter 11. For the reasons set forth below, the Court finds that the plan should be CONFIRMED, and the non-consensual release APPROVED, subject to the modifications set forth in this opinion.

Pending before the Court is the request of Debtor Hal Luftig Company, Inc. (the "**Debtor**") to confirm the Debtor's *Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 55)[1], as modified by that certain *Plan Supplement* (the "**Plan Supplement**") (Docket No. 63) (collectively, the "**Plan**"). The Debtor supports its request with the *Memorandum of Law in Support of Confirmation of Debtor's Small Business Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (Docket No. 84) (the "**Memo in Support**"). The Plan is also supported by: (i) the *Declaration of Hal Luftig in Support of Confirmation of Debtors' Small Business Plan of Reorganization under Chapter 11 of the Bankruptcy Code* and the exhibits thereto (Docket No. 85) (the "**Confirmation Declaration**");

---

[1]    References to "Docket No. __" are to filings entered on the docket in this bankruptcy case, No. 22–11617. References to "Claim No. __" are to proofs of claim filed on the claims register in this bankruptcy case. References to "AP Docket No. __" are to filings entered on the docket in the related adversary proceeding styled *Hal Luftig Company, Inc. v. FCP Entertainment Partners, LLC*, Case No. 22-01176. References to "Section __ of the Bankruptcy Code" are to Title 11 of the United States Code. References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure.

(ii) the *Declaration of Brian Ryniker in Support of Confirmation of Debtor's Chapter 11 Plan of Reorganization under Subchapter V of the Bankruptcy Code* and the exhibits thereto (Docket No. 86) (the "**Ryniker Declaration**"); and (iii) the *Declaration of Sheryl P. Giugliano Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting Debtor's Small Business Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (Docket No. 90) (the "**Voting Declaration**").

The objection deadline was July 5, 2023 (the "**Objection Deadline**"). The Court received the following objections prior to the Objection Deadline:

(i)     the United States Trustee's (the "**U.S. Trustee**") *Objection of the United States Trustee to Debtor's Small Business Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (Docket No. 87) (the "**U.S. Trustee Objection**"); and

(ii)    FCP Entertainment Partners, LLC's ("**FCP**") *Objection to Confirmation of Small Business Plan of Reorganization* (Docket No. 89) (the "**FCP Objection**" and, together with the U.S. Trustee Objections, the "**Objections**").

The Debtor responded to the Objections with its *Reply in Support of Confirmation of Debtor's Small Business Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (Docket No. 93) (the "**Reply**"). FCP later filed the *Notice of Supplemental Authority in Further Support of its Objection to Confirmation of Small Business Plan of Reorganization* (Docket No. 98) (the "**FCP Supplement**"). The Debtor then filed its *Response to FCP Entertainment Partners, LLC's Notice of Supplemental Authority in Further Support of its Objection to Confirmation of Small Business Plan of Reorganization* (Docket No. 100) (the "**Response to FCP Supplement**"). The Court has received no other objections to the Plan.

The Court heard evidence and arguments of counsel at a hearing on July 11, 2023 (the "**Hearing**," and the transcript thereof (Docket No. 97), the "**Hearing Transcript**").

The Court has reviewed (i) the Plan; (ii) the Memo in Support; (iii) the Confirmation Declaration; (iv) the Ryniker Declaration; (v) the Voting Declaration; (vi) the Objections; (vii) the Reply; (viii) the FCP Supplement; (ix) the Response to FCP Supplement; (x) the testimony and arguments presented at the Hearing; and (xi) all other relevant material on the record.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), and 1334, and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). Plan confirmation is generally a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). However, as discussed *infra,* Part (IV)(B)(4), because the Luftig Release (as defined below) includes releases of "direct claims, arising under state law, against non-debtors," the Court is required to submit "proposed findings of fact and conclusions of law to the district court, for that court's [de novo] review and issuance of final judgment." *Purdue III*, 69 F.4th at 68 (discussing *Stern v. Marshall*. 564 U.S. 462, 471 (2011)). Accordingly, the Court will propose findings of fact and conclusions of law with respect to approval of the Luftig Release. *See* 28 U.S.C. § 157(c). The FCP Objection also seeks disallowance of a claim and dismissal of an adversary proceeding, both of which qualify as "core" proceedings pursuant to 28 U.S.C. § 157(b).

## III.    BACKGROUND

### A.    THE DEBTOR AND ITS SUBCHAPTER V BANKRUPTCY

The Debtor is a New York corporation engaged in the production of theatrical works both on and off Broadway. (Confirmation Declaration Ex. E (the "**First Day Declaration**") ¶¶ 2–4.) Shows produced by the Debtor include *Kinky Boots the Musical*, *Fiddler on the Roof in Yiddish*, *American Utopia*, *Plaza Suite*, *Becoming Nancy*, *Legally Blonde the Musical*, *Evita*, *Catch Me If You Can the Musical*, *Come Fly Away,* and *Life of Pi*. (First Day Declaration ¶¶ 12, 14.) The Debtor's president and sole shareholder is Mr. Hal Luftig. (First Day Declaration ¶ 1.) As

3

relevant here, the Debtor's bylaws contain a clause that requires the Debtor to indemnify

directors and officers against:

> reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, including attorney's fees actually and necessary [sic] incurred as a result of such action, to the fullest extent permissible by the laws of the State of New York if such director or officer acted in good faith, for a purpose which he reasonably believed to be in, or, not opposed to, the best interests of the Corporation . . . .

(the "**Indemnification Provision**"). (*See* First Day Declaration Ex. B § 5.)

On August 12, 2019, FCP Entertainment Partners, LLC ("**FCP**"), one of the Debtor's

investors and business partners, initiated an arbitration (the "**Arbitration**") against the Debtor

for breach of contract and against Mr. Luftig for breach of fiduciary duty. (First Day Declaration

¶ 26.) In the Arbitration, FCP generally alleged that FCP did not receive certain income from the

productions of *Kinky Boots* and *Elephant Man*, which income FCP claims it was entitled to

pursuant to a 2007 agreement. (*Id.* at ¶¶ 20–21, 24.)

On April 1, 2022, the arbitrator issued a final award (the "**Final Award**") finding that: (i)

the Debtor and Mr. Luftig were jointly and severally liable to FCP in the amount of

approximately $2.6 million for the breach of contract claim brought against the Debtor (First

Day Declaration ¶¶ 28–29); (ii) the breach of fiduciary duty claim against Mr. Luftig in his

individual capacity was dismissed (First Day Declaration ¶ 29); and (iii) the Debtor and Mr.

Luftig were obligated to pay 55% of the net income from *Kinky Boots* to FCP (First Day

Declaration ¶ 30). On October 26, 2022, the District Court confirmed the Final Award. (First

Day Declaration ¶ 33.) On November 2, 2022, the District Court entered a Clerk's Final

Judgment, the enforcement of which was automatically stayed for 30 days, until December 2,

2022. (First Day Declaration ¶¶ 34–38.) Mr. Luftig filed an appeal of the confirmation of the Final Award (the "**Appeal**"), but the Debtor did not. (First Day Declaration ¶¶ 39–40.)

On December 1, 2022 (the "**Petition Date**"), one day before the stay of enforcement of the Final Award expired, the Debtor filed this voluntary Subchapter V small business reorganization case. (Confirmation Declaration ¶ 13.) The Debtor immediately commenced an adversary proceeding (the "**Adversary Proceeding**") seeking an extension of the automatic stay to non-debtor Mr. Luftig, and the issuance of a preliminary injunction enjoining FCP from executing on the Final Judgment against Mr. Luftig. (*See Hal Luftig Company, Inc. v. FCP Entertainment Partners, LLC*, Case No. 22–01176.) The Court granted the requested relief, finding that: (i) the enforcement of the Final Judgment against Mr. Luftig would impact his efforts on behalf of the Debtor; (ii) the Debtor was likely to successfully reorganize; (iii) the Debtor would likely suffer irreparable harm without the requested relief; (iv) the balance of harms weighed in favor of the injunction; (v) the injunction was not adverse to the public interest; and (vi) the Debtor did not have another adequate remedy at law. *See Hal Luftig Co. v. FCP Ent. Partners, LLC (In re Hal Luftig Co.)*, Case No. 22-01176, 2023 Bankr. LEXIS 19, at *13–17 (Bankr. S.D.N.Y. Jan. 5, 2023).

On the Petition Date, Charles N. Persing was appointed as the Subchapter V Trustee (the "**Subchapter V Trustee**") in this case. (Docket No. 9.)

On May 31, 2023, the Court so-ordered a stipulation wherein the Debtor and FCP agreed that the liquidated and unliquidated portions of the Final Award together gave rise to a claim of $2,862,776 against the estate (the "**FCP Claim**"). (*See Stipulation and Order Allowing Unsecured Claim of FCP Entertainment Partners, LLC* (Docket No. 81).)

5

Various other proofs of claim were filed against the estate, including two by Mr. Luftig. The first is Claim 2-1, which asserts that the Debtor is obligated to indemnify Mr. Luftig for "certain liabilities related to [Mr. Luftig's] position as President and sole shareholder of the Debtor, and his work with and involvement in the Debtor's Business." (Claim No. 2-1 rider § 1(c)) (such claim, the "**Luftig Indemnification Claim**"). The amount of Claim 2-1 is undetermined, but includes any amounts of the Final Award recovered from Mr. Luftig (*Id.*) in addition to amounts resulting from loans Mr. Luftig made to the Debtor. (Hearing Transcript 26:17–24.) Mr. Luftig also filed Claim 7-1, which seeks an undetermined amount owed to Mr. Luftig for deferred and unpaid compensation from January 1, 2020, through the Petition Date (such claim, the "**Luftig Deferred Compensation Claim**"). (*See* Hearing Transcript 28:8–24.) The Debtor also included in its schedules a debt owed to Mr. Luftig in the amount of $164,505.74, based on a "Promissory Note for loan to Debtor" (such claim, the "**Luftig Note Claim**"). (Schedule E/F 3.9, Docket 23.)

On March 1, 2023, the Debtor filed the *Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, which was later supplemented on March 27, 2023, when the Debtor filed the Plan Supplement. The Plan Supplement includes, *inter alia*: (i) financial projections (attached to the Plan Supplement as Exhibit A); (ii) a liquidation analysis (attached to the Plan Supplement as Exhibit B); (iii) a proposed employment agreement for Mr. Luftig (the "**Employment Agreement**") (attached to the Plan Supplement as Exhibit C); and (iv) a proposed security agreement (the "**Security Agreement**") in favor of Mr. Luftig (attached to the Plan Supplement as Exhibit D). (*See* Plan Supplement.) The financial projections and liquidation analysis were later updated (such updated documents hereafter referred to as the "**Financial Projections**" and the "**Liquidation Analysis**," respectively) to account for the passage of time

6

and collection of projected distributions received by the Debtor. (*See* Ryniker Declaration at ¶ 8

(the Financial Projections and Liquidation Analysis are attached to the Ryniker Declaration as

Exhibits A-1 and B-1, respectively).)

Prior to the Hearing, on July 6, 2023, the Debtor and FCP submitted a Joint Pretrial Order

(the "**Joint Pretrial Order**"), which was so-ordered by the Court on the same day. (*See* Docket

No. 91.)

B. <u>**SUMMARY OF THE PLAN**</u>

As set forth in Article II, the Plan creates six classes and treats each as follows:

| <u>Class</u> | <u>Description</u> | <u>Amount in Class</u> | <u>Treatment</u> | <u>Impairment</u> |
|---|---|---|---|---|
| Class 1 | Priority wage claims under Section 507(a)(4) | $13,650.00 | Paid in full at the Effective Date[2] | Unimpaired |
| Class 2 | Secured Claims | $163,946.92 | Paid in full at the Effective Date | Unimpaired |
| Class 3 | FCP Claim | $2,862,776.00 | Paid a portion of the Luftig Cash Contribution (as defined below) at the Effective Date <u>plus</u> Pro Rata Share[3] of the Debtor's | Impaired |

---

[2] "Effective Date" is defined in the Plan as "the first day on which the Confirmation Order has become a Final Order and on which all the conditions to the Effective Date in the Plan have been satisfied or waived." (Plan at 16.)

[3] "Pro Rata Share" is defined in the Plan as "the proportion that the Allowed Claim bears to the sum of all Allowed Claims, Disputed Claims, and Undetermined Claims of that particular Class. In the case of the FCP Claim, after receiving its portion of the Luftig Cash Contribution, any unpaid portion of the FCP Claim shall be treated as a Class 4 Claim for purposes of distributions of Disposable Income under the Plan." (Plan at 19.)

| | | | Disposable Income[4] over the life of the Plan[5] | |
|---|---|---|---|---|
| Class 4 | General Unsecured Claims | $328,628.92 (estimated) | Pro Rata Share of Disposable Income over the life of the Plan | Impaired |
| Class 5 | Insider Claims[6] | Unliquidated | No distribution[7] | Fully Impaired |
| Class 6 | Equity | n/a | No distribution, but Mr. Luftig retains all equity | Unimpaired |

The life of the Plan will be five years. (Plan at 1.)

Administrative expenses and priority claims will be paid in full. (Plan at 5–6.)

The Plan is to be funded by: (i) the Debtor's Disposable Income; (ii) a $500,000.00 cash contribution from Mr. Luftig (the "**Luftig Cash Contribution**"); (iii) a $50,000.00 payment (the "**Luftig Settlement Payment**") by Mr. Luftig to settle a certain avoidance claim related to the Debtor's partial repayment in October 2022 of a loan from Mr. Luftig (for which settlement payment Mr. Luftig will receive a claim against the estate (such claim, the "**Luftig Settlement Claim**"); and (iv) an agreement by Mr. Luftig to contribute up to $100,000 to the extent

---

[4]    "Disposable Income" is defined in the Plan as having "the meaning given to it in Bankruptcy Code § 1191(d), as calculated and projected by RKC and set forth in the Plan Supplement." (Plan at 16.) The Debtor's forecasts that the Debtor's Disposable Income over the next five years will total approximately $550,000. (Ryniker Declaration Ex. A–1.)

[5]    The Debtor's expert estimates the recovery on the FCP Claim will be approximately $1,022,500.00, or a 36% recovery. (Ryniker Declaration ¶ 17.)

[6]    "Insider Claims" is defined in the Plan as "the following Claims which shall be determined to be Allowed Claims under the Plan without any further action, and the Debtor anticipates that the Claims shall be subordinated in right of payment to the payment of all other Allowed Claims under the Plan: (i) the Luftig Note Claim; (ii) the Luftig Settlement Claim; (iii) the Luftig Indemnification Claim; and (iv) the Luftig Deferred Compensation Claim." (Plan at 17.)

[7]    Mr. Luftig is agreeing to subordinate Insider Claims, as discussed *supra*.

necessary to satisfy Section 1191(c)(2)(B)[8] of the Bankruptcy Code (the "**Back–Stop**

**Commitment**"). (*See* Plan at 8–9, 18.) The Plan also requires Mr. Luftig to enter into the

Employment Agreement with the Debtor, whereby Mr. Luftig would be paid a salary of

$210,000 to spend approximately 50% of his "business time and efforts" acting as President of

the Debtor. (*Id.*) (the Employment Agreement is attached to the Plan Supplement as Exhibit C.)

Under the Plan, Mr. Luftig would also not charge the Debtor rent for operating in his home.

(Plan at 18, definition of "Luftig Contribution"). In exchange for these contributions, the Debtor

will issue a secured promissory note (the "**Luftig Secured Note**") to Mr. Luftig that will be

subordinated until after the Plan expires. (Plan at 8.)

