Sheryl P. Giugliano
Michael S. Amato
Ruskin Moscou Faltischek, P.C.
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, New York 11556-0190
(516) 663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Attorneys for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

In re:                                                                  Chapter 11 (Subchapter V)


HAL LUFTIG COMPANY, INC.,
                                                                        Case No. 22-11617 (JPM)

                                        Debtor.
------------------------------------------------------------------x


**MEMORANDUM OF LAW (I) IN SUPPORT OF
CONFIRMATION OF DEBTOR'S THIRD AMENDED SMALL BUSINESS PLAN
OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (ECF
DOC. NO. 172), AND (II) IN RESPONSE TO THE OBJECTION TO CONFIRMATION
FILED BY FCP ENTERTAINMENT PARTNERS, LLC (ECF DOC. NO. 170)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

I.      BACKGROUND ................................................................................................ 3

      A.  Relevant Facts and Background .......................................................... 3

      B.  Plan Solicitation ................................................................................... 4

II.     ARGUMENT ..................................................................................................... 5

      A.  FCP Is Estopped from Arguing That the Plan Is Not Confirmable ........................ 6

      B.  The Plan Satisfies Bankruptcy Code §1190 ........................................ 9

      C.  The Plan Satisfies the Confirmation Requirements for a
          Nonconsensual Plan Under Bankruptcy Code §1191(b) ...................... 10

      D.  The Objection Fails to Offer Any Financial Evidence, and Relies
          Upon Conjecture from a Non-Financial "Expert" with Limited
          Industry Experience and Outdated Information .................................... 12

      E.  The Extension of the Automatic Stay to Mr. Luftig (i) Tracks the
          Automatic Stay Afforded to the Debtor Consistent with the Stay
          Order and the Bankruptcy Code, and (ii) Is the Law of the Case ........................ 16

            i.  The Extension of the Automatic Stay to Mr. Luftig Tracks
                the Automatic Stay Afforded to the Debtor and Is
                Consistent with the Bankruptcy Code and Applicable Law ..................... 17

            ii.  The Extension of the Stay Under the Stay Order Is the Law
                of the Case ................................................................................. 19

      F.  The Plan Satisfies the Applicable Provisions of Bankruptcy Code
          §1129(a) ............................................................................................ 21

      G.  The Plan Complies with Bankruptcy Code §1129(a)(7) ...................... 22

H.  The Plan Complies with Bankruptcy Code §1129(a)(11) .......................................23

I.  Bankruptcy Code §§ 1129(a)(6), (8), (10), (12), (13), (14), (15),
and (16) Are Inapplicable .......................................................................................24

J.  The Plan Meets All of the Requirements Under Bankruptcy Code
§1191(b) ...................................................................................................................24

III.    CONCLUSION ...........................................................................................................25

## **TABLE OF AUTHORITIES**

Page(s)

Cases

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999) ...................................................................................... 22

*Berger v. Heckler*,
  771 F.2d 1556 (2d Cir. 1985) ........................................................................ 20

*County of Suffolk v. Stone & Webster Engineering Corp.*,
  106 F.3d 1112 (2d Cir. 1997) ........................................................................ 19

*In re Adelphia Bus. Solutions, Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) .......................................................... 23

*In re Calpine Corp.*,
  365 B.R. 401 (S.D.N.Y. 2007) ...................................................................... 18

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................................................ 21

*In re Lyondell Chem. Co.*,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009) .......................................................... 18

*In re One Times Square Assocs. Ltd. P'ship*,
  159 B.R. 695 (Bankr. S.D.N.Y. 1993) .......................................................... 23

*In re Pearl Res. LLC*,
  622 B.R. 236 (Bankr. S.D. Tex. 2020) .......................................................... 11

*In re Peck*,
  155 B.R. 301 (Bankr. D. Conn. 1992) ............................................................. 6

*In re Samurai Martial Sports, Inc.*,
  644 B.R. 667 (Bankr. S.D. Tex. 2022) .......................................................... 11

*In re Texaco, Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................................ 21

*International Petroleum Products and Additives Company, Inc. v. Black Gold S.A.R.L.*,
  115 F.4th 1202 (9th Cir. 2024) ................................................................. 20, 21

*Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) ..................................................................... 21, 23

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009) ................................................................. 20

*In re Lesie Fay Companies, Inc.*,
    207 B.R. 764 (Brankr. S.D.N.Y. 1997) ........................................... 23

*McCarron v. Andrews, et al. (In re Andrews)*,
    385 B.R. 496 (Bankr. D. Conn. 2008) ........................................... 6, 7

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................................... 6

*Simon v. Safelite Glass Corp.*,
    128 F.3d 68 (2d Cir. 1997) ................................................................. 7

*U.S. v. Carr*,
    557 F.3d 93 (2d Cir. 2009) ............................................................... 19

*U.S. v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ..................................................... 19, 20

*United States v. Reorganized CF&I Fabricators, Inc.*,
    518 U.S. 213 (1996) ......................................................................... 22

*Uzdavines v. Weeks Marine, Inc.*,
    418 F.3d 138 (2d Cir. 2005) ............................................................... 7

Statutes

Bankruptcy Code § 105 ...................................................................... 17

Bankruptcy Code. § 362 ..................................................................... 17

Bankruptcy Code §362(c)(2) ............................................................. 17

Bankruptcy Code § 1122 .................................................................... 21

Bankruptcy Code § 1123 .................................................................... 21

Bankruptcy Code §1126 ....................................................................... 4

Bankruptcy Code §1127(d) .................................................................. 5

Bankruptcy Code § 1129 .............................................................. *passim*

Bankruptcy Code § 1129(a)(6) .......................................................... 24

Bankruptcy Code §1129(a)(7) ........................................................................ 21, 22

Bankruptcy Code § 1129(a)(8) ............................................................................ 24

Bankruptcy Code § 1129(a)(10) .......................................................................... 24

Bankruptcy Code §1129(a)(11) .............................................................. 22, 23, 24

Bankruptcy Code § 1129(a)(12) .......................................................................... 24

Bankruptcy Code § 1129(a)(13) .......................................................................... 24

Bankruptcy Code § 1129(a)(14) .......................................................................... 24

Bankruptcy Code § 1129(a)(15) .......................................................................... 24

Bankruptcy Code §1129(a)(16) ........................................................................... 24

Bankruptcy Code § 1190 ............................................................................. *passim*