 The Plan also contains a third-party release provision (the "**Luftig Release**," and any

claims released thereby, "**Released Claims**") that purports to release all claims against Mr.

Luftig held by the FCP Parties (as defined *infra*). The Plan defines "Luftig Release" as:

> [T]he release by the FCP Parties of all claims against Mr. Luftig, except for any
> claim or right to payment FCP is entitled to under the Plan. The Luftig Release
> shall be conditioned upon: (i) confirmation of the Plan, (ii) completion of all
> payments to FCP as required under the Plan, (iii) delivery of the Luftig
> Contribution, and (iv) the subordination in right of payment of the Allowed
> Insider Claims. The Luftig Release shall include a mutual non–disparagement
> provision which will bind the Debtor, Mr. Luftig, and the FCP Parties.

(Plan at 18.)

 Article V of the Plan, entitled "Discharge, Exculpation, and Release," includes a

provision entitled "The Luftig Release," which provides as follows:

> Under the Plan and pursuant to the Confirmation Order, in consideration of and
> on account of the Luftig Contribution, the Back-stop Commitment, and the
> agreement to subordinate in right of payment all of the Insider Claims in Class 5,
> Mr. Luftig shall receive the Luftig Release from the FCP Parties, and such release

---

[8] Section 1191(c)(2)(B) of the Bankruptcy Code requires that, for a plan to be "fair and equitable," the value
of property to be distributed must not be "less than the projected disposable income of the debtor." 11 U.S.C. §
1191(c)(2)(B).

shall include all claims, judgments, [and] causes of action held by the FCP
Parties, their assigns and successors, against Mr. Luftig. The Luftig Release shall
be conditioned upon: (i) the confirmation of the Plan; (ii) completion of all
payments to FCP as required under the Plan; (iii) the delivery of the Luftig
Contribution; (iv) execution of the Employment Agreement, (v) the provision of
the Back-stop Commitment; and (vi) the subordination in right of payment of the
Allowed Insider Claims.

(Plan at 12.)

Additionally, the Plan defines "FCP Parties" broadly as "FCP, its officers, directors,

members, agents, parents, subsidiaries, affiliates, successors, assigns, and attorneys, including,

but not limited to its principal (directly or indirectly) Warren Trepp." (Plan at 17.)

As set forth above, the Luftig Release includes a mutual non-disparagement provision

(the "**Non-Disparagement Provision**") that provides as follows:

In addition to the foregoing, the Luftig Release includes an agreement by and
among the FCP Parties and Mr. Luftig, as well as their respective parents,
affiliates, subsidiaries, officers, directors, employees, shareholders, agents and
representatives, as applicable, not to disparage the other, in writing or orally, in
any manner likely to be harmful to them or their business, business reputations or
personal reputations.

(Plan at 12.)

## C.  RESULTS OF VOTING ON THE PLAN

Classes 3 and 4 were the only classes entitled to vote.[9] The voting deadline was May 17,

2023. (Voting Declaration ¶ 3.) Class 3 (*i.e.*, FCP) voted to reject the Plan, while Class 4 (non-

insider general, unsecured claims) voted to accept the Plan.[10] (Voting Declaration ¶ 12.)

---

[9]    Classes 1, 2, and 6 are unimpaired and are therefore deemed to accept the Plan without voting. (Plan at 6–8.)
Class 5 is fully impaired and is therefore deemed to reject the Plan without voting. (*Id.*)

[10]    Class 4 consists of Amy Deutsch, a friend of Mr. Luftig, and Kevin Connor, an employee of the Debtor.
(Voting Declaration at 4 n.2; Hearing Transcript 59:3–10.)

### D. **THE PARTIES' CONFIRMATION BRIEFS**

#### 1. **The Debtors' Memorandum of Law in Support of Confirmation**

The Debtor argues that the Plan satisfies all the requirements of Chapter 11 of the Bankruptcy Code and applicable caselaw. (Memo in Support at 4.) With respect to the Luftig Release, the Debtor asserts that under *Purdue III*, this Court may approve of third-party releases of "derivative claims," which are claims that arise from "harm done to the estate and that seek relief against [the] third part[y] that pushed the debtor[s] into bankruptcy." (*Id.* at 5.) (citations omitted). The Debtor argues that the FCP Claim is derivative because it is "based on the Debtor's conduct," as FCP's claims in the Arbitration "against Mr. Luftig individually were rejected by the [A]rbitrator." (*Id.* at 6.) In the alternative, the Debtor argues that the Court can still approve the Luftig Release even if the Court finds that the FCP claim is a direct claim, because the Debtor's conduct is "legally relevant" to the claim as required by *Purdue III*. (*Id.* at 6.)

The Debtor next argues that this Court has subject matter jurisdiction pursuant to the Bankruptcy Code to approve the Luftig Release pursuant to the Bankruptcy Code because the collection on the FCP Claim has a conceivable effect on the bankruptcy estate, as set forth in *Purdue III*. (*Id.* at 7 (citing *Purdue III*, 69 F.4th at 71–72 (additional citations omitted)).) Specifically, the Debtor asserts that, without the Luftig Release: (i) Mr. Luftig will not make the Luftig Cash Contribution; (ii) the Debtor will be obligated to indemnify Mr. Luftig pursuant to the Debtor's Indemnification Provision; (iii) Mr. Luftig will not settle an alleged preferential transfer claim against him; and (iv) Class 5 Insider Claims will no longer be subordinated. (*Id.* at 7–9.)

Further, the Debtor argues that this Court has constitutional authority to approve the Luftig Release because the released claims are "core" under *Stern v. Marshall*, 564 U.S. 462, 471

(2011) (Memo in Support at 9), and that this Court has statutory authority under the Second

Circuit's recent decision in *Purdue III*. (Memo in Support at 9–10.) The Debtor also states that

the seven factors set forth in *Purdue III* for the consideration of non-consensual third-party

releases weigh in favor of approving the Luftig Release. (Memo in Support at 10–15.)

Additionally, the Debtor claims that "extreme and extraordinary circumstances" exist in this case

that support approval of the Luftig Release in the exercise of the Court's equitable powers.

(Memo in Support at 15–17.) Finally, the Debtor argues that the Plan satisfies the statutory and

disclosure requirements for confirmation under the Bankruptcy Code. (Memo in Support at 17–

29.)

### 2.   The U.S. Trustee Objection

The U.S. Trustee objects to confirmation of the Plan because of the Luftig Release, which

the U.S. Trustee calls "abusive." (U.S. Trustee Objection at 1–2.) The U.S. Trustee first argues

that the Luftig Release cannot be approved because this is not a "rare or unusual case"

warranting such relief. Rather, the U.S. Trustee instead asserts that this is a "typical small

business Subchapter V case," where the sole shareholder of a company is jointly and severally

liable with the company. (U.S. Trustee Objection at 6.) The U.S. Trustee describes the Luftig

Release as Mr. Luftig "forc[ing] an involuntary settlement upon his primary creditor." (Memo in

Support at 6.)

The U.S. Trustee also argues that certain factors from *Purdue III* weigh against approval

of the Luftig Release: (i) Mr. Luftig's contributions are not essential to the reorganization; (ii)

Mr. Luftig's contributions are not substantial; (iii) FCP, the only affected creditor, does not

support the Plan; and (iv) there is insufficient evidence that the Plan provides for fair payment of

enjoined claims. (U.S. Trustee Objection at 6–8.) Additionally, the U.S. Trustee believes that

12

approving the Luftig Release is a non-core proceeding such that the Court cannot enter a final

order confirming the Plan. (U.S. Trustee Objection at 5.)

### 3.    **The FCP Objection**

FCP also objects to confirmation of the Plan because of the Luftig Release. (FCP

Objection at 3.) FCP argues that the Plan would unfairly result in a large financial loss to FCP,

while resulting in a multimillion dollar gain for Mr. Luftig. (FCP Objection at 2.) FCP further

states that certain factors from *Purdue III* weigh against imposing the Luftig Release: (i) the

Luftig Release is not limited in scope; (ii) the Luftig Release is not essential to confirmation; (iii)

Mr. Luftig's contributions are not substantial in light of the benefits he will receive; (iv) FCP

does not support the Plan; and (v) a 37% recovery on the FCP Claim is not a fair payment.[11]

(FCP Objection at 9–11.) FCP also argues that the existing factual record is not sufficient to

support approval of the Luftig Release. (FCP Objection at 11–12.) Additionally, FCP asserts that

approval of the Luftig Release would be inequitable because FCP incurred legal costs pursuing

legal action against the Debtor and Mr. Luftig. (FCP Objection at 12–13.) Moreover, FCP argues

that Mr. Luftig's claim for indemnification, Claim 2-1, should be disallowed (FCP Objection at

13) and that the Adversary Proceeding should be dismissed (FCP Objection at 13–14.)

### 4.    **The Debtor's Reply**

In its Reply, the Debtor argues that the Luftig Release is not abusive, but rather is an

equitable remedy necessary to protect both the Debtor and Mr. Luftig from a "vindictive, deep-

pocketed judgment creditor laser-focused on destroying the Debtor and its sole shareholder's

life's work." (Reply ¶ 2.) The Debtor rejects FCP's contention that Mr. Luftig will have a "net

---

[11]      The Court notes that the Ryniker Declaration posits that the Plan would provide for a 36% recovery on the
FCP Claim, not 37%. (Ryniker Declaration ¶ 17.)

gain" under the Plan. (Reply ¶¶ 4–6.) The Debtor also argues that there is sufficient evidence on

the record to support approval of the Luftig Release and that FCP had an opportunity to conduct

further discovery but declined to do so. (Reply ¶¶ 7–14.) The Debtor further states that the

*Purdue* factors weigh in favor of approving the Luftig Release. (Reply ¶¶ 15–21.) The Debtor

also asserts that the Luftig Indemnification Claim should not be disallowed because the claims

are not contingent, are subordinated under the Plan, and FCP's challenge is procedurally

defective. (Reply ¶¶ 22–26.) Additionally, the Debtor argues that FCP's claims are "derivative"

and therefore "core." (Reply ¶ 27.) The Debtor also asserts that "[t]here has been no change in

circumstances, no change in the law, and no change in terms of Mr. Luftig's dedication to the

Debtor and this reorganization case which would warrant termination of the extension of the

automatic stay to Mr. Luftig" as provided by the Adversary Proceeding. (*See* Reply ¶ 28.)

Finally, the Debtor posits that the U.S. Trustee Objection should be afforded less weight because

it was filed "without the benefit of the [Confirmation] Declaration which makes significant

financial disclosures to confirm that FCP is receiving more with the Luftig Release under the

Plan than if the Luftig Release is not approved . . . whether Mr. Luftig files personal bankruptcy

or not." (Reply ¶ 29.)

### E.   TESTIMONY AT THE HEARING

At the Hearing on July 11, 2023, the Court received into evidence the Confirmation

Declaration (*see* Hearing Transcript 8:15–16), the Ryniker Declaration (*see* Hearing Transcript

9:16–18), and the exhibits to each declaration. Mr. Luftig was cross-examined by FCP (Hearing

Transcript 11:2–53:9) and the U.S. Trustee (Hearing Transcript 53:10–59:16), examined on re-

direct by the Debtor (Hearing Transcript 59:17–76:23), and on re-cross by FCP (Hearing

Transcript 76:24–81:1). Brian Ryniker, the Debtor's expert, was cross-examined by FCP

(Hearing Transcript 82:3–92:7) and examined on re-direct by the Debtor (Hearing Transcript 92:12–93:4).

**Mr. Luftig's Testimony**. Mr. Luftig is the president and sole shareholder of the Debtor. (Confirmation Declaration ¶ 1.) Mr. Luftig stated in his Declaration that he has attended almost every hearing in this case and has worked to gather information required to be filed with the Court and needed to analyze the Debtor's finances. (*Id.* at ¶ 15.) Mr. Luftig further stated that the Debtor's business is reliant upon his relationships and experience in the theater industry. (Confirmation Declaration ¶ 51.) He also stated that if he has to defend against FCP's efforts to enforce the Final Judgment, his ability to focus on the Debtor's business will be jeopardized and his reputation as a fundraiser will be ruined. (Confirmation Declaration ¶¶ 68, 71.) Mr. Luftig's Confirmation Declaration also expressed his willingness and ability to provide the contributions described above and in the Plan. (Confirmation Declaration ¶¶ 52–53.)

Mr. Luftig's Confirmation Declaration also stated that, because he has no non-exempt assets to satisfy the Final Award, the Luftig Cash Contribution will be taken from assets that would be exempt if he himself filed for bankruptcy. (*Id.* at ¶ 54.) Specifically, Mr. Luftig set forth a summary of his personal assets and liabilities, including: (i) a bank account with less than $100,000 liquid cash; (ii) $2.2 million in qualified retirement plans; (iii) a beneficial interest in a trust that owns a limited liability company that owns one-third of Mr. Luftig's primary residence, the value of which third is estimated to be $1.15 million;[12] and (iv) an estimated $500,000 interest in a second home.[13] (*Id.* at ¶¶ 56–58.) Mr. Luftig further stated that he will be

---

[12]     This residence is subject to two mortgages securing debt of approximately $1 million. (*Id.* at ¶ 56.)

[13]     This second home is subject to a mortgage securing a debt of approximately $300,000. (*Id.* at ¶ 56.)

contributing more cash under the Plan than FCP would be able to receive if he personally filed for bankruptcy. (*Id.* at ¶ 67.)

On cross-examination, Mr. Luftig testified about the nature of his claims against the Debtor. (Hearing Transcript 22:14–25:13.) For instance, he testified that the Luftig Indemnification Claim includes approximately $1 million in legal fees and loans made to the Debtor (including loans made to the Debtor from proceeds of a home equity line of credit Mr. Luftig took out against his own home). (*Id.*)

Mr. Luftig also testified on cross-examination that his salary as president of the Debtor previously depended on the success of the Debtor's business and could be as high as $400,000. (Hearing Transcript 30:13–18.) However, on both re-direct and re-cross, Mr. Luftig clarified that under the Plan, his salary would be subordinate to other claims due under the Plan. (*Id.* at 73:11–74–5; 77:10–80:19.)

Additionally, Mr. Luftig stated on cross-examination that he did not know whose claims would be released by the Luftig Release, other than FCP and Mr. Trepp, and did not know if the Luftig Release would release any claims held by, for instance, FCP's law firm in this case. (Hearing Transcript 35:15–38:22.) As to the Non-Disparagement Provision, Mr. Luftig testified on cross that he did not know what the recourse would be for violations of this provision. (Hearing Transcript 44:2–7.)

Mr. Luftig also testified that if he does not receive the Luftig Release, he may consider filing for personal bankruptcy. (Hearing Transcript 54:12–20.)

Finally, Mr. Luftig testified on cross-examination that the two creditors who voted in favor of the Plan were an employee of the Debtor and a personal friend. (*Id.* at 59:11–13.)

On re-direct, Mr. Luftig testified that under the Plan, he would have to pay FCP a certain amount and would have to make up any shortfall before drawing his salary, but the amount he would have to pay is not the full amount of the FCP Claim. (*Id.* at 78:10–79:21.) He also explained that when he incurred expenses or other obligations on behalf of the Debtor, he expected to be indemnified and was regularly repaid by the Debtor for such obligations over the past 20 years. (Hearing Transcript 65:19–69:5.)

**Mr. Ryniker's Testimony**. Mr. Ryniker is a member of RK Consultants LLC, who has been retained as the Debtor's financial advisor in this case. (Ryniker Declaration ¶¶ 1, 3.)