Bankruptcy Code §1190(1)(A) .............................................................................. 9

Bankruptcy Code § 1190(1)(B) ............................................................................. 9

Bankruptcy Code §1190(1)(C) .............................................................................. 9

Bankruptcy Code § 1190(1)-(2) ............................................................................ 9

Bankruptcy Code § 1191 ............................................................................. *passim*

Bankruptcy Code §1191(b) .......................................................................... *passim*

Bankruptcy Code §1191(d) ................................................................................... 9

Bankruptcy Code §1192 ...................................................................................... 17

Rules

Fed. R. Bankr. P. 3019(a) ...................................................................................... 5

FRCP 26 (a)(2)(B) .......................................................................................... 3, 12

Other Authorities

H.R. Rep. No. 95-595 .......................................................................................... 21

S. Rep. No. 95-989.............................................................................................. 21

Hal Luftig Company, Inc. (the "**Debtor**"), the above-captioned debtor and debtor in possession, respectfully submits this memorandum of law (the "**Memorandum**"): (i) in support of confirmation of the Debtor's *Third Amended Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* dated November 21, 2024 (ECF Doc. No. 172) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**")[1] pursuant to §§ 1129 and 1191 of title 11, United States Code (the "**Bankruptcy Code**"), and (ii) in response to *FCP Entertainment Partner's Objection to Confirmation of Debtor's Second Amended Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 170) (the "**Objection**").   In further support of confirmation of the Plan, the Debtor has also simultaneously filed the Declaration of Hal Luftig dated November 26, 2024 (the "**November Luftig Declaration**"), and the Declaration of Brian Ryniker dated November 26, 2024 (the "**November Ryniker Declaration**"), each of which are incorporated herein by reference.   This Memorandum also incorporates by reference to the extent applicable the *Memorandum of Law in Support of Confirmation of Debtor's Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 84), and the *Reply in Support of Confirmation of Debtor's Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 93). In support of confirmation of the Plan, the Debtor respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

Subchapter V was created for small businesses to reorganize and make meaningful payments to creditors in a streamlined process. The Debtor has demonstrated a commitment to the underlying principles of Subchapter V, as well as the statutory requirements. The Debtor seeks confirmation of the Plan which provides meaningful recoveries to creditors.  The Debtor cannot

---

[1] All capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan.

1

force FCP to act in its own economic best interest, or retain a qualified financial expert, but the Debtor is permitted under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules to confirm a plan of reorganization over FCP's baseless objection which (i) contributes one hundred percent (100%) of its net disposable income to creditors, (ii) treats creditors fairly and equitably, (iii) provides creditors with a larger distribution than they would receive in a liquidation, and (iv) remains consistent with the law of the case and includes an extension of the automatic stay to Mr. Luftig for as long as the Debtor benefits from the automatic stay.

On the first day of the Debtor's case, the Debtor asked this Court to extend the automatic stay to Mr. Luftig and enjoin FCP from any judgment enforcement efforts against Mr. Luftig, allowing him to focus on the Debtor's reorganization. This Court recognized that Mr. Luftig is the lifeblood of the Debtor's business operations, and entered the Stay Order. The Stay Order enjoins FCP from taking any actions against Mr. Luftig or his assets, allowing him to focus on the Debtor's reorganization and future projects stemming from legacy productions; and Mr. Luftig responded by dedicating the majority of his time (approximately 60%) to the Debtor's reorganization – with his personal effort, time, and money.

To his credit, and to FCP's direct benefit, Mr. Luftig transformed *Becoming Nancy* and *Midnight in the Garden of Good and Evil* (two "legacy projects" and the reasons the Debtor's financial projections were updated in July 2024) from development projects into well-received, high-grossing shows in their respective locations. Mr. Luftig is directly responsible for the complete turnaround of those shows, and FCP's reliance on outdated reviews to support a speculation that they may not produce significant recoveries demonstrates the lack of sophistication and qualification held by its "expert."[2]

---

[2] The Objection includes a document titled the *Rebuttal Report of Martin Platt in Response to the Declaration of Brian Ryniker in Support of Confirmation of Debtor's Second amended Chapter 11 Plan of*

Under the Plan, holders of Allowed General Unsecured Claims are projected to receive distributions over the life of the Plan of not less than 25%. This amount is greater than the recovery those claimants would receive in a hypothetical chapter 7 liquidation (17%). The Plan also provides that the Debtor will pay in full: Administrative Expenses; Priority Claims (including Priority Tax Claims); and Allowed Secured Claims.

As demonstrated herein, the Plan satisfies the requirements for confirmation under Bankruptcy Code §§ 1190, 1191 and 1129 (as applicable), and is in the best interests of the Debtor's estate, creditors and all parties in interest. The Debtor respectfully requests that the Plan be confirmed with the extension of the automatic stay to Mr. Luftig in place for as long as the Debtor benefits from the automatic stay.

## I.    **BACKGROUND**

The facts of this matter are set forth in the Plan, the November Luftig Declaration, and the November Ryniker Declaration, each of which are incorporated herein by reference, and except as necessary will not be repeated but will be referred to below as appropriate.

### A.  **Relevant Facts and Background**

On July 25, 2024, the Debtor filed the Second Amended Plan (ECF Doc. No. 155) to update the procedural posture of the Debtor's case, remove the Luftig Release and the Luftig Contribution, and update the Liquidation Analysis and Disposable Income Analysis given the passage of time.

On July 25, 2024, the Debtor filed the *Declaration of Brian Ryniker in Support of Confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization Under Subchapter*

---

*Reorganization Under Subchapter V of the Bankruptcy Code.* The Debtor respectfully submits that FCP and Mr. Platt failed to comply with the requirements of FRCP 26 (a)(2)(B)(ii, iii, iv, v and vi), which is applicable herein under Bankruptcy Rule 9014(c)

*V of the Bankruptcy Code* (ECF Doc. No. 156) (the "**July Ryniker Declaration**")[3] with exhibits updating the Liquidation Analysis and Disposable Income Analysis.

On July 25, 2024, the Debtor filed the *Declaration of Hal Luftig in Support of Confirmation of Debtor's Second Amended Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 157) (the "**July Luftig Declaration**")[4] with exhibits updating the Court on the Debtor's significant progress with *Plaza Suite* in London, *Becoming Nancy*, and *Midnight in the Garden of Good and Evil*.

On November 15, 2024, FCP filed the Objection.