Mr. Ryniker prepared the Liquidation Analysis (attached to the Ryniker Declaration as Exhibit B–1) and states in his declaration that he believes that each class of claims in the Plan would receive more under the Plan than in a hypothetical chapter 7 liquidation of the Debtor. (*Id.* at ¶ 7.)

Mr. Ryniker also stated in his declaration that the Debtor has a possible cause of action against Mr. Luftig for a $250,000 payment made in October 2022, in partial repayment of a loan by Mr. Luftig to the Debtor. (*Id.* at ¶ 11.) Further, Mr. Ryniker stated that it is possible that the Court might conclude that this transfer was made in the ordinary course of business. (*Id.* at ¶ 12.)

Mr. Ryniker also prepared the Financial Projections (attached to the Ryniker Declaration as Exhibit A–1) that forecast a disposable income for the Debtor of $550,000 in aggregate over the next five years. (*Id.* at ¶¶ 13–17.) Mr. Ryniker testified that, from the Debtor's projected Disposable Income and Mr. Luftig's contributions, FCP is projected to receive a 36% distribution on the FCP Claim under the Plan. (*Id.* at ¶ 17; Hearing Transcript 88:9–11, 90:19–22.)

17

On cross-examination, Mr. Ryniker also stated that he understood the Plan to be

providing Mr. Luftig a future benefit to continue to "move forward with the [Debtor]." (Hearing

Transcript 86:13–18.) Mr. Ryniker later testified on cross-examination that distributions to

creditors could be lower if the projected results from certain productions are not met. (Hearing

Transcript 89:5–8.) Further, Mr. Ryniker testified on cross-examination that a plan of

reorganization would be possible based solely on the Debtor's Disposable Income, *i.e.,* without

Mr. Luftig making any contribution. (Hearing Transcript 90:23–91:6.) Finally, Mr. Ryniker

testified on redirect that his opinions and projections were based on the assumption that the

Debtor would "continu[e] in the normal operations," *i.e.,* that Mr. Luftig would continue to

operate the Debtor. (Hearing Transcript 92:24–93:3.)

**Subchapter V Trustee**. While the Subchapter V Trustee did not testify as a witness, he

indicated that he supports the Plan and believes that it would be damaging to the Debtor's

business for Mr. Luftig to file for personal bankruptcy. (Hearing Transcript 142:16–143:15.)

IV.    **LEGAL ANALYSIS**

The Court will first address the statutory plan confirmation requirements, and then

consider the U.S. Trustee's and FCP's objections to approval of the Luftig Release. The Court

will then address FCP's requests to disallow the Luftig Indemnification Claim and to dismiss the

Adversary Proceeding.

A.    **THE UNCONTESTED CONFIRMATION REQUIREMENTS**

Section 1191 of the Bankruptcy Code sets forth the requirements to confirm a plan of

reorganization under Subchapter V of the Bankruptcy Code. *See* 11 U.S.C. § 1191. Specifically,

Section 1191(a) provides for confirmation of a consensual plan if all the requirements of Section

18

1129(a) of the Bankruptcy Code are met, other than Section 1129(a)(15).[14] *See* 11 U.S.C. §

1191(a). However, if a plan is not fully consensual, Section 1191(b) still permits confirmation

where all of the requirements of Section 1129(a) other than Sections 1129(a)(8)[15], (10)[16], and

(15) are met, and where the Court finds that the plan "does not discriminate unfairly, and is fair

and equitable, with respect to each class of claims" that is impaired[17] and has not accepted the

plan. 11 U.S.C. § 1191(b).

　　　　Section 1191(c) defines what it means for a Subchapter V plan to be fair and equitable.

*See* 11 U.S.C. § 1191(c). That section provides, in relevant part, that a plan is "fair and

equitable" within the meaning of Section 1191(b) when, as of the effective date of the plan, "the

value of the property to be distributed under the plan in the 3-year period, or such longer period

not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is

due under the plan is not less than the projected disposable income of the debtor." 11 U.S.C. §

1191(c)(2)(B).

---

[14]　　　　Section 1129(a)(15) provides that the Court shall not confirm a plan in a case where the Debtor is an individual and where the holder of an allowed unsecured claim objects to the confirmation of the plan unless "(A) the value . . . of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." *See* 11 U.S.C. § 1129(a)(15).

Notably, even if Section 1129(a)(15) was applicable to Subchapter V cases, that provision only applies to individual debtors and not corporations. *See* 11 U.S.C. § 1129(a)(15) ("In a case in which the debtor is an individual . . . .").

[15]　　　　Section 1129(a)(8) provides that each class of claims must either accept the plan or not be impaired under the plan. *See* 11 U.S.C. § 1129(a)(8).

[16]　　　　Section 1129(a)(10) provides that, if a class of claims is impaired under the plan, at least one class of impaired claims has to accept the plan, excluding insiders. *See* 11 U.S.C. § 1129(a)(10).

[17]　　　　A claim is "impaired" within the meaning of Section 1124 if "the plan of reorganization, rather than the [Bankruptcy] Code, alters the creditor's legal, equitable, or contractual rights." *In re LATAM Airlines Group S.A.*, 55 F.4th 377, 385 (2d Cir. 2022), *cert. denied sub nom. TLA Claimholders Group v. LATAM Airlines Group S.A.*, 143 S. Ct. 2609 (2023).

Here, the Plan is clearly non-consensual, as FCP did not vote to accept the plan. (Voting

Declaration ¶ 12.) Accordingly, confirmation of the Plan is only possible pursuant to Section

1191(b). Importantly, neither the U.S. Trustee nor FCP argues that any of the subsections of

Section 1129(a) of the Bankruptcy Code applicable under Section 1191(b) of the Bankruptcy

Code is unsatisfied.[18] Therefore, the Court must only determine whether the plan is fair and

equitable.

In this case, the Plan provides that Mr. Luftig is proffering a Back-Stop Commitment

"only to the extent the [] Court determines it is necessary to satisfy Bankruptcy Code

§1191(c)(2)(B) . . . ." (Plan at 16.) Given that the Debtor's profitability has apparently been

---

[18]    Courts within this district have taken various positions with respect to whether approval of a non-consensual third-party release must be considered within the context of the confirmation requirements of Section 1129(a), and specifically, paragraph 7, which provides in relevant part: "for the holder of a claim that has not accepted its treatment under a plan, such holder must be projected to 'receive or retain under the plan *on account of such claim* . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would *so receive* or retain if the debtor were liquidated under chapter 7 of this title on such date.'" *See In re Purdue Pharma L.P. ("Purdue I"), 633 B.R. 53 (Bankr. S.D.N.Y. 2021)* (citing 11 U.S.C. § 1129(a)(7) (emphasis in original)).

For instance, in *Purdue I*, certain objecting claimants argued that the plan could not satisfy Section 1129(a)(7) because "in a Chapter 7 liquidation [the claimants] would have two sources of recovery—from the [d]ebtors' estates and separately from the [] released parties." *Purdue I*, 633 B.R. at 110. In rejecting that argument and finding that Section 1129(a)(7) does not apply to third-party releases, *Purdue I* found that "[a]s a matter of grammar, . . . the comparison required by section 1129(a)(7) apparently is between the amount that the objecting creditor would receive under the plan on account of its claim and what it would 'so' receive—that is, also on account of its claim—if the debtor were liquidated under chapter 7. It would not, therefore, require analysis of the claimant's rights against third parties." *Purdue I,* 633 B.R. at 110.

However, *Purdue I* also pointed out that other courts examining third party releases under Section 1129(a)(7) have found that courts "should take into account a claimant's recovery from a third-party source that is precluded by the plan if one can make a reasoned determination of the recovery on that third-party claim." *Id.* (discussing *In re Ditech Holding Corp.*, 606 B.R. 544, 610–14 (Bankr. S.D.N.Y. 2019) and *In re Quigley Co., Inc.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010)).

The Court finds that, even if the Lutfig Release is considered under Section 1129(a)(7), the Luftig Release satisfies Section 1129(a)(7), as the uncontested testimony presented at the confirmation hearing showed that FCP is receiving more under the Plan than they could otherwise recover against Mr. Luftig directly if this case was converted to a Chapter 7 liquidation. (Confirmation Declaration ¶¶ 54–59, 67.); *see also Purdue I,* 633 B.R. at 110–11.

volatile in the past (*see* Hearing Transcript at 29–31), the Court finds that the Back-Stop

Commitment is necessary to satisfy 11 U.S.C. § 1191(c)(2)(B).

With that caveat, and based on the Court's review of the Confirmation Declaration, the

Ryniker Declaration, the Voting Declaration, and the testimony at the Hearing, the Court

concludes that the Debtor has carried its burden of proof with respect to the confirmation

requirements of Section 1191(b).

### B. **THE LUFTIG RELEASE**

#### 1. **The Law on Non-Consensual Third-Party Releases**

Although it is undisputed that the Debtor's Plan satisfies Section 1191 of the Bankruptcy

Code, both the U.S. Trustee and FCP argue that the Court cannot confirm the Plan because it

contains the Luftig Release. (*See* U.S. Trustee Objection at 2; FCP Objection at 2.)

As set forth in *Purdue III*, the Second Circuit has consistently held that bankruptcy courts

may approve non-consensual third-party releases of direct claims against a non-debtor so long as

the release "plays an important part in the debtor's reorganization plan." *See Purdue III*, 69 F.4th

45, 75–77 (2d Cir. 1988) ("[O]ur precedents permit the imposition of third-party releases *jointly*

under 11 U.S.C. § 105(a) and 11 U.S.C. § 1123(b)(6).") (emphasis in original); *see also In re*

*Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–43 (2d. Cir. 2005); *In re Drexel Burnham*

*Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *MacArthur Co. v. Johns–Manville Corp.*

*(In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir. 1988). Nevertheless, a bankruptcy court

may only approve a non-consensual third-party release in certain circumstances. *Purdue III*, 69

F.4th at 77 ("[W]e remain conscious of the 'heightened' 'potential for abuse' posed by such

releases, and our analysis of pertinent factors is informed by that risk."); *In re Metromedia Fiber*

*Network, Inc.*, 416 F.3d at 143 ("A nondebtor release in a plan of reorganization should not be

approved absent the finding that truly unusual circumstances render the release terms important to success of the plan . . . .").

For example, in the 1988 case *In re Johns-Manville Corp.*, the Second Circuit considered a case where the debtor filed for bankruptcy as a response to its estimated $2 billion mass-tort liability for asbestos-related diseases caused by its products. *In re Johns-Manville Corp.*, 837 F.2d at 90–91. There, the Second Circuit approved a third-party release that released claims against the debtor's insurers in exchange for a $770 million-dollar settlement with the insurers, where the proceeds were channeled into a settlement fund for the asbestos victims. *Id.* at 90–93 (approving releases because they were "necessary to effectuate the [c]ourt's channeling authority, that is, to make sure that the claims to [the debtor's] insurance proceeds were, in fact, channeled to the settlement fund and could not be asserted directly against the insurers").

Similarly, in the 1992 case *In re Drexel Burnham Lambert Group, Inc.*, the Second Circuit considered a case where the debtor was an investment bank that collapsed after massive violations of securities laws were exposed. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 287–89. There, the Second Circuit approved a bankruptcy settlement that released claims held by certain creditors against the debtors' former directors and officers because the releases were "unquestionably an essential element of [the debtor's] ultimate reorganization." *Id.* (finding that the third-party release was "a key component of the [debtor's] Settlement Agreement" because it "enable[d] the directors and officers to settle these suits without fear that future suits will be filed").

In the 2005 case *In re Metromedia Fiber Network, Inc.*, the Second Circuit found that the bankruptcy court erred in its approval of a non-consensual third-party release. *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 139, 143 (2d Cir. 2005). There, the bankruptcy court had

approved a plan that included "[broad] releases [] permanently enjoin[ing] creditors from suing various non-debtors" in exchange for, *inter alia*, the influx of substantial liquidity to the debtor and the estate.[19] *Id.* at 141. Noting that "a nondebtor release is a device that lends itself to abuse," the Second Circuit found that "[t]he bankrupty court's findings were insufficient" because "there [was] no finding (or evidence presented) that the [] [r]elease was *itself* important to the plan . . . ." *Id.* at 141–43 (noting that "a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan," but finding that "[t]he bankruptcy court's findings were insufficient" with respect to the release at issue) (internal quotations omitted).

Most recently, in the Second Circuit's decision in *Purdue III*, the Second Circuit considered a bankruptcy proceeding precipitated by the prospective mass-tort liability of Purdue Pharma, L.P. and certain of its subsidiaries (collectively, "**Purdue Pharma**") for harm allegedly caused by the opioid product OxyContin. *Purdue III*, 69 F.4th at 58. As set forth in *Purdue III*, "[m]embers of the Sackler family held various director and officer positions throughout the company and, from approximately 1993 to 2018, Purdue's Board of Directors contained at least six members of the Sackler family . . . [and various] Sackler family members held other positions of influence in the company." *Id.* at 58. Indeed, the Sackler family faced "over 400 [individual]

---

[19]    Specifically, the plan at issue in *Metromedia* provided that:

> [T]he [third-party] would [i] forgive approximately $150 million in unsecured claims against Metromedia; [ii] convert $15.7 million in senior secured claims to equity in the Reorganized Debtors; [iii] invest approximately $12.1 million in the Reorganized Debtors; and [iv] purchase up to $25 million of unsold common stock in the Reorganized Debtors' planned stock offering . . . .

*Metromedia*, 416 F.3d at 141.

actions . . . concerning liability for OxyContin" at the time of Purdue Pharma's bankruptcy, but the family members did not file for bankruptcy themselves. *Id.* 58–60, 79.

Facing an onslaught of litigation brought by, among others, individual tort claimants, state governments, and federal agencies, Purdue Pharma filed for chapter 11 relief on September 12, 2019. *Id.* at 60. After two years of negotiation, the bankruptcy court confirmed a plan of reorganization pursuant to which the Sacklers would contribute $4.325 billion to Purdue Pharma's bankruptcy estate in exchange for a broad release of direct third-party claims against the Sacklers. *Id*. As initially proposed, this release would have included claims related to, *inter alia*, the same subject matter as any claim treated in the plan; any business or other contractual arrangements including transfers; any employment-related conduct; any pending opioid actions and opioid-related activities; and the bankruptcy process. *Id.* at 60–62. This plan was "overwhelmingly" accepted by each voting class.[20] *Id.* at 62. The bankruptcy court subsequently approved the plan subject to certain modifications, which, notably, included that the third-party release would be substantially narrowed to cover only those causes of action as to which Purdue Pharma's conduct was a "legal cause" or "legally relevant factor." *Purdue III*, 69 F.4th at 61; *see also Purdue I*, 633 B.R. 53.

The bankruptcy court's decision was then appealed to the district court, which vacated the plan's confirmation. *Purdue III*, 69 F.4th at 65–67; *see In re Purdue Pharma, L.P.* ("***Purdue II***"), 635 B.R. 26 (S.D.N.Y. 2021). As relevant here, the district court held that: (i) the bankruptcy court "lacked [constitutional] authority to give final approval to those releases, even

---

[20]     The Second Circuit noted that, for the purposes of non-consensual third-party releases, "[a] reference point to define 'overwhelmingly' can be found in 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), which requires approval by a minimum of 75% of voting creditors in favor of the plan … [but] that threshold [is] the bare minimum[.]" *Purdue III*, 69 F.4d at 78–79; *see also id.* at 82 (where the Second Circuit found that "[t]he [affected] claimants voted overwhelmingly to approve the Plan" where over 95% of the personal injury classes voted to accept the Plan).

though they were incorporated into a plan of reorganization," making the "standard of review …

*de novo* as to both the Bankruptcy Court's factual findings and its conclusions of law;" (ii) the

releases fell within the bankruptcy court's subject matter jurisdiction given that "the claims

asserted against the [Sacklers] *might have* some conceivable effect on the estate of [Purdue

Pharma];" but (iii) "the sections of the [Bankruptcy] Code . . . [relied upon by the bankruptcy

court] do not confer on *any* court the power to approve the release of non-derivative third-party

claims against non-debtors . . . ." *Purdue II*, 635 at 90 (emphasis added).