On November 21, 2024, the Debtor filed the *Third Amended Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 172) to include language requested by the U.S. Trustee.  The U.S. Trustee has confirmed to the Debtor that, with this clarifying language added, the U.S. Trustee has no objection to confirmation of the Plan.

### B.  Plan Solicitation

Pursuant to Bankruptcy Code §1126, only holders of claims in an impaired class (*i.e.* Classes 3 and 4) were entitled to vote on the Plan. 11 U.S.C. § 1126. The voting results were reflected in the tabulation summary filed on July 26, 2023 (ECF Doc. No. 90), and reflected that: (i) FCP as the sole member of Class 3 rejected the Plan; and (ii) Class 4 accepted the Plan.  Classes 3 (FCP Claim) and 4 (General Unsecured Claims) were the only Classes entitled to vote to accept or reject the Plan.

The Debtor did not resolicit votes to accept or reject the Second Amended Plan (or the Third Amended Plan recently filed), because the modifications did not adversely change the

---

[3] This July Ryniker Declaration is incorporated by reference into the November Ryniker Declaration.

[4] This July Luftig Declaration is incorporated by reference into the November Luftig Declaration.

treatment of any claim of any creditor who did not accept the modifications in writing.  *See* Fed. R. Bankr. P. 3019(a).  Moreover, at the Status Conference on August 20, 2024 at which the Court authorized FCP to file an objection to the Second Amended Plan, the Court did not direct (nor did FCP request) the Debtor to resolicit votes accepting or rejecting the Plan.  *Id.*    Thus, under Bankruptcy Code §1127(d), the holders of Claims in Classes 3 and 4 that accepted or rejected the Plan are deemed to accept or reject, respectively, the Plan as modified. 11 U.S.C. §1127(d).

The Debtor seeks to confirm the Plan pursuant to Bankruptcy Code §1191(b).  As demonstrated herein, and in the November Luftig Declaration and the November Ryniker Declaration: (a) the Plan satisfies Bankruptcy Code §1191(b), because it does not "discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted, the [P]lan," and thus satisfies the statutory requirements for confirmation and should be confirmed; and (b) the extension of the automatic stay to Mr. Luftig through the life of the Plan (paralleling the Debtor's automatic stay) is not only permissible, but absolutely necessary to ensure the Debtor's survival and ability to comply with the Plan. 11 U.S.C. §1191(b).

## II.    ARGUMENT

The Plan should be confirmed because it satisfies the requirements under Chapter 11 of the Bankruptcy Code and applicable case law, and the automatic stay should continue to be extended to Mr. Luftig because: (1) the Stay Order remains the law of the case; and (2) Mr. Luftig remains the lifeblood of the Debtor's business, and his relationships, reputation, knowledge, and expertise,

continue to create valuable opportunities for the Debtor which will allow it to successfully reorganize and make meaningful payments to creditors.

### A. FCP is Estopped from Arguing that the Plan is Not Confirmable.

FCP must be judicially estopped from taking the position that the Plan cannot be confirmed for failure to satisfy the statutory requirements, because: (i) FCP made statements to the contrary upon which the Court relied at the hearing on July 11, 2023, and (ii) the Plan considered at the July 11, 2023 hearing is substantially similar to the Second Amended Plan (and the Third Amended Plan) other than removing the Luftig Release and updating the financial projections to account for the passage of time (not to correct any errors or missed projections). The Plan has not changed, but FCP's position has, and it must be judicially estopped from doing so.

"The doctrine of judicial estoppel provides that 'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *McCarron v. Andrews, et al. (In re Andrews)*, 385 B.R. 496, 502 (Bankr. D. Conn. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). "[J]udicial estoppel 'generally prevents a party from prevailing *in one phase of a case* on an argument and then relying on a contradictory argument *to prevail in another phase.*'" *In re Andrews*, 385 B.R. 496, 502 (Bankr. D. Conn. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). "The purpose of the doctrine is to 'protect judicial integrity by preventing litigants from playing fast and loose with the courts, and thereby avoiding unfair results and unseemliness.'" *In re Andrews*, 385 B.R. 496, 502 (Bankr. D. Conn. 2008) (quoting *In re Peck*, 155 B.R. 301, 305 (Bankr. D. Conn. 1992) (citations omitted)).

In the Second Circuit, application of judicial estoppel is limited to "situations 'where the risk of inconsistent results with its impact on judicial integrity is certain,' *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 148 (2d Cir. 2005), and is inapplicable where the first statement was the result of a good faith mistake or an unintentional error." *In re Andrews,* 385 B.R. 496, 502 (Bankr. D. Conn. 2008) (citing *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 73 (2d Cir. 1997)).

FCP must be judicially estopped from taking the position that the Plan is not confirmable for failure to satisfy the statutory requirements, because on July 11, 2023 FCP stood before the Court and took a directly contrary position, even though the Plan has not substantively changed (other than to remove the Luftig Release which allegedly served as the basis of FCP's objections to confirmation in the first place).  In the Objection, FCP argues that the Plan should not be confirmed because it is not "in the best interests of creditors" and "it is not fair or equitable." Objection, p.7.  The Objection goes on for seven (7) pages about how the Plan, even without the Luftig Release, fails to satisfy the statutory requirements necessary for confirmation of a chapter 11 plan of reorganization.

At the confirmation hearing on July 11, 2023, FCP took the position that the Plan was confirmable absent the Luftig Release. *See* Nov. Luftig Decl., Ex. B.  The position taken by FCP in the current Objection is in direct contradiction of the position taken by FCP on July 11, 2023, as demonstrated by express statements by FCP's counsel at that hearing:

(i)     "Yes, Your Honor.  I mean, I think, except for in the pretrial order, our dispute is really limited.  You know, a lot of the components of the plan and meeting requirements, I think set forth in the pretrial order being worked out, is really not in dispute, and so I think counsel will be able to go through those relatively expediently and really our issue is very limited to the release, and you know, I think we've gotten testimony and I would have you know may be a 15 minute-ish closing statement, something like that." Tr. July 11, 2023, 95:2-11.

(ii)    "I think it's just, in a quick rundown, again, our issue here and I think is, again, we're looking at these seven factors with regard to approval of the release or not.

7

> That's FCP's dispute and objection with this plan is that the inclusion of the release is inappropriate, . . . ." Tr. July 11, 2023, 129:8-12.