The district court's decision was subsequently appealed to the Second Circuit. *Purdue III*,

69 F.4th at 67. While that appeal was pending, eight states and the District of Columbia—each of

which had appealed confirmation of the original plan—negotiated a modified plan wherein the

Sacklers would increase their contribution from $4.325 billion to between $5.5 to $6 billion.

*Purdue III*, 69 F.4th at 67–68. The eight states and District of Columbia thereafter withdrew their

objections. *Id.*

The Second Circuit ultimately reversed the district court and affirmed the bankruptcy

court's approval of the plan. *Purdue III*, 69 F.4th at 86. First, the Second Circuit agreed with the

district court that approving the release was a "non-core" proceeding under *Stern v. Marshall*,

564 U.S. 462 (2011), and thus the bankruptcy court's approval of the release amounted to a

submission of proposed findings of fact and conclusions of law to the District Court. *Purdue III*,

69 F.4th at 68–69. The Second Circuit reasoned:

> The released claims at issue here—which . . . are permanently enjoined, have res
> judicata effect, and, as such, are effectively finally resolved—do not stem 'from
> the bankruptcy itself,' but are direct claims, arising under state law, against non-
> debtors held by third parties who have not sought to recover on those claims in
> bankruptcy, or otherwise consented to a bankruptcy court's adjudication of those
> claims.

*Purdue III*, 69 F.4th at 68. Thus, although "the resolution of the third-party claims
[against the Sacklers] might impact the *res* of the Estate,"[21] the Second Circuit concluded
that "the bankruptcy court lacked constitutional authority to finally approve of the
releases [proposed in the plan] . . . ." *Id.* (noting that "the district court correctly
construed the bankruptcy court's decision as setting forth its proposed findings of fact
and conclusions of law [regarding the third-party release] for the district court's *de novo*
review").

Second, *Purdue III* held that the bankruptcy court had statutory subject matter
jurisdiction to impose the releases because "it is conceivable, indeed likely, that the resolution of
the released claims would directly impact the *res*." *Purdue III*, 69 F.4th at 71–72. The Second
Circuit predicted that the released claims would impact the *res* in two ways. As a practical
matter, the Second Circuit found the third-party claims asserted directly against the Sacklers
would have "likely impact[ed] [Purdue Pharma's] ability to pursue, and the likelihood of
recovering on, the Estate's own claims against the Sacklers" given that "at least some of the
third-party claims . . . are closely related to the derivative claims [] the Estate might bring against
the Sacklers." *See id.* (noting that "many of the states that, below, objected to the Plan . . . have
laws which imposed direct liability on individuals who, as officers of a corporation, personally
participated in acts of corporate fraud"). Additionally, the Sacklers themselves possessed
indemnification rights against Purdue Pharma for "any and all expenses (including attorneys
fees) . . . incurred or suffered as a result of . . . any pending, threatened or completed actions,
suits or proceedings," except where "a final decision by a court … established that the [Sacklers]

---

[21]     In *Purdue III*, the Second Circuit used the term "*res*" to mean the bankruptcy estate of Purdue Pharma.
*Purdue*, 69 F.4th at 60.

did not act in good faith." *Id*. at 58–59, 72 (noting that "the question of bad faith in this case is hotly disputed" but that "the jurisdictional issue does not require us to resolve that question").

Finally, the Second Circuit re-affirmed the bankruptcy court's statutory authority to enter non-consensual third-party releases of direct claims, finding such authority under both Section 105(a) and 1123(b)(6)[22] of the Bankruptcy Code. *Purdue III*, 69 F.4th at 72–75. After discussing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) and *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, (2d Cir. 1988), the Second Circuit concluded that "our precedents permit the imposition of third-party releases *jointly* under 11 U.S.C. § 105(a) and 11 U.S.C. § 1123(b)(6)." (emphasis in original) The Second Circuit cautioned, however, that third-party releases are not a "merit badge that somebody gets in return for making a positive contribution to a restructuring," nor "a participation trophy," nor a "gold star for doing a good job." *Purdue III*, 69 F.4th at 77–78 (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 726–27 (Bankr. S.D.N.Y. 2019)). The Second Circuit also stated that it is "abusive" to provide third-party releases based solely on the third-party's financial contribution to the case. *Purdue III*, 69 F.4th at 77 n.19. The Second Circuit then set forth a seven-factor test to evaluate whether a release is appropriate—and importantly—noted that the release must ultimately be considered "against a backdrop of equity." *Purdue III*, 69 F.4th at 78–79. The seven factors set forth by the Second Circuit in *Purdue III* in the evaluation of non-consensual third-party releases are:

(i)    whether there is an identity of interests between the debtors and released third parties, including indemnification relationships, such that a suit against the non–debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

---

[22]    Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6).

(ii)    whether claims against the debtor and nondebtor are factually and legally
intertwined, including whether the debtors and the released parties share
common defenses, insurance coverage, or levels of culpability;

(iii)    whether the scope of the releases is appropriate such that its breadth is
necessary to the plan;

(iv)    whether the releases are essential to the reorganization;

(v)    whether the non-debtor contributed substantial assets to the
reorganization;

(vi)    whether the impacted class of creditors "overwhelmingly" voted in
support of the plan with the releases; and

(vii)    whether the plan provides for the fair payment of enjoined claims.

*Purdue III*, 69 F.4th at 78–79 (citations and quotation marks omitted).

Even where each factor weighs in favor of the third-party release, the Second Circuit
cautioned that the release should not necessarily be approved given "the 'heightened' 'potential
for abuse' posed by such releases . . . ." *Purdue III*, 69 F.4th at 77, 79 (noting that "courts should
exercise particular care when evaluating [third-party non-consensual releases]").

The Second Circuit's decision in *Purdue III* was timely appealed, and the Supreme Court
granted certiorari with respect to the issue of "[w]hether the Bankruptcy Code authorizes a court
to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a
release that extinguishes claims held by nondebtors against nondebtor third parties, without the
claimants' consent." *Harrington v. Purdue Pharma L.P*., No. (23A87), 2023 WL 5116031 (U.S.
Aug. 10, 2023). On October 12, 2023, the Supreme Court set the case for oral argument on
December 4, 2023. *William K. Harrington, U.S. Tr. V. Purdue Pharma L.P.*, No. 23-124 (U.S.
*docketed* Aug. 10, 2023).

Notably, the Supreme Court's resolution of the central issue in *Purdue III* will resolve a
contentious, long-standing split amongst the circuits. *See Purdue III*, 69 F.4th at 90–91 (Wesley,

28

J. concurring) (noting that *Purdue III* pins the Second Circuit "firmly on one side of a weighty

issue that, for too long, has split the courts of appeals" and that "[a]s it stands, a nondebtor's

ability to be released through bankruptcy turns on where a debtor files"); *see also*, *Bank of N.Y.*

*Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251–53

(5th Cir. 2009) (vacating the approval of a plan that would have "release[d] [several third parties]

from liability—other than for willfulness and gross negligence—related to proposing,

implementing, and administering the plan" because "[t]he law states [] that 'discharge of a debt

of the debtor does not affect the liability of any other entity on . . . such debt'") (citing 11 U.S.C.

§ 524(e)); *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401–02 (9th

Cir. 1995) (collecting cases and noting that "[t]his court has repeatedly held, without exception,

that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors")*;*

*Landsing Diversified Props.-II v. First Nat'l Bank and Tr. Co. of Tulsa (In re W. Real Estate*

*Fund, Inc.)*, 922 F.2d 592, 600–602 (10th Cir. 1990) ("[T]he stay [contemplated by section

105(a)] may not be extended post-confirmation in the form of a permanent injunction that

effectively relieves the nondebtor from its own liability to the creditor.").

When the Supreme Court granted certiorari, it also stayed the Second Circuit's mandate

in *Purdue III*. *Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (U.S. Aug.

10, 2023). Notwithstanding this stay, *Purdue III* remains binding precedent on this Court unless

and until it is reversed, overruled, vacated, or otherwise modified by the Supreme Court of the

United States. *See S.E.C. v. Amerindo Inv. Advisors, Inc.*, No. 05 CIV. 5231 RJS, 2014 U.S. Dist.

LEXIS 15696, at *11–12, 2014 WL 405339, at *4 (S.D.N.Y. Feb. 3, 2014), *aff'd sub nom. S.E.C.*

*v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016) ("As the Eleventh Circuit has

explained, '[t]he stay of [a] mandate in [a circuit case] merely delays return of jurisidiction [sic]

to the district court to carry out [the circuit's] judgment in that case. The stay in no way affects the duty of [all courts] to apply now the precedent established by [the circuit case] as binding authority.'") (quoting *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992)); *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992) ("Thus, [the stayed circuit case] is the law in this circuit unless and until it is reversed, overruled, vacated, or otherwise modified by the Supreme Court of the United States or by this court sitting en banc.").

Accordingly, the Court will consider the Luftig Release pursuant to the tests discussed in *Purdue III*.

### 2.  Claims Released by the Plan

All parties agree—and the Court finds—that the Luftig Release, which would release "all claims against Mr. Luftig" held by FCP (or any other FCP Party), constitutes a non-consensual release of third-party claims against a non-debtor.[23] The Court must, however, assess the scope of the Luftig Release, as this implicates both: (i) the Court's subject matter jurisdiction; and (ii) the Court's ability to render a final judgment with respect to the released claims. *See Purdue III*, 69 F.4th at 68, 72–73.

As set forth in *Purdue III*, the first issue is whether the Luftig Release encompasses claims that are "direct," as opposed to "derivative," as the Court's ability to release direct claims

---

[23]    As set forth *supra,* Part (III)(B), the Luftig Release, as proposed by the Debtor, would release "all claims" held by "the FCP Parties . . . against Mr. Luftig, except for any claim or right to payment FCP is entitled to under the Plan." (Plan at 19.)

is more limited than with derivative claims.[24] *See* 69 F.4th at 70 (quoting *In re Bernard L.*

*Madoff Inv. Secs. LLC*, 740 F.3d 81, 89 n.9 (2d Cir. 2014)) (internal alterations omitted). "Direct

claims" are "causes of action brought to redress a direct harm to a plaintiff caused by a non-

debtor third party." *Purdue III*, 69 F.4th at 70. "Derivative claims," on the other hand, are "ones

that arise from harm done to the estate and that seek relief against the third party that pushed the

debtors into bankruptcy." *Purdue III*, 69 F.4th at 70 (noting that "it is well-settled that a

bankruptcy court may approve . . . third-party releases of derivative claims because those claims

really belong to the estate of the debtor") (internal alterations omitted). Fraudulent transfer

claims are, for example, typically derivative claims, as the real injury is to the debtor's estate.

*Purdue III*, 69 F.4th at 70.

The Debtor argues that the Released Claims are "derivative" claims because the Final

Award against Mr. Luftig is "based upon the Debtor's conduct" rather than the conduct of Mr.

Luftig. (Memo in Support at 5–6.) The Debtor also argues that the only Released Claim relevant

to this analysis is the Final Award against Mr. Luftig, because any other Released Claim would

be barred by either res judicata or a statute of limitations. (Hearing Transcript 103:11–20.) The

U.S. Trustee, however, argues that the Final Award against Mr. Luftig is a direct claim "for

breach of contract against Mr. Luftig that exists separate and apart from the [D]ebtor . . . ."

(Hearing Transcript 140:15–18, 141:8–13) (arguing that if the Final Award against Mr. Luftig

---

[24]      Although the facts of *Purdue III* raised a "primary dispute [as to] whether direct claims brought by creditors
. . . can be released," the Second Circuit also found that the "claims [against the Sacklers] c[ould] be grouped into two
categories: direct claims and derivative claims." 69 F.4th at 70–71 ("[I]t is well-settled that a bankruptcy court may
approve . . . third-party releases of *derivative* claims because those claims really belong to the estate of the debtor . . .
[and] [w]e now clarify any ambiguity and identify the factors that should be considered in order for a bankruptcy court
to approve of nonconsensual third-party releases of *direct* claims against a non-debtor and to include them in a plan.")
(emphasis added).

was derivative, Mr. Luftig would not need the Luftig Release to extinguish it); (U.S. Trustee Objection at 5.)

The Court is sympathetic to the Debtor's position. In the Arbitration, the only claim asserted directly against Mr. Luftig (the breach of fiduciary duty claim) was dismissed, and the arbitrator did not otherwise provide an explanation for why Mr. Luftig was jointly and severally liable on the breach of contract claim. (*See generally* Confirmation Declaration Ex. H & I (the arbitrator's interim and final awards in favor of FCP).) Put differently, Mr. Luftig's liability with respect to the Final Award is the product of a claim asserted exclusively against the Debtor.

Nevertheless, the Arbitrator issued the Final Award (which the District Court confirmed), finding that the Debtor and Mr. Luftig are jointly and severally liable on the breach of contract claim. (*Id.*) Accordingly, the Court agrees with the U.S. Trustee that the Final Award against Mr. Luftig is a direct claim, as Mr. Luftig's liability under the Final Award arises from a "cause[] of action brought to redress a direct harm to a plaintiff caused by a non-debtor third party." *Purdue III.*, 69 F.4th 45, 70 (citations omitted); *compare MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.) ("Manville I"),* 837 F.2d 89, 92–93 (2d Cir. 1988) (alleged co-insured's claims were "derivative" because they sought to recover "[from] the proceeds of [the debtor's] insurance policies on the basis of [the debtor's] conduct")*; Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns–Manville Corp.) ("Manville III"),* 517 F.3d 52, 58, 62 (2d Cir.2008) (tort claims against the debtor's insurer were found to be "non-derivative" because plaintiffs alleged the insurer "influenced [the debtor's] purported failure to disclose its knowledge of asbestos hazards," meaning the plaintiffs "s[ought] to recover directly from [the non-debtor insurer] for its *own* alleged misconduct") (emphasis added). Additionally, because the issue has not been adequately briefed, the Court is not persuaded by the Debtor's argument that any other

32

claims held by FCP are "a non-issue," as the Court is not in a position to determine whether any Released Claims are in fact "barred by [] the statute of limitations or res judicata . . . ." (Hearing Transcript at 108.) In any event, the broad language of the Luftig Release ("all claims against Mr. Luftig") covers any claim, whether direct or derivative. The Court thus finds that the Luftig Release would—at a minimum—release certain direct claims.[25] *Purdue III*, 69 F.4th at 68.

### 3.  The Court's Subject Matter Jurisdiction

Because the Luftig Release encompasses direct claims, the Court must next consider whether, under Section 157(a) of Title 28, subject matter jurisdiction exists over the Released Claims. *Compare In re Bernard L. Madoff Inv. Securities LLC,* 740 F.3d 81, 89 (2d Cir. 2014) ("Insofar as [these] claims are truly . . . derivative, they undoubtedly have an effect on the bankruptcy estate and, thus, are subject to the Bankruptcy Court's jurisdiction.") *with Purdue III*, 68 F.4th at 71 ("[A] bankruptcy court may only 'enjoin [direct] claims that directly affect the *res* of the bankruptcy estate.'").