(iii)    "There's a plan here that's confirmable without the release and the companion components that go with it or demands that go with it." Tr. July 11, 2023, 132:6-8.

(iv)    "So, again, it's our view, Your Honor, that this debtor, you know, can survive, has a confirmable plan on its own but inclusion of the Luftig Release is inappropriate and so we would ask that you deny confirmation." Tr. July 11, 2023, 135:19-22.

Importantly, this Court relied upon FCP's position at the July 11, 2023 hearing – *i.e.,* that FCP did not take issue with the elements of the Plan beyond the Luftig Release. Specifically, the Court held that: "Importantly, neither the U.S. Trustee nor FCP argues that any of the subsections of Section 1129(a) of the Bankruptcy Code applicable under Section 1191(b) of the Bankruptcy Code is unsatisfied. *Id.* Therefore, the Court must only determine whether the Plan is fair and equitable." Proposed Findings of Fact and Conclusions of Law, p.20. The Court went on to hold that with the Back-Stop Commitment (which the Plan still includes), "the Debtor has carried its burden of proof with respect to the confirmation requirements of Section 1191(b)." *Id.* at p.21.

Any argument by FCP that the Debtor's Disposable Income Analysis is different and, therefore, FCP's position is not contrary, must be rejected. The Debtor is contributing, and FCP does not argue otherwise, one hundred percent (100%) of its Disposable Income to pay creditors over the life of the Plan, and the same components were used to calculate those projections.

In sum, FCP is making an argument in the Objection that is irreconcilable with the statements made on the record to this Court on July 11, 2023, and relied upon by the Court in its November 22, 2023 Proposed Findings of Fact and Conclusions of Law. FCP must be judicially estopped from arguing that the Debtor's Plan without the Luftig Release fails to satisfy the necessary statutory requirements for confirmation.

### B.  The Plan Satisfies Bankruptcy Code §1190.

The Plan satisfies the disclosure requirements of Bankruptcy Code §1190. 11 U.S.C. § 1190(1)-(2).

First, Article I of the Plan provides a history of the Debtor and its business operations, in compliance with Bankruptcy Code §1190(1)(A).

Second, Article VII of the Plan references the Exhibits, including the updated Liquidation Analysis, and the updated Disposable Income Analysis.  July Ryniker Decl., ¶6, Exs. A-2, B-2; 11 U.S.C. § 1190(1)(B) and (C). As discussed below, the Liquidation Analysis shows that holders of Allowed Claims in Classes 3 and 4 are projected to receive distributions in excess of the estimated distribution in a hypothetical chapter 7 liquidation. The Liquidation Analysis shows that in a liquidation scenario creditors will receive a 17% distribution on account of Allowed Claims.  The Disposable Income Analysis provides that under the Plan (without the Luftig Contribution) FCP (Class 3) is projected to receive in the aggregate $720,000.00 or 25% of its Allowed Claim over the life of the Plan, and Holders of Allowed Class 4 Claims are projected to receive an amount equal to 25% of their Allowed Claims.  July Ryniker Decl., Ex. A-2.

Third, Article III of the Plan provides that the Debtor will fund the payments under the Plan with Disposable Income over a period of five (5) years. 11 U.S.C. §1190(1)(C).  "Disposable Income" is defined as "the meaning given to it in Bankruptcy Code §1191(d), as calculated and projected by the Debtor's financial advisor and set forth in the Plan Supplement."  Plan, Art. VIII. The Disposable Income Analysis provides sufficient evidence of the Debtor's ability to make the

projected payments under the Plan; thus, satisfying the feasibility requirement.  July Ryniker Decl., ¶¶11-12.

The Objection asserts that the Disposable Income Analysis is based on unreliable and unreasonable projections. Mr. Ryniker relied upon the Debtor's projections in creating the Disposable Income Analysis. Mr. Ryniker assessed whether the Debtor's projections were reasonable under the circumstances, and ultimately determined that they were, based in part on the Debtor's past performance. Since RKC's retention, the Debtor has provided cash flow projections which historically have been substantially accurate.  In creating the Liquidation Analysis and assigning values to the Debtor's interests in various projects, RKC discounted by approximately forty percent (40%) the values assigned by the Debtor, but with respect to the Disposable Income Analysis it is standard practice to analyze whether the Debtor's projections are reasonable and then to create a disposable income analysis.

The Objection fails to recognize what is standard practice in the industry for financial advisors and valuation experts, because FCP's "expert", Mr. Platt, satisfies neither category. Furthermore, the Objection (and Mr. Platt) fail to understand the basic principle that if *Becoming Nancy* and *Midnight in the Garden of Good and Evil* should be removed from the Disposable Income Analysis as too speculative and unreliable (which they are not, as explained below), then those same assets must be removed from the Liquidation Analysis, and in that hypothetical environment creditors will not fare better in a liquidation than in a reorganization.

Thus, the Plan satisfies Bankruptcy Code §1190 and should be confirmed.

## C. The Plan Satisfies the Confirmation Requirements for a Nonconsensual Plan Under Bankruptcy Code §1191(b).

Under Bankruptcy Code § 1191(b), a Subchapter V plan can be confirmed or "crammed down" notwithstanding the rejection of the plan by an impaired class of creditors, if: (i) all of the

applicable requirements of section 1129(a), other than subsections 1129(a)(8), (10), and (15) are satisfied, and (ii) "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. §1191(b).  *See In re Samurai Martial Sports, Inc.,* 644 B.R. 667 (Bankr. S.D. Tex. 2022) (noting debtor may "cramdown" a plan under Section 1191(b)).

The "fair and equitable" requirement in Section 1191(b) requires under Section 1191(c) that: (1) as of the effective date of the plan, such plan includes the debtor's contribution of all of its projected disposable income over the life of the plan (three to five years), and (2) either the debtor will make all payments under the plan or, if there is a "reasonable likelihood" that the debtor will able to do so, then the plan provides for "appropriate remedies."  11 U.S.C. §1191(c).