Section 157(a) provides that a bankruptcy court may hear "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . ." 28 U.S.C. § 157(a). As the Second Circuit has observed, "[a] bankruptcy court's subject-matter jurisdiction under [Section 157(a)] is broad"—even with respect to direct claims, a bankruptcy court has jurisdiction in "all civil actions so long as the action's outcome might have any conceivable effect on the bankrupt estate." *Purdue III*, 69 F.4th at 71 (internal quotation marks omitted) (citing *Parmalat Cap. Fin. Ltd. V. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir.

---

[25]    Although the parties have not identified any such claims, to the extent any of the Released Claims are derivative, the Court can issue a final order releasing those claims because they "really belong to the estate of the [D]ebtor." *See Purdue III*, 69 F.4th 45, 70 (2d Cir. 2023) (citing 11 U.S.C. § 1123(b)(3)(A) and *Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81, 88 (2d Cir. 2014)).

2011) and 28 U.S.C. §§ 157(a), 1334). As noted above, *Purdue III* found that the bankruptcy court had subject matter jurisdiction to enjoin the direct claims against the Sacklers because: (i) "at least some of the third-party claims, although directly asserted against the Sacklers, are closely related to the derivative claims which the Estate might bring against the Sacklers;" and (ii) "the Sacklers are covered by the Sackler-Purdue Indemnity Agreement, and, therefore, depending on the outcome of any given claims against them, would have a reasonable basis to seek indemnification from the Debtors." *Purdue III*, 69 F.4th at 71–72.

The Debtor argues that the Court has subject matter jurisdiction to approve the Luftig Release because, without the Luftig Release, there will be a "significant . . . effect on the administration of the Debtor's reorganization . . . ." (Memo in Support at 7.) Neither the U.S. Trustee nor FCP argue that the Court does not have subject matter jurisdiction.

The Court concludes that, under Section 157(a), it has subject matter jurisdiction to consider the Luftig Release. As in *Purdue III*, two findings support this conclusion. First, the Luftig Release would, again, release FCP's claim against Mr. Luftig, which itself is premised exclusively upon the breach of contract claim that FCP successfully asserted against the Debtor in the state court Arbitration. (*See* Confirmation Declaration Ex. H (where, in the Final Award, the arbitrator finds that FCP "presented no credible evidence or testimony to support its claim [for breach of fiduciary duty]"); *see also* Confirmation Declaration at 9 (where, Mr. Luftig claims that "FCP's claims in the arbitration as against me were rejected by the arbitrator. Only the claims asserted against the Debtor resulted in the Final Award, nevertheless the arbitrator found me personally liable too").) There is thus a significant—if not absolute—factual and legal overlap between the Final Award and the claims levied against the Debtor. *See Purdue III*, 69 F.4th at 72 (noting that "although the various state statutes ensure that managerial personnel can

34

be held independently liable for the same conduct that subjects the corporation to liability, those claims often 'rely on detailed and virtually identical set of facts to make the claims' against both Purdue and the Sacklers").

Second, and as mentioned above, the Indemnification Provision between the Debtor and Mr. Luftig provides that the Debtor must "indemnify [Mr. Luftig] . . . against all liabilities, losses, damages and expenses . . . in connection with any claim . . . arising out of, or relating to, his services for the company . . . ." (Confirmation Declaration Ex. C.) The successful enforcement of the Final Award would therefore provide Mr. Luftig with "a reasonable basis to seek indemnification from [the Debtor] . . . [which] is enough to implicate [a] bankruptcy court's 'related to' jurisdiction under [Second Circuit] precedent." *See Purdue III*, 69 F.4th at 72 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 341–42 (2d Cir. 2018)). For these reasons, the Court finds that it has subject matter jurisdiction to consider the Luftig Release because the Released Claims "might have [a] conceivable effect on the bankrupt estate." *Id.* (citing *SPV*, 882 F.3d 333, 339–40) (emphasis removed).

### 4.  The Court's Authority to Approve the Luftig Release

Finally, the Court must consider its authority to approve the Luftig Release, particularly as it relates to FCP's direct claim against Mr. Luftig. *See Purdue III,* 69 F.4th at 68 (holding that "the district court correctly construed the bankruptcy court's decision as setting forth its proposed findings of fact and conclusions of law" because the released claims against the Sacklers were "direct claims, arising under state law, against non-debtors held by third parties . . . .").

Although *Purdue III* held that bankruptcy courts may approve non-consensual third-party releases of direct claims under Sections 105(a) and 1123(b)(6), *see* 69 F.4th at 72–77, the Second Circuit also observed that, under the Bankruptcy Code, this Court's authority to render final orders is limited to "core" proceedings. *Id.* (citing 28 U.S.C. § 157(b)). For "non-core"

35

proceedings, the Court must submit proposed findings of fact and conclusions of law to the district court for its review and final approval.[26] *See id.* (citing 28 U.S.C. § 157(c)). The United States Code defines "core proceedings" as those "arising under title 11, or arising in a case under title 11," and gives various examples of core proceedings, including matters concerning the administration of the estate, allowance or disallowance of claims, and confirmation of plans. 28 U.S.C. § 157(b). "Non-core proceedings," on the other hand, are those that are not core but are otherwise "related to a case under title 11." *See* 28 U.S.C. § 157(c). Plan confirmation is generally a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

However, as noted in *Purdue III*, the Supreme Court held in *Stern v. Marshall* that a bankruptcy court does not have the *constitutional* authority to enter final judgments on certain types of claims that are nonetheless designated as "core" by the Bankruptcy Code. *See Purdue III*, 69 F.4th at 68 (discussing *Stern v. Marshall,* 564 U.S. 462 (2011)); *see also 2 Collier on Bankruptcy* ¶ 3.02 [3] (noting that, in *Stern*, the Supreme Court "held, at a minimum, that Section 157(b)(2)(C) . . . has unconstitutionally assigned, for at least some proceedings, the 'judicial Power of the United States' to the non-Article III bankruptcy judges . . . [but] [i]t should generally be clear . . . that most of the matters included as core [in Section 157] can still be finally determined by the bankruptcy court"). Thus, under *Stern*, a bankruptcy court's constitutional "core" authority extends to claims that either "stem from the bankruptcy itself or [that] would necessarily be resolved in the claims allowance process." *See* 564 U.S. 462, 499 (2011); *see also Purdue II*, 635 B.R. 26, 80 (S.D.N.Y. 2021) ("*Stern* itself illustrates that not every issue that is litigated under the [statutory] umbrella of a core proceeding is, to use [the

---

[26]     A bankruptcy court may also enter final orders in non-core proceedings to the extent the parties consent. *See Purdue III*, 69 F.4th at 68 (citing 28 U.S.C. § 157(c)).

bankruptcy court's] phrase, 'constitutionally core.'"); *Purdue III*, 69 F.4th 45, 68 (2d Cir. 2023)

("For substantially the same reasons articulated by the district court, we agree that the

bankruptcy court lacked constitutional authority to finally approve of the releases, and, therefore,

that the district court correctly construed the bankruptcy court's decision as setting forth its

proposed findings of fact and conclusions of law . . . [because] the released claims at issue here .

. . are direct claims, arising under state law, against non-debtors held by third parties who have

not sought to recover on those claims in bankruptcy, or otherwise consented to a bankruptcy

court's adjudication of those claims.") (internal citations omitted).

Here, the U.S. Trustee argues that "[the Court] lacks constitutional authority to finally

approve the [Luftig] release" because "[such] approval is a non-core proceeding under *Stern v.*

*Marshal* . . . ." (U.S. Trustee Objection at 5–6.) The Debtor nonetheless maintains that, under

*Stern*, the Released Claims "stem from the bankruptcy itself" because: (i) the FCP Claim was

allowed pursuant to a claim stipulation; (ii) the FCP Claim is the result of the Final Award,

which itself awarded liability against both the Debtor and Mr. Luftig; and (iii) FCP consented to

this Court's adjudication of the Final Award by stipulating the amount of the FCP Claim against

the Debtor. (Memo in Support at 9.)

The Court disagrees with the Debtor. The Luftig Release inarguably extends to the Final

Award against Mr. Luftig, which was the result of a pre-petition breach of contract claim against

the Debtor arising under state law that "in no way derive[s] from or [is] dependent upon

bankruptcy law . . . ." *See Stern,* 564 U.S. at 498; *see also Granfinanciera, S.A. v. Nordberg,* 492

U.S. 33, 52 (1989) (discussing the "public rights" doctrine and noting that "[l]egal claims are not

magically converted into equitable issues by their presentation to a court of equity") (internal

quotations omitted); *Purdue III*, 69 F.4th at 68; (*see also* Confirmation Declaration Exs. H & I (where the arbitrator applies California law to FCP's breach of contract claims)).

Moreover, the fact that this Court allowed FCP's proof of claim pursuant to a claim stipulation does not, without more, mean that the Luftig Release raises issues that "stem[] from the bankruptcy itself or [that] would necessarily be resolved in the claims allowance process," nor does it mean that FCP consented to the jurisdiction of this Court. *See Stern*, 564 U.S. at 498 (comparing causes of action where a party "assert[s] a right of recovery *created by federal bankruptcy law*" with "state tort action[s] that exist[] without regard to any bankruptcy proceeding") (emphasis added); *id.* at 495 (noting that "it is hard to see why [a creditor's] decision to file a claim [in bankruptcy] should make any difference with respect to the characterization of [the debtor's state law] counterclaim"). Accordingly, and much like many of the claims at issue in *Purdue III*, the Final Award is a "direct claim[], arising under state law, against [a] non-debtor[] held by a third party who ha[s] not . . . consented to a bankruptcy court's adjudication of th[at] claim[]." *Purdue III*, 69 F.4th at 68 (finding that the direct claims against the Sacklers do not "stem 'from the bankruptcy itself'").

Thus, with respect to the Luftig Release and in accordance with the reasoning underlying both *Purdue III* and *Stern*, the Court submits the following "proposed findings of fact and conclusions of law for the district court's de novo review." 69 F.4th at 68.

### 5.  The *Purdue* Test

Having reviewed the Court's jurisdiction to consider and authority to approve the Luftig Release, the Court will apply the test set forth in *Purdue III*. As set forth *supra,* Part (IV)(B)(1), the seven factors set forth by the Second Circuit in *Purdue III* in the evaluation of non-consensual third-party releases are:

(i)      whether there is an identity of interests between the debtors and released third parties, including indemnification relationships, such that a suit against the non–debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(ii)     whether claims against the debtor and nondebtor are factually and legally intertwined, including whether the debtors and the released parties share common defenses, insurance coverage, or levels of culpability;

(iii)    whether the scope of the releases is appropriate such that its breadth is necessary to the plan;

(iv)    whether the releases are essential to the reorganization;

(v)     whether the non-debtor contributed substantial assets to the reorganization;

(vi)    whether the impacted class of creditors "overwhelmingly" voted in support of the plan with the releases; and

(vii)   whether the plan provides for the fair payment of enjoined claims.

*Purdue III*, 69 F.4th at 78–79 (citations and quotation marks omitted).

The Second Circuit directed bankruptcy courts to support each factor with specific and detailed findings of a kind that should often require extensive discovery into the claims against the released party. *Purdue III*, 69 F.4th at 79 (citing *In re Dow Corning Corp.*, 280 F.3d 648, 653 (6th Cir. 2002)). Even where each factor weighs in favor of the third-party release, the Second Circuit cautioned that the release should not necessarily be approved given "the 'heightened' 'potential for abuse' posed by such releases . . . ." *Purdue III*, 69 F.4th at 77, 79 (noting that "courts should exercise particular care when evaluating [third-party non-consensual releases]"). The Court will address each factor in turn, then address the principals of equity implicated by the facts of this case. *See id.* at 77 (discussing *Metromedia* and noting that non-consensual third-party releases "*may* be permitted so long as bankruptcy courts make sufficient factual findings and satisfy certain equitable considerations"); *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) (noting that a bankruptcy court must "make 'specific factual

39

findings that support its conclusions' before authorizing nondebtor releases") (discussing *Dow Corning*, 280 F.3d at 658).

### a)  First *Purdue* Factor: Whether There is Identity of Interest

The Second Circuit drew the first factor from *In re Dow Corning,* 280 F.3d 648, 658 (6th Cir. 2002), noting that this requirement reflected the Second Circuit's earlier statement in *Metromedia* that non-consensual third-party releases "have been allowed in circumstances including those where 'the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution.'" *Purdue III*, 69 F.4th at 78 (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005)). In *Purdue III*, the Second Circuit held that this factor was satisfied where the released third parties were directors and officers of the closely held corporate debtor. *Purdue III*, 69 F.4th at 80.

The Debtor argues that there is a sufficient identity of interests because Mr. Luftig's personal efforts are essential to the Debtor's business, and because the Debtor will be obligated to indemnify Mr. Luftig for any enforcement of FCP's claims against Mr. Luftig. (Memo in Support at 11–12.) FCP concedes this factor is not at issue. (FCP Objection at 5.) The U.S. Trustee does not argue that there is not an identity of interest. *See generally* (U.S. Trustee Objection.)

The Court finds that there is an identity of interest between the Debtor and Mr. Luftig. Two considerations support this finding: (i) Mr. Luftig is both the president and sole shareholder of the Debtor, and is otherwise intimately involved in the Debtor's business; and (ii) the Indemnification Provision creates an indemnification relationship between Mr. Luftig and the Debtor. *See* 69 F.4th at 79 (finding this factor met both because the debtor "was a closely held corporation" and because "the Sacklers 'took a major role in corporate decision–making'"). This factor thus supports the approval of the Luftig Release.

40

**b)** **Second _Purdue_ Factor: Whether Claims are Factually and Legally Intertwined**

With respect to this factor, the Second Circuit indicated that "[bankruptcy] courts should consider whether claims against the debtor and nondebtor are factually and legally intertwined, including whether the debtors and the released parties share common defenses, insurance coverage, or levels of culpability." _Purdue III_, 69 F.4th at 78; _see also Purdue I_, 633 B.R. at 104–05 (collecting cases and finding that "[t]o properly be subject to a third-party claims release under a plan, therefore, the third-party claim should be premised as a legal matter on a meaningful overlap with the debtor's conduct"); _In re W.R. Grace & Co._, 900 F.3d 126, 136 (3d Cir. 2018) (considering Section 524(g)[27] and finding that "the plain language of the statute makes clear[] [it] does not permit the extension of a channeling injunction to include . . . non-derivative third-party actions, _i.e._, claims against [third parties that] allege independent liability[] wholly separate from any liability involving [the debtor]." (internal quotations omitted)).

The bankruptcy court's decision in _Purdue I_ was informed primarily by _In re Quigley Co., Inc._, 676 F.3d 45 (2d Cir. 2012). _See Purdue I_, 633 B.R. at 104–105. In _Quigley_—the relevant portion of which concerned the scope of a bankruptcy court's authority to issue non-consensual third-party releases of asbestos-related claims under Section 524(g) of the

---

[27] Section 524(g) provides, in pertinent part, that "[a]fter notice and a hearing, a court that enters an order confirming a plan of reorganization under Chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section." 11 U.S.C. § 524(g)(1)(A). Notably, Section 524(g)'s applicability is, by its own terms, limited to "actions [against non-debtors that] seek[] recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products." _See Purdue III_, 69 F.4th at 76 (citing 11 U.S.C. § 524(g)(2)(B)(i)(I) and Bankruptcy Reform Act of 1994, Pub. L. No. 103–394, 108 Stat. 4106 (1994)).