"The feasibility requirement for confirmation under §1191(c) requires a showing that the debtor can realistically carry out its plan."  *In re Samurai Martial Sports, Inc.,* 644 B.R. 667, 699 (Bankr. S.D. Tex. 2022) (citing *In re Pearl Res. LLC,* 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020)). "Though a guarantee of success is not required, the court should be satisfied that the reorganized debtor can stand on its own two feet."  *Id.*

Here, the Plan is "fair and equitable" with respect to Class 3 (FCP), because: (i) the Court already held that the Plan without the Luftig Release is "fair and equitable" with the Back-Stop Commitment, which is still part of the Plan; *see* Proposed Findings and Conclusions, p.21; (ii) as of the Effective Date, the Debtor is contributing all of its Disposable Income to fund the Plan; and (iii) the Disposable Income Analysis confirms that the Debtor will make all payments under the Plan.  Nov. Ryniker Decl. ¶9.  Indeed, even if *Becoming Nancy* and *Midnight in the Garden of Good and Evil* were removed from the Disposable Income Analysis, the Debtor would still be

11

contributing one hundred percent (100%) of its Disposable Income (creditors would simply receive a smaller distribution) and the Plan would remain feasible under Bankruptcy Code § 1191(c).

The Plan is feasible under Section 1191(c) as set forth in the Ryniker Declarations and supported by the Disposable Income Analysis.  *See* Nov. Ryniker Decl. ¶¶12-13; July Ryniker Decl., Exh. A-2 (confirming working capital needs and deferred compensation for Mr. Luftig will allow for payments under the life of the Plan).

### D.  The Objection Fails to Offer any Financial Evidence, and Relies Upon Conjecture from a Non-Financial "Expert" With Limited Industry Experience and Outdated Information.

The Objection fails to offer any financial evidence or information contradicting or refuting what was relied upon by the Debtor and shared with FCP, and instead relies upon testimony from Mr. Platt, an individual who has, to the best of Mr. Luftig's knowledge, minimal producing experience, and only two Broadway credits to his name: (1) one from 2013 that closed after running only 189 performances; and (2) another from 2015 which ran for only 85 performances. He has no Broadway credits since then.[5]  Mr. Platt's "report," and "curriculum vitae" fail to satisfy the requirements of FRCP 26 (a)(2)(B)(ii, iii, iv, v and vi) because they are missing: (i) the facts or data considered by Mr. Platt in forming his opinions; (ii) any exhibits that will be used to summarize or support them; (iii) Mr. Platt's qualifications, including a list of all publications authored in the previous 10 years; (iv) a list of all other cases in which, during the previous four (4) years, Mr. Platt testified as an expert at trial or by deposition; and (v) a statement of the compensation to be paid for the study and testimony in the case.  It is nothing more than a hastily

---

[5] "Produced" is used in two ways in the industry: (1) the traditional meaning of being a "lead producer" by meaningfully acting as an executive of a production by negotiating rights and contracts, casting, venue, physical production, press and marketing; and (2) acting as a passive investor.  Those in the latter category may earn Tony awards but they are not experienced in producing a show.  Mr. Luftig has decades of experience in the former, but Mr. Platt's is far less clear or substantive.

typed listing of random projects which demonstrates that he may have invested or participated in theatrical productions, but his hands-on experience producing Broadway hits is minimal at best, especially compared to Mr. Luftig's forty-year history in the business.

The Objection asserts that Mr. Ryniker's Disposable Income Analysis is faulty and speculative because it "provides no details regarding the specific factual documentation that was reviewed in its preparation." Objection, p.9. The Objection goes on to argue that *Becoming Nancy* and *Midnight in the Garden of Good and Evil* are unlikely to achieve the success predicted by the Disposable Income Analysis, because of initial reviews of those shows specifically, and more generally Broadway musicals, do not have a widespread history of economic success for investors.[6] The Objection then wrongly concludes that FCP and other creditors would recover more in a liquidation scenario than under the Plan and, therefore, the Plan is not confirmable.

First, the Debtor and its financial advisor RKC provided substantially all of its work product to FCP's counsel, including percentages of ownership in the various entities, so FCP's assertion that it did not have sufficient details as to RKC's work product or the basis for its conclusions is puzzling. The only items missing from the documents provided were contractual operating agreements for the limited liability companies for each of the Debtor's production partnerships. The Debtor does not believe that copies of the agreements are necessary to analyze the financial data provided. Furthermore, it is standard practice for a financial advisor to rely upon the underlying financial data from a debtor in formulating financial projections. Of course, a financial advisor assesses the reasonableness of the data and projections provided, but a financial

---

[6] Mr. Platt's focus is clearly on revenue streams from an investor's point of view. From the producer's perspective (*i.e.,* the Debtor's and Mr. Luftig's), Mr. Platt acknowledges that "it is true that producers are also entitled to weekly fees and other royalties" but he then demurs from further analysis of these revenue streams with the feeble excuse, "without access to these details from the operating documents, it is not possible to establish what other income Debtor may be able to realize from either of these Shows in the form of weekly fees and royalties." Platt Decl. at 8.

advisor is not in a position to question a debtor's business judgment.  Perhaps more important to this analysis is that historically in this case the Debtor's financial projections for future income receipts has been almost entirely accurate.

Second, the general success of Broadway musicals is hardly a relevant database from which to extrapolate estimates of the future performance of the Debtor's legacy projects *Becoming Nancy* and *Midnight in the Garden of Good and Evil*.  Mr. Platt erroneously relies on outdated reviews to assert that those shows are unlikely to be successful.  A more meaningful measure of whether those two shows are actually likely to succeed (according to an actual expert in the industry) are: (i) the performance of those shows to date (Mr. Platt conveniently leaves out the more recent rave reviews of both shows after Mr. Luftig's developmental expertise has been applied to nascent projects); and (ii) the Debtor's history of producing profitable shows.  With respect to the latter, Mr. Luftig and the Debtor have a long history of producing profitable shows and musicals.[7]  Mr. Platt refers to the fact that *The Life of Pi* (a non-Debtor project produced by Mr. Luftig) closed with "large losses" on Broadway as evidence that Mr. Ryniker's five-year projections are "statistically unlikely to be accurate."  It is unclear where Mr. Platt secured his information because he offers one-off examples, but his conclusions are baseless and wrong.  Although *Life of Pi* was not profitable on Broadway, investors will ultimately recoup 100% of their investment.

A more helpful database for assessing whether the Debtor will produce successful shows is not all Broadway shows generally, but rather the Debtor's shows and in particular, the Debtor's shows in which FCP was an investor (a subject entirely passed over by the Objection and Mr. Platt).  Between 2007 and 2014, the total gross income that FCP and related entities earned was

---

[7] Mr. Platt's inaccurate projections demonstrate his lack of experience.  For example, he disregards (or does not know) that even shows that do not recoup on Broadway may become profitable on tour – an area in which Mr. Luftig is considered an industry expert with a successful track record.