As the Second Circuit has observed, "[Section] 524(g) was enacted to address the unique problem posed by asbestos-related bankruptcies" and "give[s] bankruptcy courts power to channel all [related] claims to [a] trust . . . [while] allowing the bankruptcy court to enter an injunction barring certain actions brought against non-debtor third parties." _Quigley_, 676 F.3d at 59.

Bankruptcy Code—the Second Circuit held that released claims must "arise as a *legal consequence*" of the four relationships enumerated in Section 524(g)(4)(A)(ii) of the Bankruptcy Code. *In re Quigley Co., Inc.*, 676 F.3d 45, 59–60 (2d Cir. 2012) (emphasis in original). The bankruptcy court in *Purdue I* thus concluded that released claims "should be premised as a legal matter on a meaningful overlap with the debtor's conduct." *See Purdue I*, 633 B.R. at 105 (noting that "given a causal legal dependence on the [d]ebtor's conduct, or a legally meaningful relationship with the debtor's conduct, a third-party claim is sufficiently close to the claims against the debtor to be subject to settlement under the debtor's plan if enough other considerations support the settlement").

The Debtor argues that the FCP Claim against the Debtor is factually and legally intertwined with FCP's claim against Mr. Luftig because liability for each is based on the Final Award, and because any claims asserted by FCP against Mr. Luftig arise from the Debtor's conduct. (Memo in Support at 12.) FCP concedes this factor is not at issue with respect to claims arising from the Final Award (*see* FCP Objection at 5, 10), but at the Hearing FCP elicited testimony that the Luftig Release would release any claims potentially held by FCP against Mr. Luftig that are entirely unrelated to the Debtor. (Hearing Transcript 50:6–52:14.) The U.S. Trustee does not deny that the claims are intertwined.

The Court finds that certain claims against the Debtor and Mr. Luftig—namely, the claims arising from the Final Award—are factually and legally intertwined. Indeed, the Final Award against Mr. Luftig arose from (and perhaps exclusively from) the Debtor's conduct, for which Mr. Luftig was held to be jointly and severally liable with the Debtor. (Confirmation Declaration Ex. I (where the arbitrator finds the Debtor and Mr. Luftig "jointly and severally liable for the damages described in the Interim Award and therefore also in the Final Award.");

Confirmation Declaration at 9.) There is thus a significant—if not absolute—factual and legal

overlap between the Released Claims and the claims levied against the Debtor.[28] Accordingly, as

in *Purdue III*, this factor weighs in favor of the approval of a third-party release.

### c)   Third *Purdue* Factor: Whether Scope is Proper

The third factor is taken directly from *Metromedia. See Purdue III*, 69 F.4th at 78; *see

also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) (concluding that

the bankruptcy court's findings had been insufficient to approve a third-party release where the

bankruptcy court made no inquiry into whether the "breadth" of the release was "necessary" to

the plan of reorganization); *In re Karta Corp.,* 342 B.R. 45, 57 (S.D.N.Y. 2006) (noting that "[a]

necessary corollary of *Metromedia* must be that the releases offered to the [n]on-[d]ebtors bear a

reasonable relationship to the protection of the estate and go no further than necessary to protect

those interests").

In *Purdue III,* the Second Circuit considered a release that read as follows:

> The [Sacklers] . . . shall be conclusively, absolutely, unconditionally, irrevocably,
> fully, finally, forever and permanently released . . . from any and all Causes of
> Action, including any derivative claims [and future claims] . . . (x) based on or
> relating to, or in any manner arising from, in whole or in part, (i) the Debtors, . . .
> (ii) the Estates or (iii) the Chapter 11 Cases and (y) as to which any conduct,
> omission or liability of any Debtor or any Estate is the legal cause or is otherwise
> a legally relevant factor.[29]

---

[28]    Additionally, because the Indemnification Provision would obligate the Debtor to pay Mr. Luftig for amounts
FCP recovers from Mr. Luftig on the Final Award, the Final Award against Mr. Luftig is further intertwined with the
claim levied against the Debtor's bankruptcy estate.

[29]    Notably, in *Purdue I,* the bankruptcy court—concerned about the extent of its jurisdiction—narrowed the
releases to apply only where: (i) "a debtor's conduct or claims asserted against it are a legal cause or a legally relevant
factor to the cause of action against the . . . released party;" and (ii) "the claims directly affect the *res*." *Purdue III*, 69
F.4th at 80 (internal alteration markings omitted); *see also Purdue I*, 633 B.R. at 105 ("To properly be subject to a
third-party claims release under a plan, therefore, the third-party claim should be premised as a legal matter on a
meaningful overlap with the debtor's conduct. Otherwise, the release would be too broad and would cover, for
example, a claim against one of the Sacklers, some of whom are doctors, for negligently prescribing OxyContin to a
patient"). On appeal, the Second Circuit found this language "proper in scope" given that the release extended
exclusively to "claims related to the Debtor's conduct and the Estate." *Purdue III*, 69 F.4th at 78, 80.

.

*Purdue III*, 69 F.4th at 61 (citation omitted).

Analyzing the scope of the release in tandem with the fourth *Purdue* factor,[30] the Second

Circuit held that the releases approved by the bankruptcy court were appropriate because they

were limited to claims "related to the Debtors' conduct and the Estate." *Purdue III*, 69 F.4th at

78, 80. (noting that "[t]he bankruptcy court limited the Releases extensively in order not to

exceed its jurisdiction," the Second Circuit further found that the release's "breadth is necessary

to the [p]lan") (internal quotation marks omitted).

Here, the Luftig Release reads:

> Under the Plan and pursuant to the Confirmation Order, in consideration of and
> on account of the Luftig Contribution, the Back-stop Commitment, and the
> agreement to subordinate in right of payment all of the Insider Claims in Class 5,
> Mr. Luftig shall receive the Luftig Release from the FCP Parties, and such release
> shall include all claims, judgments, causes of action held by the FCP Parties, their
> assigns and successors, against Mr. Luftig.[31]

(Plan at 13.) The Debtor argues that its proposed release is "narrowly tailored to the claims

asserted by FCP against Mr. Luftig in the context of the Plan." (Memo in Support at 12.)

Additionally, the Debtor argues that any claims unrelated to the Final Award that FCP has

against Mr. Luftig are a "non-issue" because those claims were not brought in the Arbitration

and therefore subject to either a statute of limitations or collateral estoppel. (Reply ¶ 16; Hearing

Transcript at 108).) Finally, the Debtor argues that the Non-Disparagement Provision is

---

[30]     The Second Circuit noted that the third and fourth *Purdue* factors are interrelated and would be considered
together, but that a different factual record might require separate consideration. *Purdue III*, 69 F.4th at 80 n.22. The
Court believes that these factors are best analyzed separately here.

[31]     As noted above, the Luftig Release also contemplates the execution of "an agreement by and among the FCP
Parties and Mg. Luftig . . . not to disparage the other, in writing or orally, in any manner likely to harmful to them or
their business, business reputations or personal reputations." (Plan at 13.)

appropriate because it is limited to being between Mr. Luftig and FCP, and both members of the

press and Mr. Luftig's business partners have been interested in this bankruptcy case. (Reply ¶

16.)

The U.S. Trustee does not specifically argue that the Luftig Release is overly broad. FCP,

however, argues that the scope of the Luftig Release is improper because it would release *all*

claims against Mr. Luftig held by FCP (and others). (FCP Objection at 10.)

The Court finds FCP's position persuasive; as proposed, the Luftig Release is overly

broad. The Luftig Release would release "*all claims* against Mr. Luftig [held by the FCP Parties],

except for any claim or right to payment FCP is entitled to under the Plan." (Plan at 19,

definition of "Luftig Release" (emphasis added).) This release would thus encompass any claims

FCP might have against Mr. Luftig arising from their business relationship prior to or

independent of the existence of the Debtor. (*See* Hearing Transcript 50:6–52:14 (where Mr.

Luftig testifies that he and Mr. Trepp produced *The Secret Garden* before the Debtor existed and

that this project continues to generate revenue).) Because, *inter alia*, these claims could not be

"factually or legally intertwined" with the Debtor, the Luftig Release is at least partially

improper in scope.

This deficiency is not, however, necessarily fatal to the Plan's confirmation. In *Purdue I,*

the bankruptcy court permitted the parties to make modifications to the proposed plan no less

than twelve times. *See generally* 633 B.R. 53, 105 (Bankr. S.D.N.Y. 2021) (largely confirming

the eleventh version of the plan but nevertheless "requir[ing] . . . [the third-party release] to be

further modified to state that a Debtor's conduct, or a claim asserted against the Debtor, must be

a legal cause of the released claim, or a legally relevant factor to the third-party cause of action

against the shareholder released party"); *see also Purdue III*, 69 F.4th 45, 61, 80 (2d Cir. 2023)

(noting that "[t]he bankruptcy court limited the Releases extensively *in order not to exceed its jurisdiction*, restricting their scope to ensure that the released claims related to the Debtors' conduct and the Estate") (emphasis added). The Court thus believes a reformed version of the Plan containing language comparable to that used in *Purdue I* and affirmed in *Purdue III* would weigh in favor of the approval of a third-party release.[32]

### d) <u>Fourth Purdue Factor: Whether the Release is Essential</u>

The fourth factor is also taken directly from *Metromedia*. *Purdue III*, 69 F.4th at 78 (noting that "[t]his factor also reflects the first factor required by *Metromedia*—that the release be important to the plan"). In *Purdue III*, the Second Circuit held that releases are "essential to the reorganization" where, without the releases, "there [would be] little likelihood of a plan's success." *Purdue III*, 69 F.4th at 78 (quoting *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)) (internal alteration marks omitted).

In *Purdue III*, the Second Circuit concluded that releases were essential where, absent the releases: (i) the debtors would have been required to litigate indemnification claims that would entirely deplete the *res* regardless of outcome; and (ii) the *res* would be completely depleted by the recovery of one priority creditor, leaving nothing for other creditors. *Purdue III*, 69 F.4th at 80. The Second Circuit cautioned that "if the only reason for the inclusion of a release is the non-debtor's financial contributions to a restructuring plan, then the release is not essential to the bankruptcy." *Purdue III*, 69 F.4th at 81.

---

[32] An appropriate release might, for example, provide as follows:

Under the Plan and pursuant to the Confirmation Order, in consideration of and on account of the Luftig Contribution, the Back-stop Commitment, and the agreement to subordinate in right of payment all of the Insider Claims in Class 5, Mr. Luftig shall receive the Luftig Release from the FCP Parties, and such release shall include all claims, judgments, causes of action held by the FCP Parties, their assigns and successors, against Mr. Luftig, *as to which any conduct, omission or liability of the Debtor or the Estate is the legal cause or is otherwise a legally relevant factor*.

The Debtor maintains that because "[t]he Debtor is a closely held business reliant upon Mr. Luftig's relationships and expertise," both Mr. Luftig and the Luftig Release are "essential to the Plan's success . . . ." (Memo in Support at 22–23 (arguing that Mr. Luftig "cannot dedicate himself to [the Plan's] success absent the Luftig Release").) As such, the Debtor argues that, without the Luftig Release:(i) Mr. Luftig will be unable to focus on the Debtor's business because he will be distracted by further litigation; (ii) Mr. Luftig will be forced to defend himself against the Final Award, resulting an additional Indemnification Claim against the estate; and (iii) Mr. Luftig will not make the Plan contributions described above, including the Luftig Cash Contribution. (Memo in Support at 22–23.)

In response, the U.S. Trustee argues that the Debtor would be able to confirm a plan without the Luftig Cash Contribution. (U.S. Trustee Objection at 6–7.) FCP likewise argues that the Debtor has sufficient income to confirm a plan without the Luftig Cash Contribution. (FCP Objection at 10–11.) The Debtor replies that while a plan could technically be confirmed without the Luftig Cash Contribution, any reorganization will fail without the Luftig Release because Mr. Luftig will be unable to focus on the Debtor's business. (Reply ¶ 17.)

To a point, the Court agrees with the Debtor: a third-party release is necessary to a successful reorganization in this case.[33] While the Debtor might technically be able to confirm a plan without the Luftig Release, it is undisputed that the Plan's terms were based entirely on financial projections that were premised on the Debtor's business continuing as it has been. (Hearing Transcript at 92:18–93:3.) It is likewise undisputed that the Debtor's business is almost entirely dependent on the efforts and relationships of Mr. Luftig. (Confirmation Declaration ¶ 64); *see also* (Hearing Transcript at 86:13–18 (where the Debtor's expert finds that "the Debtor has a future benefit based on how well [Mr. Luftig] can continue to move forward as a personal and as a principal of the [Debtor] . . . .").) There is thus a substantial risk that, without the Luftig Release, FCP's enforcement of the Final Award against Mr. Luftig individually would severely endanger—if not eliminate—the Debtor's ability to generate revenue.[34] (Confirmation

---

[33]    However, as noted above, the as-proposed Luftig Release is overbroad in scope and would reach claims unrelated to the Debtor's bankruptcy. *See supra*, Part (IV)(B)(5)(c).

Additionally, the Non-Disparagement Provision included in the Luftig Release is simply not necessary to the Debtor's reorganization. As a practical matter, the Debtor has not indicated what—if any—effect the Non-Disparagement Provision would have on the Debtor's ability to reorganize. (*See generally* Memo in Support; Reply.) It is therefore unclear how this portion of the Luftig Release is "essential to the [Debtor's] reorganization" in accordance with *Purdue III*. Put differently, the Court agrees with FCP that the Non-Disparagement Provision does no more than "place[] new obligations on FCP that could create future liability if the Debtor and/or Mr. Luftig [believe] a violation has occurred." (FCP Opposition at 10.) Moreover, as a legal matter, the Court is not certain whether it even has the authority to impose such an obligation through a plan of reorganization—*Purdue III* did not consider such a provision, and the Debtor did not otherwise cite any authorities in its briefs or at the Hearing to support the proposition that a bankruptcy court may impose a non-consensual non-disparagement provision as part of a plan of reorganization. (*See* Hearing Transcript 104:5–8; Memo in Support; Reply.) FCP is thus correct in that "[the] legal basis for bootstrapping the non-disparagement provision onto the Luftig Release" is unclear. (FCP Opposition at 10.)

Simply put, and as described *infra*, Part (V), confirmation of the Plan should be expressly conditioned upon the filing of an Amended Plan containing a revised Luftig Release that both lacks a non-disparagement provision and conforms to the language and scope approved of in *Purdue III* and prior Second Circuit precedent.

[34]    Indeed, this Court has already found, in the context of the adversary proceeding, that Mr. Luftig is "the driver of revenue for [the Debtor], [and] any burdens placed upon Mr. Luftig will impair his management of the company and reduce the likelihood of a successful reorganization." *Hal Luftig Company, Inc., v. FCP Entertainment Partners, LLC*, No. 22–01176 (Docket No. 22, p. 12) (finding that "the enforcement of the [Final Award] against Mr. Luftig would create a significant obstacle to confirmation of a plan and a successful reorganization").

Declaration ¶ 14 (where Mr. Luftig describes himself as "the lifeblood of the Debtor's business operations"); ¶ 45 (describing investors' concerns regarding FCP's prosecution of the Final Award and noting that Mr. Luftig had missed meetings related to the Debtor's projects to prepare for the Hearing); ¶¶ 68, 71 (stating that FCP's enforcement efforts against Mr. Luftig would likely distract Mr. Luftig and harm the Debtor's reputation).) Such disruption would almost certainly cause a reduction in the Debtor's projected income, which would serve only to further deplete the *res*.