$1,212,786.53 from non-Kinky Boots Debtor productions.  FCP subsequently earned an additional either $2,340,711.74 (according to FCP) or $2,347,857.94 (according to the Debtor) from *Kinky Boots* on Broadway and the U.S. tour.  Using even the more conservative figure, the total gross revenue FCP earned from the Debtor was $3,553,498.27, which averaged out over the 2007 to 2014 period amounts to $444,187.28 annually, a 211% return on FCP's $210,000 annual fee to the Debtor. .

With respect to the performance of *Becoming Nancy* and *Midnight in the Garden of Good and Evil*, Mr. Luftig's successful turnaround of *Becoming Nancy* since its developmental stages is noticeably absent from the Objection, and demonstrates the Plan's high likelihood of success, even more so with Mr. Luftig's assistance, dedication, and attention undistracted by judgment enforcement and collection actions by FCP.  Although *Becoming Nancy* opened to somewhat mixed reviews in its initial developmental stage in Atlanta during pre-COVID times, it is now doing incredibly well in Birmingham, United Kingdom, with ticket sales accounting for 99% of the theatre's gross capacity.  The Debtor's team successfully refreshed the performance, moved the location, and turned the show into a musical hit.  Mr. Luftig was in Birmingham working with the cast and crew daily for six (6) weeks. Mr. Luftig's dedication to the turnaround of *Becoming Nancy* did not waver even though it is a Debtor legacy project and the profits run to the Debtor's creditors, including FCP.  Similarly, under Mr. Luftig's dedicated attention including five (5) weeks on-site, *Midnight in the Garden of Good and Evil* is now the third-largest grossing musical in the history of the Goodman Theatre in Chicago.

Mr. Luftig's history of taking shows opening to mixed reviews and reworking them into musical sensations is not limited to *Becoming Nancy* or *Midnight in the Garden of Good and Evil*, and further supports Mr. Ryniker's reliance on the Debtor's projections and conclusion that they

are reasonable.  For example, *Kinky Boots* originally opened in Chicago to negative reviews.  When the Debtor (and Mr. Luftig) became involved, they took it to Broadway and turned it around into a musical sensation.

  Third, the Objection and statements by Mr. Platt are quick to criticize the Debtor's well-qualified, certified, and experienced financial advisor, but FCP, its counsel, and Mr. Platt all fail to recognize three important concepts: (i) if you remove *Becoming Nancy* and *Midnight in the Garden of Good and Evil* from the Disposable Income Analysis, you must also remove them from the Liquidation Analysis, defeating any argument that FCP would fare better in a liquidation of the Debtor's assets than under the Plan; (ii) liquidation of the Debtor's interests in the production partnerships would not enable a creditor like FCP to step into the Debtor's shoes without the consent of that entity's manager, who in most cases likely would not have an interest in working with an entity responsible for the Debtor's liquidation.  These partnerships and opportunities are based on interpersonal relationships built by Mr. Luftig over the course of his forty year career; and (iii) as long as the Debtor is contributing 100% of its Net Disposable Income to the Plan, the Plan is confirmable under the Bankruptcy Code. 11 U.S.C. § 1191.

  **E.  The Extension of the Automatic Stay to Mr. Luftig (i) Tracks the Automatic Stay Afforded to the Debtor Consistent with the Stay Order and the Bankruptcy Code, and (ii) is the Law of the Case.**

  The Debtor is not asking the Court to approve a nonconsensual third-party release.  The Debtor is asking the Court to leave in place the protections granted by this Court to the Debtor and Mr. Luftig on day one of the case.   FCP's repeated attempts throughout this case to reach Mr. Luftig's personal assets, even when such attempts were not in FCP's own economic best interests, demonstrates the extreme vitriol motivating FCP's actions and support why the stay must be extended to Mr. Luftig for the life of the Plan.

16

      **(i)**      **The Extension of the Automatic Stay to Mr. Luftig Tracks the Automatic Stay Afforded to the Debtor and is Consistent with the Bankruptcy Code and Applicable Law.**

First, the extension of the automatic stay to Mr. Luftig for the life of the Plan is consistent with the Stay Order and applicable provisions of the Bankruptcy Code. As set forth in the Stay Order, "pursuant to 11 U.S.C. §§ 105 and 362, the automatic stay is hereby extended to non-debtor Hal Luftig." Stay Order, ¶2. Bankruptcy Code §362(c)(2) provides that the automatic stay continues until the earliest of (1) the case is closed, (2) the case is dismissed, or (3) the time a discharge is granted or denied. Bankruptcy Code §1192 provides that in a Subchapter V case, if a plan of reorganization is confirmed under Bankruptcy Code §1191(b) – *i.e.,* is a nonconsensual plan – a debtor will not receive its discharge until the date the "last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; . . . ." 11 U.S.C. §1192. Here, the Debtor is seeking to confirm the Plan under Bankruptcy Code §1191(b), because FCP voted to reject the Plan. Accordingly, the earliest opportunity for termination of the automatic stay as to the Debtor will be when the discharge is granted.

The Stay Order does not state when the extension of the automatic stay to Mr. Luftig will terminate, but circumstances that existed at the initial stages of the Debtor's case, which served as the basis for the Stay Order, continue to exist and are even more significant for a successful reorganization under the Plan. Mr. Luftig is still one of three employees of the Debtor, and remains its president and sole shareholder. The Debtor's ability to succeed in developing revenue-generating projects still depends entirely on Mr. Luftig's ability to develop and produce shows and to pursue new opportunities.

The Debtor complied with its requirements of a Subchapter V debtor early on in the case, and since then has demonstrated that there is a high likelihood of a successful reorganization if

Mr. Luftig is free to meaningfully assist the Debtor.  *See In re Lyondell Chem. Co.,* 402 B.R. 571, 589 (Bankr. S.D.N.Y. 2009); *In re Calpine Corp.,* 365 B.R. 401, 410 (S.D.N.Y. 2007).  Since the Petition Date, *Plaza Suite* opened in London to rave reviews generating significant profits for the Debtor's estate and its creditors, *Becoming Nancy* was transformed into an incredibly well-received musical hit in Birmingham, England, and *Midnight in the Garden of Good and Evil* became a top-grossing show at Chicago's Goodman Theatre.  Mr. Luftig was free to dedicate his time and attention to legacy projects which flow directly to the benefit of the Debtor's estate and its creditors (including FCP), because he was not distracted by aggressive litigation, judgment enforcement or collection efforts.  The Plan cannot and will not succeed if Mr. Luftig is being chased-down by FCP's judgment enforcement and collection efforts – which FCP has confirmed it seeks to do immediately, even though it is not in its own economic best interests to do so.