Additionally, and as described at length below, a third-party release is a means of ensuring several material benefits to both the *res* and the Debtor, namely: (i) the Luftig Contribution; (ii) the Back-Stop Commitment; and (iii) perhaps most notably, Mr. Luftig's "agreement to subordinate in right of payment all of the Insider Claims," including his Indemnification Claim against the Debtor. (Plan at 13); *see also Purdue III*, 69 F.4th at 80 (finding the releases at issue "essential to reorganization" because, absent the releases, "the Debtors would . . . be required to litigate indemnity and contribution claims brought against them by the Sacklers," and because the releases enabled a "fair distribution" of assets that would otherwise not be possible); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (noting that "[c]ourt[s] have approved non debtor releases when . . . the enjoined claims would directly impact the debtor's reorganization 'by way of indemnity or contribution'"). Simply put, a third-party release is essential to the Plan because it preserves the Debtor's ability to earn income and continue as a going concern while simultaneously protecting—and

49

contributing significant value to—the Debtor's Estate. This factor thus weighs in favor of the

approval of a third-party release.[35]

### e) **Fifth *Purdue* Factor: Whether Contribution is Substantial**

The fifth factor is also taken from *Metromedia*, and the Second Circuit noted that this

factor was of particular significance in *In re Dow Corning*, 280 F.3d 648, 658 (6th Cir. 2002),

and *In re Master Mortgage Investment Fund*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

*Purdue III*, 69 F.4th at 78. The Second Circuit instructs that, when evaluating whether a

contribution is substantial, the "primary focus is on the impact of the financial contribution"

rather than "whether a greater contribution from the [non-debtor third-party] would be desirable .

. . ." *Purdue III*, 69 F.4th at 81.[36]

The Debtor argues that Mr. Luftig will provide a substantial contribution because: (i) the

Luftig Cash Contribution will provide FCP with a greater distribution than if Mr. Luftig

---

[35]    Both in its Objection and at the Confirmation Hearing, the U.S. Trustee has taken the position that "[Mr.] Luftig's contributions to the Plan are not essential to confirm a plan" because "[t]he Debtor can [simply] confirm a plan without the release by providing its disposable income to its creditors for a period of three to five years [pursuant to] 11 U.S.C. §§1191(b), (c) & (d)." (*See* U.S. Trustee Objection at 7–8; *see also* (Hearing Transcript at 138 (arguing that in a "Subchapter V Chapter 11 case . . . the debtor doesn't even need creditor voting for the plan to confirm it. It just needs to just provide its distribution, its disposable income")).)

The Court agrees with the U.S. Trustee. Even without creditor support, a Subchapter V plan may be confirmed under Section 1191 if, *inter alia*, the plan "does not discriminate unfairly, and is fair and equitable, with respect to each [impaired class]" and the debtor "[commits] all of [its] projected disposable income" to creditors for three-to-five years "beginning on the date that the first payment is due . . . ." 11 U.S.C. §1191(b), (c). As described above, however, a third-party release in this case would simultaneously: (i) secure the influx of substantial liquidity to the Estate; (ii) protect the Debtor's ability to generate revenue; and (iii) largely shield the Estate from the claims Mr. Luftig has against the Debtor, all *without the need for further litigation*.

Simply put, the U.S. Trustee is correct—the Debtor could technically confirm a plan lacking a third-party release under Section 1191(b) and (c). That plan would be, however, a thoroughly ineffective means of optimizing creditor recovery and maximizing the value of the *res*.

[36]    As noted above, in *Purdue III*, the Second Circuit upheld the bankruptcy court's finding below that the Sackler's contribution of approximately $5.5-6.0 billion—believed to be the largest contribution in a bankruptcy in the United States—was substantial, even though the released parties had an estimated net worth of $11 billion. *Purdue III*, 69 F.4th at 81.

personally filed for bankruptcy; (ii) Mr. Luftig is agreeing to subordinate his Insider Claims; (iii)

Mr. Luftig's salary under the proposed employment agreement is reduced from his historical

salary; (iv) Mr. Luftig is providing the Back-Stop Commitment; (v) the Luftig Settlement

Payment will settle Mr. Luftig's potential avoidance action for only 20% of the total claim and

without any litigation costs; (vi) Mr. Luftig will dismiss the Appeal; and (vii) Mr. Luftig will not

charge the Debtor rent for operating in his home. (Memo in Support at 13–14.)

For its part, the U.S. Trustee argues that Mr. Luftig's contributions are not substantial

because pursuant to the Employment Agreement, he will receive a salary of $210,000 per year,

or over $1 million over the life of the Plan. (U.S. Trustee Objection at 7.) FCP echoes the

concerns voiced by the U.S. Trustee, arguing that Mr. Luftig receives more from the Plan than he

contributes, and further argues that Mr. Luftig would improperly improve his position via the

Luftig Secured Note. (FCP Objection at 11.) The Debtor replies that the Employment Agreement

will not provide Mr. Luftig with a "net gain" as he will be working to earn the $210,000 salary.

(Reply ¶ 5.) The Debtor also contends that the Luftig Secured Note does not improve the

Debtor's position given that his Insider Claims are subordinated in priority to the claims of other

creditors during the life of the Plan. (Reply ¶ 19.)

The Court agrees with the Debtor. The terms of the Plan—in particular, the Employment

Agreement and the reasonable salary it contemplates—permit Mr. Luftig to continue his work

for the Debtor which, in turn, allows the Debtor to make payments to the creditors involved in

this bankruptcy proceeding.[37] Additionally, the Court finds that, contrary to the position taken by FCP, the Luftig Secured Note will not somehow improve Mr. Luftig's position vis-à-vis other creditors given that almost all of Mr. Luftig's claims against the Debtor are "subordinated in right of payment to the Debtor's obligations to make payments and distributions under the Plan" to all other creditors, including FCP. (Plan at 8.) The terms of the Plan thus do not provide Mr. Luftig with a "net gain."

Finally—and as emphasized repeatedly *infra* and *supra*—the undisputed evidence in the record indicates that the Luftig Cash Contribution allows FCP to recover more on the FCP Claim than FCP would recover if: (i) the Debtor filed for chapter 7 relief; or if (ii) Mr. Luftig was driven into bankruptcy himself. (*See* Ryniker Declaration ¶ 7 (where the Debtor's expert concludes that "[b]ased on [] estimates and the estimated liquidation values of assets, I believe each Class of Claims under the Plan will receive more than such Class would receive in a hypothetical chapter 7 liquidation of the Debtor."); Confirmation Declaration ¶¶ 54–59, 67 (noting that the Luftig Cash Contribution is being made from Mr. Luftig's assets that would be exempt if he filed for bankruptcy).) Mr. Luftig's contribution is therefore "substantial" in that it enables the greatest recovery for the Debtor's creditors. This factor thus weighs in favor of the imposition of a third-party release.

---

[37]    Relatedly, the Court recognizes that Mr. Luftig's salary has historically fluctuated depending upon the Debtor's commercial success. (*See* Hearing Transcript 30:14–22 (where Mr. Luftig states that his salary "depended on the profitability of the shows that were currently running").) As such, the Court does not find that a $210,000 salary is unreasonable or excessive given that the Debtor had previously paid Mr. Luftig as much as $400,000 in a single year. (*Id.* at 70:5–7; *see also* (*id.* at 28:19 (where Mr. Luftig notes that "during the pandemic, [he] didn't take a salary")).)

**f)  Sixth *Purdue* Factor: Whether Support is Overwhelming**

The sixth factor was taken from *In re Master Mortgage Investment Fund, Inc.*, where the

Second Circuit found that a bankruptcy court must "consider whether the impacted class of

creditors 'overwhelmingly' voted in support of the plan [containing] the releases." *See Purdue

III*, 69 F.4th at 78–79. The Second Circuit explained that "[a] reference point to define

'overwhelmingly' can be found in 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), which requires approval

by a minimum of 75% of voting creditors in favor of the plan. However, we consider that

threshold to be the bare minimum, and instead express approval for requiring overwhelming

approval of the plan." *Purdue III*, 69 F.4th at 78–79. The U.S. Trustee and FCP both point out

that this factor is not satisfied. (U.S. Trustee Objection at 7; FCP Objection at 11.) However, the

Debtor argues that this factor should not be given any weight here, as *Purdue III* involved

thousands of mass tort claimant and not a single judgment creditor. (Memo in Support at 14.)

In this case, support for the Luftig Release is indisputably not "overwhelming," as the

one affected creditor—FCP—is unequivocally opposed to the Plan as proposed by the Debtor.

(*See* FCP Objection at 11 (where FCP points out that *Purdue III* "views [75% of impacted

creditor] approval as the 'bare minimum'" and observes that "0% [impacted creditor approval] is

not overwhelming").)

Nevertheless, the Court concludes that FCP's objection has little weight as to the

propriety of a non-consensual third-party release here. Two findings support this conclusion.

First, because this case arises under Subchapter V, the Bankruptcy Code itself contemplates the

confirmation of a plan without the consent of any creditor. *See supra*, Part (IV)(A) (citing 11

U.S.C. §1191(b), (c).) The Debtor's ability to reorganize thus does not depend upon collective

creditor support, let alone upon the support of a single creditor.

Moreover, as discussed below, the undisputed evidence before the Court indicates that the Plan is the best possible means of enabling FCP's recovery. *See infra,* Part (IV)(B)(5)(i). Put differently, FCP has not identified—and the Court has not found—a tangible financial harm that would result from the approval of a third-party release. For these reasons, the Court finds that the lack of "overwhelming creditor support" is a consideration carrying minimal significance under the specific facts of this case.[38]

### g) **Seventh *Purdue* Factor: Whether Payment is Fair**

The seventh factor seems to come from comments made in *Metromedia*, where the Second Circuit noted that other courts had permitted releases where the enjoined claims would be paid in full. *Purdue III*, 69 F.4th at 79. The Second Circuit in *Purdue III* explained that "[w]hile the full payment of the enjoined claims would of course tend to favor the approval of a plan containing [non-consensual third party] releases, we are concerned with the fairness of the payment, as opposed to the final amount of payment. Because the amount of the payment does not necessarily indicate its fairness, the determinative question is not whether there is full payment, but rather whether the contributed sum permits the fair resolution of the enjoined claims." [39] *Purdue III*, 69 F.4th at 78–79.

---

[38]    The Court recognizes that another court in this district found that, under *Purdue III*, a debtor seeking a non-consensual third-party release "w[ould] *need* to receive 'overwhelming' support from creditors . . . ." *In re Roman Catholic Diocese of Rockville Ctr., New York*, No. 20-12345 (MG), 2023 WL 4833307, at *2 (Bankr. S.D.N.Y. July 18, 2023) (emphasis added). That finding, however, was based on the presumption that "the only way to [receive overwhelming creditor support] is for the third parties to make substantial monetary contributions that will incentivize creditors to favor approval of a plan over litigating their individual claims . . . ." *Id.* That decision thus did not consider a situation where—as here—a creditor withholds support for a plan despite receiving both a substantial contribution from a non-debtor third-party and receiving more under the proposed plan than under any other scenario.

[39]    Interpreting *Purdue*, the court in *Diocese of Rockville Centre* noted that it would consider "the extent of the disclosure regarding [released third parties'] finances" when evaluating this factor. *In re Roman Catholic Diocese of Rockville Centre, New York*, 2023 WL 4833307, at *3 (Bankr. S.D.N.Y. July 18, 2023).

The Debtor argues that the Plan provides for the fair payment of the claims released by the Luftig Release because FCP will receive a distribution of approximately 37% of the FCP Claim, without incurring legal fees in connection with appeals or enforcement efforts. (Memo in Support at 15.) The U.S. Trustee, in turn, argues that the Debtor has not shown whether the Plan provides for fair resolution of the released claims because Mr. Luftig has not disclosed any financial information, such as his net worth. (U.S. Trustee Objection at 7–8.) FCP argues that a 37% recovery on the FCP Claim is simply not a fair payment. (FCP Objection at 11.) The Debtor replies that a 37% recovery is greater than what FCP would otherwise receive from Mr. Luftig directly. (Reply ¶ 21.)

The Court finds that, particularly when coupled with the information provided by the Debtor, there is enough financial information in the record for the Court to properly evaluate this factor.[40] (*See* Confirmation Declaration ¶¶ 54–59.) As discussed above, it is undisputed that Mr. Luftig is making the Luftig Cash Contribution from his exempt assets that would otherwise be unavailable to FCP to satisfy the Final Award if Mr. Luftig himself filed for bankruptcy.

---

[40]    To the extent FCP argues that there is "[insufficient] evidence to support the [propriety of the] Luftig Release," (*see* FCP Objection at 11), the Court is not convinced.

The Debtor has, both in its briefing and at the Confirmation Hearing, indicated that "Mr. Luftig attempted to share his personal financial information with FCP on a confidential basis to verify that his non-exempt personal assets are insufficient to make the Luftig Cash Contribution let alone satisfy the Judgment, but FCP refused to engage in any exchange of information with any confidentiality restrictions whatsoever." (*See* Memo in Support at 26, n.6; *see also* Hearing Transcript at 110:5-11 (where the Debtor explains that "Mr. Luftig made a high level financial disclosure [in the Confirmation Declaration] . . . because FCP would not agree to a single confidentiality restriction . . . [and because] [i]t was the only way to show the Court that FCP stands to make more under this plan than it would otherwise."); Reply at 4 (noting that the records in both this proceeding and the Adversary Proceeding are "devoid of any document requests, deposition notices or even [] informal requests for information" because FCP failed to "take in discovery [in either proceeding] . . . and did not file a motion to allow an examination of [either] Mr. Luftig or the Debtor under Bankruptcy Rule 2004").) FCP has not disputed this assessment of the parties' discovery practice. (*See generally* Hearing Transcript; FCP Objection.) The Court thus finds that any absence of evidence regarding the finances of either the Debtor or Mr. Luftig is the result of FCP's unwillingness to engage in meaningful discovery rather than the fault of another party.

(Confirmation Declaration ¶¶ 54–59, 67.) Specifically, Mr. Luftig stated that his principal assets include: (i) a bank account with less than $100,000 liquid cash; (ii) $2.2 million in qualified retirement plans; (iii) a beneficial interest in a trust that owns a limited liability company that owns one-third of his primary residence, the value of which third is estimated to be $1.15 million;[41] and (iv) an estimated $500,000 interest in a second home.[42] (*Id.* ¶¶ 56–58.)

Given that: (i) the evidence indicates that the Plan would provide all creditors with more than they would be able to collect from either the Debtor or Mr. Luftig in any other situation; and (ii) the Plan eliminates the cost and uncertainty of further litigating both the Appeal and the Luftig Indemnification Claim, the Court finds that the Plan provides for fair and equitable payment of the Released Claims. *See Purdue III*, 69 F.4th at 82 (finding this factor met where "the valuation of the claims [against the estate]" exceeds the total funds available, as well as the Sacklers' personal wealth); *see also id.* at 80 (noting that, with respect to the third and fourth factors discussed above, the absence of a third-party release would mean that the debtor "would, in all likelihood, be required to litigate indemnity and contribution claims brought against them by the Sacklers, which would likely deplete the *res*, no matter the ultimate outcome of those claims").

### h) Weighing the *Purdue* Factors

In sum, the Court finds that the first, second, fourth, fifth, and seventh *Purdue* factors unequivocally weigh in favor of approving the Luftig Release (and the sixth factor is less significant under the present facts). There are thus three obstacles presently preventing the Plan's

---

[41]    This residence is subject to two mortgages securing debt of approximately $1 million. (*Id.* at ¶ 56.)