Last, this case remains "unique and exceptional," because of the clear vitriol which motivates FCP's every move in this case, clearly aimed at destroying the Debtor and Mr. Luftig.  *See* Proposed Findings and Conclusions, p.61 (holding "this case is unique and 'exceptional' because FCP, the Debtor's largest creditor, is apparently willing to: (i) incur the costs concomitant with further litigation; and (ii) derail a Plan that would purportedly *optimize its own recovery* (and the recovery of every other creditor) in order to either drive the Debtor into Chapter 7 or drive the Debtor's principal into bankruptcy himself.").

Another significant consequence of terminating the extension of the stay at this juncture in the case is the future expensive and protracted litigation with FCP that will continue, and the distraction it will cause for Mr. Luftig who is essential to the Debtor's successful reorganization.  By way of example, at the beginning of the Debtor's case, Mr. Luftig testified by declaration that he was in the midst of pursuing the opening of *Plaza Suite* (a highly-successful and profitable

limited engagement featuring Matthew Broderick and Sarah Jessica Parker) in both London and Los Angeles. Once the Stay Order was entered, Mr. Luftig was free to continue working for the Debtor and its legacy projects without distraction. *Plaza Suite* in London was one of the Debtor's highest grossing legacy projects since the Petition Date.

Mr. Luftig always has been, and remains, dedicated to ensuring the success of the Debtor, its legacy projects, and the proposed Plan. Mr. Luftig's ability to continue those efforts will be thwarted if he is distracted by judgment enforcement efforts by FCP, and his reputation in the industry as a fundraiser could be tarnished. Since the plan confirmation hearing in July 2023, there have been additional incidents that were extremely damaging to Mr. Luftig's ability to develop and raise funds for future projects. By way of example and not limitation, one particular individual who historically invests in shows produced by Mr. Luftig ultimately decided to pass on a legacy project, because of the continuing chapter 11 case and ensuing litigation. If Mr. Luftig's personal bank accounts are frozen, his wages are garnished, and subpoenas are served on his business partners (all measures FCP has stated it will take), his reputation in the industry as a trustworthy and reliable fundraiser will be ruined after decades of success.

(ii)     **The Extension of the Stay Under the Stay Order is the Law of the Case.**

The extension of the automatic stay to Mr. Luftig under the Stay Order is the law of the case. *See U.S. v. Carr,* 557 F.3d 93, 102 (2d Cir. 2009) ("[W]hen a court has ruled on an issue, 'that decision should generally be adhered to by that court in subsequent stages in the same case.'") (quoting *U.S. v. Quintieri,* 306 F.3d 1217, 1225 (2d Cir. 2002)). FCP did not appeal the Stay Order, did not reserve its rights under the Stay Order to contest its application through the Debtor's discharge, and did not contest the portion of the Proposed Findings and Conclusions denying FCP's request to terminate the extension of the stay. *See County of Suffolk v. Stone & Webster*

*Engineering Corp.,* 106 F.3d 1112, 1117 (2d Cir. 1997) ("To the extent that the court imposes a condition that a party finds unacceptable, that party's recourse is either to retreat from the agreement, and continue the litigation or settlement negotiations, or to challenge the judicial condition on appeal within the time for appeal from the judgment incorporating the condition.") (citing *Berger v. Heckler,* 771 F.2d 1556, 1567 (2d Cir. 1985)).

Further, this Court has rejected every effort by FCP to terminate the extension of the stay to Mr. Luftig. *See* Proposed Findings and Conclusions, p.63.

Last, as demonstrated above, there are no new compelling reasons, there is no new evidence, there is no "manifest injustice" or "clear error" which would warrant departing from the law of the case and terminating the extension of the stay to Mr. Luftig on the eve of confirmation – he remains as essential as ever to the Debtor's successful reorganization. *See Johnson v. Holder,* 564 F.3d 95, 100 (2d Cir. 2009) (declining to find "'cogent' or 'compelling' reasons including an intervening change in law availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice" sufficient to depart from an earlier ruling and the law of the case) (quoting *U.S. v. Quintieri,* 306 F.3d 1217, 1225 (2d Cir. 2002)).

Any argument by FCP that the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.* is an "intervening change in law" is a purposeful effort to conflate an alleged impermissible nonconsensual third-party release with the permissible, lawful, and justified extension of the automatic stay to Mr. Luftig. Indeed, when the Debtor's automatic stay terminates at the granting of its discharge at the end of the Plan, the extension of the automatic stay to Mr. Luftig will terminate as well.

FCP's reliance upon and citation to the decision by the U.S. Court of Appeals for the Ninth Circuit in *International Petroleum Products and Additives Company, Inc. v. Black Gold S.A.R.L.,*

115 F.4th 1202 (9th Cir. 2024) is misplaced, at best. The facts of *Black Gold* are entirely distinguishable from the facts of this case: it involves a foreign debtor whose petition for recognition under chapter 15 was initially denied by a bankruptcy court; that decision was later reversed by a higher court triggering the automatic stay; and then the issue of whether the automatic stay could be applied to a stay creditor's alter ego claim against the non-debtor sole owners of the foreign debtor. *Id.* Further, the Ninth Circuit did not reject the concept of adopting the test endorsed in the Fourth Circuit for extending the automatic stay, but rather held that "this case is not the correct procedural posture for us to decide whether to adopt *A.H. Robins* as the law in this Circuit." *Id.* at 1217. In sum, the *Black Gold* decision does not support FCP's position, and is totally distinguishable.

F.   **The Plan Satisfies the Applicable Provisions of Bankruptcy Code §1129(a).**

As required by Bankruptcy Code §1191(b), the Plan satisfies Section 1129(a)(1), which requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]" - notably, those governing classification of claims and interests and the contents of a plan. 11 U.S.C. § 1129(a)(1). The legislative history of Bankruptcy Code § 1129(a)(1) explains that this provision encompasses the requirements of Bankruptcy Code §§ 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986); *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Texaco, Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988).

Here, the Plan complies with all of the applicable provisions of the Bankruptcy Code, including sections 1122 and 1123 and, therefore, it should be confirmed. Except as discussed below, the Court and interested parties are respectfully referred to the *Memorandum of Law in*

*Support of Confirmation of Debtor's Small Business Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 84) for additional support concerning the Plan's satisfaction of Bankruptcy Code §§ 1122 and 1123, and 1129(a).

### G.  The Plan Complies with Bankruptcy Code §1129(a)(7).

Bankruptcy Code §1129(a)(7) requires that, with respect to each class of impaired claims or interests under a plan, every holder of a claim or interest in such impaired class either: (i) accept the plan, or (ii) receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7). This is often referred to as the "best interests test." Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated [under chapter 7 of the Bankruptcy Code]." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999); *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996).

The Debtor has put forth affirmative evidence establishing that general unsecured creditors (Classes 3 and 4) will fare better under the Plan than in a chapter 7 liquidation. The Liquidation Analysis demonstrates that holders of Classes 3 and 4 are projected to receive under the Plan distributions equal to at least 25% of their Allowed Claims, which is greater than the distribution they would expect to receive in a hypothetical chapter 7 liquidation of approximately 17%.  July Ryniker Decl., Ex. A-1.  The Plan satisfies the best interest of creditors test.

FCP argues in the Objection that confirmation of the Plan including the extension of the automatic stay to Mr. Luftig is not in FCP's best interests because FCP would secure a "higher recovery" if it is entitled to pursue enforcement against Mr. Luftig immediately.  FCP's argument

must be rejected because FCP offers no evidence or even reliable conjecture that it will recover more from Mr. Luftig personally if the automatic stay is not extended, and has no basis for making that statement. To the contrary, Mr. Luftig established through his Declaration filed with the Court on July 25, 2024 (ECF Doc. No. 157) that substantially all of his personal assets are encumbered or exempt and he may be forced to file a personal bankruptcy if and when FCP is permitted to pursue collection from him individually.

### H.  The Plan Complies with Bankruptcy Code §1129(a)(11).

Bankruptcy Code § 1129(a)(11) requires that the Bankruptcy Court find that the Plan is feasible, as a condition precedent to confirmation. 11 U.S.C. § 1129(a)(11). To demonstrate that a plan is feasible, it is not necessary that success be guaranteed. *See Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success."). "In making determinations as to feasibility . . . a bankruptcy court does not need to know to a certainty or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success*." In re Adelphia Bus. Solutions, Inc*., 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003); *see In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) (same); *see also In re Leslie Fay Companies Inc*., 207 B.R. (Bankr. S.D.N.Y. 1997) at 788- 89 (same).

There are two important aspects of a feasibility analysis. The first aspect considers whether the debtor will have sufficient cash on hand on the effective date to pay all the claims and expenses which are entitled to be paid on such date. This aspect of feasibility is satisfied as demonstrated by the Disposable Income Analysis. July Ryniker Decl., Ex. A-2. The Debtor's payment obligations on or immediately following the Effective Date are as follows: (a) Allowed Administrative Claims estimated to require approximately $211,056.00, subject to Bankruptcy Court approval; (b)

Allowed Priority Non-Tax Claims estimated to require approximately, $13,650.00; and (c) Allowed Secured Claims in accordance with the pre-Petition Date agreement between the SBA and the Debtor in connection with the EIDL, estimated to require approximately $2,205.00.

The second aspect of feasibility considers whether the Debtor will have sufficient cash under the Plan to make the required Plan payments. As set forth in the Disposable Income Analysis and the Ryniker Declaration, the Debtor anticipates having sufficient funds to make distributions equaling at least 25% to FCP in Class 3 and holders of Allowed General Unsecured Claims in Class 4. July Ryniker Decl., Ex. B-1. The Plan will be funded from Disposable Income (over the life of the Plan, $772,000.00). The Debtor will have sufficient proceeds to meet its various obligations under the Plan on or after the Effective Date. July Ryniker Decl., Ex. B-1.

Based upon all of the foregoing, the Debtor submits the feasibility requirements of Bankruptcy Code §1129(a)(11) are satisfied.

## I.    Bankruptcy Code §§ 1129(a)(6), (8), (10), (12), (13), (14), (15), and (16) Are Inapplicable.

Bankruptcy Code §§ 1129(a)(6), (8), (10), (12), (13), (14), (15), and (16)[8] are inapplicable.

## J.    The Plan Meets All of the Requirements Under Bankruptcy Code § 1191(b).

The Plan satisfies applicable provisions of Bankruptcy Code § 1129(a), and thus, the Plan satisfies the "cram down" provisions of section 1191(b).

---

[8] Bankruptcy Code §1129(a)(16) requires that transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. While a "plausible reading can be put forward that the provision seems to apply to all transfers, and then imposes on all such transfers the same restrictions placed on transfers by nonprofit entities, Congress was clear that this provision was meant to 'restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust.'" 7 COLLIER ON BANKR., ¶ 1129.02 (16th ed. 2011). This Section is inapplicable as the Plan calls for no such transfers.

## III.    CONCLUSION

The Debtor seeks confirmation of the Plan which provides meaningful recoveries to creditors, including FCP.  In light of compelling facts and circumstances of this case which have existed and remained since the Petition Date, the Court should confirm the Plan and decline to prematurely terminate the extension of the automatic stay to Mr. Luftig.  Mr. Luftig is clearly committed and integral to the success of the Debtor and the Plan, and FCP has failed in every respect to identify a compelling reason to hold otherwise. Finally, this Memorandum demonstrates that the Plan satisfies all necessary statutory requirements for confirmation.

**WHEREFORE,** for the reasons set forth above the Debtor respectfully requests that this Court:

  i.      enter an order confirming the Plan including the extension of the automatic stay to Mr. Luftig as long as the Debtor benefits from the automatic stay;

 ii.      overrule any objections to the Plan; and

iii.      grant the Debtor such other and further relief as is just and proper.

Dated:  Uniondale, New York
        November 26, 2024

RUSKIN MOSCOU FALTISCHEK, P.C.
*Attorneys for Debtor in Possession Hal Luftig Company, Inc.*


By: */s/ Sheryl P. Giugliano*
    Sheryl P. Giugliano
    Michael S. Amato
    1425 RXR Plaza
    East Tower, 15th Floor
    Uniondale, NY 11556-1425
    (516) 663-6600