[42]    This second home is subject to a mortgage securing a debt of approximately $300,000. (*Id.* at ¶ 56.)

confirmation: (i) the scope of the Luftig Release; (ii) the fact that the Luftig Release contains the Non-Disparagement Provision; and (iii) FCP's Objection to the Plan.

From the outset, the Court assumes that, in response to the concerns delineated above, the Debtor will file a revised Plan that both removes the Non-Disparagement Provision and narrows the scope of the Luftig Release as set forth *supra*, Part (IV)(B)(5)(c). However, the Objections of both FCP and the U.S. Trustee make much of the fact that creditor support is not "overwhelming" within the meaning of *Purdue III*. (*See* FCP Objection at 11, 13 (arguing that "no aspect of the Luftig Release is equitable or fair to the lone impaired [and objecting] creditor, FCP."); U.S. Trustee Objection at 1, 7 (noting that "affected creditors *unanimously* object to the Plan with the release") (emphasis in original).)

FCP and the U.S. Trustee misunderstand the manner in which the *Purdue III* test is to be applied. Critically, *Purdue III* did not purport to set out a rigid, black-and-white litmus test for the assessment of non-consensual third-party releases, but instead endorsed a multi-factor approach "imposed against a backdrop of equity." *See Purdue III*, 69 F.4th at 79; *see also id.* at 73 (observing that "bankruptcy courts [possess] a 'residual authority' consistent with 'the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships'"); *id.* at 78 (naming the "factors that should be *considered* in order for a bankruptcy court to approve of nonconsensual third-party releases of direct claims against a non-debtor and to include them in a plan") (emphasis added); *id.* (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) and finding that "courts should *consider* whether the impacted class of creditors 'overwhelmingly' voted in support of the plan with the releases") (emphasis added); *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R at 935 (noting that "[n]o court has set out a rigid 'factor test' to be applied in every circumstance.

57

Rather, the courts have engaged in a fact specific review, weighing the equities of each case").

As such, the Court must take a flexible approach to the issues inherent in non-consensual third-party releases by balancing the factors enumerated in *Purdue III* against the overall fairness of a given plan.[43] *See In re Metromedia Fiber Network, Inc.,* 416 F.3d 136 (2d Cir. 2005) (the propriety of a given third-party release "is not a matter of factors and prongs"); *Purdue III*, 69 F.4th at 56 (stating that "[b]ankruptcy is inherently a creature of competing interests, compromises, and less-than-perfect outcomes"); *In re Contl. Airlines*, 203 F.3d 203, 212 (3d Cir. 2000) (describing the Second Circuit's pre-*Purdue* jurisprudence as adopting a "more flexible approach [than that taken by other circuits]"). Given that—as discussed below—equity considerations support the inclusion of a third-party release, the Court concludes that FCP's Objection, without more, does not render the Luftig Release impermissible.

### i) __Equitable Considerations__

The Court must next analyze the equitable considerations related to the Plan. The Debtor argues that equity favors the Luftig Release because: (i) Mr. Luftig is vital to the Debtor's continued success; (ii) FCP is the sole creditor affected by the Luftig Release; (iii) Mr. Luftig is making a substantial contribution from his otherwise exempt assets; (iv) FCP will receive more under the Plan with the Luftig Release than it could otherwise; and (v) without the Luftig Release, Mr. Luftig will be distracted from rehabilitating the Debtor. (Memo in Support at 16.) Although the U.S. Trustee's Objection does not address equity considerations, FCP argues that

---

[43]    The Court notes that other circuits permitting non-consensual third-party releases have adopted a fairness-first approach. *See, e.g.*, *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 139 (3d Cir. 2019) (finding that "[t]he hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings [] support[ing] these conclusions"); *In re Seaside Engr. & Surveying, Inc.*, 780 F.3d 1070, 1079 (11th Cir. 2015) (noting that "[t]he factors [relevant to third-party releases] should be considered a nonexclusive list of considerations, and should be applied flexibly, always keeping in mind that such bar orders should be used 'cautiously and infrequently . . . and only where essential, fair, and equitable'").

the Luftig Release is inequitable because it will allow Mr. Luftig to escape "millions in liability

for minimal cost" and will otherwise "set a terrible precedent [while] open[ing] the door for

widespread abuse of the bankruptcy process." (FCP Objection at 11–12.)

      The Court finds that equity supports the approval of a non-consensual third-party release.

Critical to this finding is the fact that: (i) the Debtor has, throughout the course of this

proceeding, presented evidence indicating that the Debtor's creditors—including FCP—will

receive more under the Plan than in a chapter 7 proceeding, or in the event Mr. Luftig filed for

bankruptcy himself; and (ii) the parties to this proceeding—including FCP—have presented

absolutely no evidence to the contrary. (*See* Ryniker Declaration ¶ 7 (where the Debtor's expert

concludes that "[b]ased on [] estimates and the estimated liquidation values of assets, I believe

each Class of Claims under the Plan will receive more than such Class would receive in a

hypothetical chapter 7 liquidation of the Debtor"); Hearing Transcript at 84–90 (where the

Debtor's expert explains basis for his opinion); Confirmation Declaration ¶¶ 54–59, 67

(describing Mr. Luftig's assets and noting that the Luftig Cash Contribution is being made from

assets—namely, retirement accounts—that would be exempt if Mr. Luftig filed for bankruptcy

himself); Hearing Transcript at 110:5–11 (where Debtor's counsel explains that that "Mr. Luftig

made a high level financial disclosure [in the Confirmation Declaration] . . . because FCP would

not agree to a single confidentiality restriction . . . [and because] [i]t was the only way to show

the Court that FCP stands to make more under this plan than it would otherwise").)

      In its Objection or at the Confirmation Hearing, FCP could have proffered its own

evidence (expert or otherwise) identifying problems with the implementation of the Plan; it did

not. (*See* Reply at 4 (noting that the records in both this proceeding and the Adversary

Proceeding are "devoid of any document requests, deposition notices or even [] informal requests

for information" because FCP failed to "take in discovery [in either proceeding] . . . and did not

file a motion to allow an examination of [either] Mr. Luftig or the Debtor under Bankruptcy Rule

2004").) A fair reading of the record thus indicates that the Plan—including the contributions

and concessions enabled by the inclusion of a third-party release—represents the best possible

means of paying the Debtor's creditors and maximizing the value of the Estate. Put more simply,

the undisputed evidence before the Court indicates that the Plan (or, at least, the Plan with a

modified version of the Luftig Release, as forth *supra*, Part (IV)(B)(5)(c)), presents the most

equitable outcome in this case. This is especially true where, as here, the Plan: (i) has received

the support from the Subchapter V Trustee; (ii) is otherwise supported by two of the three

impaired creditors, both of whom are non-principals of the Debtor; and (iii) includes a release

that would enjoin a claim precipitated by a cause of action brought exclusively against the

Debtor rather than against Mr. Luftig individually. (*See* Hearing Transcript 142:16–143:15

(where the Subchapter V Trustee states that he "see[s] the plan with the release as something that

will enable Mr. Luftig to continue to run and continue to get additional revenues from [the

Debtor's operations] . . . . "); Plan at 8 (noting that "[t]he Debtor estimates that holders of Class 4

Claims will receive distributions equal to approximately 15% – 25% of their Allowed Claims . . .

."); Voting Declaration at 4 (cataloguing the votes of the holders of Class 4 Claims)); *FCP Ent.*

*Partners, LLC v. Hal Luftig Co., Inc.,* No. 22–CV–2768 (LAK), 2022 WL 14928458, at *2

(S.D.N.Y. Oct. 26, 2022) (noting that "the arbitrator's analysis . . . referred only to breach of

contract [as to the Debtor] . . . [and the arbitrator] denied all claims which he analyzed as

involving alleged breaches of fiduciary duty [on the part of Mr. Luftig]").)

     Relatedly, both the FCP and the U.S. Trustee maintain that this case does not present the

"exceptional circumstances" necessary to justify the imposition of a non-consensual third-party

release. (*See* U.S. Trustee Objection at 6 (arguing that "[t]he Debtor has not—and cannot—demonstrate that this is a rare or unusual case that warrants a nonconsensual third-party release in favor of [Mr.] Luftig, the Debtor's sole shareholder"); FCP Objection at 2.)

As FCP asserts, this proceeding is not a "high-profile . . . [mass tort] case[] involving nonconsensual third-party releases where the vast majority of the creditors supported the plan with only a few opponents" and is instead, fundamentally, a "narrow dispute between a single creditor and a judgment debtor . . . ." (FCP Objection at 2 (citing *Purdue III*).) This case is thus not unique in its complexity, or because it presents a high volume of claimants.

However, this case is unique and "exceptional" because FCP, the Debtor's largest creditor, is apparently willing to: (i) incur the costs concomitant with further litigation; and (ii) derail a Plan that would purportedly *optimize its own recovery* (and the recovery of every other creditor) in order to either drive the Debtor into Chapter 7 or drive the Debtor's principal into bankruptcy himself. For these reasons, and for the reasons outlined in this Court's application of the factors set forth in *Purdue III*, the Court finds that the Plan should be confirmed—conditional, of course, upon the Debtor's compliance with the required revisions enumerated *supra*, Part (IV)(B)(5)(c).

### C. <u>THE LUFTIG INDEMNIFICATION CLAIM & THE ADVERSARY PROCEEDING</u>

Under Section 502(e)(1)(B) of the Bankruptcy Code, the Court "shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor . . . to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . ." 11 U.S.C. § 502(e)(1)(B). In other words, for a claim to be disallowed under Section 502(e)(1)(B) of the Bankruptcy Code, three elements must be met: (i) the party asserting the claim must be liable with the debtor on the

61

claim of a third party; (ii) the claim must be contingent at the time of its allowance or

disallowance; and (iii) the claim must be for reimbursement or contribution.[44] *In re Lyondell*

*Chemical Co.*, 442 B.R. 236, 243 (Bankr. S.D.N.Y. 2011).

FCP argues that the Luftig Indemnification Claim should be disallowed because "[b]y its

nature, [Mr.] Luftig's unliquidated claim for indemnification is exactly the type of claim

contemplated by Section 502(e)(1)(B) . . . ." (FCP Objection at 13.) In response, the Debtor

argues that: (i) the Luftig Indemnification Claim is not contingent because Mr. Luftig has already

incurred and paid out-of-pocket expenses for which he is obligated to be indemnified (Reply ¶

23); (ii) the Plan settles and liquidates the Luftig Indemnification Claim, meaning that the Luftig

Indemnification Claim would not burden or prolong the bankruptcy case (Reply ¶ 24); (iii) the

Luftig Indemnification Claim is subordinated under the Plan and thus has little-to-no economic

impact on the Debtor's reorganization (Reply ¶ 25); and, (iv) FCP's objection to the Luftig

Indemnification Claim is otherwise procedurally improper (Reply ¶ 26).

The Debtor does not contest that the Luftig Indemnification Claim satisfies the "co-

liability" and the "reimbursement or contribution" elements, and the Court finds that these

elements are satisfied.[45] Mr. Luftig's Indemnification Claim is not, however, "contingent" within

the meaning of Section 502(e)(1)(B).

A claim is "contingent" when "it has not yet accrued and . . . is [instead] dependent upon

some future event . . . ." *In re GCO, LLC*, 324 B.R. 459, 466 (Bankr.S.D.N.Y.2005); *see also In*

---

[44]    The purpose of Section 502(e)(1)(B) of the Bankruptcy Code is twofold: first, to preclude redundant recovery of identical claims; and second, to expedite the bankruptcy case by avoiding having to estimate contingent claims. *See Aetna Cas. & Sur. Co. v. Georgia Tubing Co.*, No. 93 CIV. 3659 (LAP), 1995 WL 429018, at *3 (S.D.N.Y. July 20, 1995), *aff'd sub nom. Aetna Cas. & Sur. Co. v. Georgia Tubing Corp.*, 93 F.3d 56 (2d Cir. 1996).

[45]    The Court will not address the Debtor's argument that FCP's objection is procedurally improper, as it will not impact the outcome here.

*re Chase,* 372 B.R. 125, 132 (Bankr.S.D.N.Y.2007) (noting that "[t]he Bankruptcy Code does not define the term 'contingent' but the court has stated that a claim is 'contingent' when the debtor's legal duty to pay it does not come into existence until triggered by the occurrence of a future event"). Here, the Luftig Indemnification Claim includes: (i) claims arising from amounts that Mr. Luftig has previously advanced to the Debtor as means of, *inter alia,* "keep[ing] the [Debtor] afloat during the pandemic;" and (ii) claims arising from legal fees Mr. Luftig has incurred during this proceeding and prior proceedings. (*See* Hearing Transcript 22:14–25:13.) Thus—and directly contrary to the position taken by FCP—Mr. Luftig's Indemnification Claim is not "dependent upon some future event that may never happen," but is instead the result of past expenses that have already been incurred. *See In re Lyondell Chemical Co.*, 442 B.R. 236, 248 (Bankr. S.D.N.Y. 2011) (discussing authority supporting the conclusion that "until and unless amounts *are actually paid* [by the claimant], the claims for reimbursement or contribution with respect to those amounts remain contingent for 502(e)(1)(B) purposes") (emphasis in original). As such, the Court declines to disallow the Luftig Indemnification Claim.

Finally, FCP requests that the Court dismiss the Adversary Proceeding and rescind the stay protections that the Court extended to Mr. Luftig because the Plan cannot be confirmed. (FCP Objection at 13–14.) The Debtor, in turn, argues that no change in circumstances or law warrants termination of the stay protection extended to Mr. Luftig in the Adversary Proceeding. (Reply ¶ 28.) As discussed herein, the Court finds that the Plan is confirmable, subject to certain modifications to the Luftig Release. Accordingly, the Court finds that there is no reason at this time to alter the stay protections extended to Mr. Luftig. The Court likewise declines to dismiss the Adversary Proceeding.

## V.    **CONCLUSION**

Based on the above analysis, the Court makes the following findings of fact and/or conclusions of law:

(i)      the Debtor has satisfied its burden with respect to the statutory requirements set forth in 11 U.S.C. § 1191 to confirm the Plan;

(ii)     the Back-Stop Commitment is required pursuant to 11 U.S.C. § 1191(c)(2)(B);

(iii)    given the presence of the Luftig Release, under *Purdue III*, 69 F.4th 45 (2d Cir. 2023) and *Stern v. Marshall,* 564 U.S. 462 (2011), the Court does not have the constitutional authority to render a final decision with respect to the Plan's confirmation;

(iv)     the Luftig Indemnification Claim is not contingent and should not be disallowed under 11 U.S.C. § 502(e)(1)(B) of the Bankruptcy Code;

(v)      there is no reason at this time to alter the stay protections extended to Mr. Luftig; and

(vi)     the Adversary Proceeding should not be dismissed.

Additionally, based on the above analysis, the Court submits the following proposed findings of fact and/or conclusions of law:

(i)      based on the *Purdue III* factors and equitable considerations, unusual circumstances exist that render the Luftig Release important to the success of the Plan, subject to the modifications thereto described herein;

(ii)     the Objections should otherwise be **OVERRULED**; and

(iii)    the Plan should be **CONFIRMED** subject to the modifications described herein.

The Court directs the Debtor to file a Revised Plan in accordance with the above within seven (7) days of the issuance of this decision, or otherwise advise the Court.

**IT IS SO ORDERED.**

Dated: New York, New York

November 22, 2023

/S/ John P. Mastando III
THE HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE